IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHANDA CALLAWAY,
as Administrator of the Estate of
CHANNING LAMAR SPIVEY,
Deceased,

        Plaintiff,

*versus*

MASON ADCOCK,

        Defendant.

Civil Action No.

2:20-cv-598

Jury Trial Demanded

## COMPLAINT

### Nature of the Action, Jurisdiction and Venue

1. This civil action is brought pursuant to 42 U.S.C. §1983, et seq., to assert claims and recover damages for violations of the Fourth Amendment to the U.S. Constitution by defendant Mason Adcock, the Assistant Chief of Police for the City of Luverne, Alabama; and to assert and recover damages under pendent state law claims.

2. These constitutional violations include claims made pursuant to 42 U.S.C. §1983 arising from the defendant Adcock's wrongful and excessive use of force and resulting death of plaintiff's decedent on May 27, 2020.

3. This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. §1331 and §1343(a)(3)-(4) as Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. §1983 and the Fourth Amendment to the United States Constitution. This Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. §1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

1

4. Venue is proper in this Court under 28 U.S.C. §1391(b) because all defendants reside in the Middle District of Alabama and the incidents, events, actions, and occurrences giving rise to these causes of action occurred in the Middle District of Alabama.

## Parties

5. Plaintiff Chanda Callaway is an adult citizen and resident of Crenshaw County, Alabama; and is the duly appointed Administrator of the estate of Channing Spivey, a 34-year old resident of Crenshaw County, Alabama, who defendant Mason Adcock shot and killed on May 27, 2020. Chanda Callaway was Channing Spivey's aunt and had been appointed his legal guardian in 2004 after Channing's mother died.

6. Defendant Mason Adcock is an adult citizen and resident of Crenshaw County, Alabama. He was the Assistant Police Chief of the City of Luverne, Alabama, when, on May 27, 2020, he shot and killed Channing Lamar Spivey.

## FIRST CLAIM FOR RELIEF
### Unlawful use of deadly force
### Fourth Amendment Violations, §1983 liability

7. In March, 2020, Channing Spivey underwent surgery to remove a brain tumor. In performing this surgery, Channing's head was shaved and his surgeon sawed through Channing's skull from the crown or top of his head to his forehead, leaving a 6 to 8 inch healing incision, in order to surgically remove a tumor from Channing's brain.

8. It was readily apparent and obvious to anyone who saw Channing Spivey in March, April or May, 2020, that Channing had suffered either severe head trauma or brain surgery, because the incision and scar that remained was very prominent and was impossible to miss or overlook—not only had his head been shaved, what hair remained on Channing's head had fallen out as a side-effect of the radiation and chemotherapy treatments Channing was undergoing.

9. After his surgery, during the months of April and May, 2020, Channing was living at a home owned by Chanda Callaway at 3956 North Glenwood Road southeast of Luverne recuperating from the surgery and undergoing radiation and chemotherapy treatments. He lived there with his brother, Westley Spivey, and Westley's girlfriend, Zanna Bloodsworth.

10. Defendant Mason Adcock, the Luverne Assistant Police Chief, was Channing Spivey's closest neighbor. Mason Adcock lived at 3985 North Glenwood Road which was only approximately 100 yards from Channing's home.

11. Among the usual side-effects of the brain surgery that Channing underwent are irritability, changes in personality, confusion, irrational thought process, declines in brain function, agitation, seizures, and erratic behavior. Channing had also lost body weight and been physically weakened by both the surgery and by the radiation treatments and chemotherapy treatments he was undergoing.

12. On the morning of May 27, 2020, Channing Spivey had been experiencing a mild form of some of these side-effects for several days.

13. Channing left that morning in his GMC Yukon. He drove to an empty lot owned by a family friend and wrecked his vehicle while doing "donuts" in this empty lot when he ran into a tree on his friend's property.

14. Two Luverne policemen, Coggin and Green, came to the property and asked the property owner if he wanted to make a complaint about any damage to his property or to the tree and the owner said he did not. Because Channing's vehicle was inoperable, the police offered to give Channing a ride, but he declined and started walking back to his home on Glenwood Road.

