1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  2:20-CV-598

6    CHANDA CALLAWAY, as Administrator of the

7    Estate of CHANNING LAMAR SPIVEY, Deceased,

8              Plaintiff,

9              vs.

10   MASON ADCOCK,

11             Defendant.

12                  VOLUME 2

13          S T I P U L A T I O N

14        IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the video deposition of Mason

17   Adcock may be taken before Sara Wilson, CCR,

18   at the offices of Holtsford, Gilliland,

19   Higgins, Hitson & Holtsford, at 4001

20   Carmichael Road, Suite 300, Montgomery,

21   Alabama 36106, on the 29th day of April,

22   2021.

23          DEPOSITION OF MASON ADCOCK

Page 230

1    IT IS FURTHER STIPULATED AND AGREED
2 that the signature to and the reading of the
3 deposition by the witness is waived, the
4 deposition to have the same force and effect
5 as if full compliance had been had with all
6 laws and rules of Court relating to the
7 taking of depositions.
8    IT IS FURTHER STIPULATED AND AGREED
9 that it shall not be necessary for any
10 objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties
13 may make objections and assign grounds at the
14 time of the trial, or at the time said
15 deposition is offered in evidence, or prior
16 thereto.
17    IT IS FURTHER STIPULATED AND AGREED
18 that the notice of filing of the deposition
19 by the Commissioner is waived.
20
21    * * * * * * * * * * * * *
22
23

Page 231

1    * * * * * * * * * * * * *
2       I N D E X
3    EXAMINATION CONTINUED
4             PAGE LINE
5 BY MR. SIKES...................... 236   5
6    PLAINTIFF'S EXHIBITS
7             PAGE LINE
8 Exhibit 25 - Copy of
9    the CAD report........... 259   4
10 Exhibit 51 - Photo of
11    Mr. Adcock's house and
12    surrounding area......... 309   13
13 Exhibit 30 - A
14    depiction of two men
15    standing six feet
16    apart................... 327   7
17 Exhibit 31 - Copy of
18    Luverne Rescue Squad's
19    records................. 351   20
20 Exhibit 50 - List of
21    ten items that are not
22    disputed................ 375   17
23    (Exhibit 51 Retained By Counsel.)

Page 232

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5 CASE NUMBER:  2:20-CV-598
6 CHANDA CALLAWAY, as Administrator of the
7 Estate of CHANNING LAMAR SPIVEY, Deceased,
8         Plaintiff,
9    vs.
10 MASON ADCOCK,
11         Defendant.
12
13 BEFORE:  Sara Wilson, Commissioner.
14
15 APPEARANCES:
16    GRIFFIN SIKES, JR., ESQUIRE,
17 P.O. Box 11234, Montgomery, Alabama 36111,
18 appearing on behalf of the Plaintiff.
19    RICK A. HOWARD, ESQUIRE, of
20 HOLTSFORD, GILLILAND, HIGGINS, HITSON &
21 HOWARD, 4001 Carmichael Road, Suite 300,
22 Montgomery, Alabama 36106, appearing on
23 behalf of the Defendant.

Page 233

1 APPEARANCES:  (Cont.)
2    APRIL MCKAY, ESQUIRE, of HOLTSFORD,
3 GILLILAND, HIGGINS, HITSON & HOWARD, 4001
4 Carmichael Road, Suite 300, Montgomery,
5 Alabama 36106, appearing on behalf of the
6 Defendant.
7    WILLIAM M. RAYBORN, JR., ESQUIRE,
8 of RAYBORN LAW FIRM, P.O. Box 46, Brantley,
9 Alabama 36009, appearing on behalf of the
10 Defendant.
11    MICKEY MCDERMOTT, ESQUIRE, of THE
12 LAW OFFICES OF MICKEY MCDERMOTT, 441 High
13 Street, Suite 100, Montgomery, Alabama 36104,
14 appearing on behalf of the Defendant.
15    ALSO PRESENT:  JOHN BADGLEY
16
17
18
19
20
21    * * * * * *
22
23

2 (Pages 230 - 233)

Page 234

1       I, Sara Wilson, CCR, a Court
2  Reporter of Pike Road, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of Holtsford, Gilliland, Higgins, Hitson &
8  Holtsford, 4001 Carmichael Road, Suite 300,
9  Montgomery, Alabama 36106, beginning at 1:01
10 p.m., Mason Adcock, witness in the above
11 cause, for oral examination, whereupon the
12 following proceedings were had:
13       VIDEOGRAPHER: Good afternoon.
14 We're on the Record at 1:01 on Thursday,
15 April 28th, 2021. This begins media unit 1
16 in the video recorded deposition of Mason
17 Adcock in the matter of Chandra Callaway
18 versus Mason Adcock.
19       MR. SIKES: Adcock.
20       COURT REPORTER: Adcock.
21       VIDEOGRAPHER: Adcock.
22       Will Counsel please identify
23 yourself and state whom you represent.

Page 235

1       MR. SIKES: Griffin Sikes
2  representing the Plaintiff.
3       MR. HOWARD: Rick Howard
4  representing the Defendant.
5       MR. MCDERMOTT: Mickey
6  McDermott representing the Defendant.
7       MS. MCKAY: April McKay for
8  the Defendant.
9       VIDEOGRAPHER: Will -- Will
10 the Court Reporter please swear in the
11 witness.
12       MR. SIKES: We'll have -- We
13 are -- We'll be joined shortly by another
14 lawyer in my --
15       MR. MCDERMOTT: Billy Rayborn.
16       MR. SIKES: I'm sorry. Do you
17 want to get his name on the Record?
18       MR. MCDERMOTT: Mr. Bill
19 Rayborn for the Defendant.
20       MASON ADCOCK,
21 being first duly sworn, was examined and
22 testified as follows:
23       COURT REPORTER: Thank you.

Page 236

1  Usual stipulations?
2       MR. SIKES: Yes.
3       MR. HOWARD: Sure.
4       EXAMINATION CONTINUED
5  BY MR. SIKES:
6    Q.    Would you state your name for
7  the Record, please, sir.
8    A.    James Mason Adcock.
9    Q.    You live in Luverne?
10   A.    No, sir.
11   Q.    Out -- South of Luverne?
12   A.    Yes, sir.
13   Q.    Not in the city limits?
14   A.    Correct.
15   Q.    Okay. On May 27th of last
16 year, did you shoot and kill Channing Spivey?
17   A.    Yes, I did.
18   Q.    Channing was your closest
19 neighbor at the time; right?
20   A.    Yes.
21   Q.    You had known Channing for
22 five to ten years before the shooting?
23   A.    Approximately.

Page 237

1    Q.    And you were on a first-name
2  basis with Channing?
3    A.    Yes, sir.
4    Q.    I believe that we'll -- there
5  will be testimony that Channing lived in
6  Luverne most, if not all, of his thirty-three
7  years or so. How long have you lived in or
8  around Luverne?
9    A.    About twenty years now.
10   Q.    What is the population of
11 Luverne, do you know?
12   A.    No, sir, I don't.
13   Q.    Approximately?
14   A.    Twenty-five hundred.
15   Q.    All right, sir.
16       I grew up in Andalusia,
17 another little town thirty, forty miles down
18 the road from Luverne. Andalusia had a
19 population of about seven or eight thousand
20 when I lived there. Everybody there pretty
21 much knew everybody else in town, or they
22 knew about them when I lived in Andalusia.
23 Will you say that's sort of the case in

3 (Pages 234 - 237)

Page 238

1  Luverne also?
2      A.    Yes, sir.
3      Q.    Okay.  You didn't know of any
4  criminal history that Channing had; correct?
5      A.    No, sir.
6      Q.    And Channing did not have any
7  reputation for violence in the community, did
8  he?
9      A.    Not that I was aware of.
10     Q.    Or a history of violent
11 behavior; correct?
12     A.    None that I was aware of.
13     Q.    Okay.  You were also aware in
14 May of last year when this shooting occurred,
15 that Channing had brain cancer or a brain
16 tumor, and was being treated medically for
17 it; correct?
18     A.    I had heard that, yes.
19     Q.    Okay.  Has -- Has one of your
20 family members; a parent, child, brother,
21 sister, uncle, aunt, anybody in your family
22 ever had cancer?
23     A.    I'm not sure.

Page 239

1      Q.    Okay.  Do you know a -- had a
2  friend that's had cancer?
3      A.    Yes.
4      Q.    Yeah.  Do you know what some
5  of the most common types of treatment for
6  cancer are?
7          MR. MCDERMOTT:  Objection.
8  Calls for a medical conclusion.
9      A.    I would say radiation and
10 chemotherapy is the only two things I
11 would --
12     Q.    Yes, sir.
13     A.    -- have heard of.
14     Q.    Well, I think there's going
15 to be testimony that Channing was undergoing
16 both.  Do you -- What do you understand
17 radiation treatment to be?
18         MR. HOWARD:  If you know
19 this -- If you know.
20     A.    I -- I really don't other --
21 Just you see a doctor and they give you
22 radiation treatment.  I don't . . .
23     Q.    By -- By radiation, they --

Page 240

1  they take something that's radioactive and
2  beam it at the tumor.  Is that your
3  understanding, or you don't know that?
4      A.    I -- I don't know that, no,
5  sir.
6      Q.    Okay.  All right.
7  Chemotherapy, what do you understand that to
8  be?
9      A.    It's a chemical that's
10 introduced into the body to fight the cancer.
11 That's all I'm . . .
12     Q.    Do you know both of those
13 treatments significantly weaken cancer
14 patients, do you know that?
15     A.    Not that I'm familiar with,
16 no, sir.
17     Q.    You're not familiar with
18 that?
19     A.    Well, not firsthand, no, sir.
20     Q.    Well, I -- I didn't ask
21 firsthand.
22         MR. HOWARD:  He wants you to
23 guess, apparently.

Page 241

1      Q.    No, sir, I'm not asking you
2  to guess.  You don't know that?
3      A.    No, sir.
4      Q.    Okay.  You and Channing both
5  lived on North Glenwood Road just south of
6  the Luverne city limits; correct?
7      A.    Correct.
8      Q.    And who lived there with
9  Channing while he was recuperating from brain
10 surgery?
11     A.    As far as I know, Wesley
12 Spivey and Zanna Bloodsworth.
13     Q.    Okay.  You knew both of them?
14     A.    I'm -- I'm familiar with who
15 they are, yes.
16     Q.    Okay.  How many yards would
17 you say it is, say, from your mailbox on
18 North Glenwood Road down to your nearest
19 neighbor, the Spiveys?
20     A.    A hundred yards.
21     Q.    Okay.  I'm going to show you
22 Exhibits 15, 16, and 17.  Have you seen those
23 photographs before?

4 (Pages 238 - 241)

Page 242

1  A.   (Witness complies.) I believe
2  these look similar to ones that you showed me
3  the first time I was in for deposition.
4  Q.   Yes.  Yes, sir.  Do you
5  recognize Channing Spivey in those
6  photographs?
7  A.   Yes, sir.
8  Q.   Okay.  Is that how Channing
9  was dressed when he was shot and killed?
10  A.   I believe so.
11  Q.   No shirt?
12  A.   No shirt.
13  Q.   No shoes?
14  A.   No, sir.
15  Q.   I'm -- I'm asking now at the
16  time of the shooting?
17  A.   I don't remember him having
18  any shoes on, and he did not have a shirt on.
19  Q.   Okay.  Only a pair of shorts,
20  as far as you could tell, and the best you
21  recall?
22  A.   Yes, sir.
23  Q.   Okay.  Was Channing armed

Page 243

1  with a gun or a weapon when you shot him?
2  A.   No, sir.
3  Q.   Did anyone other than you
4  fire any bullets at Channing that day?
5  A.   Not that I'm aware of.
6  Q.   What's the mod -- make and
7  model of the gun that you -- you fired at
8  Channing?
9  A.   Springfield XDS.  Did you ask
10  me for the caliber on it?
11  Q.   A 45 caliber?
12  A.   Yes, sir.  A 45 caliber.
13  Q.   Okay.  That was not your
14  regular service weapon, but that's a private
15  gun you own; is that right?
16  A.   Correct.
17  Q.   How long had you owned the
18  gun?
19  A.   I want to say about five
20  years.
21  Q.   Okay.  How far away from you
22  was Channing when you began firing at him?
23  A.   Probably about six feet.

Page 244

1  Q.   Okay.  As you kept firing,
2  you fired five times at him, at least; is
3  that correct?
4  A.   I fired six.
5  Q.   Okay.  One of them missed, or
6  do you know?
7  A.   I do not know.
8  Q.   Okay.  The autopsy indicates
9  he was hit with five bullets.
10  A.   Okay.
11  Q.   As you kept firing them, did
12  the distance between you and Channing
13  increase or decrease during the period of
14  time you were firing at him?
15  A.   It increased.
16  Q.   It increased.
17  A.   It increased.  I was -- I was
18  retreating away from him as I was firing.
19  Q.   Okay.  You didn't -- Did you
20  turn your back on him, or did you simply
21  back -- back up?
22  A.   Just ba -- I was walking
23  backwards, backing up.

Page 245

1  Q.   Okay.  Okay.  While you were
2  firing at Channing, was Channing ever closer
3  than -- to you than six feet?
4  A.   While I was firing?
5  Q.   Yes, sir.
6  A.   No, sir.
7  Q.   Any other time, was he ever
8  closer than five feet that you can recollect?
9  A.   Yes, sir.
10  Q.   And when was that?
11  A.   Before I started firing.
12  Q.   Okay.  Before you fired,
13  you -- you saw that Channing had nothing in
14  either of his hands; correct?
15  A.   Yes, sir.
16  Q.   Okay.  Did you have any
17  reason to believe that Channing had a gun or
18  a weapon?
19  A.   No, sir.
20  Q.   Okay.  So you knew him to be
21  unarmed?
22  A.   Yes, sir.
23  Q.   Would you agree that

Veritext Legal Solutions
877-373-3660                                                    800.808.4958

Page 246

1 Channing's hands were all he had to harm or
2 injure you with at the time?
3    A.    Yes, sir.
4    Q.    Do you agree that striking
5 someone with your fists is not deadly force?
6    A.    No, sir.
7    Q.    Well, have you changed your
8 mind about that?
9    A.    Well . . .
10    Q.    Go ahead.  You can answer.
11    A.    I just -- It's an opinion
12 thing, and so I'm -- I'm not sure, you know.
13    Q.    Would you look at your
14 deposition taken back a couple of months ago,
15 page 187.
16    A.    (Witness complies.) Yes, sir.
17    Q.    I'm going to ask you to look
18 down at -- at line 18.  Do you see that?
19    A.    Yes, sir.
20    Q.    At that time, I asked you:
21 When a policeman strikes a person with his
22 fists, that's not deadly or lethal force, is
23 it?  What was your answer then?

Page 247

1    A.    No, sir.
2    Q.    Okay.  Have you changed your
3 mind, then?
4    A.    That's a different question,
5 so I -- I feel like I'm comfortable with
6 answering it differently.
7    Q.    Is it different -- Is it --
8 Is a police officer striking someone with
9 their fist not deadly force, but a -- a
10 citizen striking someone with a fi -- with
11 their fist is deadly force, is that your
12 answer?
13    A.    I'm -- I'm . . .
14    Q.    Let's come back and ask the
15 question.
16    A.    Well, I was just --
17    Q.    Did -- Is -- Is striking
18 someone with their fist, is that the use of
19 deadly force?
20    A.    It could be.
21    Q.    I'm not asking what it --
22 what it might be.  It can happen in rare
23 circumstances; right?