15. Soon thereafter a neighbor saw Channing walking along Glenwood Road, was concerned about him and called to report this to Westley, who relayed it to Chanda.

16. After receiving this report Chanda Callaway thought this was strange and was concerned. She did not understand why Channing was on foot and she was afraid that Channing might thereafter be picked up or arrested by the police. She knew Channing was acting aberrantly and irrationally and feared what might happen in an encounter between Channing and the police.

17. Chanda then called the Luverne Police Department at approximately 8:50 AM. When a female dispatcher or officer answered, Chanda asked if they had Channing in custody. The female officer told her they did not, stating that policemen had been sent to the property but that the property owner had declined to make a complaint. Chanda then told her that Channing had recently had brain surgery and that he wasn't himself and was acting irrationally because of the surgery. Chanda asked that Luverne policemen be told that Channing had recently had brain

surgery and was not in his right mind, that he need to see a doctor and that if they had any encounters with him, to be aware of this. She asked that if Channing acted irrationally that the police take his condition into consideration and try to avoid causing him injury and particularly that they not to strike him in his head.

18. After this call, Chanda also telephoned Sheriff Terry Mears, who she knew personally, and repeated essentially the same things to Sheriff Mears.

19. Soon thereafter a neighbor saw Channing walking along Glenwood Road, was concerned about him and called to report this to Westley, who relayed it to Chanda.

20. After Channing came home he took a nap. However, when he woke up in the late afternoon, he again experienced some of these side-effects and became irrational, argumentative and belligerent toward his brother, Westley, and a friend and co-worker, Justin Robinson, who was visiting Westley.

21. When his irrational conduct continued and Channing grew more agitated, Westley's girlfriend, Zanna Bloodsworth, called 911. She told them about Channing's brain surgery, his irrational and belligerent behavior and asked that EMTs be sent to their home at 3956 North Glenwood Road to treat Channing.

22. Soon thereafter, EMTs or paramedics were dispatched in response her call, accompanied by a Crenshaw County Deputy Sheriff, Brent Penny.

23. When the EMT personnel and Deputy Penny arrived, Channing would not comply with Deputy Penny's directions and the EMTs were not able to examine or treat him.

24. Channing grew more agitated, belligerent and irrational, and he attacked a window of the EMT vehicle, breaking it. Deputy Penny then used his taser to attempt to subdue Channing.

25. After witnessing this and fearing for Channing's safety, Zanna ran down to get help from Mason Adcock, the Luverne Assistant Police Chief, who lived only 100 yards down the road at 3985 North Glenwood Road. She wanted to get another policeman to help Deputy Penny to bring order to the situation, to prevent Penny from shooting or hurting Channing, and to get Channing the medical attention he needed.

26. While Zanna was running down to the Adcock home, back at the Spivey home, when Channing continued not to comply with Deputy Penny's direction and began to walk toward him, Deputy Penny drew his firearm and aimed it at Channing telling him to stop and get on the ground.

27. When Channing continued to walk toward Deputy Penny, while Penny continued to aim his gun at Channing, Penny began retreating, walking backward down North Glenwood Road toward Mason Adcock's house. Westley Spivey and his friend and co-worker, Justin Robinson, saw Deputy Penny pointing a gun at Channing and, fearing that Channing might be shot, followed after Deputy Penny and Channing toward the Adcock's house.

28. When Zanna reached the Adcock house and entered it, she heard radio transmissions on Adcock's police scanner. She told defendant Adcock that Channing had had brain surgery and was acting "out of his head" and that she was very afraid that Deputy Penny might shoot him. Zanna, who was not aware that Deputy Penny and Channing had followed her to the Adcock house, mistakenly thought that they were still at the Spivey home. She pled for defendant Adcock to go to the Spivey house and help Deputy Penny and help avoid Channing from being injured or shot.

29. When Zanna entered the Adcock house, defendant Adcock appeared to be aware of the situation unfolding at the Spivey home from his police scanner and appeared to be preparing to leave the house. When Zanna related to him what was occurring and asked him to go to the Spivey home, Adcock asked her no questions, but quickly got his gun and his police radio or scanner and left to help Deputy Penny.

30. However, as he left his house, he almost immediately saw Deputy Penny and Channing coming up the driveway of the Adcock home.