Page 248

1    A.    It can.
2    Q.    Okay.  It is not a usual
3 outcome from striking someone with your fist,
4 is it?
5    A.    I've -- I've never really
6 seen anything to give me statistics on that,
7 to make an opinion.
8    Q.    Would you agree that -- that
9 people don't generally die from striking --
10 being struck with the fist?
11    A.    Yes.
12    Q.    Okay.  And usually, the --
13 the limit of what you get with striking
14 somebody with their fist, is, you get a black
15 eye or a bruise, or you get -- they lose a
16 tooth, something like that; correct?
17    A.    That can happen, yes.
18    Q.    No.  That's usually the
19 outcome, is that not right -- correct?
20         MR. HOWARD:  Object to form.
21         MR. MCDERMOTT:  Objection.  It
22 calls for speculation.
23         MR. HOWARD:  Unless you've

Page 249

1 analyzed every one of them.
2    Q.    (Mr. Sikes) Is that not the
3 usual outcome of -- of fists -- a fist fight?
4    A.    I don't know what usuals are
5 on -- on fist fights.
6    Q.    Well, let's look at -- look
7 at the bottom of page 187, line 22.
8    A.    (Witness complies.)
9    Q.    I've ask -- asked:  Because
10 you don't -- Well, it can happen in rare
11 circumstance; but for the most part, you
12 don't kill people by striking with your --
13 your fist.  What did you answer then?
14    A.    Correct.
15    Q.    All right.  And I asked then,
16 what's the next question I asked:  They get
17 bruised or they get a black eye or they lose
18 a tooth or they get a bruise in the chest,
19 that's sort of the limit of what you can do
20 with your fist; right?  And what did you
21 answer?
22    A.    I said:  Yes, sir.
23    Q.    Okay.  You want to change

6 (Pages 246 - 249)

Page 250

1  your testimony now from that?
2      A.     From this or --
3      Q.     What you said --
4      A.     -- or from just now, or
5  what -- what -- I --
6      Q.     From what you just -- What
7  you testified earlier. Do you want to change
8  the testimony that you gave two months ago?
9          MR. HOWARD: He's asking do
10  you want to change that answer to the prior
11  deposition I think is what he's asking you.
12      Q.     Do you . . .
13          THE WITNESS: Okay.
14      A.     I -- I really -- I don't know
15  how to answer what you're asking me.
16  So . . .
17      Q.     (Mr. Sikes) On May 27th, when
18  did you first see or hear anything about
19  Channing Spivey or his activities that day?
20      A.     Just right around eight o --
21  eight p.m.
22      Q.     All right.
23      A.     Or shortly before.

Page 251

1      Q.     Was that from a telephone
2  call from Tim White?
3      A.     Yes.
4      Q.     Okay. That was the first you
5  had heard or seen or knew anything about
6  Channing Spivey that day or his activities
7  that day; correct?
8      A.     I didn't know it was Channing
9  Spivey. He never did tell me it was Channing
10  Spivey.
11      Q.     Oh, okay. What did --
12          MR. HOWARD: Tim -- Tim White?
13          THE WITNESS: Tim White,
14  correct.
15          MR. HOWARD: Okay.
16          THE WITNESS: Yes.
17      Q.     (Mr. Sikes) All right.
18      Well, let's -- Let's do this.
19  Tell me -- And again, as -- as -- as --
20  How -- How long was the conversation with Tim
21  White?
22      A.     Well, I don't recall.
23      Q.     Well, I know you don't --

Page 252

1  can't say it's thirty-seven seconds, but was
2  it -- did it go on for four or five minutes,
3  or was it about a minute-and-a-half, or your
4  best judgment about it is what I'm asking you
5  for?
6      A.     I believe it was short. One
7  to two minutes.
8      Q.     Okay.
9      A.     I believe.
10      Q.     Tell me as bes- -- Did you
11  have more than one phone call with Tim White
12  prior to the shooting?
13      A.     Not that I recall.
14      Q.     Okay. So you had a one- to
15  two-minute phone call with Tim White. Tell
16  me who Tim White is.
17      A.     He was a paramedic with
18  Luverne Rescue. Just somebody I know, been
19  friends with for several years.
20      Q.     All right, sir. Tim White,
21  what was the occasion for him to call you?
22  What -- Why did he call you, do you know?
23      A.     His question was, did I hear

Page 253

1  the ruckus, racket, whatever, going on across
2  the road.
3      Q.     Did you know what he was
4  talking about?
5      A.     No, sir, I did not.
6      Q.     Okay. What other information
7  did Tim White give you in the call?
8      A.     Just that they had received
9  some type of call to come down there, and
10  that they were waiting on a deputy to get
11  there.
12      Q.     Did he tell you where?
13      A.     Across the street.
14      Q.     Across the street from you?
15      A.     Yes.
16      Q.     Did you understand that to be
17  the Spivey household he was talking about?
18      A.     That's the way I understood
19  it to be.
20      Q.     You understood it at the
21  time?
22      A.     Yes.
23      Q.     Okay. So -- I -- And I

7 (Pages 250 - 253)

Page 254

1 want -- I want to be real careful about this.
2 I want to make certain that you tell me
3 everything that Tim White told you on that
4 occasion, please, sir. You say that there
5 was -- He was asking could you hear the
6 ruckus down there, is that what -- something
7 to that effect?
8     A.    Yes, sir.
9     Q.    All right. And you told him
10 you couldn't?
11     A.    Correct.
12     Q.    And did he identify -- Did he
13 use the word Spivey, or did he use -- or
14 how -- how did he identify where this was
15 going on?
16     A.    I want to -- I want to say he
17 said across the street.
18     Q.    All right. Anything more
19 that he told you in that conversation, other
20 than a ruckus across the street, is that the
21 limit of what all you can recall he told you?
22     A.    Yes, sir.
23     Q.    All right. Now, I have read

Page 255

1 back over your statement that you gave to the
2 ABI agent on June 10th, and I read back over
3 your previous deposition. Have you reviewed
4 those today prior to coming here to testify?
5     A.    Prior to today, I did read
6 over my -- listened to my deposition --
7     Q.    All right.
8     A.    -- I mean, over my statement
9 with SBI.
10     Q.    Okay. In your ABI statement
11 and in your deposition, the only information
12 that I saw where you said you had some
13 infor -- or you obtained information on May
14 27th about Channing or his activities were
15 from three sources; this phone call with Tim
16 White, and that was the first time you heard
17 anything about Channing that day; right?
18 And -- And again, what -- with the proviso
19 that you maybe didn't know it -- exactly that
20 it was about Channing at the time?
21     A.    Correct. Yes.
22     Q.    Just about a ruckus down the
23 street?

Page 256

1     A.    Correct. Yes.
2     Q.    Okay. All right. So you
3 didn't receive, really, any information from
4 Tim White about Channing Spivey?
5     A.    Correct.
6     Q.    Only about something going
7 on, some hubbub, or ruckus down at -- down
8 the street, across the street from you?
9     A.    Correct.
10     Q.    All right. You also received
11 information from Zanna Bloodsworth when she
12 came to your house just before the shooting;
13 correct?
14     A.    Correct.
15     Q.    Okay. That's -- Is that the
16 second information of any sort you received
17 that day about Channing Spivey or his
18 activities that day?
19     A.    Again, it -- Zanna was
20 like Tim never provided a name.
21     Q.    Okay.
22     A.    So I was aware something was
23 happening.

Page 257

1     Q.    Okay.
2     A.    But not who.
3     Q.    But didn't know what. Okay.
4         And the other piece of
5 information I would suppose you had about
6 Channing Spivey before you shot and killed
7 him was what you heard and saw after you came
8 out of your house?
9     A.    Yes, sir.
10     Q.    That correct?
11     A.    Yes, sir.
12     Q.    So actually, the only
13 information you really had about Channing
14 Spivey was what you saw and heard in the few
15 seconds or minutes before -- after you came
16 out of your house, but before you shot him;
17 correct?
18     A.    Correct.
19     Q.    Okay. Please take a minute
20 and think carefully now. Did you have any
21 other information that day about any problem
22 down at the Spivey household or about
23 Channing Spivey that day, other than these

8 (Pages 254 - 257)

Page 258

1  three sources we've just talked about?
2      A.    No, sir.
3      Q.    Okay. And Tim Spivey --
4  Excuse me. Tim White was one of the EMT crew
5  that came down on the call to hi -- to the
6  Spivey household?
7      A.    Correct.
8      Q.    And you think that that
9  was -- that call occurred sometime around
10  eight o'clock on the evening of the 27th?
11      A.    Just before eight, I believe.
12      Q.    Okay.
13      A.    Within -- Within minutes
14  before eight, I believe.
15      Q.    Okay. Have you seen a CAD
16  report?
17      A.    I -- I don't recall if I
18  looked at it or not.
19      Q.    Do you know -- Tell -- Tell
20  me what I'm talking about by -- Tell me
21  what -- what a CAD report is.
22      A.    A CAD report would have been
23  from the log that dispatch, computer-assisted

Page 259

1  dispatch is what CAD stands for.
2      Q.    All right.
3      A.    Excuse me.
4          (Plaintiff's Exhibit 25
5          was marked for
6          identification purposes.)
7      Q.    I'm going to offer
8  Plaintiff's Exhibit 25.
9          MR. SIKES: Do you want a
10  copy, also?
11          MR. HOWARD: We can share or
12  it doesn't matter.
13          MR. SIKES: All right.
14      Q.    (Mr. Sikes) Taking a look at
15  that CAD report, re -- refresh yourself with
16  it for a second. I want to ask you some
17  questions about it, please.
18          MR. HOWARD: Have you ever
19  seen this before?
20          THE WITNESS: I don't remember
21  if I've looked at it or not. Honestly, I
22  don't recall if I've seen it.
23      Q.    (Mr. Sikes) Are you familiar

Page 260

1  with CAD reports, generally?
2      A.    Yes, sir.
3      Q.    Okay. Well, you -- You know
4  how to read them and what they -- what they
5  are and what they show, generally?
6      A.    Yes.
7      Q.    Okay. And -- And tell us
8  that, if you would, what they are and what
9  they show.
10      A.    Like I say, CAD stands for
11  computer-assisted dispatch. This is a report
12  of a call that the dispatch center would
13  receive, what information they have. And
14  then how it's disbursed to the appropriate
15  agency, whether it be law enforcement,
16  rescue, fire personnel, and then what
17  activities that those people conduct. It
18  gives the times that they conduct it or that
19  they a -- announce to the dispatcher they
20  conduct it.
21      Q.    Okay. Let me look -- let you
22  look -- the third line down. Caller PX back
23  and requested rescue and deputies at 19:49,

Page 261

1  at 19:51 LRS paged. Will you interpret that
2  for us, what does that mean?
3      A.    Caller PX means called.
4      Q.    Okay.
5      A.    Caller called back and
6  requested rescue and deputies at 7:49 p.m.
7      Q.    Okay.
8      A.    At 7:51 p.m., Luverne Rescue
9  Squad was paged. At 7:54 p.m., Luverne
10  Rescue Squad was on the way to the scene.
11      Q.    Okay. All right. So, does
12  that coincide, does that help narrow down or
13  give you -- confirm again it was slightly
14  before eight o'clock that you got a call
15  from -- from Tim White?
16      A.    Yes, sir.
17      Q.    Okay. The next en -- entry,
18  the next line down, if you'll look toward the
19  end of it, it talks about requested backup.
20  And I think there's a number there, 2407
21  requested backup.
22      A.    Uh-huh.
23      Q.    Do you know what 2407 is?

9 (Pages 258 - 261)

Page 262

1    A.    Twenty -- 2407 would have
2 been the designation for the deputy. That
3 would have been his call number -- call sign.
4    Q.    And that -- That would have
5 been Deputy Penny?
6    A.    It should have been Deputy
7 Penny.
8    Q.    It -- It turned out?
9    A.    Yes.
10    Q.    Okay. So 2407, that's at
11 8:07, is that correct, in the evening?
12    A.    Let's see. Eight.
13    Q.    Pardon me. I'm sorry.
14 Twenty -- I'm -- 2407 is the -- is the deputy
15 number pardon me?
16    A.    Yes.
17    Q.    Requested backup at 20:09.
18 That would have been 8:09 p.m.?
19    A.    Correct.
20    Q.    Okay. And requested backup
21 again at 8:10; correct?
22    A.    Correct.
23    Q.    All right. The ne -- The

Page 263

1 last line there indicates shots fired
2 subject, and then there's a symbol, and then
3 this 10 -- excuse me, 20:11; correct?
4    A.    Correct.
5    Q.    That indicate to you that
6 the -- that the shooting occurred at -- right
7 at 8:10, reported at 8:11. Is that fair?
8    A.    Fair. Yes.
9    Q.    Okay. All right. Well,
10 we're -- We're coming back to Tim White,
11 again. Had Tim White gotten to the Spivey
12 home when he called you?
13    A.    No.
14    Q.    Okay. Was he in the
15 ambulance headed to the Spivey home when he
16 called you, is that what you understood?
17    A.    What I understood from him is
18 he had stopped. There's a small graveyard on
19 top of the hill. Several --
20    Q.    Couple hundred yards up the
21 road?
22    A.    -- several hundred yards back
23 north toward Luverne. They had pulled over

Page 264

1 there and was waiting, staged, I believe is
2 how he stated it to me. He said: They're
3 staged, waiting on a deputy to get -- get
4 there.
5    Q.    All right. And I think you
6 told me you -- you -- you didn't get more --
7 one call from -- from Tim White prior to the
8 shooting; correct?
9    A.    Correct.
10    Q.    Okay. And you've told me all
11 about that one- to two-minute phone call that
12 you can recall?
13    A.    Correct.
14    Q.    Okay. Again, it never
15 mentioned Channing Spivey simply, but a
16 rusk -- ruckus across the road or across the
17 street, which you understood to be down at
18 the Spivey home. That was what you sort of
19 put it together?
20    A.    Correct.
21    Q.    Okay. No -- No other
22 informational content conveyed to you by Tim
23 White, that you can recall?

Page 265

1    A.    No, sir.
2    Q.    Okay. Do you know where
3 the -- You -- You think he was parked at --
4 up at the top of the hill a couple hundred
5 yards up the road when he spoke with you on
6 the phone?
7    A.    That's what I understood from
8 him.
9    Q.    Okay. Okay. He -- In any
10 event, he had not gotten to the house when he
11 spoke with you?
12    A.    He had stopped. They were --
13 They had actually had stopped and were
14 waiting on the deputy is what he had conveyed
15 to me.
16    Q.    No, I know. Stopped prior to
17 getting to the house?
18    A.    Yes. Correct.
19    Q.    Yeah. So he had not gone to
20 the Spivey house at the time he spoke with
21 you?
22    A.    That's what I understood from
23 him.