31. When Adcock walked into his yard, Deputy Penny then turned away from Channing and ran to join Adcock. There, in Adcock's yard, Penny and Adcock, standing side by side, pointed their guns at Channing.

32. Westley Spivey and his friend, Justin Robinson, who had followed Deputy Penny and Channing to the Adcock's house, saw Adcock and Penny pointing their guns at Channing and they began shouting to them not to shoot Channing, that he had recently had brain surgery and for them to wait and they would help control Channing.

33. Channing took an additional step in the direction of Adcock and Penny and immediately defendant Adcock, acting under color of law, began firing and he continued to repeatedly fire his weapon seven or eight times, striking Channing five times and killing him.

34. Deputy Penny did not fire his weapon.

35. At the time Adcock fired his weapon, killing Channing, defendant Adcock had no information or knowledge that Channing had committed any crime. To the extent Channing committed any crime, it would have been a non-violent misdemeanor.

36. At the time defendant Adcock shot and killed Channing, Channing was unarmed, this fact was known to both Adcock and Penny, Channing obviously had nothing in either hand, and he was wearing only two items of clothing: a pair of swim trunks and a pair of underwear.

37. In addition to the fact that Channing was unarmed and the fact this was known and obvious to defendant Adcock, Channing also obviously had no weapon available to him and no ready access to a weapon. Therefore, even if Channing had given any intention that he meant to harm Adcock or Penny, Channing would have posed no immediate threat of serious bodily injury to defendant Adcock or Deputy Penny or anyone else, as had no weapon and was outnumbered two to one by two armed law enforcement officers.

38. Also, besides Adcock and Penny, Channing's brother Westley and his friend, Justin, were on site and available and were offering to assist in controlling Channing. Thus, there were four adult males, two of whom were armed and presumably trained policemen, available to subdue the unarmed Channing if he persisted.

39. Defendant Adcock never told Channing that he was being arrested; Channing was not actively resisting arrest, nor was he attempting to evade arrest by flight at the time Adcock shot and killed him.

40. Defendant Adcock's use of deadly force, firing and continuing to fire his weapon at Channing, striking him five times, was an excessive use of force and violated the Fourth Amendment.

41. Defendant Adcock's excessive and unlawful use of deadly force was a proximate cause of Channing Spivey's death.

WHEREFORE Plaintiff demands judgment against Defendant Mason Adcock for the use of unlawful and excessive force in violation of the Fourth Amendment that caused the death of Channing Lamar Spivey in such sum as a jury may determine to be necessary and appropriate to punish defendant Adcock for his excessive use of force and to deter Adcock and other policemen from similar actions and conduct in the future; for a reasonable attorney's fee pursuant to 42 U.S.C. §1988; for the costs of this action; and for such other further additional, necessary, proper or suitable relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF

Wrongful death claim asserted under state law
§ 6-5-410, Code of Alabama, 1975

42. In March, 2020, Channing Spivey underwent surgery to remove a brain tumor. In performing this surgery, Channing's head was shaved and his surgeon sawed through Channing's skull from the crown or top of his head to his forehead, leaving a 6 to 8 inch healing incision, in order to surgically remove a tumor from Channing's brain.

43. It was readily apparent and obvious to anyone who saw Channing Spivey in March, April or May, 2020, that Channing had suffered either severe head trauma or brain surgery, because the incision and scar that remained was very prominent and was impossible to miss or overlook— not only had his head been shaved, what hair remained on Channing's head had fallen out as a side-effect of the radiation and chemotherapy treatments Channing was undergoing.

44. After the surgery, during the months of April and May, 2020, Channing was living at a home owned by Chanda Callaway at 3956 North Glenwood Road southeast of Luverne recuperating from the surgery and undergoing radiation and chemotherapy treatments. He lived there with his brother, Westley Spivey, and Westley's girlfriend, Zanna Bloodsworth.

45. Defendant Mason Adcock, the Luverne Assistant Police Chief, was Channing Spivey's closest neighbor. Mason Adcock lived at 3985 North Glenwood Road which was only approximately 100 yards from Channing's home.