10 (Pages 262 - 265)

Page 266

1    Q.    Okay.  All right.
2          Now, North Glenwood Road is a
3 rural two-laned highway south of Luverne;
4 correct?
5    A.    Yes, sir.
6    Q.    Yeah.  And I'm going to ask
7 you to look at -- I think there's Plaintiff's
8 Exhibit 13 in there.
9          MR. HOWARD:  Of the
10 deposition?
11         MR. SIKES:  Uh-huh.
12         MR. HOWARD:  Okay.
13         MR. SIKES:  The prior
14 deposition.
15         MR. HOWARD:  Yeah.
16         THE WITNESS:  In the back?
17         MR. HOWARD:  Yeah, it's going
18 to be in the back.
19    Q.   (Mr. Sikes) That's what I'm
20 looking for right there (indicating).  Do you
21 see 13?
22    A.    Yes, sir.
23    Q.    Okay.  That's an accurate

Page 267

1 depiction of your house and the Spivey
2 household, their orientation with each other;
3 correct?
4    A.    Yes, sir.
5    Q.    Okay.  Do you see the -- the
6 north, south, east, west symbol up there?
7    A.    Yes, sir.
8    Q.    Okay.  The roadway there from
9 the Spivey household down to your household,
10 that's proceeding in a -- a south-easterly
11 direction; correct?
12    A.    Yes, sir.
13    Q.    Okay.  For ease of reference
14 during the course of this deposition, do you
15 see how your house is oriented there?
16    A.    Yes, sir.
17    Q.    Your hou -- house runs almost
18 directly -- the long-wise, it runs almost
19 directly north and south; correct?
20    A.    Yes, sir.
21    Q.    And at the bottom -- The
22 bottom of the house that -- depicted on
23 Plaintiff's Exhibit 13, that would be the

Page 268

1 south end of the house; correct?
2    A.    Correct.
3    Q.    And the other end of the
4 house would be the north end?
5    A.    Correct.
6    Q.    I'm going to use north, east,
7 south, and west, based off -- off of those
8 directions, if that's -- And we can use, I
9 think, the house, sort of as the -- the
10 north, south arrow, so to speak.
11    A.    Yes, sir.
12    Q.    Okay.  Is that fair?
13    A.    Yes, sir.
14    Q.    All right.  How far off
15 the -- Well, both of your -- Both of your
16 house -- Both your house and -- and the --
17 and the Spivey house are on that highway;
18 correct?  On Glenwood Road; correct?
19    A.    Yes.
20    Q.    Yours sits a number of yards
21 off the road?
22    A.    Correct.
23    Q.    How many yards off the road

Page 269

1 would you say?
2    A.    Fifty to seventy-five, maybe.
3    Q.    Okay.  Can you see the Spivey
4 home from your house?
5    A.    Depending on the time of the
6 year, there's a wood line.
7    Q.    Uh-huh.
8    A.    Of wintertime you can see a
9 silhouette of the house.
10    Q.    Yeah.
11    A.    Because there's no leaves on
12 the trees.  During the summer you can't.
13    Q.    Well, this was in May.  Could
14 you see it, then?
15    A.    No, sir, you couldn't.
16    Q.    Okay.  The -- The -- The
17 woods blocked it out?
18    A.    Correct.
19    Q.    Okay.  The trees lining the
20 highway over on your side of Glenwood Road
21 blocked your view of the Spivey home on May
22 27th?
23    A.    Yes, sir.

11 (Pages 266 - 269)

Page 270

```
 1    Q.      Okay.  You identified Tim
 2  White.  He's an EMT or an emergency medical
 3  technician; right?
 4    A.      Yes, sir.
 5    Q.      He's not law enforcement
 6  officer?
 7    A.      No, sir.
 8    Q.      He's trained in emer --
 9  emergency medical care; correct?
10    A.      Yes, sir.
11    Q.      He doesn't carry pistols or
12  weapons as part of his work?
13    A.      Not that I'm aware of.
14    Q.      Okay.  They are -- EMTs
15  aren't sent to perform law enforcement
16  duties, are they?
17    A.      Correct.
18    Q.      And they are sent to take
19  care of medical problems for people needing
20  emergency medical care; correct?
21    A.      Yes, sir.
22    Q.      You understood from that
23  that -- that chat -- there was a call at --
```

Page 271

```
 1  at the Spivey house for some emergency
 2  medical treatment, then?
 3    A.      Yes, sir.
 4    Q.      Okay.  Let's talk about the
 5  second source of information.  And, again,
 6  you said that -- you -- Technically you --
 7  And -- And that would be Zanna -- Zanna
 8  Bloodsworth.  Technically, she didn't use
 9  Channing's name, I -- I think that's what you
10  said; is that correct?
11    A.      Correct.
12    Q.      How did you know or bel --
13  come to believe it was Channing she was
14  talking about?
15    A.      I didn't make that
16  assumption.
17    Q.      Oh, you didn't?
18    A.      No, sir.
19    Q.      Okay.  Oh.  You didn't know
20  who --
21    A.      Correct.
22    Q.      -- she was talking about?
23    A.      Correct.
```

Page 272

```
 1    Q.      Okay.  All right.  She came
 2  to your house to get your help as a
 3  policeman; correct?
 4    A.      Yes.
 5    Q.      And that's how you responded,
 6  as a policeman?
 7    A.      Yes.
 8    Q.      And not as a private citizen?
 9    A.      Correct.
10    Q.      Tell me how long a
11  conversation did you have with Zanna
12  Bloodsworth.
13    A.      I'd say le -- It was thirty
14  seconds, a minute, maybe.  It was very short.
15    Q.      Okay.  And tell me as fully
16  and completely and accurately as you can what
17  all Zanna Bloodsworth said to you.
18    A.      I don't remember the exact
19  words she used.  She had said basically that:
20  He's -- He's crazy or he's lost his mind.
21  He's -- You know, he's going to kill
22  everybody.  He's whatever.  She was so
23  distraught, and I don't really recall any
```

Page 273

```
 1  exact words she used.
 2        I didn't see anybody behind
 3  her, and that was because she had come to the
 4  front door and I had to open the door.  And
 5  it was obvious that there was a problem, she
 6  was wrong, I told her to come in the house
 7  and I'd shut the door.  And then she's --
 8  She's telling me this stuff as she's coming
 9  in the door.  So . . .
10    Q.      Okay.  By the front door,
11  you're talking about the -- the -- the door
12  of the house that faces west; correct?
13    A.      Correct.
14    Q.      Okay.  And the door that --
15  The other door on the other side of the house
16  faces east, you call that the back door?
17    A.      Correct.
18    Q.      And there isn't a south door
19  on that house, is there?
20    A.      No, sir.
21    Q.      It's solid brick across
22  there?
23    A.      Correct.
```

12 (Pages 270 - 273)

Page 274

1    Q.    Right?  And with a -- With a
2  fireplace in there also, a chimney?
3    A.    Correct.
4    Q.    Well, anything else that you
5  can recollect in this thirty seconds or so
6  that Zanna Bloodsworth spoke to you?
7    A.    No, sir.  I mean . . .
8    Q.    Did you ever receive after --
9  Well, you -- Did you -- You let her into the
10 house, call -- called her into your house?
11   A.    Yes, sir.
12   Q.    Okay.  Did she ever give you
13 any additional information, other than what
14 she told you right there when she first came
15 to your house and was let into your house?
16   A.    No, sir.
17   Q.    Okay.  You never did question
18 her about anything?
19   A.    No, sir.
20   Q.    Okay.  Are you aware that
21 Zanna has testified differently about what
22 she said to you?
23   A.    I believe I read her

Page 275

1  statement, but I don't recall what it had
2  said.
3    Q.    Have you read her deposition?
4    A.    I don't think I have.
5    Q.    Okay.  Have you read the
6  statement that she gave to the ABI that
7  evening, an hour or two after the shooting?
8    A.    I think that's the one I did
9  read.
10   Q.    Okay.  Both in her statement
11 made on the night of the 27th, and she made
12 that statement to an ABI agent; correct?
13   A.    That was my understanding,
14 yes.
15   Q.    Okay.  And a -- In the
16 statement she made an hour or so after the
17 shooting, and again in her deposition, Zanna
18 denied making any statement about Cha -- that
19 Channing or anybody going to kill everybody.
20   A.    Okay.
21   Q.    Are you aware of that?
22   A.    Like I say, I don't recall
23 what was in her state -- I don't remember --

Page 276

1  I read it, but I don't remember what her
2  answer was.
3    Q.    All right.  Her testimony was
4  she was worried about Channing being killed
5  by Deputy Penny, and that's what she was
6  talking about any -- any talk about killing.
7  Her testimony was she was worried about
8  Channing being killed, rather than Channing
9  killing anybody or it -- it -- You didn't
10 understand that?
11       MR. HOWARD:  Object to form.
12   A.    No, sir.
13   Q.    Well, between Channing and
14 Deputy Penny, which of the two of them had a
15 gun?
16   A.    Deputy Penny.
17   Q.    Okay.  Who would you be
18 concerned about doing killing, someone with a
19 gun or someone without a gun?
20       MR. HOWARD:  Object to form.
21   A.    Are we talking this
22 circumstance that night?
23   Q.    I'm talking about just in

Page 277

1  general.  Between a person who doesn't have a
2  gun and a person who does have a gun, which
3  one is there more concern about them being a
4  threat to other people's lives?
5    A.    The person with a gun.
6    Q.    Okay.  Would you agree that
7  Zanna, who gave her statement to the ABI
8  agent only hours after the shooting, she
9  didn't have time to invent any kind of story,
10 did she?
11       MR. MCDERMOTT:  Objection.
12 Calls for speculation.
13       MR. HOWARD:  Object to the
14 form.  Unless you know what she was thinking
15 that night, you can answer.
16   A.    I -- I don't know if she had
17 time.
18   Q.    (Mr. Sikes) Okay.  Would you
19 also agree that because Zanna hadn't shot
20 anyone that night, she had no reason to be
21 concerned about being criminally prosecuted
22 for Channing's death, did she?
23       MR. HOWARD:  Object to form.

13 (Pages 274 - 277)

Page 278

1    A.    No, sir. I wouldn't think
2 so.
3    Q.    Okay. But you testified that
4 you were immediately concerned after the
5 shooting about being criminally prosecuted
6 for shooting -- for killing Channing;
7 correct?
8    A.    Yes, sir.
9    Q.    And unlike Zanna, you had ten
10 days before you were questioned about the
11 shooting; correct?
12    A.    Yes, sir.
13    Q.    And, in fact, you called your
14 lawyer, Mr. Rayborn, within minutes after the
15 shooting; correct?
16        MR. RAYBORN: Objection.
17    A.    Correct.
18    Q.    When did you first give a
19 statement about the shooting?
20    A.    To -- As in to who?
21    Q.    To anybody.
22    A.    I spoke with my attorney
23 briefly about it.

Page 279

1    Q.    With your attorney being you
2 got -- You -- You -- You've got three
3 attorneys here, don't you?
4    A.    Yes, sir.
5    Q.    Which ones are you talking
6 about?
7    A.    Mr. Rayborn.
8    Q.    Okay. All right. I'm not
9 going to ask you about what you talked to
10 him. You told him something about it that
11 night; correct?
12    A.    Correct.
13    Q.    Okay. What's the next time
14 you ever gave any statement to anybody about
15 it?
16    A.    That night, I also spoke with
17 my chief to tell him the basics of what had
18 occurred.
19    Q.    Okay.
20    A.    After that, I spoke with SBI
21 when I give my statement.
22    Q.    All right. And when did you
23 speak with the S -- SBI?

Page 280

1    A.    Was that June? I have to
2 look at that date. It was --
3    Q.    I believe it's June 6th.
4    A.    It was the date --
5    Q.    Does that sound right?
6    A.    Maybe.
7    Q.    Saturday?
8    A.    It was a Saturday, the
9 date -- It was the one you were referring to
10 while ago.
11    Q.    Right. A Saturday, a week
12 after the shooting?
13    A.    Yes.
14    Q.    This shooting occurred on,
15 what, a Wednesday or Thursday, I believe?
16    A.    Wednesday.
17    Q.    Wednesday. Okay. So it
18 wasn't three days later you gave the
19 statement on a Saturday. It was ten days
20 later?
21    A.    Correct.
22    Q.    On a Saturday?
23        So you had ten days after May

Page 281

1 27th to consider what you would say in your
2 first, on-the-Record statement about the
3 shooting; correct?
4    A.    I did.
5    Q.    Where did you give your
6 statement?
7    A.    Sir?
8    Q.    Where did you give your
9 statement?
10    A.    Luverne Police Department.
11    Q.    Well, let me back up just a
12 second and ask you. You said that you -- In
13 addition to Mr. Rayborn, you also gave some
14 basic details about the shooting to the
15 chief, your police chief?
16    A.    I called Chief Mike Johnson
17 and reported to him that I had been involved
18 in a shooting at my residence.
19    Q.    Anything more you told him
20 about it, other than that?
21    A.    No, sir.
22    Q.    Did you ever speak with him
23 about it on any other occasion where you told

14 (Pages 278 - 281)

Page 282

1 him what occurred that night?
2     A.     No, sir. No, sir.
3     Q.     No. So the -- The only
4 statements that you've -- you've given about
5 this are to Mr. Rayborn on the night of the
6 shooting. You gave just the -- the briefest
7 kind of statement, just reported you were in
8 a shooting to your police chief?
9     A.     Correct.
10     Q.     Anything more that you can
11 recall in that statement, other than I've
12 been involved in a shooting?
13     A.     No, sir.
14     Q.     All right. The next time you
15 ever gave a statement to anyone was at the
16 police station to the ABI on June 10th?
17         MR. HOWARD: Huh-uh.
18     Q.     Excuse me, June 6th?
19     A.     The 6th, yes.
20     Q.     Right. Okay. Now, tell me
21 who all was present there at the police
22 station on June 6th when you gave a statement
23 to SBI.

Page 283

1     A.     Mr. Rayborn and Mr.
2 McDermott, and the -- the agent taking the
3 statement, Heath Carpenter.
4     Q.     Now, Mr. Rayborn is your
5 lawyer -- one of your lawyers?
6     A.     Correct.
7     Q.     Mr. McDermott was one of your
8 lawyers, also?
9     A.     Correct.
10     Q.     Okay. Do you recall the ABI
11 agent's name?
12     A.     Heath Carpenter.
13     Q.     Okay. And you -- Now, you've
14 got a third lawyer in -- in -- in this case;
15 right? That's Mr. Rick Howard sit -- sitting
16 next to you; correct?
17     A.     Correct.
18     Q.     When did you first see or
19 talk with him about this?
20     A.     I do not recall.
21     Q.     Okay.
22         MR. HOWARD: Memorable, wasn't
23 it?

Page 284

1     Q.     You were -- You say you --
2 you were aware and were concerned about a
3 criminal prosecution immediately after the
4 shooting. And you were also concerned about
5 it when you gave your statement to the ABI,
6 you knew you were under a criminal
7 investigation, then, also, didn't you?
8     A.     Yes, sir.
9     Q.     Okay. But by the 6th, you
10 had had plenty of lawyers and plenty of time
11 to go over your story before giving it to the
12 ABI, correct, or SBI?
13         MR. MCDERMOTT: Object to the
14 form.
15     A.     Yes, sir.
16     Q.     During that ten days, did it
17 occur to you that you might benefit from
18 making Channing sound dangerous or
19 threatening that night?
20         MR. MCDERMOTT: Objection.
21 Calls for speculation.
22     A.     I -- I'm not quite un -- not
23 quite sure I understand what you're asking

Page 285

1 me.
2     Q.     Did it occur to you that it
3 would benefit you to -- for you to make
4 Channing appear dangerous or threatening that
5 night?
6     A.     I don't know if I ever had
7 that thought or not.
8     Q.     Okay. Can you think of any
9 reason that Zanna would have to give a false
10 story to the ABI agent only a few hours after
11 the shooting?
12     A.     No, sir.
13     Q.     Okay. Can you think of any
14 reason you might have to give a false
15 statement to the SBI about the shooting?
16     A.     No, sir.
17     Q.     You can't think of one?
18     A.     No, sir.
19     Q.     Would it not be to avoid
20 being criminally prosecuted?
21     A.     No, sir.
22     Q.     That wouldn't be a reason for
23 you to do it?