46. Among the usual side-effects of the brain surgery that Channing underwent are irritability, changes in personality, confusion, irrational thought process, declines in brain function, agitation, seizures, and erratic behavior. Channing had also lost body weight and been physically

weakened by both the surgery and by the radiation treatments and chemotherapy treatments he was undergoing.

47. On the morning of May 27, 2020, Channing Spivey had been experiencing a mild form of some of these side-effects for several days.

48. Channing left that morning in his GMC Yukon. He drove to an empty lot owned by a family friend and wrecked his vehicle while doing "donuts" in this empty lot when he ran into a tree on his friend's property.

49. Two Luverne policemen, Coggin and Green, came to the property and asked the property owner if he wanted to make a complaint about any damage to his property or to the tree and the owner said he did not. Because Channing's vehicle was inoperable, the police offered to give Channing a ride, but he declined and started walking back to his home on Glenwood Road.

50. Soon thereafter a neighbor saw Channing walking along Glenwood Road, was concerned about him and called to report this to Westley, who relayed it to Chanda.

51. After receiving this report Chanda Callaway thought this was strange and was concerned. She did not understand why Channing was on foot and she was afraid that Channing might thereafter be picked up or arrested by the police. She knew Channing was acting aberrantly and irrationally and feared what might happen in an encounter between Channing and the police.

52. Chanda then called the Luverne Police Department at approximately 8:50 AM. When a female dispatcher or officer answered, Chanda asked if they had Channing in custody. The female officer told her they did not, stating that policemen had been sent to the property but that the property owner had declined to make a complaint. Chanda then told her that Channing had recently had brain surgery, that he wasn't himself and was acting irrationally because of the surgery. Chanda asked that Luverne policemen be told that Channing had recently had brain surgery and was not in his right mind, that he need to see a doctor and that if they had any encounters with him, to be aware of this. She asked that if Channing acted irrationally that the police take his condition into consideration and try to avoid causing him injury and particularly that they not to strike him in his head.

53. After this call, Chanda also telephoned Sheriff Terry Mears, who she knew personally, and repeated essentially the same things to Sheriff Mears.

54. Soon thereafter a neighbor saw Channing walking along Glenwood Road, was concerned about him and called to report this to Westley, who relayed it to Chanda.

55. After Channing came home he took a nap. However, when he woke up in the late afternoon, he again experienced some of these side-effects and became irrational, argumentative and belligerent toward his brother, Westley, and a friend and co-worker, Justin Robinson, who was visiting Westley.

56. When his irrational conduct continued and Channing grew more agitated, Westley's girlfriend, Zanna Bloodsworth, called 911. She told them about Channing's brain surgery, his irrational and belligerent behavior and asked that EMTs be sent to their home at 3956 North Glenwood Road to treat Channing.

57. Soon thereafter, EMTs or paramedics were dispatched in response her call, accompanied by a Crenshaw County Deputy Sheriff, Brent Penny.

58. When the EMT personnel and Deputy Penny arrived, Channing would not comply with Deputy Penny's directions and the EMTs were not able to examine or treat him.

59. Channing grew more agitated, belligerent and irrational, and he attacked a window of the EMT vehicle, breaking it. Deputy Penny then used his taser to attempt to subdue Channing.

60. After witnessing this and fearing for Channing's safety, Zanna ran down to get help from Mason Adcock, the Luverne Assistant Police Chief, who lived only 100 yards down the road at 3985 North Glenwood Road. She wanted to get another policeman to help Deputy Penny to bring order to the situation, to prevent Penny from shooting or hurting Channing, and to get Channing the medical attention he needed.

61. While Zanna was running down to the Adcock home, back at the Spivey home, when Channing continued not to comply with Deputy Penny's direction and began to walk toward him, Deputy Penny drew his firearm and aimed it at Channing telling him to stop and get on the ground.

62. When Channing continued to walk toward Deputy Penny, while Penny continued to aim his gun at Channing, Penny began retreating, walking backward down North Glenwood Road toward Mason Adcock's house. Westley Spivey and his friend and co-worker, Justin Robinson, saw Deputy Penny pointing a gun at Channing and, fearing that Channing might be shot, followed after Deputy Penny and Channing toward the Adcock's house.