15 (Pages 282 - 285)

Page 286

1    A.    For me, no.
2    Q.    But in any event, Zanna
3 wasn't concerned about any crim -- crim --
4 criminal prosecution when he gave -- she gave
5 her statement; correct?
6          MR. MCDERMOTT:  Objection.
7 Calls for the speculation into the mind of
8 another person.
9          MR. HOWARD:  Object to the
10 form.
11   A.    I don't believe she was
12 concerned with it.
13   Q.    (Mr. Sikes) Okay.  But you
14 were?
15   A.    Yes, sir.
16   Q.    Okay.  At the time of the
17 shooting, you had no knowledge of what had
18 gone on down at the Spivey household, had
19 you?
20   A.    No, sir, I did not.
21   Q.    Okay.  I mean, there had been
22 some talk about Tasers being fired and
23 windshields being broken and Channing jumping

Page 287

1 on hoods of cars.  You didn't know anything
2 about any of that at the time of the
3 shooting, did you?
4    A.    No, sir.
5    Q.    Okay.  And, in fact, you
6 didn't know anything about any events at the
7 Spivey home that evening at all, other than
8 what Tim White had told you; correct?
9    A.    Correct.
10   Q.    Okay.  Do you remember, and
11 this is maybe about two or three months ago
12 when we took your first deposition, I asked
13 you what Zanna said to you and what you said
14 to Zanna, and you refused to answer the
15 questions on that occasion; correct?
16   A.    I don't recall.
17   Q.    You -- Do you not recall
18 taking the Fifth Amendment about all of the
19 events surrounding the -- the shooting?
20   A.    I remember taking -- excuse
21 me.  I remember taking the Fifth on several
22 questions.  I don't remember specific
23 questions, though.

Page 288

1    Q.    Well, look at page 210 of
2 your deposition, please.
3    A.    (Witness complies.)
4    Q.    Look at line 6, page 210.  I
5 asked:  What did Zanna Bloodsworth say to you
6 when she got to your house?  What was your
7 answer?
8    A.    Based on advice of my
9 attorney, I'm going to refuse to answer
10 citing the Fifth.
11   Q.    What did she say -- What --
12 Excuse me.  What did you say to Ms.
13 Bloodsworth when she came your house, and
14 what did you answer?
15   A.    Based on advice of my
16 attorney, I'm refusing to answer and citing
17 the Fifth.
18   Q.    So in January of this year at
19 your first deposition, eight months after the
20 shooting, you still were concerned about
21 being charged with homicide for Channing's
22 death --
23          MR. MCDERMOTT:  Object to the

Page 289

1 form.
2    Q.    -- and you took the Fifth
3 Amendment; correct?
4          MR. HOWARD:  Object to form.
5    A.    Yes.
6    Q.    (Mr. Sikes) Okay.  You also
7 testified in January that if you answered my
8 questions in that regard or the questions
9 about the shooting honestly, you believe that
10 your honest answers might tend to incriminate
11 you -- might be used to criminally prosecute
12 you; correct?
13          MR. HOWARD:  Object to the
14 form.
15   A.    Yes.
16   Q.    Okay.  Luverne is in Crenshaw
17 County, isn't it?
18   A.    Correct.
19   Q.    Do you know the D.A. or the
20 district attorney in Crenshaw County?
21   A.    Yes, sir.
22   Q.    All of policemen in Crenshaw
23 County, in a sense, work with or for the D.A.

16 (Pages 286 - 289)

Page 290

1 there?
2          MR. RAYBORN:  Object to the
3 form.
4      A.      They prosecute the cases that
5 we -- felony cases that we bring to trial.
6      Q.      Right.  Had you worked with
7 the D.A. there in Crenshaw County on prior
8 cases?
9      A.      Yes, sir.
10     Q.      How many times?
11     A.      Dozens.  I mean, I -- I
12 wouldn't even begin to even know a number.
13     Q.      Did you usually work with a
14 particular member of the D.A.'s staff, or was
15 it with the D.A., herself, or . . .
16     A.      Usually, you start out with
17 the A.D.A. that's for Crenshaw.  And
18 depending on whether cases get worked,
19 settled, took care of before it goes to trial
20 period, most of the time, it's with him.  If
21 you go to trial, then that's most of the
22 time, when we have to deal with Charlotte
23 Tesmer, which is the D.A.

Page 291

1      Q.      Okay.  And you had dealt with
2 Ms. Tesmer before?
3      A.      Yes.
4      Q.      Okay.  Again, on how many
5 occasions with Ms. Tesmer, herself?
6      A.      Honestly, I -- I -- A dozen.
7      Q.      No.  Two or three, eight or
8 ten, fifteen to twenty, eighty or ninety,
9 two-hundred-and-fifty?  Give me some idea.
10     A.      I'll say a dozen.
11     Q.      Okay.  Do you know how
12 indictments occur?
13     A.      Ye- --
14          MR. RAYBORN:  Object to the
15 form.
16     A.      Yes.
17     Q.      And how do they occur?
18          MR. RAYBORN:  Object to the
19 form.
20     A.      What I'm familiar with is a
21 case is presented to the Grand Jury, and then
22 they return an indictment based on the
23 evidence presented to them.

Page 292

1      Q.      Right.  Who decides what
2 evidence to present to the Grand Jury?
3          MR. RAYBORN:  Object to the
4 form.
5      Q.      Do you know?
6      A.      I can only speak from my
7 experience.
8      Q.      Uh-huh.  Wouldn't that be the
9 D.A. --
10     A.      As --
11     Q.      -- that decides what -- what
12 evidence to present to the Grand Jury?
13          MR. RAYBORN:  Object to the
14 form.
15     A.      I -- In my experience,
16 what -- when I've presented cases, I brought
17 my case file in and presented what I had.
18 And that -- that -- I mean, that's -- I
19 don't -- I don't know what other officers
20 have done.  I don't -- I just can only speak
21 for myself.
22     Q.      All right.  Do you know
23 whether -- You know now that there was a

Page 293

1 presentment made to the Grand Jury with
2 regard to whether you would be indicted or
3 not, regarding this shooting; correct?
4      A.      Correct.
5      Q.      Do you know who presented
6 that case to the Grand Jury?
7      A.      I believe it was going to be
8 Agent Brian Harvin with the State Bureau of
9 Investigation.
10     Q.      Do you know Agent Harvin?
11     A.      I -- Not personally, no.
12     Q.      Do you know him -- At what
13 you -- You would -- Your answer tends to make
14 me believe you know him in some regard.  Is
15 it --
16     A.      I've met him multiple times.
17     Q.      Okay.  Okay.
18     A.      Over the years as -- in his
19 role as an SBI agent.
20     Q.      Okay.
21     A.      Working cases.
22     Q.      You have now been advised
23 that the Grand Jury did not indict you for a

17 (Pages 290 - 293)

Page 294

1  homicide in this case; correct?
2    A.    Correct.
3    Q.    Okay.  Do you know what
4  double jeopardy is?
5          MR. RAYBORN:  Object to the
6  form.
7          MR. HOWARD:  Objection.
8    A.    My understanding would be is
9  if you're -- if you're case is dismissed, you
10  can't be tried again or brought that --
11  criminally can't be brought against you
12  again.
13    Q.    (Mr. Sikes) Okay.  You can't
14  be tried criminally for the same offense;
15  correct?
16    A.    Correct.
17    Q.    Okay.  Do you know that
18  double jeopardy does not apply to presentment
19  to -- of evidence to the Grand Jury?
20          MR. RAYBORN:  Object to the
21  form.
22          MR. HOWARD:  Object to form.
23    A.    I'm sorry.  Do what, now?

Page 295

1    Q.    (Mr. Sikes) Do you know
2  that -- that double jeopardy does not apply
3  to presentments to the Grand Jury?
4          MR. RAYBORN:  Object to the
5  form.
6          MR. HOWARD:  Same objection.
7  If you know.
8    A.    I -- I -- Yes.  I understand
9  that it can be represented.
10    Q.    What?
11    A.    A case can be represented to
12  the Grand Jury at a later time.
13    Q.    So the fact that you weren't
14  indicted on -- at that particular grand jury,
15  if there were later evidence to come to the
16  attention of the D.A., and it was presented
17  to a later grand jury, you could still be
18  indicted?
19          MR. RAYBORN:  Object to the
20  form.
21    Q.    Correct?
22    A.    Yes.
23    Q.    Okay.  Let's talk about --

Page 296

1  We -- We've talked about the two, really,
2  just sort of passing pieces of information
3  you had from one -- first, from Mr. White,
4  Tim White; and the second from Zanna
5  Bloodsworth.  Both of those were less than a
6  minute or so of information.  And you've told
7  me all of the content of what both Mr. White
8  told you and Zanna Bloodsworth told you?
9    A.    Correct.
10    Q.    Nothing else that you can --
11  comes to mind now in thinking about it?  Any
12  other information either one of them gave you
13  that we haven't talked about?
14    A.    No, sir.
15    Q.    Okay.  Let's talk -- The --
16  The last source of information you had about
17  Channing Spivey would have been what you saw
18  and heard after you came out of your house
19  just prior to shooting and killing him;
20  correct?
21    A.    Correct.
22    Q.    Okay.  Tell me what all
23  you -- As best you can, tell me all of the

Page 297

1  activities in -- you've had prior to coming
2  out of your house.  Now, what I'm -- What I'm
3  trying to get at, maybe I'm not as -- Strike
4  the question.
5          Zanna Bloodsworth came to your
6  door and gave you the information you've told
7  us about.  Several minutes later, you came
8  out of your house; correct?
9    A.    I don't think it was several
10  minutes.
11    Q.    How long was it?
12    A.    I would think it's more along
13  the lines of a minute or less.
14    Q.    Okay.  A minute or so later,
15  you came out.  Tell me all of what you did in
16  that minute or minute-and-a-half between when
17  you ceased speaking with Zanna Bloodsworth
18  and when you came out of your house.
19    A.    I procured my flashlight and
20  I told her and my wife to stay in the house,
21  not to come outside.  I went for the back
22  door and went out.
23    Q.    Well, you are forgetting

18 (Pages 294 - 297)

Page 298

1 something. You say you got your flashlight.
2 You got your gun also, didn't you?
3    A.    I had it before then.
4    Q.    You had it in your -- When --
5 You had it in you your hand when Zan -- when
6 you went to the door to talk to Zanna?
7    A.    I had -- I had it on my side
8 already when I went to her. I had already
9 put on a pair of pants and got my gun and my
10 boots.
11    Q.    When did you do that?
12    A.    After Tim called me.
13    Q.    I see.
14    A.    I was -- I was sitting in my
15 chair in a pair of box -- gym-type shorts and
16 T-shirt.
17    Q.    Right.
18    A.    After Tim called me, I just
19 had a feeling uneasy. I got up, put on my
20 pants and my boots.
21    Q.    Okay.
22    A.    And put my gun on my side.
23    Q.    And by -- You have a side

Page 299

1 holster?
2    A.    It's commonly referred to as
3 paddle holster.
4    Q.    As a what?
5    A.    Paddle holster. It just
6 clips on the pants.
7    Q.    Okay.
8        MR. HOWARD: It's P-A-D-D.
9        MR. SIKES: Uh-huh. Yeah.
10    Q.    (Mr. Sikes) Okay. And this
11 was -- Was this the XDS, the Springfield?
12    A.    Yes, sir.
13    Q.    Okay. Is there any reason
14 you picked that handgun, rather than a --
15 than your service weapon?
16    A.    Just normally what I carry
17 around when I'm off duty. It's lighter and
18 smaller.
19    Q.    Okay. All right. Now, you
20 had a baton available also to you; correct?
21    A.    Yes.
22    Q.    But do --
23    A.    Well, at what point? Let --

Page 300

1 Let me clarify at what point?
2    Q.    Yeah. When -- When you
3 went -- When you went and put your gun on.
4    A.    Yes, there was a baton in my
5 bedroom.
6    Q.    Okay. All right. And it was
7 hanging on the back of the door; correct? Is
8 that what you told us?
9    A.    Yes.
10    Q.    Okay. So you walked past the
11 baton into the bedroom and got your gun off
12 the nightstand; is that right?
13    A.    Not really. Because the
14 sta -- nightstand where the gun was sitting
15 is immediately to the left of the entrance to
16 the bedroom.
17    Q.    Okay.
18    A.    In other words, the door is
19 open. You step in the bedroom, the table --
20 the nightstand is immediately there.
21    Q.    Okay. It would -- It'd be on
22 your left?
23    A.    Correct.

Page 301

1    Q.    And on the back of the door
2 to your right -- immediately to your right
3 when you enter that room was the baton?
4    A.    Yes. The door swings back to
5 the right, and the duty belt hangs on the
6 back of the door.
7    Q.    Did you ever give any thought
8 to -- to getting your baton?
9    A.    No, sir.
10    Q.    And why was that?
11    A.    Didn't think I would need it.
12    Q.    But you did think you'd need
13 a gun?
14    A.    Actually, Mr. Sikes, I carry
15 a gun almost everywhere I go every day. So
16 it's not out of the ordinary for me to pick
17 up my gun.
18    Q.    You were right-handed;
19 correct?
20    A.    Yes.
21    Q.    Okay. And the gun was on
22 your right side?
23    A.    Yes.

19 (Pages 298 - 301)

Page 302

1   Q.      In the hol -- this paddle
2 holster?
3   A.      Yes.
4   Q.      Okay.  As you came out of the
5 house, did the -- did you have the gun in
6 your hand?
7   A.      No, sir.
8   Q.      It was on your hip in the
9 holster?
10   A.      Yes, sir.
11   Q.      Okay.  At some point, you had
12 took the gun out of your holster?
13   A.      Yes, sir.
14   Q.      When was that?
15   A.      I went out the back door and
16 started around the house on the south side,
17 going to look back toward my front door to
18 see if I could see anybody had followed Zanna
19 to the front of the house.
20          Deputy Penny entered the yard
21 and was yelling, and Mr. Spivey come in the
22 yard right behind him.  I drew my weapon, and
23 come to a ready gun position.

Page 303

1   Q.      What is a ready gun position?
2   A.      Drawn, but not aimed.  It's
3 down in front.
4   Q.      Okay.  After taking the gun
5 out of your holster, did you ever put the gun
6 back in your holster?
7   A.      Yes, sir.
8   Q.      When?
9   A.      Before Mr. Spivey got to me,
10 as he was approaching me, he had no weapons
11 in his hands, and I knew that it was going to
12 become a physical confrontation, I holstered
13 my weapon.
14   Q.      Okay.  How did you know it
15 was going to be a physical confrontation?
16   A.      Because my intention was to
17 try to grab his arms, subdue him somehow.
18   Q.      Now, Penny was right there
19 with you also, Deputy Penny; correct?
20   A.      Yes, sir.
21   Q.      Okay.  How far away from you
22 was he?
23   A.      Approximately, fifteen feet.

Page 304

1   Q.      Okay.
2          MR. HOWARD:  Do you need some
3 more water?
4   Q.      Yeah, you want to take -- Do
5 you need to take a break?
6   A.      Yeah.
7          MR. RAYBORN:  Yeah.
8          MR. HOWARD:  You do?  Okay.
9          THE WITNESS:  Yeah.  Sure.
10          MR. SIKES:  All right.
11          VIDEOGRAPHER:  This ends disc
12 1.  Going off the Record at two o'clock.
13          (Recess taken.)
14          VIDEOGRAPHER:  This begins
15 disk 2.  Going back on the Record at 2:14.
16          Mr. SIKES:  Ready to go?  On
17 the Record?
18          VIDEOGRAPHER:  Yes, sir.
19   Q.      (Mr. Sikes) Okay.  Mr.
20 Adcock, the -- the -- the -- the time
21 interval between when Zanna got to your house
22 and you came out the back door of your house,
23 you say, was maybe a minute-and-a-half, two

Page 305

1 minutes, something like that?
2          MR. HOWARD:  No.  He said a
3 minute or less.
4          MR. SIKES:  A minute or less.
5 Okay.
6   A.      Yeah.  Yeah, that's right.
7   Q.      (Mr. Sikes) Okay.  All right.
8 Did you have any conversation with anybody
9 else at your house in that time period?
10   A.      Only what I said -- told them
11 to stay in the house and not come outside.
12   Q.      Stay in the house.  Okay.
13 All right.  When you came out of the house,
14 what did you expect to find, or did you?
15   A.      I -- My -- The only
16 expectation I had was possibly somebody had
17 come up behind Zanna to my front door.
18   Q.      Okay.
19   A.      That that's -- That's what I
20 was looking to see if somebody had followed
21 her to the house.
22   Q.      All right.  You weren't --
23 You -- You weren't looking for any particular

20 (Pages 302 - 305)

Page 306

1 person when you came out. Were you looking
2 for -- Did you expect to see Deputy Penny,
3 did you expect to see Channing, did you
4 expect to see anybody else?
5      A.      No, sir. I had no particular
6 person I was expecting to see.
7      Q.      -- to see. Okay. All right.
8 Was it -- I -- I guess, was it a surprise to
9 see Channing, then, or not?
10     A.      Yes, sir.
11     Q.      Okay. All right. And was it
12 a surprise to see Deputy Penny?
13     A.      Yes, sir.
14     Q.      Okay. All right. Well,
15 you -- You knew Channing; correct?
16     A.      Correct.
17     Q.      Okay. Well, and -- And you
18 knew him not to be a violent person, and not
19 to be a bad man, not to have any criminal
20 record. Did that not relieve you to some
21 degree?
22     A.      No, sir.
23     Q.      Why not?