63. When Zanna reached the Adcock house and entered it, she heard radio transmissions on Adcock's police scanner. She told defendant Adcock that Channing had had brain surgery and was acting "out of his head" and that she was very afraid that Deputy Penny might shoot him. Zanna, who was not aware that Deputy Penny and Channing had followed her to the Adcock house, mistakenly thought that they were still at the Spivey home. She pled for defendant Adcock to go to the Spivey house and help Deputy Penny and help avoid Channing from being injured or shot.

64. When Zanna entered the Adcock house, defendant Adcock appeared to be aware of the situation unfolding at the Spivey home from his police scanner and appeared to be preparing to leave the house. When Zanna related to him what was occurring and asked him to go to the Spivey home, Adcock asked her no questions, but quickly got his gun and his police radio or scanner and left to help Deputy Penny.

65. However, as he left his house, he almost immediately saw Deputy Penny and Channing coming up the driveway of the Adcock home.

66. When Adcock walked into his yard, Deputy Penny then turned away from Channing and ran to join Adcock. There, in Adcock's yard, Penny and Adcock, standing side by side, pointed their guns at Channing.

67. Westley Spivey and his friend, Justin Robinson, who had followed Deputy Penny and Channing to the Adcock's house, saw Adcock and Penny pointing their guns at Channing and they began shouting to them not to shoot Channing, that he had recently had brain surgery and for them to wait and they would help control Channing.

68. Channing took an additional step in the direction of Adcock and Penny and immediately defendant Adcock began firing and he continued to repeatedly fire his weapon seven or eight times, striking Channing five times and killing him.

69. Deputy Penny did not fire his weapon.

70. At the time Adcock fired his weapon, killing Channing, defendant Adcock had no information or knowledge that Channing had committed any crime. To the extent Channing committed any crime, it would have been a non-violent misdemeanor.

71. At the time defendant Adcock shot and killed Channing, Channing was unarmed, this fact was known to both Adcock and Penny, Channing obviously had nothing in either hand, and he was wearing only two items of clothing: a pair of swim trunks and a pair of underwear.

72. In addition to the fact that Channing was unarmed and the fact this was known and obvious to defendant Adcock, Channing also obviously had no weapon available to him and no ready access to a weapon. Therefore, even if Channing had given any intention that he meant to harm Adcock or Penny, Channing would have posed no immediate threat of serious bodily injury to defendant Adcock or Deputy Penny or anyone else, as had no weapon and was outnumbered two to one by two armed law enforcement officers.

73. Also, besides Adcock and Penny, Channing's brother Westley and his friend, Justin, were on site and available and were offering to assist in controlling Channing. Thus, there were four adult males, two of whom were armed and presumably trained policemen, available to subdue the unarmed Channing if he persisted.

74. Defendant Adcock never told Channing that he was being arrested; Channing was not actively resisting arrest, nor was he attempting to evade arrest by flight at the time Adcock shot and killed him.

75. Defendant Adcock's use of deadly force, firing and continuing to fire his weapon at Channing, striking him five times, was an excessive use of force and violated the Fourth Amendment.

76. In the aforesaid actions, defendant Mason Adcock committed wrongful intentional acts or negligent acts which were a proximate cause of the death of Channing Lamar Spivey.

WHEREFORE Plaintiff demands judgment against Defendant Mason Adcock for his wrongful actions that caused the death of Channing Lamar Spivey in such sum as a jury may determine to be necessary and appropriate to punish defendant Adcock for his wrongful acts and to deter him and others from similar actions and conduct in the future; for the costs of this action; and for such other further additional, necessary, proper or suitable relief as the Court deems appropriate.

_____
Griffin Sikes, Jr.
Attorney for Plaintiff
Post Office Box 11234
Montgomery, Alabama 36111
334.233.4070
sikeslawyer@gmail.com


/s/ Nathan Dickson, II
_____
Nathan A. Dickson, II
Jinks, Crow and Dickson, P.C.
Attorney for Plaintiff
219 North Prairie Street
Union Springs, AL 36089
334.738.4225
ljinks@jinkslaw.com

## Jury Demand

Plaintiff demands trial by jury of these claims.

_____
Of Counsel