Page 307

1      A.      Well, he -- He appeared to be
2 chasing Deputy Penny when I first seen him.
3      Q.      Okay.
4      A.      And he also -- His appearance
5 concerned me. He was wet looking, and then
6 looked like maybe blood on him, and only the
7 shorts.
8      Q.      Okay.
9      A.      Just his appearance and the
10 fact that he appeared to be chasing Deputy
11 Penny, I --
12     Q.      Okay.
13     A.      -- it was not -- It was not
14 settling, actually.
15     Q.      Okay. But clearly he was not
16 armed?
17     A.      Correct.
18     Q.      Okay. What was your initial
19 plan, as you saw him, to deal with the
20 situation?
21     A.      I started giving him verbal
22 commands to stop and not come any further.
23     Q.      I'm not talking about what

Page 308

1 you did. What were your plans about how you
2 were going to handle the situation?
3      A.      Give him verbal commands was
4 my plan.
5      Q.      But beyond that?
6      A.      I didn't have one.
7      Q.      Okay. Had you done anything
8 in the house to plan to deal with whatever
9 situation outside you might encounter?
10     A.      Picked up my flashlight cause
11 it was getting about dark. I -- As I say, I
12 always carry my pistol around with me, so I
13 had obtained it.
14     Q.      Yeah. So the only thing you
15 did to prepare for the situation is got your
16 gun and a flashlight?
17     A.      Correct.
18     Q.      I -- I'm -- I have heard a --
19 an expression, and I don't -- maybe -- maybe
20 I don't know whether it has any validity
21 within your experience or not, but I've
22 always heard the expression, you don't ever
23 draw your gun unless you are plan on -- or

Page 309

1 prepared to use it. Do you subscribe to that
2 idea?
3      A.      I've heard people say that.
4      Q.      All right. Is that your
5 idea, also?
6      A.      Yes, sir.
7      Q.      Okay. And then you planned
8 on and were prepared to use your gun when you
9 came out of the house and took it out of the
10 holster; correct?
11     A.      If need be, I was prepared
12 to, yes.
13            (Plaintiff's Exhibit 51
14            was marked for
15            identification purposes.)
16     Q.      Okay. Let me let you look at
17 Plaintiff's Exhibit 51. That's a blowup.
18 You -- I showed that to you just, I think,
19 prior to us going on the Record. Do you
20 recognize that as a part of a --
21            MR. HOWARD: Yeah, I'm just
22 going to show him where it came from, if
23 that's okay.

21 (Pages 306 - 309)

Page 310

1      MR. SIKES: Yeah, Plaintiff's
2 Exhibit 13. Sure.
3      MR. HOWARD: It's 31, is that
4 it?
5      MR. SIKES: 13 -- No, it's 51.
6      THE WITNESS: 51.
7      MR. SIKES: Yeah.
8      MR. HOWARD: You and I are
9 both blind.
10      This is this one that we used
11 the last time I was going to let you see
12 them. Maybe it didn't make it in there.
13   A.   That's 13-A?
14   Q.   (Mr. Sikes) Yeah. It -- It's
15 the same but -- 13 and 13-A are the same.
16   A.   Yeah.
17      MR. HOWARD: The new number is
18 going to be 51. Is that --
19      MR. SIKES: Well, the --
20 It's -- That's a separate -- That's a
21 separate exhibit, yeah, because it's a part
22 of it.
23      MR. HOWARD: I understand. I

Page 311

1 understand.
2   Q.   (Mr. Sikes) But do you see
3 how it's -- how it's cut out of there?
4   A.   (Witness complies.) Yes.
5   Q.   Okay. Does 51 accurately --
6 Does it accurately portray your house, I
7 think there's a little ponytail palm and a
8 bigger tree, and then there also is a -- is
9 that a tire with plantings inside of it?
10   A.   Yes, sir.
11   Q.   Okay. That's the smaller
12 green dot there?
13   A.   That's a flower bed.
14   Q.   Okay. What --
15   A.   And it's made out of a tire,
16 yes.
17   Q.   Right. But it's -- It
18 doesn't obstruct view. You -- I mean, it's
19 only less than a foot tall, that?
20   A.   This (indicating)?
21   Q.   Yeah.
22   A.   Correct.
23   Q.   Okay. The ponytail palm is

Page 312

1 up over your head; correct?
2   A.   Yes, sir. It's probably
3 eight feet tall.
4   Q.   Okay.
5      MR. HOWARD: Which one are we
6 calling the ponytail palm?
7      MR. SIKES: Right there
8 (indicating).
9      THE WITNESS: Referring to
10 here (indicating).
11   Q.   (Mr. Sikes) All right. Thank
12 you.
13   A.   Yes, sir.
14   Q.   And there's another tree over
15 there, also?
16   A.   Correct.
17   Q.   A larger tree?
18   A.   A cedar, yes.
19   Q.   Right. Okay.
20      And do you recognize your
21 driveway there (indicating)?
22   A.   Yes.
23   Q.   And there also are some

Page 313

1 stiles or some railings along that allow you
2 to close a gate there. Show us -- Show us
3 the -- the railings you're -- there.
4   A.   This --
5   Q.   A brown.
6   A.   This is a fence (indicating).
7 This is a fence (indicating). This is a gate
8 that swings (indicating).
9   Q.   Open and shut there?
10   A.   Open and shut, yes.
11   Q.   Okay. All right. What I
12 would like for you to do, if you would,
13 please, sir, I'm going to ask you -- I've --
14 I've gotten three stickers here that I've
15 labeled A -- A-1, C-1, and P-1. The A is for
16 Adcock.
17   A.   Okay.
18   Q.   C is for Channing, and P is
19 for Penny. When you -- Put -- Place those on
20 there where -- when you -- when you came
21 around the corner of the house there, where
22 you stopped and saw Deputy Penny and Channing
23 Spivey.

22 (Pages 310 - 313)

Page 314

1    A.    Okay.  Where I was?
2    Q.    Right.  When you -- When you
3 first saw them.
4    A.    (Witness complies.) This is
5 obviously approximate.
6    Q.    You weren't closer to the
7 house than that?
8    A.    Sir?
9    Q.    You weren't closer to the
10 house than that?
11    A.    No, sir.
12    Q.    Okay.  All right.  Go ahead.
13 And where was -- Where was Deputy Penny?
14    A.    Where I -- Where I seen him
15 from that location?
16    Q.    Yes, sir.
17    A.    Okay.  He would have been
18 here coming around the palm (indicating).
19    Q.    All right.
20    A.    And --
21    Q.    All right.  Show me now where
22 Channing, as you recollect, when you first
23 saw him, where he was.

Page 315

1    A.    It would have been the same
2 location as Deputy Penny.
3    Q.    He -- They were right there
4 together?
5    A.    No, sir.  I -- I -- I had
6 quit moving.  All right.  So I'm standing
7 there.  I see Deputy Penny.
8    Q.    Uh-huh.
9    A.    He's running or in a trot,
10 then Channing appears behind him in a trot.
11    Q.    I see.
12    A.    So the --
13    Q.    Okay.
14    A.    When I first observe both of
15 them, they're both in the same -- it's at the
16 same place.
17    Q.    Just -- Just put them right
18 there close to each other.
19    A.    It -- It would have been at
20 the same place where I seen them.
21    Q.    If I understand you
22 correctly, what happened is, that you didn't
23 see Channing when you saw Penny to begin

Page 316

1 with?
2    A.    Correct.
3    Q.    You -- Penny kept on coming
4 towards you, and as he did, Chan -- The --
5 Channing was right about where you put the
6 dot -- the -- the -- the green dot there;
7 correct?
8    A.    Correct.  He --
9    Q.    Okay.
10    A.    And he -- Penny was not
11 approaching me this way (indicating).  He was
12 coming up the driveway.
13    Q.    Okay.  All right.  Do this,
14 Well, I -- I -- I'm going to get you to draw
15 it in a second.  Tell me about the -- the
16 movements of you three people there; Adcock,
17 Channing, and Penny.  Describe where -- what
18 the paths were that you took, Channing took,
19 and that Penny took --
20    A.    All right.
21    Q.    -- with your finger first.
22    A.    So I'd stopped over here
23 (indicating).

Page 317

1    Q.    Uh-huh.
2    A.    Cause I hear Penny, and I'm
3 looking and I see him.
4    Q.    Uh-huh.
5    A.    And he keeps moving up.
6    Q.    Down the -- Okay.
7    A.    Up the driveway.
8    Q.    All right.
9    A.    And then I see Channing --
10    Q.    All right.
11    A.    -- behind him.
12    Q.    And what -- What was
13 Channing -- What did Channing do, was he
14 following along --
15    A.    He was --
16    Q.    -- along the --
17    A.    -- along this path.  Along
18 the path.
19    Q.    Same path.
20    A.    He was the same path.  I
21 observed him.  We had --
22         MR. HOWARD:  Let him finish
23 his question before you answer.

23 (Pages 314 - 317)

Page 318

1    THE WITNESS: Okay. All
2 right.
3    MR. HOWARD: Then he's going
4 to let you finish before he asks you another
5 question.
6    THE WITNESS: I got you. Yes,
7 sir.
8    Q.    (Mr. Sikes) All right. All
9 right. At some point, both Penny and
10 Channing came off of that driveway; correct?
11    A.    Correct.
12    Q.    Where -- Show me
13 approximately where they were when they came
14 off of it, and what -- what direction did
15 they move in.
16    A.    So Channing had got -- I
17 mean, my apology. Penny had got up in this
18 area (indicating). I had moved down just a
19 little bit more (indicating). Once I seen
20 both of them in the yard.
21    Q.    Uh-huh.
22    A.    I had moved down a little
23 more. Penny had come up on my side

Page 319

1 (indicating). I didn't -- I quit paying
2 attention to Penny. I started focusing on
3 Channing. He's coming by. I'm giving him
4 commands to stop. Don't come any further.
5 And he turns, and starts to -- starts towards
6 me (indicating).
7    Q.    Okay.
8    A.    Deputy Penny is somewhere off
9 to my left.
10    Q.    Okay. How long a period of
11 time was there between when you first saw
12 Channing and when you fired the shots?
13    A.    How long a time period?
14    Q.    Yes, sir.
15    A.    I -- Really, I -- I had no
16 perception of the time as -- as it was all
17 occurring. It . . .
18    Q.    Was it -- Did it occur over
19 three or four minutes, then?
20    MR. HOWARD: No. He said he
21 had no perception, so he doesn't know.
22    A.    I -- I -- Yeah, I don't know.
23 I just -- Truly, I don't know.

Page 320

1    Q.    It could have been as long as
2 three or four minutes?
3    A.    It -- It could had. I don't
4 know. I -- I'm -- I'm trying to give you an
5 honest answer, sir.
6    Q.    Okay. All right. That's
7 what I want.
8    What movements did you make
9 from where you were standing that -- that --
10 that red dot right there with your A-1 on it,
11 what movements did you make as Penny
12 approached you and Channing approached you?
13    A.    I -- Like I say, I had moved
14 down a few more feet just -- just walking,
15 giving verbal commands.
16    Q.    Okay. You were moving toward
17 both of them?
18    A.    Well, I would have been
19 moving more toward Channing, because like I
20 say, Pe --
21    Q.    Okay.
22    A.    Deputy Penny was approaching
23 around to -- to my left.

Page 321

1    Q.    Okay. All right. All right.
2 Tell me, as best you can -- do you -- you can
3 recollect, how the events unfolded from
4 there. Who did what, and in what -- what
5 order were things done prior to the shooting?
6    A.    All right. So I described
7 Deputy -- Channing Spivey turning in -- out
8 of the driveway into the yard, starting to
9 approach me. Seeing he had nothing in his
10 hands, I holstered my weapon and prepared for
11 a physical confrontation. As I said, I was
12 going to try to subdue him, try to grab him.
13 Something was going on, I didn't -- don't
14 know what, but something was going on. There
15 was a reason that he was running from the
16 deputy, I mean --
17    Q.    All right.
18    A.    -- as running after the
19 deputy. I grabbed him.
20    Q.    And where did -- Where did
21 y'all meet? Show me about where that was.
22 Right there (indicating).
23    A.    We were in -- We were in the

24 (Pages 318 - 321)

Page 322

1  yard (indicating.)  And it was --
2      Q.      In that area?
3      A.      It was in the grass,
4  somewhere just --
5      Q.      Okay.
6      A.      -- just down below the --
7  close to or below the -- the flower.
8  So . . .
9      Q.      All right.  And where was
10 Penny at this time, he's off to your left?
11     A.      Like I say, I -- I -- I had
12 kind of quit tracking him.
13     Q.      Uh-huh.
14     A.      I would pick him up in my
15 peripheral vision.  He was -- He was
16 somewhere over here (indicating), already out
17 of the driveway into the grass.
18     Q.      Progress within, tell me what
19 happened from there.
20     A.      So as -- As I attempted to
21 grab him, he pulled back, and we started
22 fighting.  Like, blows started -- Blows
23 started passing.  He struck me, you know.

Page 323

1  We're quite literally face-to-face.
2      Q.      Okay.
3      A.      And -- And we're fighting,
4  and we fight.
5      Q.      Okay.  Did you strike him?
6      A.      I tried to.
7      Q.      Did you strike him?  And I
8  don't want to know you tried.  Did you strike
9  him?
10     A.      I honestly don't know if I
11 ever landed any punches or not.
12     Q.      Okay.  Do you claim he hit
13 you?
14     A.      He did.
15     Q.      And how many times did he hit
16 you?
17     A.      I know I had a bruise on my
18 stomach, above my belt line on my left side.
19 I had the inside of my lip, bottom lip was
20 busted.  And also I had been struck on the
21 left side of my head right at my hairline.
22 So I know he -- I know he struck me a minimum
23 of three times.

Page 324

1      Q.      All right.  How long a period
2  of time was there where y'all were fighting
3  or tousling with each other?
4      A.      I -- I -- I do not recollect.
5      Q.      Okay.  During the shooting,
6  were you -- both you and Channing standing
7  upright?
8      A.      Yes.
9      Q.      Okay.  And when I -- When I
10 used during the shooting, I'm -- I'm
11 including in addition to while you're
12 firing your gun at Channing, I'm talking
13 about in the moments leading up to the
14 shooting, and also immediately following the
15 time that you fired your last shot into
16 Channing, you were upright the whole time,
17 was he upright the whole time?
18     A.      After I sh -- As I was
19 shooting, like as I -- as I finished firing
20 all the rounds, as I was finishing, he was
21 falling at the end.
22     Q.      Okay.  Well, certainly he --
23 He fell from being shot.  I understand.

Page 325

1      A.      Yes.
2      Q.      What I'm talking about is, in
3  the altercation you had with him, as he
4  approached you and as you interacted with
5  him, were both of y'all upright?
6      A.      Yes.
7      Q.      At all times?
8      A.      Correct.  Yes.
9      Q.      Okay.
10             MR. HOWARD:  Let him finish
11 his question.
12             THE WITNESS:  I'm sorry.
13     Q.      (Mr. Sikes) Okay  All right.
14             MR. HOWARD:  And he will let
15 you finish, too.
16             THE WITNESS:  I -- I'm -- I'm
17 sorry.
18             MR. HOWARD:  Okay.
19     Q.      (Mr. Sikes) Were -- Were you
20 or Channing ever falling backwards or
21 forwards?
22     A.      I would say that I was --
23 described as I was being pushed back.  In

25 (Pages 322 - 325)

Page 326

1 other words, he was overtaking the position I
2 had.
3     Q.    Okay.  Okay.  But you were
4 still upright, though.  You -- He never did
5 push you to the ground?
6     A.    I never did go to the ground,
7 no, sir.
8     Q.    Okay.  Were either of you
9 kneeling or stooping at any time?
10     A.    No, sir.
11     Q.    Okay.  Did either of you turn
12 away from each other at any time?
13     A.    No, sir.
14     Q.    Okay.  Is it your testimony
15 that you were upright and facing each other
16 throughout the shooting?
17     A.    Yes, sir.
18     Q.    Okay.  And I think you told
19 me that -- And I believe you told the FBI
20 that you were at least six feet away from him
21 when you fired; correct?
22     A.    Yes, sir.
23     Q.    Both of you standing upright?

Page 327

1     A.    Yes, sir.
2     Q.    Okay.  And he was never any
3 closer than six feet to you?
4     A.    While I was firing?
5     Q.    Yes, sir.
6     A.    Correct.
7            (Plaintiff's Exhibit 30
8            was marked for
9            identification purposes.)
10     Q.    Okay.  I'm going to show you
11 Plaintiff's Exhibit 30.  And those are two
12 men standing upright.  And I've used the --
13 I've placed a man at the bottom laying down
14 right there to really as a -- as a guide to
15 distance.  Average guy is maybe five-ten, six
16 feet, something like that.  That would be
17 a -- the approximate distance between two
18 people who were at six feet apart exactly,
19 maybe.  What -- Is that --
20         MR. HOWARD:  Object to that
21 right there because that's not what that
22 represents.  Because you've got them --
23 You've got the shooter extending over up to

Page 328

1 the knee on the guy, and you've got the hand
2 extending over to the neck.
3         MR. SIKES:  I -- I don't have
4 anything.  I've -- I'm showing you a diagram.
5     Q.    (Mr. Sikes) Does that
6 accurately depict y'all both standing
7 upright, the configuration and the
8 orientation y'all had to each other at the
9 time of the shooting?
10     A.    No, sir.
11     Q.    What's different about
12 that -- how y'all were standing?
13     A.    The -- In this picture that
14 you have here, the person holding a gun is
15 canted to the right.  And they're not -- And
16 the -- the person, I'm assuming here being
17 shot at is -- got their left side of their
18 body presented to the . . .
19     Q.    Well, I'm -- I'm not talking
20 about that did he have his hands down to his
21 side.  I'm trying to get the dist -- the --
22 the -- the distances between -- the distance
23 between you at the time.  You -- Those are --

Page 329

1 That -- That's -- You said you were both
2 upright; correct?
3     A.    Yes.
4     Q.    When you fired all the shots?
5     A.    Yes.
6     Q.    And you were six feet, at
7 least, apart; correct?
8     A.    Correct.
9     Q.    All right.  Does that depict
10 accurately, then, people approximately six
11 feet apart, both of them standing upright?
12         MR. HOWARD:  Object to form
13 based on my same objection as earlier.
14     A.    I -- Does -- Okay.  Is this
15 represent people six feet apart, is that what
16 you're asking me?
17     Q.    Is that -- Is that a fair
18 representation of both of y'all stand -- how
19 you were both standing upright?  Again, I'm
20 not talking about exactly where your hands or
21 his hands were, but you were pointing a gun
22 at him from about six feet away, and he was
23 standing upright.  That would -- Would that

26 (Pages 326 - 329)

Page 330

1  be a representation of approximately how
2  y'all's distance from each other was, and
3  your both of you -- with both of you standing
4  upright?
5        MR. HOWARD: Object to form.
6     A.    I mean, I -- I -- I can't
7  agree that this is a -- a representation of
8  it --
9     Q.    All right.
10    A.    -- I mean.
11    Q.    Tell -- Tell -- Tell me all
12  of what's -- what's -- what's different in
13  Plaintiff's Exhibit 30 from how you and
14  Spivey were during the period of time you
15  were firing at him.
16    A.    Okay. So the -- The -- The
17  man on -- Or the -- The image on the left,
18  has the left side of his body presented or
19  her body -- its body presented toward the
20  person with the gun.
21    Q.    Uh-huh.
22    A.    It appears in this, that
23  their -- their -- their body is facing away.

Page 331

1     Q.    Okay. All right.
2     A.    Mr. Spivey's body was facing
3  me.
4     Q.    Right.
5     A.    On the other side here
6  (indicating), you have the -- the --
7     Q.    -- the shooter?
8     A.    -- the image of representing
9  a man with a gun or a person with a gun.
10  That person is canted toward the right with
11  the weapon drawn up. I was -- My body was
12  facing directly to his body. I was not
13  canted.
14    Q.    Okay.
15    A.    And the weapon was extended
16  out, and it -- it was drawn and extended in
17  front of me with both hands as I was
18  retreating.
19    Q.    Okay. Other than that, is
20  there anything else that you would say is
21  inaccurate about that portrayal?
22    A.    If we're going to assume that
23  this -- this image on the ground is six foot,

Page 332

1  I would say no.
2     Q.    Okay. That there's --
3  There's not anything else you'd correct about
4  it?
5     A.    Not that I see at the moment.
6     Q.    Okay. Okay. If you do   at
7  some -- at some other time, let me know.
8        After you shot Channing, he
9  fell to the ground; correct?
10    A.    Correct.
11    Q.    Did he begin to fall before
12  or after you fired the last of the shots you
13  fired at him?
14    A.    Before, I believe.
15    Q.    Okay. Now, both Wesley
16  Spivey and Justin Robinson testified that
17  they were right behind Deputy Penny,
18  following him.
19        MR. HOWARD: Object to the
20  form.
21    Q.    And that they were present
22  when you began shooting Channing.
23        MR. HOWARD: Object to the

Page 333

1  form.
2     Q.    Do you deny that they were
3  present?
4     A.    That -- I can't say I would
5  deny that they're present. I can say that I
6  did not see both of them.
7     Q.    Okay. Did you see either of
8  them?
9     A.    I believe I seen Wesley.
10    Q.    Okay.
11    A.    But he was at a distance
12  where I -- I -- I'm assuming it was him.
13  I -- I don't know for certain.
14    Q.    Okay. Is it fair to say your
15  focus of attention was not on Wesley or
16  Justin, but was on Channing during this
17  altercation?
18    A.    Yes.
19    Q.    Okay. Same way that Deputy
20  Penny went out of your frame of vision or you
21  ceased taking notice of him also; correct?
22    A.    Correct.
23    Q.    Okay. So your testimony is

27 (Pages 330 - 333)

Page 334

1 not that they weren't there. Your testimony
2 is, if they were there, you don't remember
3 seeing them; is that correct?
4       A.       As I said, I'd seen Wesley,
5 but that was after --
6       Q.       I know.
7       A.       -- the shooting.
8       Q.       I'm talking about during the
9 shooting.
10      A.       Okay. No, sir. During the
11 shooting, I do not recall seeing either one
12 of them.
13      Q.       Okay. But, again, to make
14 sure we're clear about this. You're not
15 saying they weren't there. What you're
16 saying is, if they were there, you didn't see
17 them?
18      A.       Correct.
19      Q.       Okay. Do you know where
20 Deputy Penny was when -- Well, let me ask
21 you -- Back up a sec. What was -- Who struck
22 the first blow between you and Channing in --
23 in your version of the events?

Page 335

1       A.       Channing.
2       Q.       Okay. Who initiated first
3 contact? You said you tried to take him down
4 or wrestle him down; is that right?
5       A.       I tried to grab his arms as
6 he was -- as -- as he came up on me.
7       Q.       Okay. Did -- Did you make
8 that first contact?
9       A.       Yes. Yes. Okay.
10      Q.       Okay.
11      A.       Yes.
12      Q.       So the events occurred. You
13 tried to grab him by the arms and take him
14 down; correct?
15      A.       Yes.
16      Q.       Okay. All right. Show me --
17 Show me where you were and Channing was and
18 Penny was when y'all -- Well, let me back
19 that up. Show me where -- Or -- Or use those
20 stickers to show where you were, and where
21 Channing was when you fired the first shots
22 at him.
23              MR. HOWARD: Is that -- The

Page 336

1 letters in 2?
2              MR. SIKES: Huh? Yeah, 2.
3 Uh-huh.
4       A.       (Witness complies.)
5       Q.       Where was Deputy Penny?
6       A.       (Witness complies.)
7       Q.       Okay. So we're clear, the --
8 the P-2 is where Penny was when you fired the
9 first shot. A-2 is where you were when you
10 fired the first shot. And C-2 is where
11 Channing was when you fired the first shot?
12      A.       Yes, sir.
13      Q.       Okay. Did the distance
14 between you and Channing in -- increase or
15 decrease during the time you fired these six
16 shots?
17      A.       Increased.
18      Q.       Okay. Cause you moved away
19 from him?
20      A.       Yes.
21      Q.       Okay. All right. Did
22 Channing strike you with anything other than
23 his hands?

Page 337

1       A.       Not that I recall.
2       Q.       Okay. Do you re -- recall
3 whether he struck you with right hand or left
4 hand?
5       A.       No, sir.
6       Q.       Okay. Was it his open hand
7 or his closed hand, a fist?
8       A.       I don't know.
9       Q.       How many times do you say he
10 struck you? You've told us about three
11 times. Do you know that it was at least that
12 many times, you say?
13      A.       I would say at least that
14 many times.
15      Q.       Do you know -- ha -- have any
16 idea about how many more times it might have
17 been?
18      A.       No, sir.
19      Q.       Okay. And all that he struck
20 you with was his hands?
21      A.       That I recall.
22      Q.       Okay. Did Channing ever grab
23 hold of you with his hands or his arms?

28 (Pages 334 - 337)

Page 338

1    A.    No, sir. Not --
2    Q.    Sir?
3    A.    No, sir. Not that I recall.
4    Q.    Oh. Do you recall that
5  Channing ever made contact with you, other
6  than with his hands?
7    A.    I'm sorry?
8    Q.    Did Channing ever make
9  contact with you with anything other than his
10  hands?
11    A.    Possibly. We -- We were so
12  close together, I mean, our bodies could have
13  been bumping into each other as --
14    Q.    Okay.
15    A.    -- as we were fighting.
16    Q.    But that would be sort of
17  inadvertent. That wouldn't -- You're not
18  talking about any kind of blow?
19        MR. HOWARD: Object to the
20  form.
21    A.    I -- I didn't realize that's
22  what you was asking.
23    Q.    Okay. Well, let me back up

Page 339

1  again, then, to make sure I -- we -- we're
2  clear.
3    A.    Okay.
4    Q.    What I'm wondering is,
5  that -- is whether there was any contact
6  between you and Channing, other than
7  incidental tal -- bumping your bodies
8  together during the course of, you say, this
9  altercation. Other than that, was there any
10  other contact between y'all, fists and
11  inadvertent bumping up -- up against each
12  other as you tussled?
13        MR. MCDERMOTT: Object to the
14  form as to inadvertent bumping.
15        MR. HOWARD: Do you understand
16  what he's asking?
17        THE WITNESS: I -- I --
18        MR. HOWARD: Don't guess.
19        THE WITNESS: I mean, no, yes.
20  I don't know.
21    Q.    (Mr. Sikes) How -- How --
22  Again, how would you describe the -- Wa --
23  Was there ever any -- Is there ever a full-on

Page 340

1  wrestling match?
2    A.    We weren't having a wrestling
3  match, no, sir.
4    Q.    I know. That's what I'm
5  asking. Well, you tried to wrestle with him.
6  You tried to grab him sort of, I guess in
7  a -- a takedown, is that what you intended to
8  do, take him to the ground?
9    A.    I was trying to just get a
10  hold of him.
11    Q.    Okay.
12    A.    Get a hold of his arms to
13  start with, and then go from there.
14    Q.    Okay. Look at Plaintiff's
15  Exhibit 21, please, sir.
16    A.    (Witness complies.)
17        MR. HOWARD: Does that one go
18  with her, or did you already enter that one?
19        MR. SIKES: Yeah. Yeah. I
20  offer Plaintiff's Exhibit 30.
21    Q.    (Mr. Sikes) Are these the
22  photo -- you've -- I think we've -- we've --
23  I don't want to be terribly repetitious, but

Page 341

1  I got to lay some foundation about this.
2  You -- You had testified earlier, these were
3  photographs you took either the night of the
4  fight or the next day; correct?
5    A.    Correct.
6    Q.    All of them are?
7    A.    Let me look through them, but
8  I . . .
9    Q.    Sure. Sure.
10    A.    (Witness complies.) Yes.
11    Q.    All right. Some of those
12  were taken -- Well, let me back up a sec.
13  The -- The -- The bottom of each of the
14  photographs, we can make reference to them,
15  it's got a Calloway versus Adcock, and a 0 --
16  they start with 00238 and go to 00255.
17        I will represent to you these
18  were produced by your attorney. And when
19  they were produced to us, they had that --
20  that number on them. I'm going to use that
21  number to refer to them.
22    A.    Okay.
23    Q.    Okay?

29 (Pages 338 - 341)

Page 342

1     A.     Yes, sir.
2     Q.     The photographs that were
3  taken that night, I think you testified were
4  taken by Floyd Wright with the rescue squad?
5     A.     Yes, I believe so.
6     Q.     Okay. And you took one or
7  two of the photographs the next morning;
8  correct?
9     A.     I believe that's correct.
10    Q.     And one was taken by your
11 wife on the afternoon of the 28th; correct?
12    A.     I believe that was correct.
13    Q.     The next day. Okay.
14        Now, Brent Penny testified
15 that your attorney, Mr. McDermott, took
16 photographs of you after the shooting. Do
17 you recollect that?
18    A.     I don't recall if he did or
19 not.
20        MR. HOWARD: Oh, he's
21 asking --
22        Well, are you asking him if he
23 remembers Brent Penny saying that, or does he

Page 343

1  remember Mickey doing that?
2        MR. SIKES: Does he remember
3  Mickey taking photographs.
4     A.     And that's how I answered it.
5     Q.     (Mr. Sikes) Yeah.
6     A.     I don't -- I don't remember
7  Mickey taking pictures. I'm not saying he
8  didn't, I just don't remember them.
9        MR. SIKES: I'll ask you,
10 Mi -- Mickey. Did you take any photographs?
11        MR. MCDERMOTT: I did. Of
12 Penny.
13        MR. SIKES: Huh?
14        MR. MCDERMOTT: Of Penny.
15        MR. SIKES: You didn't take
16 any photographs of -- of Mr. Adcock?
17        MR. MCDERMOTT: I did not.
18        MR. SIKES: Okay.
19    Q.     (Mr. Sikes) All right.
20 The -- The -- The photographs in Plaintiff's
21 Exhibit 21, you say that they -- they depict
22 you as you appeared either that night or the
23 next morning or the next day?

Page 344

1     A.     Ye -- Well, yes and no.
2  It -- It is me, and they are -- show
3  injuries. The color is -- appears to be off.
4  The pictures appear to be somewhat grainy.
5     Q.     Yes, sir.
6     A.     But --
7     Q.     And also, they -- they --
8  there's an unusual orange tu -- tint to them,
9  too. Do you notice that?
10    A.     They have a tint, yes, sir.
11 Like I say, that's . . .
12    Q.     Okay. Let me ask you. Do
13 any of those photographs show any cuts,
14 punctures or lacerations?
15    A.     00249 shows the inside of my
16 lip, where I'd referred to earlier, about it
17 was busted.
18    Q.     That was taken when?
19    A.     And that would have been
20 taken, I believe I took that the next day,
21 yes.
22    Q.     Okay. Any -- Any other
23 photographs show any cuts, punctures,

Page 345

1  lacerations?
2     A.     No, sir. Not that I've --
3  Not that I've seen.
4     Q.     Do they show any place on
5  your body where your skin was broken?
6     A.     No, sir.
7     Q.     Do they show any place on
8  your body where you were bruised?
9     A.     Yes, sir.
10    Q.     And which ones do you say?
11    A.     241 shows my hairline, and
12 the bruising that was there. 242 --
13    Q.     Does 241, let me ask you.
14 That -- That -- That's -- That doesn't look
15 like dried blood to you?
16    A.     No. It was -- I believe it
17 was bruising starting to come under the skin.
18 At the hairline?
19    Q.     Yes, sir. Let me look. You
20 have blood down underneath your ear. Is that
21 blood or dirt or what, do you know?
22    A.     I believe that's dried blood.
23    Q.     Okay. And whose blood would

30 (Pages 342 - 345)

Page 346

1 that have been?
2     A.     It was transferred on -- I
3 believe it was transferred onto me from
4 Spivey.
5     Q.     So that would have been Mr.
6 Spivey's blood?
7     A.     I would think it was his.
8     Q.     Okay. Okay. It -- It's not
9 your blood?
10    A.     No, sir.
11    Q.     Okay. All right. Did you
12 suffer any cut, puncture or lacerations in
13 the altercation?
14         MR. HOWARD:  Is that the same
15 as while ago?
16         MR. SIKES:  No.  I -- I --
17 That photograph, I -- He had -- I asked
18 whether the photographs showed any.  I --
19 I -- I don't -- I don't see any in there, and
20 he didn't identify any, other than what he
21 said.
22         MR. HOWARD:  Okay.
23     Q.     (Mr. Sikes) I'm asking did

Page 347

1 you suffer any that aren't shown?
2     A.     No, sir.
3     Q.     Okay. Other than 241, which
4 you say you think shows some bruising, is
5 there an -- any other photograph shows any
6 bruising?
7     A.     Well, 242 is the same area.
8 243 is the same area.  244 depicts my lower
9 lip from the outside, the swelling.  245
10 depicts the area at the hairline, again.  246
11 shows the lower left side of my stomach right
12 above my belt line where I had bruising.
13    Q.     You think 246 shows bruising?
14    A.     Yes, sir.  246 shows bruising
15 right there above the belt line.  247 shows
16 the swelling in my lip.  Show 248 shows the
17 hairline picture, again.  And then we had
18 talked about 249 being the inside of my lip.
19    Q.     Let me ask you.  You've --
20 You've -- You've shown -- We've talked about
21 some photographs that show the left side of
22 your head at the hairline, you say.  I don't
23 see but two photographs that show both the

Page 348

1 right and left side of your head.  Look at --
2 at photographs 2 -- 244 and 247.
3     A.     (Witness complies.)
4     Q.     That shows you full on, full
5 faced in both of them; right?
6     A.     Almost.
7     Q.     Right.  Do you see any
8 difference in the two sides of your head,
9 the -- at the temple in those photographs?
10    A.     No.
11    Q.     All right.  Again, do you
12 have any explanation about how the -- your
13 skin appears to be sort of a unnatural
14 reddish-orange color in those photographs?
15    A.     No, sir, I don't.
16    Q.     But you -- You -- You detect
17 that also?
18    A.     Definitely the color is --
19 is --
20    Q.     -- off?
21    A.     -- appears to be off on these
22 photos.
23    Q.     Yeah.  Now, the Luverne

Page 349

1 Rescue Squad records, we're going to get to
2 those in a moment.  But both of those state
3 that you had blood on both of your arms, and
4 had blood on the left side of your head;
5 correct?
6     A.     I would have to look at it to
7 agree.
8     Q.     We'll get to it in a minute.
9     A.     Yes, sir.
10    Q.     That's -- That was my ind --
11 What you identified as bruising, it looked to
12 me to be dried blood.  And that's the -- what
13 the Luverne Rescue Squad records say also.
14 We'll get to those in a minute.
15         You -- You still maintain
16 that -- that 241 shows what -- bruising
17 rather than blood, dried blood?
18    A.     Yes.  On the hairline, yes.
19    Q.     Right.  Was there blood on
20 any part of Channing's body before you shot
21 him?
22    A.     It looked like his face,
23 arms, chest, torso, it -- it -- it was had --

31 (Pages 346 - 349)

Page 350

1 looked like had blood on him.
2    Q.    Okay.
3    A.    Even down on his legs,
4 possibly.
5    Q.    Do you know of any reason why
6 he would have had blood on him?
7    A.    Not at the time.
8    Q.    Okay. Which of these
9 photographs show the worst injury you say you
10 received that day?
11    A.    Well, there's several that
12 depict the hairline on the left side of my
13 head, and I would have to say that that
14 would -- that was the worst injury at the
15 moment, the one that occurred.
16    Q.    The -- The worst -- Wait.
17 At -- At what moment?
18    A.    At the moment it occurred.
19 I -- I didn't finish. I'm sorry.
20    Q.    Oh, okay Excuse me.
21    A.    I'm done now.
22    Q.    Okay. You -- You say the --
23 the blow to the left side of your head was

Page 351

1 the most serious injury you received?
2    A.    At the time when the injuries
3 occurred.
4    Q.    I don't know what that -- I
5 mean . . .
6    A.    It almost caused me to lose
7 consciousness.
8    Q.    The -- The -- The worst
9 injury you received is depicted in what --
10 what photograph? What's the best -- Pick --
11 Pick the best photograph that shows the worst
12 injury you -- you -- you sustained.
13    A.    Considering the discoloration
14 and all, the tint issue, I would say 241
15 gives the most -- the most visible.
16    Q.    Okay. Okay. All right.
17 Have you seen the Luverne Rescue Squad
18 records?
19    A.    Not that I recall.
20          (Plaintiff's Exhibit 31
21           was marked for
22           identification purposes.)
23    Q.    I'm going to show you what's

Page 352

1 been marked -- I marked it Plaintiff's
2 Exhibit 31. Is that your signature down
3 at -- by the X about two-thirds of the way
4 down? This is to certify I am refusing
5 treatment or transport, and have been
6 informed of the risks of doing so?
7    A.    (Witness complies.) Yes.
8    Q.    Uh-huh. Okay. Did you
9 receive any serious bodily injury in this
10 altercation you say -- you described?
11          MR. HOWARD: Object to form.
12    A.    I -- I almost -- I almost
13 lost consciousness.
14    Q.    I -- I -- I hear you say
15 that. I -- Did -- Did you ever seek any
16 treatment for any concussion or -- or a head
17 injury at any time?
18    A.    No, sir.
19    Q.    Okay. Did you sustain any
20 serious body -- bodily injury in this
21 assault?
22          MR. HOWARD: Object to form.
23    A.    As I stated with that, with

Page 353

1 the head, and then my -- the lip that was
2 busted.
3    Q.    Again, right, you understand
4 the difference in a minor injury that goes
5 away in a couple of days and a serious bodily
6 injury, do you not?
7          MR. HOWARD: Maybe define it
8 for him.
9          MR. RAYBORN: Object to the
10 form.
11    Q.    (Mr. Sikes) Do you understand
12 the difference between the two?
13    A.    Define for me what -- what
14 you consider.
15    Q.    No, sir. You -- Again,
16 you've been a police officer for how long?
17    A.    Many years.
18    Q.    Okay. You don't have a
19 conception of what a serious bodily injury
20 is?
21          MR. RAYBORN: Object to the
22 form.
23          MR. HOWARD: He's already

32 (Pages 350 - 353)

Page 354

1  said -- already answered it.
2      Q.     Do --
3          MR. SIKES:  Again, let him
4  answer it, not you.
5          MR. HOWARD:  He's done it
6  twice.
7      A.     Mr. Sikes, I -- I believe
8  I've given you the answer already, sir.
9      Q.     (Mr. Sikes) Did you suffer a
10  serious bodily injury in this altercation you
11  suffered?
12          MR. RAYBORN:  Object to the
13  form.
14      A.     I said yes.
15      Q.     You did.  And what is that
16  serious bodily injury that you received?
17      A.     The injury to my head on the
18  hairline, and my busted lip on the inside of
19  it.
20      Q.     Okay.  And you consider those
21  serious bodily injuries?
22          MR. RAYBORN:  Object to the
23  form.

Page 355

1      A.     I do.
2      Q.     Okay.
3          MR. MCDERMOTT:  It's three
4  o'clock.  Let's take a break.
5          MR. SIKES:  All right.
6          VIDEOGRAPHER:  This ends disk
7  2.  Going off the Record at three o'clock.
8          (Recess taken.)
9          VIDEOGRAPHER:  This begins
10  disk 3.  Going back on the Record at 3:14.
11      Q.     (Mr. Sikes) Mr. Adcock, a
12  moment ago, I was asking you about serious
13  medical injuries.  And I understood you to --
14  to list two things.  One had to do with the
15  blow to your left side of your head and shown
16  in, you said, the best photograph of that
17  is -- is I think was photograph two-forty --
18  241?
19      A.     Yes, sir.
20      Q.     Okay.  And the other was a
21  busted lip, the other thing you mentioned.
22      A.     Yes.
23      Q.     Do you consider a busted lip

Page 356

1  a serious bodily injury?
2      A.     It took several days to heal.
3      Q.     Again, I'm just -- You do
4  consider a busted lip a serious bodily
5  injury?
6          MR. RAYBORN:  Object to the
7  form.
8      Q.     Is that correct or not?
9      A.     The -- The busted lip, I
10  had, considering the amount of time it took
11  to heal, I -- I consider that one serious.
12      Q.     You think the busted lip was
13  a serious medical injury?
14          MR. RAYBORN:  Object to the
15  form.
16      A.     Mine?
17      Q.     Yes, sir.
18      A.     Yes.
19      Q.     Did you ever seek medical
20  attention for it?
21      A.     No, sir.
22      Q.     Didn't seek any that night?
23      A.     No, sir.

Page 357

1      Q.     Or ever at any time in the --
2  after that night?
3      A.     Correct.
4      Q.     Okay.  And the reddening
5  along the left side of your temple, as you
6  call it, you didn't see any difference in the
7  right temple and the left temple in the two
8  photographs that show you full faced, do you?
9      A.     I -- I referred to the
10  hair -- to my hairline --
11      Q.     Uh-huh.
12      A.     -- up there, not to my
13  temple.  So the temples, yes --
14      Q.     Did --
15      A.     -- they did appear the same.
16      Q.     Okay.  All right.  Look at
17  the -- Again, look at Plaintiff's Exhibit 31.
18  There's a what -- what's called a narrative
19  section down there.  Do you know who wrote
20  that?  The narrative section, this -- the
21  words here (indicating), do you know who
22  wrote that?
23      A.     Yes.  I was looking to see if

33 (Pages 354 - 357)

Page 358

1 I could find a name of who wrote it.

2    Q.    Oh, no. Okay. I just -- I

3 thought maybe you knew before him. I

4 didn't -- I don't -- I didn't see that it's

5 signed anywhere.

6    A.    No, sir. It's -- I don't --

7 I believe Tim White wrote it.

8    Q.    Okay.

9    A.    But I don't remember for

10 certain.

11    Q.    Okay. All right. And some

12 of the things written in that narrative

13 section there are things that the writer

14 knows because he saw and observed them;

15 correct?

16    A.    Correct.

17    Q.    And some of the things in

18 there are things he doesn't know about,

19 because he didn't see them. He's simply

20 reciting what you told him or what you

21 stated; correct?

22    A.    May I take a moment to read

23 it and see.

Page 359

1    Q.    Sure. Please.

2    A.    Look for the . . .

3    Q.    Take all the time you need to

4 read it.

5    A.    (Witness complies.) Okay.

6 Yes, sir. I'm ready.

7    Q.    Okay. So portions of it are

8 things that the writer sees and knows about

9 because he saw them; correct?

10    A.    Correct.

11    Q.    Some of them are things that

12 he doesn't know whether they're true or not.

13 They simp -- He's simply reporting what you

14 had told him; correct?

15    A.    Correct.

16    Q.    Okay. Now, you've told us

17 immediately after the shooting you were

18 concerned about being criminally prosecuted.

19 So at the time the Lu -- Luverne Rescue Squad

20 arrived, and you were already concerned about

21 a crim -- criminal prosecution at that time;

22 correct?

23    A.    Yes.

Page 360

1    Q.    Okay. It would be better for

2 you if you were attacked and had suffered

3 some sort of injury in avoiding a criminal

4 prosecution, wouldn't it?

5        MR. HOWARD: Object to form.

6    Q.    You could claim self defense,

7 for example?

8        MR. HOWARD: Object to form.

9    Q.    Correct?

10    A.    You could, yes.

11    Q.    Okay. The writer -- Again,

12 I -- I'm going to -- Let's -- We'll say it's

13 Mr. White. We will be corrected if it wasn't

14 Mr. White. There were only two crim -- crew

15 members, is that right, or three? How many

16 crew -- crew members were there?

17    A.    Two originally arrived by

18 that am -- ambulance number 38.

19    Q.    Uh-huh.

20    A.    And then a -- a third, I

21 know, appeared there. I'm not sure how he

22 got to the scene.

23    Q.    How many -- How many Luverne

Page 361

1 Rescue Squad members were present at the

2 scene at some time during this?

3    A.    That I'm aware of?

4    Q.    Yeah.

5    A.    Three.

6    Q.    And who were they?

7    A.    And that was Robert Knight

8 the driver, Tim White the --

9    Q.    EMT?

10    A.    -- EMT. And Floyd Wright

11 responded after --

12    Q.    -- came later?

13    A.    -- came later. And he is a

14 EMT, I believe.

15    Q.    Okay. Would it be logical,

16 then, Mr. Knight would not have written this

17 narrative, would he, as the driver?

18    A.    I -- I don't know if they let

19 the drivers write narratives or not, no, sir.

20    Q.    Well, he's not --

21    A.    I don't know.

22    Q.    Is the driver medically

23 trained or not, or do you know?

34 (Pages 358 - 361)

Page 362

1    A.    Mr. -- Mr. Knight is not.
2    Q.    Okay.  Okay.
3    A.    I can't say about any of the
4 rest of the drivers for certain.
5    Q.    All right.  Is it logical to
6 think that Mr. White probably wrote this
7 narrative?
8    A.    Mr. White or -- or Floyd
9 Wright would been the ones that --
10    Q.    Right.
11    A.    -- would have been the one
12 that wrote it, most likely.
13    Q.    Okay.  Okay.
14         MR. HOWARD:  That's a lot of
15 names that sound alike.
16         THE WITNESS:  I know.
17         MR. SIKES:  Wright, Knight.
18         THE WITNESS:  It gets -- gets
19 tough at times.
20    Q.    (Mr. Sikes) All right.
21         MR. HOWARD:  Knight, Wright,
22 White.
23    Q.    Oh, man.

Page 363

1         Who is your -- Do you have a
2 family doctor?
3    A.    Yes.
4    Q.    Who is that?
5    A.    Melissa Michael.
6    Q.    Okay.  And how long has she
7 been your family doctor?
8    A.    I'm estimating five, six
9 years.
10    Q.    Okay.  Did you ever consult
11 her about any injury you received that night?
12    A.    No.
13    Q.    Did you ever go to any
14 medical facility and seek any kind of
15 treatment or diagnosis of any kind of alleged
16 injury you surf -- you -- you suffered that
17 night?
18    A.    No, sir.
19    Q.    Yeah.  And the last sentence
20 of the narrative there, says that you re --
21 you refused treatment or transport; correct?
22    A.    Correct.
23    Q.    Okay.  You're familiar with

Page 364

1 the continuum of force and -- and the concept
2 in -- in -- in policing?
3    A.    Yes, sir.
4    Q.    Okay.  What are the -- In
5 general, what are the -- What are the -- the
6 nonlethal use-of-force equipment that's
7 generally available to -- to many police
8 forces?
9    A.    First and foremost are verbal
10 commands.
11    Q.    I -- I'm really -- Well, you
12 consider speaking to somebody as a use of
13 force?
14    A.    That's what I've understood
15 from the training.  And, I mean, you -- you
16 give verbal commands.
17    Q.    Okay.
18    A.    That's where you start is,
19 you give verbal commands.  That's --
20    Q.    I -- I -- I -- I realize.
21 Let -- Let me ask you about what are the
22 implements?  What -- What are the pieces of
23 equipment that -- that generally are

Page 365

1 available to police officers to exert
2 nonleth -- lethal use of force?
3    A.    The ones I'm familiar with
4 are baton, Taser, and chemical spray.
5    Q.    And that's like mace or
6 pepper spray or is a number of different
7 varieties of it, but the idea is it's a
8 chemical irritant that distracts the -- the
9 person you are trying to subdue?
10    A.    Correct.
11    Q.    Okay.  And what is the
12 purpose or benefit of these types of
13 lethal -- nonlethal equipment?
14    A.    To subdue a suspect.
15    Q.    They give the policeman an --
16 an option, somewhere between having to use
17 his fists and shooting a subject.  Will
18 that -- Is that accurate?  They give you
19 options between those two courses of action?
20    A.    Yes.
21    Q.    Okay.  Did the Luverne Police
22 Department make all of those three available
23 to you; Tasers, batons, and a chemical agent?

35 (Pages 362 - 365)

Page 366

1    A.    Available at our department
2 would be Taser and baton.
3    Q.    All right.  Your -- Your --
4 Luverne Police Department doesn't use any
5 kind of chemical agents; pepper spray or
6 mace?
7    A.    No, sir.
8    Q.    Okay.  You didn't use either
9 of those two on this occasion, did you?
10    A.    No.
11    Q.    And is it fair to say you
12 didn't use a Taser, cause you don't -- you
13 chose not to carry a Taser; correct?
14    A.    Yes.  Yes.
15    Q.    Okay.  And it was your normal
16 practice as a policeman not to carry a Taser;
17 correct?
18    A.    Correct.
19    Q.    And do you regularly carry a
20 baton?
21    A.    Yes.
22    Q.    But you didn't have one
23 available on this occasion; correct?

Page 367

1    A.    Correct.
2    Q.    And that's because you chose
3 not to take it off the back of the door, and
4 instead got your handgun; correct?
5    A.    Correct.
6    Q.    Is a baton what many people
7 call a -- a night stick or a billy club, that
8 kind of thing?
9    A.    I've heard it referred to by
10 those names.
11    Q.    Okay.  How many options did
12 you have about use of force when you came out
13 of your house?
14    A.    Verbal commands and my, you
15 know, strong arm, my hands, theirself.
16    Q.    And the gun?
17    A.    And the gun.
18    Q.    Now, you and -- and Deputy
19 Penny had a two-to-one advantage over
20 Channing Spivey; correct?  Two of y'all
21 there?
22    A.    Yes, sir.
23    Q.    Okay.  Let me ask you.  Did

Page 368

1 you -- You went to -- Did you play any sports
2 in high school?
3    A.    No, sir.
4    Q.    Okay.  You -- As a policeman,
5 though, you've had training and certification
6 in the use of your hands to control unruly or
7 violent or noncompliant subjects?
8    A.    Yes, sir.
9    Q.    Okay.  Plaintiff's Exhibit
10 27, I believe, is a certification you
11 received for PPCT defensive tactics; correct?
12    A.    Yes.
13    Q.    What -- What are those?
14    A.    That's pressure point control
15 technique.
16    Q.    Did you attempt to employ
17 that to control the sit -- to control
18 Channing Spivey?
19    A.    I don't recall if I ever had
20 the -- had an opportunity to.
21    Q.    Is the idea of the pressure
22 point control tactics, the idea is that if
23 you apply pressure to a particular point on a

Page 369

1 person's body or his chest or neck or jawline
2 or some other point, that you can control the
3 person so that you don't have to use a more
4 harmful weapon?
5    A.    I think that's an accurate
6 description.
7    Q.    And you had been trained in
8 that?
9    A.    Yes.
10    Q.    But you didn't use that?
11       MR. HOWARD:  Object to form.
12    A.    Like I said, I -- I don't
13 know that I ever had the opportunity to use
14 anything like that.
15    Q.    Were all of the shots that
16 you fired at Channing after he -- you say he
17 struck you?
18    A.    Yes.
19    Q.    Okay.  So at the time you
20 shot and killed Channing, you were already
21 aware of Channing's ability, or lack of
22 ability, to cause you serious injury at the
23 time you fired at him?

36 (Pages 366 - 369)

Page 370

1          MR. MCDERMOTT:  Object to
2  form.
3          MR. HOWARD:  Object to form.
4     A.    I -- I'm -- I'm sorry.  Can
5  you repeat?
6     Q.    Yes, sir.  He had already --
7  He had already assaulted you, you say, at the
8  time you shot him; correct?
9     A.    Correct.
10     Q.    So you knew what -- what sort
11  of ability he did or didn't have to cause you
12  serious bodily injury, didn't you?
13          MR. RAYBORN:  Object to the
14  form.
15     A.    Yes.
16     Q.    Okay.  Do you claim you had a
17  reasonable -- objectively reasonable fear
18  that Channing would kill or badly injure you?
19     A.    Yes.
20     Q.    He had only his hands;
21  correct?
22     A.    Correct.
23     Q.    And you claim that prior to

Page 371

1  when you shot him, he had already attached
2  you with the bare hands?
3     A.    Correct.
4     Q.    And the damage that you
5  had -- or injuries you say you had sustained
6  was a busted lip, and you say a -- some sort
7  of reddening on your hairline; correct?
8          MR. HOWARD:  Object to form.
9     A.    Yes.
10     Q.    And you took photograph to
11  show that damage, right, from those injuries,
12  you say; correct?
13     A.    Yes.
14     Q.    I want to make certain we
15  are -- we'll go over some things that I -- I
16  think -- make sure that these -- these things
17  are not disputed.  We're going to disagree
18  about a lot of things.  I think there -- we
19  agree about a number of things.  I want to
20  ask you if you agree or disagree about these
21  statements.
22          You had known Channing Spivey
23  for five to ten years, so you were not

Page 372

1  dealing with an unknown person; correct?
2     A.    Correct.
3     Q.    You knew Channing was not a
4  bad man.  He was -- had no criminal record or
5  history of violence that you knew of;
6  correct?
7     A.    Correct.
8     Q.    You knew that Channing was
9  ill, he was suffering from and being treated
10  for brain cancer; correct?
11     A.    Correct.
12     Q.    You knew that he was unarmed.
13  His hands were all he had to injure or cause
14  you harm with; correct?
15     A.    Correct.
16     Q.    Plaintiff's 15 -- Plaintiff's
17  Exhibit 15, 16, and 17, we looked at those
18  earlier.  Does Channing Spivey look to be
19  some sort of superman in those photographs?
20     A.    (Witness complies.) No, sir.
21     Q.    Does he look to be
22  exceedingly strong or physically intimidating
23  in those photographs?

Page 373

1     A.    No, sir.
2     Q.    Okay.  So you knew Channing
3  was not any sort of superman?
4          MR. RAYBORN:  Object to the
5  form.
6          MR. SIKES:  I'll -- I'll --
7  I'll withdraw it.  I'll -- I'll -- I'll --
8  I'll withdraw it.
9     Q.    (Mr. Sikes) And we've agreed
10  that -- that there were two of you there
11  physically present to confront and to wrestle
12  Channing down to the ground, if you had to;
13  correct?
14     A.    Correct.
15     Q.    All right.  And Channing was
16  not striking you at the time you fired any of
17  the five shots into him; correct?
18     A.    Correct.
19     Q.    And Channing wasn't even
20  within arm's length of you when you fired
21  these five shots that killed him; correct?
22     A.    Correct.
23     Q.    Now, Channing either had

37 (Pages 370 - 373)

Page 374

1 struck you before you shot him or he had --
2 He had either not struck you or he had struck
3 you several times when you shot him; correct?
4          MR. HOWARD: Object to form.
5     Q.     It's one or the other. There
6 are two different versions. The -- The other
7 witnesses say that there -- that you --
8 you -- there was no physical altercation,
9 there were no blows passed.
10         MR. HOWARD: Object to the
11 form. They said they didn't see it. They
12 didn't say it didn't happen.
13    Q.     All right. Let's assume that
14 Channing had already struck you several times
15 before you shot and killed him.
16         MR. RAYBORN: Object to the
17 form.
18         MR. MCDERMOTT: Object to the
19 hypothetical.
20    Q.     (Mr. Sikes) The worst injury
21 that you got in the assault is depicted in
22 photographs 241; correct?
23         MR. RAYBORN: Object to the

Page 375

1 form. Is there a question in there? That's
2 like a -- I -- I don't understand. There's a
3 hypothetical followed by, what, I don't know
4 if it's a question or not.
5     A.     Let me get back to the
6 pictures where I can verify it was 241.
7     Q.     Well, that's what you
8 testified earlier, I believe, is that the
9 photograph 241 show -- is the -- the injury
10 that -- is the photograph that best shows the
11 wor -- the -- the worst injury you received.
12         MR. HOWARD: Objection. Asked
13 and answered.
14    Q.     I -- Is that correct?
15    A.     241 is the one I referred to
16 earlier, yes.
17         (Plaintiff's Exhibit 50
18          was marked for
19          identification purposes.)
20    Q.     Okay. All right.
21         I'm going to show you
22 Plaintiff's Exhibit 50.
23         MR. SIKES: Do you want a

Page 376

1 copy, Rick? Here.
2         MR. HOWARD: Please.
3     Q.     (Mr. Sikes) So these are ten
4 things that we are -- are not disputed in
5 this case; correct?
6         MR. HOWARD: I want him to
7 just read them and make sure that these are
8 exactly the way his question is.
9         MR. SIKES: Okay.
10         MR. HOWARD: And if not --
11         MR. SIKES: Okay. Yeah. Tell
12 me if it's different.
13         MR. HOWARD: -- let us know.
14         And he's withdrawn number 5
15 about the superman.
16         MR. SIKES: No, I didn't.
17         MR. HOWARD: Well, it
18 didn't --
19         THE WITNESS: Well, I --
20         MR. HOWARD: Yeah, I think --
21 I think the Record will speak for itself on
22 superman.
23         And that one there

Page 377

1 (indicating), he withdrew that one, number 9.
2         MR. SIKES: I'm asking him.
3         MR. HOWARD: I know. I'm
4 giving my objection. I'm not going to argue
5 with you. It looks like 5 he withdrew as it
6 pertains to superman. And then we didn't get
7 a clear question as to number 9. And he just
8 assumed that Mason was struck several times
9 and omitted the nondescript part.
10    Q.     (Mr. Sikes) All right. Let's
11 do this. Well, are you aware there are two
12 versions of the events; that either Channing
13 struck you or he didn't strike you? You're
14 aware of that?
15         MR. HOWARD: Object to form.
16    A.     From what you've described to
17 me, yes.
18    Q.     Okay. Let's take your
19 version, and, again, assume Channing had
20 struck you several times before you shot and
21 killed him. The worst injury he caused you
22 is shown in Plaintiff's Exhibit 21-241;
23 correct?

38 (Pages 374 - 377)

Page 378

```
1          MR. RAYBORN:  Object to the
2  form.
3          MR. HOWARD:  The fourth time
4  you've asked that.  Asked and answered.
5      A.     Yes, picture 241.
6      Q.     (Mr. Sikes) All right.  So
7  again, are we agreed that -- that -- that
8  Plaintiff's Exhibit 50 are ten -- ten matters
9  we don't have a disagreement about?
10          MR. HOWARD:  But for the
11  objections already stated.
12     A.     Yeah.  Obviously, I -- And --
13  And --
14     Q.     Do you see anything you ob --
15  you -- you dispute on Plaintiff's Exhibit 50?
16     A.     I --
17          MR. HOWARD:  Other than the
18  objections I've already made.  I've made the
19  objection, and I've explained it.
20          MR. SIKES:  I'm asking him.
21  I'm not asking you, Rick.  This isn't your
22  doc -- your deposition.
23          MR. HOWARD:  I know.  But
```

Page 379

```
1  you -- You're saying that you've asked him
2  that, but you've withdrawn the question as --
3  as to superman.
4      Q.     (Mr. Sikes) Do -- Do you see
5  anything in there -- in Plaintiff's Exhibit
6  50, that you dispute?
7      A.     Number 5.
8          MR. HOWARD:  Other than the
9  objections.
10     Q.     And what -- What do you
11  dispute about 5?
12     A.     I was not done answering.
13  Number 5, you say Exhibit 15, 16, and 17
14  accurately show Channing's physical condition
15  that day.  I wasn't present for those
16  photographs to be taken, so I can't say that
17  I agree with 15, 16, and 17, other than it
18  was a picture of him.
19     Q.     Well, you told me that's how
20  he looked when you -- when he -- That's him
21  that day.  That's what physical condition he
22  was in; correct?
23          MR. HOWARD:  Object to form.
```

Page 380

```
1      A.     And he was -- When I
2  encountered him, he was covered in sweat and
3  blood and --
4      Q.     I -- I understand.
5      A.     -- also, that is not shown in
6  15, 16, and 17.  So I can't say that those
7  are the -- the same.
8      Q.     All right.  With -- With --
9  With that -- Other than that and what your
10  lawyer wants to inject into it --
11          MR. MCDERMOTT:  Object to the
12  narrative.
13     Q.     -- other than that, is there
14  anything else you disagree with about
15  Plaintiff's Exhibit 50?
16          MR. HOWARD:  Other than the
17  objections I've made.
18     A.     No, sir.  I -- Nothing else I
19  want to disagree about.
20     Q.     Okay.
21          MR. SIKES:  That's all.
22          MR. HOWARD:  Let's go to my
23  office.
```

Page 381

```
1          THE WITNESS:  Yes, sir.
2          VIDEOGRAPHER:  This concludes
3  the deposition.  We're going off the Record
4  at 3:41.
5
6
7
8
9  (The deposition was concluded at 3:41 p.m.,
10  April 29th, 2021.)
11
12
13
14
15
16
17
18
19
20
21
22
23
```

39 (Pages 378 - 381)

Page 382

```
1           REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4       I, Sara Wilson, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken down
8  by me by stenographic means, and that the
9  content herein was produced in transcript
10 form by computer aid under my supervision,
11 and that the foregoing represents, to the
12 best of my ability, a true and correct
13 transcript of the proceedings occurring on
14 said date and at said time.
15      I further certify that I am neither
16 of kin nor of counsel to the parties to the
17 action; nor in any manner interested in the
18 result of said case.
19
        Signed the 4th of May, 2021.
20
21
              Sara Wilson
22            Sara Wilson, CCR
              ACCR #420 Expires 9/30/21
23            Notary Expiration 8/13/23
```

40 (Page 382)