1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5    CASE NUMBER:  2:20-CV-598

6    CHANDA CALLAWAY, as Administrator of the

7    Estate of CHANNING LAMAR SPIVEY, Deceased,

8            Plaintiff,

9            vs.

10   MASON ADCOCK,

11           Defendant.

12

13           S T I P U L A T I O N

14           IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Mason Adcock

17   may be taken before Sara Wilson, CCR, at the

18   offices of Holtsford, Gilliland, Higgins,

19   Hitson & Holtsford, at 4001 Carmichael Road,

20   Suite 300, Montgomery, Alabama 36106, on the

21   28th day of January, 2021.

22

23           DEPOSITION OF MASON ADCOCK

Page 2

1        IT IS FURTHER STIPULATED AND AGREED
2 that the signature to and the reading of the
3 deposition by the witness is waived, the
4 deposition to have the same force and effect
5 as if full compliance had been had with all
6 laws and rules of Court relating to the
7 taking of depositions.
8        IT IS FURTHER STIPULATED AND AGREED
9 that it shall not be necessary for any
10 objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties
13 may make objections and assign grounds at the
14 time of the trial, or at the time said
15 deposition is offered in evidence, or prior
16 thereto.
17        IT IS FURTHER STIPULATED AND AGREED
18 that the notice of filing of the deposition
19 by the Commissioner is waived.
20
21      * * * * * * * * * * * * *
22
23

Page 3

1      * * * * * * * * * * * *
2        I N D E X
3        EXAMINATION
4              PAGE LINE
5 BY MR. SIKES....................  9   9
6
7      PLAINTIFF'S EXHIBITS
8              PAGE LINE
  Exhibit 19 - Mr.
9
      Adcock's Response to
10
      Plaintiff's Discovery
11
      Requests ................ 10  21
12
  Exhibit 24 - Copy of
13
      Miranda warning.......... 73  18
14
  Exhibit 18 - Initial
15
      Disclosures of Mason
16
      Adcock................... 84  23
17
  Exhibit 1 - Photo of
18
      Channing Spivey before
19
      his surgery.............. 97  23
20
  Exhibit 2 - Photo of
21
      Channing Spivey with a
22
      bandage on his head...... 98  16
23

Page 4

1 Exhibits 3 through 12
2      - Photos of the Spivey
3      house and the Adcock
4      house and the road in
5      between the two.......... 105  15
6 Exhibits 13 & 14 -
7      Grant's Forensic
8      Mapping diagrams of
9      Spivey house and Adcock
10      house.................... 108  11
11 Exhibit 21 - Photos
12      of Mr. Adcock's face
13      and hands................ 126   3
14 Exhibit 20 - Channing
15      Spivey's Report of
16      Autopsy.................. 189  20
17 Exhibits 15, 16, 17 -
18      Photos of Channing
19      Spivey in swim trunks
20      and bare feet............ 205  11
21 Exhibit 33 - Copy of
22      Mr. Adcock's driver's
23      license.................. 214   1

Page 5

1 Exhibit 34 - APOSTC
2      Officer Profile Report... 214  12
3 Exhibit 26 - Axon
4      Academy Taser
5      instructor document...... 216  20
6 Exhibit 27 - PPCT
7      Defensive Tactics Basic
8      Certification document... 217  11
9 Exhibit 28 - Lexipol
10      Certificate of
11      Attendance for
12      Arrest-Related Deaths:
13      Managing Your Medical
14      Examiner................. 218  21
15 Exhibit 23 - NIJ The
16      Use-of-Force Continuum... 221   9
17
18
19      * * * * * * * * * * * * *
20
21
22
23

2 (Pages 2 - 5)

Page 6

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5  CASE NUMBER: 2:20-CV-598
6  CHANDA CALLAWAY, as Administrator of the
7  Estate of CHANNING LAMAR SPIVEY, Deceased,
8         Plaintiff,
9         vs.
10 MASON ADCOCK,
11        Defendant.
12
13 BEFORE: Sara Wilson, Commissioner.
14
15 APPEARANCES:
16     GRIFFIN SIKES, JR., ESQUIRE,
17 P.O. Box 11234, Montgomery, Alabama 36111,
18 appearing on behalf of the Plaintiff.
19     RICK A. HOWARD, ESQUIRE, of
20 HOLTSFORD, GILLILAND, HIGGINS, HITSON &
21 HOWARD, 4001 Carmichael Road, Suite 300,
22 Montgomery, Alabama 36106, appearing on
23 behalf of the Defendant.

Page 7

1  APPEARANCES: (Cont.)
2      APRIL MCKAY, ESQUIRE, of HOLTSFORD,
3  GILLILAND, HIGGINS, HITSON & HOWARD, 4001
4  Carmichael Road, Suite 300, Montgomery,
5  Alabama 36106, appearing on behalf of the
6  Defendant.
7      WILLIAM M. RAYBORN, JR., ESQUIRE,
8  of RAYBORN LAW FIRM, P.O. Box 46, Brantley,
9  Alabama 36009, appearing on behalf of the
10 Defendant.
11     ALSO PRESENT: CHANDA CALLAWAY
12
13
14
15
16
17
18
19         * * * * * *
20
21
22
23

Page 8

1      I, Sara Wilson, CCR, a Court
2  Reporter of Pike Road, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of Holtsford, Gilliland, Higgins, Hitson &
8  Holtsford, 4001 Carmichael Road, Suite 300,
9  Montgomery, Alabama 36106, beginning at 9:00
10 a.m., Mason Adcock, witness in the above
11 cause, for oral examination, whereupon the
12 following proceedings were had:
13         MASON ADCOCK,
14 being first duly sworn, was examined and
15 testified as follows:
16         COURT REPORTER:  Thank you.
17 Usual stipulations?
18         MR. SIKES:  Yes, please.  Is
19 that fine with you, Rick?
20         MR. HOWARD:  Do you want to
21 read this transcript later and correct any --
22 You can't correct facts, but you can correct
23 names.  Typically, I would say just go with

Page 9

1  what we've got.
2          THE WITNESS:  Okay.
3          MR. HOWARD:  That's up to you.
4          THE WITNESS:  If that's your
5  recommendation, we'll go with that.
6          MR. HOWARD:  Yes, usual
7  stipulations are fine.
8              EXAMINATION
9  BY MR. SIKES:
10    Q.     Okay.  Would you state your
11 name for the Record, please, sir.
12    A.     James Mason Adcock.
13    Q.     Mr. Adcock, I'm Griffin
14 Sikes.  I represent Chanda Callaway, the
15 Plaintiff, who's seated here with us.  I'm
16 going to ask you some questions.  If at any
17 time you don't understand the question, stop
18 me, ask me to rephrase it or tell me you
19 don't understand it, and I'll state it again
20 or ask it again.  If you answer the question,
21 I'm going to expect that you understood the
22 question correctly.  Is that fair?
23    A.     Yes, sir.

3 (Pages 6 - 9)

Page 10

1  Q.   All right.  And also, if you
2  would, we're wearing masks here today because
3  of COVID, I'd ask you to speak up loudly,
4  louder maybe than you usually would.  I'm
5  going to try to do that also so that I can be
6  heard so that the court reporter can get this
7  down accurately.  Is that fine?
8  A.   Yes, sir.
9  Q.   All right.  I may prompt you
10  during the period of time to speak up.  If
11  you're having trouble hearing me, if you'll
12  ask me to speak up, I will.  Okay?
13  A.   Yes, sir.
14  Q.   I won't take any offense at
15  it.  I hope you won't take any if I ask you
16  to speak a little louder.
17  A.   Not a problem.
18  Q.   We've not met before,
19  correct, Mr. Adcock?
20  A.   Correct.
21       (Plaintiff's Exhibit 19
22       was marked for
23       identification purposes.)

Page 11

1  Q.   I'm going to ask you to take
2  a look at what I've marked as Plaintiff's
3  Exhibit 19.  Do you recognize that document,
4  sir?
5  A.   Yes, sir, I do.
6  Q.   All right.  I'll represent to
7  you that that is what we received as your
8  responses to some interrogatories or written
9  questions we requested that you answer under
10  oath.  Is that your signature on the
11  next-to-last page there?
12  A.   Yes, sir, it is.
13  Q.   Okay.  And you've sworn to
14  and subscribed to that under penalty of
15  perjury; correct?
16  A.   Correct.
17  Q.   Have you reviewed that
18  document since you signed it?
19  A.   I believe I have, yes.
20  Q.   Okay.  Did you note anything
21  that's incorrect --
22       MR. HOWARD:  Since you signed
23  it.  I don't know if you have or not.  If

Page 12

1  you've looked at it after you've signed it.
2  A.   I don't know.
3  Q.   Okay.
4  A.   I don't know.
5  Q.   All right.  Is there anything
6  in there you know to be incorrect or you'd
7  like to change?
8       MR. HOWARD:  Go through each
9  line.  Take your time.
10       THE WITNESS:  Do you have a
11  pen, Mr. Howard?
12       MR. HOWARD:  Okay.
13       THE WITNESS:  Rick, I just had
14  some clerical.  Nothing changed dramatically
15  other than clerical here and here
16  (indicating).  It was a date and an address.
17  Q.   (Mr. Sikes) Go through the
18  whole -- If you want to go through it all,
19  I'm not insisting you do, but if you do want
20  to make sure it's accurate, if you want to
21  review all of it.
22  A.   I read through the response
23  attached to each response that was typed in,

Page 13

1  and that's all I see.
2       MR. HOWARD:  Just initial
3  right here (indicating).
4       MR. SIKES:  I'm sorry?
5       MR. HOWARD:  He's going to
6  initial the changes right here (indicating).
7       MR. SIKES:  Okay.
8  A.   I believe that was the only
9  change that I see.  Like I said, it was just
10  clerical.
11  Q.   (Mr. Sikes) So you reviewed
12  them again here this morning and you affirm
13  that those are accurate answers now with the
14  corrections you made, mostly about spellings;
15  is that correct?
16  A.   Yes.
17  Q.   All right.  You provided
18  those answers to your lawyer, Mr. Howard, and
19  he typed that document up; correct?
20  A.   I did provide them to Mr.
21  Howard.  I do not know who typed them up.
22  Q.   Where did you sign them?
23  A.   They were sent to me to sign.

Page 14

1    Q.    Okay.  He sent them to you?
2    A.    Correct.
3    Q.    Well, I don't mean that he,
4 himself, physically typed it.  He and his
5 office staff sent them to you after they
6 typed them up; correct?
7    A.    I believe so, yes.
8    Q.    Okay.  All right.  Your full
9 name is James Mason Adcock?
10   A.    Correct.
11   Q.    Have you -- Are there any
12 other names that you have used or been known
13 by?
14   A.    No, sir.
15   Q.    You were born in Opp, Alabama
16 May ██ 1979?
17   A.    Correct.
18   Q.    So you had just turned
19 forty-one years old the week you shot and
20 killed Channing Spivey; correct?
21   A.    Correct.
22   Q.    You went to Elba High School;
23 correct?

Page 15

1    A.    Correct.
2    Q.    But you dropped out before
3 graduating high school?
4    A.    Correct.
5    Q.    What was the last grade in
6 high school that you finished?
7    A.    Eleventh.
8    Q.    And you finished the
9 eleventh.  You didn't quit in the middle of
10 the eleventh?
11   A.    No, sir.  I finished.
12   Q.    Senior year is all you
13 lacked?
14   A.    Correct.
15   Q.    What year did you leave high
16 school?
17   A.    I believe that was 1996.
18   Q.    You later got a GED?
19   A.    Correct.
20   Q.    When was that?
21   A.    Just a few months after I
22 quit school.
23   Q.    Was there a reason for not

Page 16

1 completing your senior year of school and
2 getting a GED as opposed to how you did it?
3    A.    I had gotten married to my --
4 was getting married to my first wife.  Got
5 married to her and we had a son on the way,
6 and I needed full-time employment to take
7 care of my family.
8    Q.    Okay.  Have you ever had any
9 further education?  And I'm not talking about
10 police training.  We'll get in to that in a
11 minute.  Any formal education from any
12 college, university, institution of higher
13 learning, that sort of thing?
14   A.    No, sir.
15   Q.    You had to have training to
16 be a policeman, to be a sworn police officer,
17 law enforcement officer in Alabama.  That's
18 given by a State organization called APOSTC?
19   A.    Correct.
20   Q.    But that's only about a
21 twelve-week course; is that right?
22   A.    At the time I attended, it
23 was twelve weeks.

Page 17

1    Q.    Is it something different
2 now?
3    A.    Yes.
4    Q.    What is it now?
5    A.    I believe it's fifteen weeks.
6    Q.    Okay.  You attended only
7 twelve weeks, though; correct?
8    A.    Correct.
9    Q.    What year was that that you
10 attended APOSTC?
11   A.    2006.
12   Q.    And you had a series of jobs
13 between '96 and 2006; correct?
14   A.    Yes, I did.
15   Q.    We'll get in to those in a
16 moment.  Where did you get that training?
17   A.    Alabama Police Academy at
18 Selma.
19   Q.    Have you had any further
20 police training, and I'm not talking about
21 one-day seminars or that sort of thing?  I'm
22 talking about any further extended courses of
23 study in law enforcement.

5 (Pages 14 - 17)

Page 18

1          MR. HOWARD:  Do you have his
2  APOSTC records?
3          MR. SIKES:  I do.
4          MR. HOWARD:  When you say
5  extended, an hour?  He needs the definition
6  for extended.
7          MR. SIKES:  I just said I'm
8  excluding one-day seminars.  That would be a
9  number of hours.
10      Q.     (Mr. Sikes) Have you had any
11  further police training, other than the
12  occasional -- I see all through your APOSTC
13  records you've got some certifications.  But
14  usually those are one-day sort of seminars;
15  correct?
16      A.     No, sir.  I don't know that
17  there's a usual or a normal to it.
18      Q.     Have you had one that's more
19  than one day?
20      A.     Yes, sir.  I believe I have.
21      Q.     Which ones?
22      A.     If I can look at my APOSTC
23  records, I can point that out.

Page 19

1      Q.     Sure.  Look at whatever you
2  want.
3      A.     I'm sure there's something I
4  could find.
5      Q.     Let's do it this way, one or
6  two or three days.  Is anything longer than
7  that?
8      A.     Longer than which time?
9      Q.     One or two or three days.
10  Three days, let's say.
11      A.     Yes.  I have one longer than
12  three days.
13      Q.     And what's that?
14      A.     That was a wide-area-search
15  class.
16      Q.     Okay.  Let me see the
17  document you're looking at, please.  What's
18  the Bates number on the bottom of it?
19      A.     Sir?
20      Q.     Is there a number on the
21  bottom of it?
22          MR. HOWARD:  There's not.
23          MR. SIKES:  This wasn't

Page 20

1  produced or that copy is not?
2          MR. HOWARD:  We scan our
3  documents in to the server, and then when we
4  print them out or send them by email and they
5  get the Bates stamps.  So my originals don't
6  have Bates stamps.  Those are the APOSTC
7  records.  We sent those to you.
8      Q.     (Mr. Sikes) Okay.  Let me
9  take a look at the documents you're speaking
10  of, please, sir.
11      A.     (Witness complies.)
12      Q.     The document you're looking
13  at and -- Let me come back.  I didn't notice
14  this in y'all's records.
15          MR. SIKES:  Do you know the
16  number of it?
17          MR. HOWARD:  I don't.
18          MR. SIKES:  I'll take a look
19  at it.
20          MR. HOWARD:  I can get you a
21  copy of that.
22          MR. SIKES:  Let's do that.
23          MR. HOWARD:  Do you want that

Page 21

1  whole thing?
2          MR. SIKES:  No.  This will be
3  fine.
4          (Off-the-Record discussion
5          was held.)
6      Q.     (Mr. Sikes) The longest
7  course I noticed on there was thirty-two
8  hours, it looks like, we can come back and
9  talk about it later, and that was only one.
10  The next one I think was maybe eighteen or
11  so.  So some of these courses may have gone
12  as long as a week or so; right?
13      A.     Could have, yes.
14      Q.     But nothing longer than that
15  that you can recall?
16      A.     Correct.
17      Q.     Okay.  And are these just
18  sort of refresher courses or courses in new
19  things that you were learning about that you
20  take from time to time during the course of
21  your serving as a police officer?
22      A.     Both.  Some of it allowed me
23  recertification.  Some of it was new

6 (Pages 18 - 21)

1 training.
2    Q.    Okay.  All right.  I'm
3 looking back at Exhibit 19 now, again.  And
4 looking at your residences there, you lived
5 from 1997 to 2002 on Morgan Mill Road in
6 Brantley?
7    A.    Correct.
8    Q.    Did you rent or own?
9    A.    I owned the trailer.  The
10 lot, it was rented.
11    Q.    Okay.  Who did you rent from?
12    A.    I believe that was Delaitha
13 Christian.
14    Q.    All right.  Your next
15 residence is on Richburg Hill in Luverne;
16 correct?
17    A.    Correct.
18    Q.    How long did you live there?
19 You said you began living there in 2002, but
20 there isn't a --
21       MR. HOWARD:  That's what he
22 corrected.
23       THE WITNESS:  No, sir.

1    A.    It's actually on here.  1997
2 to 2002 is what's listed.
3    Q.    The next one is the one I'm
4 talking about.
5       MR. HOWARD:  He moved to the
6 Richburg Hill Road location.
7    A.    I'm sorry.  My apologies.
8 That's an error on my part.  344 Richburg
9 Hill Road from 2002 to 2012.
10       MR. HOWARD:  That was a typo
11 there.
12    Q.    All right.  And who owned
13 that, please, sir?
14    A.    Myself and my wife.
15    Q.    And was that a trailer also
16 or that was a home?
17    A.    A home.
18    Q.    Okay.  Who was your wife
19 during that period of time?
20    A.    Stacy Lane Adcock.
21    Q.    When did y'all get a divorce?
22    A.    2006.
23    Q.    But you lived with her still

1 to 2012?
2    A.    Yes, sir, I did.
3    Q.    Okay.  The next address given
4 is 2076 Montgomery Highway in Luverne.  And
5 you lived there from 2012 to 2013?
6    A.    Correct.
7    Q.    Who owned -- Did you rent or
8 own there?
9    A.    I am not sure who the owner
10 of the residence was.  My current wife was
11 living in that home and allowed me to stay
12 there.
13    Q.    Okay.  All right.  And when
14 approximately did you move in there?  What
15 month of 2012?
16    A.    Late in the year.  I don't
17 recall.
18    Q.    Okay.  And you moved from
19 there in 2013 to the place where you
20 presently live; correct?
21    A.    Correct.
22    Q.    And lived at the time of the
23 shooting incident?

1    A.    Correct.
2    Q.    And that's 3985 North
3 Glenwood Road?
4    A.    Correct.
5    Q.    You've got a Goshen address.
6 Is it closer to Goshen or Luverne or about
7 halfway between?
8    A.    It's closest to Glenwood
9 mileage-wise, but the postal address is
10 Goshen.
11    Q.    I was wondering if it's
12 closer to Goshen or it's closer to Luverne?
13    A.    Luverne.
14    Q.    Okay.  Is it in Crenshaw
15 County, though?
16    A.    Correct.
17    Q.    Did you rent or own there?
18    A.    We own that home.
19    Q.    Okay.  And that's you and
20 your present wife?
21    A.    Correct.
22    Q.    Your present wife, is her
23 name spelled with an X but it's pronounced

Page 26

1  Xanthe?
2      A.    Correct.
3      Q.    And what was the date of your
4  marriage to her?
5      A.    August 6th, 2013.
6      Q.    You have two children -- I'm
7  sorry.  You got a divorce from Stacy Lane
8  Adcock.  When was that?
9      A.    2006.
10     Q.    No.  You got a divorce from
11 her in what year?
12     A.    2006.
13     Q.    But y'all continued to live
14 together until 2012?
15     A.    Correct.
16     Q.    Okay.  You have two children.
17 The first by Stacy Adcock, and that's J█████
18 █Adcock?
19     A.    Correct.
20     Q.    Does he live with you there
21 at -- on Glenwood Road?
22     A.    No, sir.
23     Q.    Where does he live?

Page 27

1      A.    ████ Kings Place Road, Unit
2  █, Frederick, Maryland.
3      Q.    And has he ever lived with
4  you at North Glenwood Road?
5      A.    Yes.
6      Q.    When did he move out?
7      A.    When he joined the Army.
8  2015, I believe, is when he moved out.
9      Q.    He was not living there at
10 the time of the shooting?
11     A.    No.
12     Q.    Okay.  I█████ G████ A███
13 Moore, what's her date of birth?
14     A.    S████████ -- I apologize.
15 I'm drawing a blank.
16     Q.    Sometime in S████████ of what
17 year?
18     A.    2007.
19     Q.    And she lives on ████████ █████
20 now, in Honoraville?
21     A.    Yes.
22     Q.    And how long has she lived
23 there?

Page 28

1      A.    I don't know.
2      Q.    Approximately?
3      A.    I don't know.
4      Q.    Have you sort of lost track
5  of her?
6      A.    Her and her mother and I do
7  not have a lot of contact.
8      Q.    So you've sort of lost track
9  of her, so to speak?
10     A.    I guess.
11     Q.    You don't have a lot of
12 contact with her.  That's what I'm talking
13 about.
14     A.    Okay.
15     Q.    What's the last time that you
16 lived in the same house with her?  What's the
17 last time you lived in the same house with --
18 Does she go by I███████, or does she go by
19 Grace, or does she go by Ann?  What does she
20 go by?
21     A.    She goes by I███████.
22     Q.    When is the last time you
23 lived in the same household with I███████?

Page 29

1      A.    I never did.
2      Q.    Okay.  Who was living at your
3  house on the day of the shooting?
4      A.    Xanthe Ann Adcock and T███
5  █████████ Myrick.
6      Q.    And who is he?
7      A.    He's my wife's son from her
8  first marriage.
9      Q.    And how old is he?
10     A.    Currently, fifteen.
11     Q.    Okay.  Who is Leigh Ruth
12 Moore?
13     A.    That is the mother of
14 █████████ G████ A██ Moore.
15     Q.    You've never been married to
16 Leigh Ruth Moore?
17     A.    Correct.
18     Q.    What was I███████ G████ A██
19 Moore -- You said her date of birth was
20 sometime in 2007?
21     A.    '7.
22     Q.    And that was while you were
23 married to -- Was that before -- That was

8 (Pages 26 - 29)

Page 30

1 while you were living with Stacy Lane Adcock?
2      A.    We were.
3           MR. HOWARD:  But he asked --
4 He asked also is that the time you were
5 married and he changed it to were you living
6 with her.
7           THE WITNESS:  Stacy and I
8 would have been divorced at that point, but
9 we were living together.
10      Q.    Yeah.  That's what you said
11 earlier.  Yeah.  So Isabella was conceived
12 during the time that you were living with
13 your divorced wife?
14      A.    Correct.
15      Q.    Okay.  Let's go through your
16 employment.  You listed a number of places
17 where you've been employed, but you didn't
18 answer all the questions that were asked in
19 the discovery request, did you?
20      A.    I'm not sure.
21      Q.    Well, you didn't -- Section G
22 asked for your direct superior, supervisor,
23 or manager at the job.  I don't think you

Page 31

1 gave that for any of them that I see;
2 correct?
3      A.    No, sir, I did not.
4      Q.    And I asked you to state the
5 reason that you left or were discharged from
6 the job.  You didn't state that, did you?
7      A.    No, sir.  I don't see that.
8      Q.    And you didn't state whether
9 you voluntarily left or whether you were
10 fired?
11      A.    No, sir.  I do not see those
12 responses either.
13      Q.    All right.  Let me ask you
14 just as an all-purpose question.  Would any
15 of these employers or your immediate
16 superiors say that you were fired from the
17 job?
18      A.    No.
19      Q.    Would any of them say that
20 you were asked to resign?
21      A.    No.
22      Q.    Let's go through who they
23 are.  Well, the other thing you didn't answer

Page 32

1 also is I asked you to give a description of
2 the job duties and responsibilities.  Some of
3 them I suppose would be if you were working
4 at the jail, I think I understand that.  Some
5 of them, I don't know what you would be doing
6 with them.  I don't know what, for example --
7 Let's go back and get answers with regard to
8 Kleinerts.  You said you were a night
9 leadman.  What kind of work were you doing?
10      A.    Kleinerts, Incorporated was a
11 sewing factory that made clothing, and we
12 handled the raw materials for that clothing
13 in the department I worked in.
14      Q.    Did you handle -- Did you
15 carry around bolts of cloth, then?
16      A.    No, sir.  The materials to
17 make clothes with, other than the cloth.
18      Q.    And what would those be?
19      A.    This is not all-inclusive,
20 but buttons, zippers, labels, tags, boxes,
21 thread, things of those nature.
22      Q.    And you worked on the night
23 shift to, again, move these various items

Page 33

1 around at Kleinerts?
2      A.    Correct.
3      Q.    All right.  Now, who was your
4 immediate superior there?
5      A.    Michael Adcock.
6      Q.    Is he any kin to you?
7      A.    Yes, sir, he was.
8      Q.    Who is he?
9      A.    He was my uncle.
10      Q.    Okay.  What was the reason
11 for leaving there?
12      A.    Just seek different
13 employment.
14      Q.    You weren't happy there?
15      A.    Correct.
16      Q.    Okay.  No problem about your
17 job performance?
18      A.    No, sir.
19      Q.    All right.  You then went to
20 the Crenshaw County Sheriff's Office as a
21 jailer?
22      A.    Correct.
23      Q.    Who was your direct superior

Page 34

1 there?
2    A.    Hugh Smith.
3    Q.    Does he still live in the
4 Luverne area?
5    A.    I do not know.
6    Q.    Was he the chief jailer?
7    A.    I believe his title was jail
8 administrator.
9    Q.    Okay.  The job you held
10 there, that was not a sworn law enforcement
11 position, was it?
12    A.    No, sir.
13    Q.    You hadn't been to APOSTC and
14 got any law enforcement training, had you?
15    A.    Correct.
16    Q.    You held that job from you
17 say 2001 to 2002.  That could be as much as
18 twenty-three months or as little as thirteen
19 months.  How long did you work there as a
20 jailer, do you recall?
21    A.    It was late in 2002.
22 Correction.  I would say -- 2001 when I went.
23 I would say around November.

Page 35

1    Q.    And when did you finish up in
2 2002?
3    A.    Maybe middle of the year.
4    Q.    So six or seven months, then?
5    A.    At least, yes, sir.
6    Q.    What was the reason for
7 leaving after six or seven months?
8    A.    Wanted to seek other
9 employment.
10    Q.    Didn't like it either?
11    A.    No, sir.
12    Q.    You got a job then at the
13 Brantley Police Department as an
14 officer/dispatcher; is that right?
15    A.    Yes, sir.
16    Q.    Well, you weren't a sworn
17 police officer, were you?
18    A.    No, sir.  Correction.  For a
19 short time I was, yes.
20    Q.    What was the short time you
21 were?
22    A.    A few months.
23    Q.    Well, I thought you didn't --

Page 36

1 When did you graduate from the academy?
2    A.    2006.
3    Q.    Well, how could you be a
4 sworn police officer, if you haven't gone to
5 the academy?
6    A.    Cause they hired me and swore
7 me in, but I did not attend the academy and
8 then they moved me to the dispatch.
9    Q.    I thought there was a state
10 statute that required that any sworn law
11 enforcement officer had to have APOSTC
12 training.  Is that not correct or do you
13 know?
14         MR. HOWARD:  I know.
15         MR. SIKES:  I'm asking him.
16    Q.    (Mr. Sikes) Do you know?
17    A.    You have to complete APOSTC
18 training within a certain amount of time of
19 taking a sworn law enforcement position.
20    Q.    I see.  You can take it, if
21 you are planning on going or if you've
22 already enrolled or what?
23    A.    Both of those would be

Page 37

1 accurate, yes.
2    Q.    Okay.  And who was your
3 superior there?
4    A.    I believe it was Chief Kelly,
5 when I started.  I don't recall his first
6 name.  And when I left, there was another --
7 a different chief, but I don't recall his
8 name.
9    Q.    What was Chief Kelly's first
10 name?
11    A.    I don't recall.
12    Q.    Is he still in the area?
13    A.    I do not know.
14    Q.    You don't know whether he
15 lives in Crenshaw County or not?
16    A.    I do not know.
17    Q.    Do you know if he's still
18 alive?
19    A.    No, sir, I do not know.
20    Q.    Was that a full-time job or
21 part time?
22    A.    Full time.
23    Q.    Okay.  And you were there

10 (Pages 34 - 37)

Page 38

1 for, it looks like, maybe three years or so
2 or thereabouts?
3    A.    Yes, sir.
4    Q.    Okay.  And what was the
5 reason for leaving there?
6    A.    To seek other employment.  It
7 was more money.
8    Q.    Okay.  And you went to work
9 for R&R Security as a security guard?
10    A.    No, sir.  I was working at
11 that job at the same time I was working at
12 Brantley Police Department.
13    Q.    Okay.  All right.  You were
14 also working at the same time then also as a
15 forklift and truck driver?
16    A.    Yes, sir.
17    Q.    For who?
18    A.    Luverne Co-Op.
19    Q.    Okay.  Who was your superior
20 there?
21    A.    Perry Catrett.
22    Q.    Is he still in the area?
23    A.    He is still the manager at

Page 39

1 Luverne Co-Op.
2    Q.    And who was your superior at
3 R&R Security?  Who did you report to?
4    A.    Ronnie White and Robin
5 Daniels were the owner of the company.  I
6 reported to whichever one I could get in
7 contact with.
8    Q.    You were also working during
9 that period some as a forklift operator?
10    A.    Yes, sir.
11    Q.    And this is -- It looks like
12 four or five jobs at the same time.  You say
13 the Brantley Police job wasn't part time?
14    A.    Well, initially, it was not.
15 By the time that I had left, it was.
16    Q.    Okay.  Because you took on
17 these other jobs on the side?
18    A.    Correct.
19    Q.    And cut back on your hours as
20 a police officer?
21    A.    Correct.
22    Q.    As a dispatcher?
23    A.    As a dispatcher.

Page 40

1    Q.    In 2005, you went over to
2 Luverne and became a police officer there?
3    A.    Correct.
4    Q.    Okay.  Who was the police
5 chief at that time?
6    A.    Paul Allen.
7    Q.    Paul Allen?
8    A.    Correct.
9    Q.    Is he still alive?
10    A.    He is.
11    Q.    Is he still in the area?
12    A.    Yes, sir.
13    Q.    Okay.  How long were you
14 there at the Luverne Police Department during
15 that period of time?
16    A.    I would say a little more
17 than twelve months.
18    Q.    Twelve, fourteen months,
19 something like that?  Twelve, thirteen,
20 fourteen months, something in that order?
21    A.    That would be reasonable,
22 yes.
23    Q.    Okay.  What was the reason

Page 41

1 for leaving then?
2    A.    Seek better pay and better
3 benefits.
4    Q.    And you went to work for the
5 Crenshaw County Sheriff's Department as a
6 deputy?
7    A.    Correct.
8    Q.    And who was the sheriff at
9 the time?
10    A.    Charles West.
11    Q.    Mr. West still around?
12    A.    He is.
13    Q.    Does he live in the area
14 still?
15    A.    He does.
16    Q.    Okay.  And you worked for
17 them until 2014?
18    A.    Correct.
19    Q.    And what was the reason for
20 leaving?
21    A.    Seek a better opportunity
22 financially.
23    Q.    I thought you left Luverne to

11 (Pages 38 - 41)

Page 42

1 advance. And then you went back to Luverne?
2　A.　Correct.
3　Q.　And you think you're going to
4 advance when you went back to Luverne?
5　A.　No, sir, I knew I was.
6 That's the reason I did it.
7　Q.　Okay. And when did you go to
8 work for the Luverne Police Department? What
9 month, do you recall?
10　A.　I swore in in December 2014.
11　Q.　Now, there's some paperwork
12 in there about a buyout of your contract or
13 some sort of -- Do you know about that? Can
14 you tell us about that?
15　A.　Yes, sir. When Luverne
16 Police Department hired me initially in 2005
17 and sent me to the academy, once I graduated,
18 I was supposed to stay with that agency for a
19 matter of twenty-four months for them to
20 recoup the cost of paying for training.
21 Being that I left before that twenty-four
22 months ended --
23　Q.　You had to pay them back?

Page 43

1　A.　-- they requested me to pay
2 them, and Crenshaw County Sheriff's Office
3 provided that to the City of Luverne.
4　Q.　Okay. On any of these jobs,
5 have you ever had any disciplinary charges
6 brought against you?
7　A.　Not that I recall.
8　Q.　Well, this would be something
9 you would recall, wouldn't it, if you had
10 disciplinary charges against you?
11　　MR. HOWARD: Object to the
12 form.
13　Q.　Is it possible you had
14 disciplinary charges brought against you, and
15 you just don't remember them now?
16　A.　It's possible.
17　Q.　Okay. If you say so. Have
18 you ever been suspended from a job?
19　A.　No, sir.
20　Q.　Have you ever been put on
21 leave?
22　A.　Yes, sir, I have.
23　Q.　And when was that?

Page 44

1　A.　In 2020.
2　Q.　Was that after this shooting?
3　A.　Correct.
4　Q.　How long were you on leave
5 there?
6　A.　Approximately, four weeks.
7　Q.　Okay. Was there any sort of
8 investigation carried on by the Luverne
9 Police Department about that, that shooting?
10　A.　No, sir.
11　Q.　Okay. Have you ever been
12 demoted in rank or position at any job?
13　A.　No, sir.
14　Q.　And you said you've never
15 been fired from any job?
16　A.　No, sir.
17　Q.　And you've never been
18 involuntarily discharged?
19　A.　No, sir.
20　Q.　And you've never been asked
21 to resign?
22　A.　No, sir.
23　Q.　Okay. How many policemen did

Page 45

1 the Luverne Police Department employ in May
2 of 2020?
3　A.　I believe thirteen.
4　Q.　Okay. How many is employed
5 now?
6　A.　Twelve.
7　Q.　In May of 2020, tell me the
8 hierarchy or the chain of command within the
9 Luverne Police Department. You've got the
10 police chief at the top. That's Chief?
11　A.　Michael Johnson.
12　Q.　Yeah.
13　A.　Next is --
14　Q.　Who's an assistant police
15 chief?
16　A.　That's the position I hold as
17 rank of captain.
18　Q.　That was in May of 2020?
19　A.　Yes, sir.
20　Q.　Okay. Do you still hold that
21 rank?
22　A.　Correct.
23　Q.　So you would have been second

12 (Pages 42 - 45)

Page 46

1  in command, sort of, at the police
2  department?
3      A.     Yes, sir.
4      Q.     What's the next tier of
5  authority in the chain of command at the
6  police department?
7      A.     Currently, our lieutenant
8  position --
9      Q.     Not currently.  In May of
10  2020?
11     A.     In May of 2020 our lieutenant
12  position was unoccupied.  Behind that, there
13  is three sergeant positions.  One of them is
14  head of investigations.  One of them is one
15  rotation on night shift and the other is the
16  other rotation of night shift.
17     Q.     And what are the names of
18  those people in May of 2020, the three
19  sergeants?
20     A.     John Powell is investigation
21  sergeant.  Kevin Bowen is patrol shift
22  sergeant at night.  And our second -- our
23  third sergeant slot is currently empty or was

Page 47

1  empty in May of 2020.
2      Q.     Okay.  And were the rest
3  below that simply sworn police officers?
4      A.     Correct.
5      Q.     No distinguishment in their
6  ranks?
7      A.     No, sir.
8      Q.     So you have the chief, the
9  captain -- you as the captain as assistant
10  police chief.  You've got the lieutenant
11  position was open.  You had the three
12  sergeants you told me about, and then you
13  would have had about eight police -- sworn
14  police officers that were just same rank;
15  correct?
16     A.     Yes, sir.
17     Q.     Okay.  When did the current
18  police chief, Mike Johnson, begin as the
19  Luverne Police Department chief?
20     A.     I believe it was March of
21  2017.
22     Q.     How long had you been at the
23  police department at that time when he was

Page 48

1  hired?
2      A.     Just over two years.
3      Q.     Where did he come from?
4      A.     Crenshaw County Sheriff's
5  Office.
6      Q.     All right.  Who was the old
7  police chief prior to that?
8      A.     Paul Allen.
9      Q.     Paul Allen?
10     A.     Correct.
11     Q.     Were you the second in
12  command at the police department under Paul
13  Allen?
14     A.     No.
15     Q.     Who was?
16     A.     David Sankey.
17     Q.     Okay.  Did you apply or seek
18  the chief of police job?
19     A.     I did.
20     Q.     Okay.  Who made the decision
21  about that, the mayor or the council or who?
22     A.     I believe they had a panel.
23     Q.     A panel?

Page 49

1      A.     That made a decision on it.
2      Q.     All right.  You applied for
3  it, but instead of hiring you, they hired
4  Mike Johnson from the Crenshaw County
5  Sheriff's Department?
6      A.     Correct.
7      Q.     Okay.  What is your general
8  state of health now?
9      A.     Healthy.
10     Q.     Are you under the care of a
11  physician for any physical condition?
12     A.     I have a family doctor I see
13  for blood pressure issues, and I also see a
14  urologist.
15     Q.     Okay.  Do you have any
16  specific -- Everybody has got a family
17  doctor.  And everybody has got some sort
18  of -- You've got various aches and pains from
19  time to time.  Is there any real physical
20  condition that impacts on you doing your job?
21     A.     No, sir.
22     Q.     Has there been in the last
23  couple years or so?

Page 50

1    A.    No, sir.
2    Q.    And who is your doctor?
3    A.    I apologize.  I'm drawing a
4  blank.  One moment.
5    Q.    Male, female?
6    A.    A female.  Dr. Michael is my
7  family doctor there in Luverne.
8    Q.    Michael is the last name, I
9  guess?
10    A.    Correct.
11    Q.    You don't know her first
12  name?
13    A.    No, I do not.
14    Q.    How long has she been your
15  doctor?
16    A.    Five, six years, maybe.
17    Q.    Okay.  Have you ever had
18  any -- been under the care of a physician or
19  counselor or anybody for any kind of mental
20  condition, psychological or psychiatric
21  problems?
22        MR. HOWARD:  Object to the
23  form.  You don't have to answer that.  That's

Page 51

1  privileged.
2        THE WITNESS:  Why?
3        MR. HOWARD:  There's a
4  specific privilege on counselors and stuff
5  like that for mental issues.
6        MR. SIKES:  No, there's not.
7  Not disclosing whether he has or not.
8  Possibly what they treated him for or that
9  sort of thing.
10        MR. HOWARD:  You may tell him
11  the name and when.  That's what he's asking.
12    A.    Dr. Faulk.
13    Q.    (Mr. Sikes) Dr. F-A-U-L-K?
14    A.    Correct.
15    Q.    And where is Dr. Faulk?
16    A.    Dothan.
17    Q.    And was this in connection
18  with the shooting, or was this prior to that
19  time?
20        MR. HOWARD:  You don't have to
21  tell him about anything you talked to Dr.
22  Faulk about.
23        MR. SIKES:  I hadn't asked him

Page 52

1  that.
2        MR. HOWARD:  You don't have to
3  answer that question.
4    Q.    (Mr. Sikes) Were you seeing
5  Dr. Faulk before the shooting, or have you
6  only seen him afterwards?
7        MR. HOWARD:  You can answer
8  that one.
9    A.    I saw him afterward.
10    Q.    You never saw him before?
11    A.    No, sir.
12    Q.    Okay.  And how long have you
13  been seeing -- Are you still seeing Dr.
14  Faulk?
15    A.    Yes.
16    Q.    And how frequently do you see
17  Dr. Faulk?
18    A.    I do not have a set schedule
19  I see him on.
20    Q.    How many times since the
21  shooting have you seen him?
22    A.    Five, I believe.
23    Q.    Okay.  What was the last

Page 53

1  time?
2    A.    Yesterday.
3    Q.    I believe you said that you
4  considered your general state of health to be
5  good now and has been for the last several
6  years?
7    A.    Yes.
8    Q.    So you were in good health on
9  May 27, 2020; correct?
10    A.    Yes.
11    Q.    That's the day of the
12  shooting.  You recognize that date?
13    A.    Yes.
14    Q.    Has there been any change in
15  your general state of health of any
16  significance that occurred since May 27 of
17  2020?
18    A.    No.
19    Q.    Do you have a current Alabama
20  driver's license?
21    A.    Yes.
22    Q.    May I see it?
23    A.    (Witness complies.)

14 (Pages 50 - 53)

Page 54

1          MR. HOWARD:  Do you want a
2  copy?
3          MR. SIKES:  Yeah.  Could I get
4  a copy of it?
5          (Off-the-Record discussion
6          was held.)
7      Q.   (Mr. Sikes) Have you had any
8  significant change in your weight since the
9  shooting?
10     A.   No.
11     Q.   Okay.  What sort of physical
12 activity did you get during the 2020 year?
13     A.   I'm not -- I guess I'm not
14 sure what you're asking.
15     Q.   Well, let me ask you.  Does
16 the Luverne Police Department require that
17 you generally keep physically fit?
18     A.   I have to be in proficient
19 enough health to perform my job.
20     Q.   Okay.  Do you own any workout
21 equipment, any set of weights, or a
22 stationary bicycle, or any kind of exercise
23 equipment?

Page 55

1      A.   I do not.
2      Q.   Do you work out with any kind
3  of regularity?
4      A.   No, sir.
5      Q.   You've been advised that you
6  are presently under investigation for
7  possible criminal prosecution in connection
8  with shooting and killing Channing Spivey;
9  correct?
10     A.   Yes.
11     Q.   Do you know who all is making
12 an investigation?
13     A.   Alabama Law Enforcement
14 Agency is all I'm aware of.
15     Q.   Okay.  You don't know whether
16 there's any federal investigation?
17     A.   Not that I'm aware of.
18     Q.   Okay.  Have you had any
19 contact with anybody in ALEA?
20     A.   Yes, sir.
21     Q.   When did you have contact
22 with people in ALEA?
23     A.   In relation to this or just

Page 56

1  in general?
2      Q.   In relation to this.  The
3  shooting.
4      A.   Lieutenant Heath Carpenter
5  interviewed me after the shooting.
6      Q.   And when did that occur?  You
7  said Heath Carpenter?
8      A.   Correct.
9          THE WITNESS:  Bill, do you
10 remember?
11         MR. HOWARD:  Just tell him
12 what you know.  Just I don't know is
13 perfectly fine.
14     A.   I don't remember the date.
15     Q.   (Mr. Sikes) Was it a day
16 after, two days after, a week after, a month
17 after?  What is your best judgment about how
18 long after the shooting that it occurred?
19     A.   Three to four weeks, maybe.
20     Q.   ALEA didn't interview you
21 until three or four weeks after the shooting.
22 You never talked to anybody at ALEA until
23 three or four weeks afterward?

Page 57

1      A.   Not that I recall.
2      Q.   Is there anybody other than
3  Heath Carpenter that you've been interviewed
4  or you've given a statement to about the
5  shooting?
6      A.   No, sir.
7      Q.   Was there anybody with
8  Lieutenant Heath Carpenter at the time?
9      A.   No, sir.
10     Q.   Where did it occur?
11     A.   At Luverne Police Department.
12     Q.   Was it tape-recorded or do
13 you know?
14     A.   Yes.
15     Q.   It was?
16     A.   It was audio recorded.
17     Q.   Who all was present?
18     A.   Mr. Carpenter, obviously.
19 William Rayborn and Mickey McDermott and
20 myself.
21     Q.   And they were there in what
22 capacity?
23     A.   They are representing my

15 (Pages 54 - 57)

Page 58

1  interest.
2      Q.    They were your lawyers?
3      A.    Correct.
4      Q.    Okay. Did you hire them?
5      A.    They were retained through
6  PBA.
7      Q.    And PBA is Police Benevolent
8  Association?
9      A.    Correct.
10     Q.    Have you ever paid them
11  anything?
12           MR. RAYBORN: I'm going to
13  object to the form on that.
14     Q.    You can answer.
15           MR. HOWARD: Have you ever
16  paid them, as in PBA?
17     Q.    (Mr. Sikes) Have you ever
18  paid those two lawyers anything?
19           MR. HOWARD: Do you understand
20  his question?
21           THE WITNESS: Yes.
22     A.    No, sir, I have not.
23     Q.    To the extent they have been

Page 59

1  paid, it's all been by PBA, to the best of
2  your knowledge?
3      A.    Yes.
4      Q.    Have you ever seen another
5  lawyer other than those two?
6      A.    Yes.
7      Q.    Who else did you see?
8      A.    Rick Howard.
9      Q.    All right. Anybody else?
10     A.    No, sir.
11           MR. HOWARD: He's seen people
12  in my office, lawyers here.
13           MR. SIKES: Yeah. Your
14  associates, or an assistant; April, for
15  example.
16           MR. HOWARD: April is the
17  brains. Have you ever met April or is this
18  the first time you've seen her?
19           THE WITNESS: Possibly. I
20  don't know.
21           MR. HOWARD: He's met Ashley
22  Tidwell. She's an associate.
23     Q.    (Mr. Sikes) Again, give me

Page 60

1  all the lawyers' names, so I make sure I've
2  got them all. Obviously, Mr. Howard?
3      A.    Correct.
4      Q.    Go ahead and name everybody
5  else.
6      A.    I said April.
7           MR. HOWARD: Just tell him
8  what you know. If you don't know them, just
9  tell him.
10     A.    I don't recall April's last
11  name. She's associated here.
12     Q.    All right. Who else?
13     A.    Mickey McDermott and William
14  Rayborn.
15     Q.    Anybody else?
16     A.    No, sir.
17           MR. HOWARD: Ashley Tidwell,
18  she's with the office.
19           MR. SIKES: Your office?
20           MR. HOWARD: Yes.
21     Q.    (Mr. Sikes) Have you been
22  told when a decision will be made whether you
23  are going to be indicted for any kind of

Page 61

1  crime arising out of Channing's death?
2      A.    No, sir.
3      Q.    Do you have any understanding
4  about when the grand jury may meet or
5  convene?
6      A.    There is a grand jury meeting
7  in Crenshaw County on February the 8th, 2021.
8  Whether this case is docketed or not, I do
9  not know.
10     Q.    The interview with Lieutenant
11  Carpenter three or four weeks after the
12  shooting, that would have been sometime in
13  late June of this year?
14     A.    Sometime in June of last
15  year.
16     Q.    Of 2020, yes, sir.
17     A.    Correct.
18     Q.    We haven't had 2021 yet.
19           MR. HOWARD: Did you say the
20  8th or the 28th?
21           THE WITNESS: 8th.
22     Q.    (Mr. Sikes) You haven't been
23  given any indication about whether the grand

16 (Pages 58 - 61)

Page 62

1  jury will -- the presentment of a possible
2  criminal case against you will be presented
3  to the grand jury on the term that begins
4  February 8th, then; correct?
5      A.     Correct.
6      Q.     When after you shot and
7  killed Channing Spivey, did you first realize
8  you might be criminally prosecuted?
9      A.     I don't know.
10     Q.     Well, I know that you can't
11 tell me 8/21. In general, when did this
12 first occur to you that the possibility of
13 you could be criminally prosecuted for this?
14     A.     Immediately after the
15 shooting, I guess.
16     Q.     Did you realize it on your
17 own, or did somebody say something to you to
18 prompt you to think that?
19     A.     On my own.
20     Q.     Okay. And by right after the
21 shooting, you're talking about within
22 fifteen, twenty, thirty minutes or so?
23     A.     Minutes, yes, sir.

Page 63

1      Q.     Yes. Okay. When did you
2  first see or consult with a lawyer in person,
3  on the phone, in any way communicate with a
4  lawyer after the shooting?
5      A.     It was minutes after the
6  shooting, I contacted William Rayborn.
7      Q.     Okay. And did you call him
8  on the phone?
9      A.     Yes.
10     Q.     Okay. About what time was
11 that?
12     A.     I don't know.
13     Q.     I said about. I'm not -- You
14 know that it was after noon, don't you?
15     A.     Yes, sir.
16     Q.     You know it was after three
17 o'clock, don't you?
18     A.     Yes, sir.
19     Q.     About what time did the
20 shooting occur, in round terms?
21     A.     About eight p.m.
22     Q.     All right. And you think
23 that you called him somewhere in the

Page 64

1  neighborhood of 8:10, 8:15, 8:30, somewhere
2  in that area?
3          MR. HOWARD: Don't guess. You
4  either know or you don't.
5      A.     I just don't.
6      Q.     You said within minutes. I
7  think that is minutes, isn't it?
8      A.     Within minutes after the
9  shooting, and the shooting was about eight
10 o'clock.
11     Q.     Okay. So that would have
12 been 8:10, 8:15, 8:30 at the latest, maybe?
13     A.     Those are all within minutes
14 of the shooting.
15     Q.     So that's correct, then?
16     A.     Could be, yes.
17     Q.     All right. Did you call from
18 your cell phone?
19     A.     Correct.
20     Q.     Where was he?
21     A.     Don't recall.
22     Q.     Did you call his office or
23 did you call his home?

Page 65

1      A.     Called his cell phone.
2      Q.     His cell phone. Okay. Did
3  you, soon after that, meet with him?
4      A.     I did.
5      Q.     The next day or two days
6  later or when?
7      A.     That night.
8      Q.     That night you met with him?
9      A.     Yes.
10     Q.     Okay. I'm not asking about
11 what you said. Where did you meet him?
12     A.     At my house.
13     Q.     Okay. And how long was he
14 there, in round terms?
15     A.     When Mr. Rayborn arrived at
16 the house that night, I stayed with -- in his
17 accompaniment until the SBI released the
18 scene, my residence, the next morning. So,
19 many hours I was with Mr. Rayborn.
20     Q.     Did you stay at his house?
21 Did y'all go to a motel? Where did you stay
22 with him?
23     A.     We left my residence, took my

17 (Pages 62 - 65)

Page 66

1 wife and stepson to another residence and
2 dropped them off. We went back to Luverne to
3 the sheriff's office to meet Mickey
4 McDermott, and then we went back out to my
5 residence and waited beside the road until
6 they released the scene.
7    Q.    Did you go to sleep that
8 night?
9    A.    No, sir.
10    Q.    Okay. You were in a car
11 during this period most all of it, or you
12 were at some other physical location? Where
13 were you?
14    A.    We drove from my house to the
15 location where we dropped off my wife and
16 stepson. We drove back to the sheriff's
17 office. We were there for a short time
18 meeting with Mr. McDermott. We drove from
19 there back out to my residence and just
20 waited beside the road.
21    Q.    Until the SBI cleared the
22 crime scene?
23    A.    Correct.

Page 67

1    Q.    Okay. Look at Plaintiff's
2 Exhibit 19 again, please, sir.
3    A.    (Witness complies.)
4    Q.    Now, you have refused to
5 answer some of those questions in our
6 discovery request based on a claim of
7 privilege under the Fifth Amendment; correct?
8    A.    Yes, sir.
9    Q.    Paragraphs 4 and 5 and 7 and
10 8?
11    A.    Yes, sir.
12    Q.    And I understand from your
13 lawyer, Mr. Howard, that here in your
14 deposition, you also intend to claim that you
15 are entitled or refuse or decline to answer
16 my questions about the events leading up to
17 and involved in your shooting and killing of
18 Channing Spivey; correct?
19    A.    Yes.
20    Q.    And that is your intention to
21 decline or refuse to answer certain of the
22 questions I'm going to ask you?
23    A.    Some of them, possibly, yes.

Page 68

1    Q.    Okay. All right. And that's
2 based on advice of counsel?
3    A.    Correct.
4    Q.    Is that unanimous, counsel?
5 That's also Mr. Rayborn's?
6        MR. HOWARD: You don't have to
7 tell him what a lawyer tells you.
8        It's the only way he would
9 know if it was unanimous.
10        MR. SIKES: I asked him if it
11 was under advice of counsel.
12    Q.    Is it all of your counsel
13 that advised you that?
14        MR. HOWARD: Don't answer
15 that. That's asking exactly what a lawyer
16 has told you or what you've heard a lawyer
17 say.
18        MR. SIKES: He's already told
19 me you advised him that.
20        MR. HOWARD: Then fine. He's
21 not going to tell you what his lawyers told
22 him.
23        MR. SIKES: I didn't ask him

Page 69

1 to tell me that. I said: Is it on advice of
2 counsel that you're refusing? He said: Yes.
3        MR. HOWARD: You asked him
4 what the lawyers individually said about
5 that?
6        MR. SIKES: No, I didn't say
7 what they individually said.
8        MR. HOWARD: Don't answer
9 that. How would he know, if they didn't say
10 it?
11    Q.    (Mr. Sikes) Before Mr. Howard
12 advised you to decline or refuse to answer
13 these questions, did you give Mr. Howard a
14 full, complete, and honest account of the
15 events surrounding the shooting?
16        MR. HOWARD: You don't have to
17 tell him what you told a lawyer.
18        MR. SIKES: I just asked did
19 you give him an account.
20        MR. HOWARD: You asked him
21 exactly what he told me.
22        MR. SIKES: I didn't ask him
23 exactly. I said: Did you give them an

Page 70

1  account of all the facts about that?
2        MR. HOWARD:  Don't answer
3  that, based on attorney-client privilege.
4        MR. SIKES:  That doesn't
5  extend to that.
6        MR. HOWARD:  I think it does.
7  You asked him to -- You've asked him what
8  I've told him or what he's told me.  How does
9  it not apply to that?
10        MR. SIKES:  I simply -- I
11  didn't ask him what you told you.
12        MR. HOWARD:  You did.
13        MR. SIKES:  Nope.  There are
14  no details in there about what was told.
15     Q.    (Mr. Sikes) Did you give him
16  an account of the shooting that was full and
17  fair and complete?
18        MR. HOWARD:  Don't answer
19  that.
20        MR. SIKES:  Note that, please.
21        MR. HOWARD:  Sure.
22        MR. SIKES:  I'm sorry.
23        MR. HOWARD:  She looked at me

Page 71

1  and, I said:  Sure, note it.
2        MR. SIKES:  You don't need his
3  permission.
4     Q.    (Mr. Sikes) Is it your
5  testimony that if you gave full, fair, and
6  honest accurate questions -- answers to my
7  questions about the shooting of Channing
8  Spivey, that it might tend to incriminate you
9  in criminal activity?
10        MR. HOWARD:  Object to the
11  form.  You can answer if you know.  He's
12  asking you for a legal conclusion.
13        MR. SIKES:  No, I'm not.
14        MR. HOWARD:  Yeah, you are.
15  You're asking if there's possible --
16        MR. SIKES:  Rick, Rick, Rick.
17  Stay out of my deposition.  I'm not taking
18  your deposition.
19        MR. HOWARD:  Then ask fair
20  questions.
21        MR. SIKES:  I'm taking his
22  deposition.  I'm going to move for sanctions,
23  if you continue to answer questions for your

Page 72

1  client.  That's improper and you know it.
2  You should know it.
3        MR. HOWARD:  If you know, you
4  can answer.
5     Q.    (Mr. Sikes) That's the basis
6  of taking -- You can't claim the privilege
7  unless you say I believe that if I answer
8  those questions it might tend to incriminate
9  me.  I'm asking you is that the basis for
10  taking your the Fifth Amendment?  If you
11  answer the questions, they might tend to
12  incriminate you in criminal activity --
13        MR. HOWARD:  Objection.
14     Q.    -- is that correct?
15     A.    I do not know if they would.
16     Q.    I know.  But you have to make
17  that claim, in order to be able to assert the
18  Fifth Amendment privilege.  Do you give
19  Miranda warnings?
20     A.    Yes.
21     Q.    How many times have you given
22  Miranda warnings in your life?
23     A.    I do not know.

Page 73

1     Q.    I know you don't know that
2  it's nine-thousand, three-hundred twenty-one,
3  Mr. Adcock.  Let's be reasonable with each
4  other, please.  Approximately, how many times
5  have you given them?  Hundreds of times would
6  you say?
7     A.    Possibly, yes.
8     Q.    Maybe even thousands?
9     A.    Maybe.
10     Q.    Okay.  You know what the
11  Miranda warning is, don't you?
12     A.    Yes.
13     Q.    Can you recite it?
14     A.    No, sir.
15     Q.    Do you read it off a card
16  when you give it?
17     A.    I do.
18        (Plaintiff's Exhibit 24
19        was marked for
20        identification purposes.)
21     Q.    I'll show you what's marked
22  Plaintiff's 24.  Is that substantially the
23  warning that you have given hundreds of

Page 74

1 times?
2      A.     Yes.
3      Q.     Okay.  Would you read it out
4 loud for us.
5      A.     Miranda warning:  You have
6 the right to remain silent.  Anything you say
7 can and will be used against you in a court
8 of law.  You have the right to an attorney.
9 If you cannot afford an attorney, one will be
10 provided for you.  Do you understand the
11 rights I have just read to you?  With these
12 rights in mind, do you wish speak to me?
13      Q.     Okay.  And based on that
14 warning set out in the case of United States
15 Supreme Court case called Miranda, that is to
16 protect Fifth Amendment rights; is that your
17 understanding?
18      A.     Yes.
19      Q.     And the Fifth Amendment right
20 protects against self incrimination; correct?
21      A.     Correct.
22      Q.     When you claim the Fifth
23 Amendment, you are concerned that if you

Page 75

1 answer the questions, they might tend to
2 incriminate you; correct?
3      A.     Yes.
4      Q.     Okay.  We can do this a lot
5 quicker, if we just be a little more
6 forthright with each other, sir.
7          MR. HOWARD:  You don't -- Just
8 answer his questions.  That's all you've got
9 to do.
10      Q.     Exactly.  But you do have to
11 do that.
12          MR. HOWARD:  If it's proper.
13      Q.     Is it true that if a person
14 believes that he or she has done nothing
15 wrong, a person can waive their right to
16 Fifth Amendment and go ahead and answer the
17 questions; correct?
18      A.     Yes.
19      Q.     But you're not going to do
20 that, are you?
21      A.     No, sir.
22      Q.     And the reason that you are
23 asserting the claim of the Fifth Amendment

Page 76

1 privilege is the possibility that you could
2 be possibly indicted and prosecuted for
3 killing Channing Spivey; right?
4      A.     Yes.
5      Q.     As we sit here today, is it
6 your testimony that you believe your honest
7 answers to my questions about that shooting
8 might be used to criminally prosecute you?
9      A.     Yes.
10      Q.     And it's because of that
11 possibility, that you are claiming under the
12 Fifth Amendment to refuse to answer my
13 questions in certain regards about the
14 shooting?
15      A.     Yes.
16      Q.     Look at paragraph 6 of
17 Plaintiff's Exhibit 19, please.
18      A.     (Witness complies.)
19      Q.     You state there:  I gave a
20 statement to the Alabama Law Enforcement
21 Agent.  Do you see that?
22      A.     Yes.
23      Q.     Is that the statement that

Page 77

1 you gave to Officer Carpenter from ALEA?
2      A.     Correct.
3      Q.     Okay.  Other than that
4 statement to ALEA, have you ever given any
5 other statements or accounts either in
6 writing or orally to anyone, except your
7 lawyers right now, have you ever given a
8 statement to anybody else other than your
9 lawyers and ALEA about the shooting or the
10 events leading up to it?
11      A.     No, sir.
12      Q.     Okay.  And you have given
13 statements -- You've discussed it and told
14 your lawyers what occurred?
15          MR. HOWARD:  Object to the
16 form.  You don't have to answer that.  He's
17 asking what you've told your lawyers.
18      A.     I have spoke with them.
19      Q.     Okay.  About the shooting?
20      A.     Yes.
21      Q.     Okay.  Did -- Other than this
22 one time with Carpenter at the police
23 station -- excuse me, at sheriff's

Page 78

1 department?
2    A.    The Luverne Police
3 Department.
4    Q.    Okay.  And Mr. McInnish was
5 there, and Mr. Rayborn was there, and you
6 were there and Carpenter was there.  Anybody
7 else there?
8    A.    I misunderstood one of the
9 names you called out.
10    Q.    Mr. Rayborn was there?
11    A.    Correct.
12    Q.    Mr. McInnish was there?
13    A.    Mr. McDermott.
14    Q.    Excuse me.  Mr. McDermott,
15 pardon me.  I know a Mickey McInnish also.
16    A.    Yes, sir.
17    Q.    To make the Record clear
18 again to avoid my mistake about the names.
19 The people present when you gave a statement
20 sometime in the last part of June of 2020 at
21 the Luverne Police Department were Lieutenant
22 Carpenter; Mickey McDermott; Mr. Rayborn,
23 William Rayborn; obviously you, anybody else?

Page 79

1    A.    That is all.  That is
2 correct.
3    Q.    And they taped it?
4    A.    Audiotaped.
5    Q.    Audiotape?
6    A.    Yes.
7    Q.    And that took place over what
8 period of time?
9    A.    One to two hours.
10    Q.    Okay.  Were you honest and
11 truthful in that statement?
12    A.    Yes.
13    Q.    Okay.  And you gave that
14 statement after getting advice from a lawyer?
15    A.    Yes.
16    Q.    Several lawyers, in fact?
17    A.    Yes.
18    Q.    You knew at the time you had
19 the right to refuse or decline to give the
20 statement to Lieutenant Carpenter; correct?
21    A.    Yes.
22    Q.    You could have asserted the
23 Fifth Amendment then; correct?

Page 80

1    A.    Yes.
2    Q.    But you decided not to?
3    A.    Yes.
4    Q.    What I said is correct.  You
5 declined to assert the Fifth Amendment at
6 that time; correct?
7    A.    Correct.
8    Q.    Do you know if that statement
9 has ever been reduced to writing?
10    A.    I do not.
11    Q.    Okay.  Have you ever signed a
12 written statement?
13    A.    No, sir.
14    Q.    Do you know if you or your
15 lawyer ever received a copy of the statement
16 you gave to Lieutenant Carpenter?
17    A.    No, sir.
18    Q.    And ALEA -- The ALEA agent
19 didn't coerce or force you to give the
20 statement?
21    A.    No, sir.
22    Q.    He didn't promise you
23 anything to try to induce you to give the

Page 81

1 statement?
2    A.    No, sir.
3    Q.    You gave the ALEA agent a
4 statement voluntarily and of your own free
5 will?
6    A.    Yes, sir.
7    Q.    That's correct.  Did you
8 refuse to answer any questions asked of you
9 by the ALEA agent in that interview?
10    A.    Not that I recall.
11    Q.    Look at Plaintiff's Exhibit
12 19 again, please.
13    A.    (Witness complies.)
14    Q.    You refused to answer the
15 questions in -- the question at number 8
16 based on your assertion of the Fifth
17 Amendment; correct?
18    A.    Correct.
19    Q.    And you state in there:
20 Quote, see my statement to the Alabama Law
21 Enforcement Agency, unquote; correct?
22    A.    Correct.
23    Q.    How can we see that

Page 82

1 statement, if you haven't provided it to us
2 and can't give it to us?
3     A.     I don't know how you would
4 receive it from them.
5     Q.     You also state in discovery
6 request number 8 in answer to it, you say:
7 My attorney is in process of obtaining the
8 file from the Alabama Law Enforcement Agency.
9 Do you see that?
10     A.     Correct. Yes.
11     Q.     And you signed this back
12 when? How long ago was that?
13     A.     October 19th of 2020.
14     Q.     Three months ago or so?
15     A.     Yes, sir.
16     Q.     In that three months, has
17 your attorney obtained the ALEA file that you
18 know of?
19     A.     Not that I know of.
20     Q.     Also in answer to discovery
21 request 8, you state: Quote, Deputy Penny
22 may have had his cell phone on during the
23 incident and 911 may have recorded the

Page 83

1 interaction. Do you see that?
2     A.     Yes.
3     Q.     Yesterday we received a
4 audiotape from a subpoena. And have you
5 listened to that audiotape?
6     A.     I have not.
7     Q.     Okay. Have you seen a
8 transcript of it?
9     A.     I have not.
10     Q.     Okay. All right.
11     MR. SIKES: I don't know how
12 to do this, Rick. However you want. What
13 I'm trying to get at is what he's talking
14 about the recording of it, is that the
15 recording that you produced yesterday?
16     MR. HOWARD: Yes.
17     MR. SIKES: Okay.
18     MR. HOWARD: I think that
19 would be -- I know what the issue is, how do
20 you authenticate what we received? The
21 answer is yes. That answer that's in number
22 8 is exactly what I was referring to is what
23 you received. Obviously, he can't answer any

Page 84

1 questions about the transcript. I can
2 authenticate it for him.
3     MR. SIKES: I'm really not
4 looking for authentication. I just want to
5 make certain that there's not another
6 statement somewhere; that there's some other
7 statement that was recorded other than the
8 one we got -- or the one you got yesterday
9 and produced to me.
10     MR. HOWARD: That's the only
11 one that we know of, and we were, at this
12 time, not even sure if that was true.
13     MR. SIKES: All right. I'll
14 leave it at that for the time being.
15     Q. (Mr. Sikes) Do you know why
16 ALEA will not give the file to your attorney?
17     A.     No, sir. I do not know.
18     Q.     Who told you that Deputy
19 Penny may have had his cell phone on?
20     A.     I don't recall anyone telling
21 me, but I do remember that night him talking
22 on it.
23     (Plaintiff's Exhibit 18

Page 85

1           was marked for
2           identification purposes.)
3     Q.     Let's look at Plaintiff's
4 Exhibit 18. I ask you to take a look at what
5 is marked Plaintiff's Exhibit 18. Can you
6 identify Plaintiff's Exhibit 18, please, sir?
7     A.     I believe this is something
8 that was sent by Mr. Howard.
9     Q.     Have you ever seen that
10 document before?
11     A.     I believe Mr. Howard had
12 provided me with a copy of it.
13     Q.     And you reviewed it, I assume
14 back then, and checked it for accuracy?
15     A.     Yes, sir.
16     Q.     Okay. Look down at the last
17 line on the first page of Plaintiff's Exhibit
18 18. Do you see there in the listing the
19 persons who might have discoverable, personal
20 information concerning the issues in the
21 case? Do you see that? That's the questions
22 that's being answered.
23     A.     Yes, sir.

Page 86

1  Q.    And you state:  Unknown
2 paramedics.  Do you see that?
3  A.    Yes.
4  Q.    That's not truthful, was it?
5  A.    I think I --
6      MR. HOWARD:  You're asking him
7 to provide whether I knew their names or he
8 knew their names?
9      MR. SIKES:  He reviewed it.
10 He said he saw it.
11  Q.    (Mr. Sikes) That's not
12 accurate, is it?
13      MR. HOWARD:  He didn't say if
14 he saw it before or after I sent it.
15      MR. SIKES:  Rick, will you
16 stay out of my deposition?  The Record is
17 what it is.
18  Q.    (Mr. Sikes) That's not
19 truthful, is it?  We'll get in to who's
20 truthful or if it's untruthful at some point,
21 maybe.  But right now, I'm asking you that's
22 not truthful, is it?  You knew at least one
23 of the paramedics or EMTs that responded to

Page 87

1 the 911 call, didn't you?
2  A.    Yes, sir, I did.
3  Q.    In fact, Tim White is a good
4 friend of yours, isn't he?
5  A.    He's a friend of mine.
6  Q.    What's his wife's name?
7  A.    Deidre.
8  Q.    You and Tim White and Deidre
9 and your wife, y'all go out socially at
10 times, don't you?  You've been to his house
11 or he's been to yours?
12  A.    No, sir.  We don't go out
13 socially.
14  Q.    You haven't been?
15  A.    No, sir.
16  Q.    But y'all are good friends?
17  A.    We're friends.
18  Q.    Okay.  You're not good
19 friends; is that right?
20      MR. HOWARD:  Ask him to define
21 good friends.
22  A.    Yes, sir.  Can you give me a
23 definition of what good friend would be?

Page 88

1  Q.    No, sir.  I'm not going to
2 give you the definition of good friend.  How
3 old are you, sir?
4  A.    Forty-one.
5  Q.    You don't know what good
6 friends means?
7  A.    I do.
8  Q.    You don't need a definition
9 then if you do.  Are you good friends with
10 him or not?
11  A.    No.
12  Q.    You're not good friends with
13 him.  EMTs aren't law enforcement officers,
14 are they?
15  A.    No, sir.
16  Q.    They don't carry guns or
17 weapons, do they?
18  A.    No, sir.
19  Q.    They're not trained in law
20 enforcement, are they?
21  A.    No, sir.
22  Q.    To the extent you know about
23 it, they're trained in emergency medical

Page 89

1 treatment; right?
2  A.    Yes.
3  Q.    That includes medical and
4 physical and mental health issues; correct?
5  A.    Yes, sir.
6  Q.    In fact, Tim White called you
7 while he was enroute as an EMT to the scene
8 of Mr. Channing Spivey's house, didn't he?
9  A.    Yes, sir.
10  Q.    What was the purpose of that
11 call?
12      MR. HOWARD:  Object to the
13 form.  That's too close to the incident.
14 He's going to plead the Fifth on that one.
15  Q.    No, sir.  You don't get to
16 take the Fifth about what Mr. White told you
17 and what you told him just before this.
18      MR. HOWARD:  Yes, he does.
19 You're going to take the Fifth on that one.
20  Q.    Are you refusing to answer
21 that question?
22  A.    I plead the Fifth.
23      MR. SIKES:  We'll certify that

23 (Pages 86 - 89)

1 also, please, ma'am.

2 Q. Is it your testimony that if
3 you truthfully told me what Tim White told
4 you, that that might be used to prosecute
5 you? Is that your testimony?

6 A. Yes.

7 Q. Okay. Do you know the name
8 of the other paramedic that came?

9 A. Robert Knight.

10 Q. So you knew them both?

11 A. Yes.

12 Q. Have you ever had any
13 conversations with Robert Knight about this
14 incident, the shooting, ever at any time?

15 A. No, sir.

16 Q. Okay. Let's look back down
17 the list of people who may have some
18 information or might have been witnesses to
19 some matter of some consequence in this case,
20 under paragraph A.

21 We know of one untruthful
22 answer so far in there; that the paramedics
23 weren't unknown to you. You knew them both;

1 correct?

2 A. Yes, sir.

3 Q. Let's go back down the rest
4 of the witnesses there. Look back over them
5 very carefully, please, sir, because I want
6 you to tell me if there are any other persons
7 who might be witnesses, might have seen or
8 known something that might have significance
9 to this case, that you know of. Please look
10 over those and take as long as you want. I
11 want to know if that's the complete list of
12 all the persons that you think might be
13 witnesses in your case or have some
14 information that's relevant to your case.
15 Either your criminal -- a criminal case
16 brought against you or this civil case.

17 A. (Witness complies.) I don't
18 believe so.

19 Q. So that's a full and complete
20 listing of all of the people you know of that
21 could possibly have any information that
22 might be relevant to a criminal prosecution
23 of you or to this civil case; correct?

1 A. No.

2 Q. Who else is there?

3 A. Floyd Wright with Luverne
4 Rescue did show up that night.

5 Q. And what information do you
6 think Mr. Wright might have, Floyd Wright?

7 A. He was able to view me after
8 the shooting and the vehicle and such.

9 Q. Okay. He didn't arrive on
10 the scene until well after the shooting,
11 after Channing Spivey was dead; correct?

12 A. Correct.

13 Q. Okay. Any information he has
14 would be to matters that occurred after the
15 shooting; correct?

16 A. Correct.

17 Q. Okay. And the principle
18 things you know of is he observed you and he
19 observed the vehicle?

20 A. Correct.

21 Q. The vehicles out there?

22 A. And his paramedics that
23 had -- and the other paramedics that came

1 previous to him, speaking of Tim and Robert.

2 Q. I'm sorry?

3 A. Speaking of Tim and Robert
4 White. He would have observed him. Tim
5 White and Robert Knight, I apologize.

6 Q. That's K-N-I-G-H-T; right?

7 A. I believe so.

8 Q. Okay. How long, prior to the
9 shooting, had you known Channing Spivey?

10 A. I'd have to refer to my
11 answers from the discovery.

12 Q. I don't know that I asked
13 that. Maybe I did. You can't tell me how
14 long you've known him?

15 MR. HOWARD: It's number
16 three.

17 A. Several years. No, sir. I
18 can't. I just don't know.

19 Q. Is several years five or six
20 years? Is it two or three years?

21 A. I would say ten or less.

22 Q. Okay. More than five?

23 A. Probably, yes.

Page 94

1    Q.    Okay. How did you first meet
2  him?
3    A.    I just -- I don't know. I
4  don't recall where the first time I met him
5  was.
6    Q.    All right. Now, he was your
7  neighbor; right? He lived a hundred yards
8  down the road, or so, from you?
9    A.    I was unaware that he was
10  living at that house.
11   Q.    Prior to the shooting, you
12  were unaware that Channing Spivey lived at
13  the house right down the road from you?
14   A.    Correct.
15   Q.    There's another house that's
16  on the same side of the road that is closer
17  to your house than Channing Spivey's house;
18  correct?
19   A.    Correct.
20   Q.    Who lives in that house?
21   A.    It's vacant.
22   Q.    And it was vacant at the time
23  of the shooting; correct, as far as you know?

Page 95

1    A.    Yes.
2    Q.    Is it occupied now?
3    A.    No.
4    Q.    Okay. So you didn't have a
5  closer neighbor than Channing Spivey at the
6  time of the shooting; correct?
7    A.    Correct.
8    Q.    Do you know how long he had
9  been living down there?
10   A.    No, sir. I was unaware he
11  was living there.
12   Q.    I know you say that you were
13  unaware then. Do you know now how long he
14  had been living there?
15   A.    No, sir.
16   Q.    Do you know who all lived
17  there with him?
18   A.    I believed that Wesley Spivey
19  was living there, and Zanna Bloodsworth were
20  living there.
21   Q.    Did you know that they lived
22  there prior to the shooting?
23   A.    I believed that they did,

Page 96

1  yes, sir.
2    Q.    You knew that at the time of
3  the shooting? At the time of the shooting,
4  you knew that?
5    A.    Yes, correct.
6    Q.    So you knew that Wesley
7  Spivey and his girlfriend Zanna Bloodsworth
8  lived in the house. But you're saying you
9  didn't know that Channing Spivey lived there;
10  correct?
11   A.    Correct.
12   Q.    How long have you known
13  Wesley Spivey?
14   A.    A couple years, maybe.
15   Q.    Maybe longer or shorter time
16  than you knew Channing Spivey?
17   A.    I would say shorter.
18   Q.    How many times would you say
19  -- With regard to Channing Spivey, how many
20  times have you had any kind of conversation
21  or words with him, exchanged any kind of
22  communications with him?
23   A.    One, two dozen times,

Page 97

1  possibly.
2    Q.    And what were they -- As best
3  you can recollect, what were they in
4  connection with? What was the occasion for
5  you to have any communications with Channing
6  Spivey?
7    A.    There for a while, Channing
8  was working for Keith Stevens Garage in
9  Luverne, and I did business with the shop,
10  the garage, and I would go in and out and
11  speak with him. I talked with him while I
12  was there.
13   Q.    Any other occasions you can
14  recall?
15   A.    I'm sure there at some point
16  I ran into him in a convenience store or
17  something, but I just -- I'm not recalling
18  any specific.
19   Q.    Okay. You readily recognized
20  him on sight, though. When you saw him, you
21  would recognize him, knew who he was?
22   A.    I believe I would, yes, sir.
23         (Plaintiff's Exhibit 1 was

25 (Pages 94 - 97)

Page 98

1          marked for identification
2          purposes.)
3     Q.    Okay. I'm going to show you
4 what's been marked as Plaintiff's Exhibit 1.
5 Do you recognize that as Channing Spivey?
6     A.    Yes.
7     Q.    So Plaintiff's Exhibit 1 is a
8 fair and accurate depiction of how Channing
9 Spivey generally looked. This is prior to
10 the surgery, now, of course.
11    A.    That's how I remember seeing
12 him when he worked at Stevens Garage.
13    Q.    Right. And you readily
14 recognize him from that photograph?
15    A.    Yes, sir.
16         (Plaintiff's Exhibit 2 was
17         marked for identification
18         purposes.)
19    Q.    Let me show you what I marked
20 as Plaintiff's Exhibit 2. Did you ever see
21 Channing Spivey -- I'll represent to you
22 Plaintiff's Exhibit 2 is a photograph taken
23 after Channing's surgery when he had his head

Page 99

1 bandaged from having his skull sawed open to
2 do brain surgery on him. Did you ever see
3 Channing Spivey with a bandage on his head?
4     A.    Not that I recall.
5     Q.    Underneath that bandage,
6 there is a scar, incision. It was a wound
7 early on in March and April. Did you ever
8 see Channing Spivey -- He had his head shaved
9 also, I believe the testimony is going to be.
10 Did you ever see Channing Spivey with a wound
11 or incision down from the top of his head
12 toward his forehead?
13    A.    No, sir, not that I recall.
14    Q.    Is it your sworn testimony
15 you weren't aware that Channing Spivey had
16 had brain surgery at the time of the
17 shooting?
18    A.    I was not aware that he had.
19    Q.    Did Channing have a
20 reputation in Luverne for being violent or
21 rowdy?
22    A.    Nothing that I was aware of.
23    Q.    Okay. How long have you

Page 100

1 lived in the Luverne area?
2     A.    2001, when I moved to that
3 area.
4     Q.    Where did you live before
5 then?
6     A.    Below Brantley.
7     Q.    Below Brantley. All right.
8 So you had lived in the Luverne area, then,
9 for almost twenty years at the time of the
10 shooting?
11    A.    Yes, sir.
12    Q.    Okay. Do you know how many
13 people live in Luverne?
14    A.    No, sir.
15    Q.    The U.S. census puts the
16 population of Luverne at
17 twenty-seven-hundred, seventy-one. Does that
18 seem reasonable to you?
19    A.    Yes, sir.
20    Q.    Okay. Now, I grew up in a
21 slightly larger town about thirty-five miles
22 down the road, Andalusia. The census
23 population -- U.S. census puts their

Page 101

1 population at eight thousand, eight-hundred,
2 sixty-four people. About three times the
3 size of Luverne. My recollection is that
4 most people in Andalusia knew almost
5 everybody else in Andalusia or knew of them.
6 Would you say that was the case, sort of, in
7 Luverne?
8     A.    Yes, sir.
9     Q.    Okay. And that would be
10 particularly true of a policeman in Luverne;
11 correct?
12    A.    Yes, sir.
13    Q.    Do you know if Channing
14 Spivey had any criminal record involving
15 violence?
16    A.    Not that I'm aware of.
17    Q.    And certainly you had been
18 off and on in law enforcement since 2006;
19 correct? Or entirely in law enforcement
20 since 2006; correct?
21    A.    Yes, sir.
22    Q.    And all in the Luverne area;
23 either the Crenshaw County Sheriff's

26 (Pages 98 - 101)

Page 102

1 Department or the Luverne Police Department?
2     A.     Yes, sir.
3     Q.     And certainly a policeman or
4 deputy sheriff in the area would be in a
5 position to know about and have access to
6 information about who around town was violent
7 or rowdy or unruly persons in Luverne,
8 wouldn't they?
9     A.     Yes, sir.
10     Q.     Okay.  And you never knew
11 anything about Channing Spivey being violent
12 or rowdy or unruly; correct?
13     A.     Correct.
14     Q.     And how did you know Wesley
15 Spivey?
16     A.     I don't recall.
17     Q.     How you first met him?
18     A.     No, sir.
19     Q.     But you do know that he lived
20 down the road from you there?
21     A.     Yes, sir.
22     Q.     Do you know how long he'd
23 been living down the road there?

Page 103

1     A.     Not really, no, sir.
2     Q.     Do you know that it was as
3 much as five years or was it two years?
4     A.     I would just guess about two
5 years.
6     Q.     Okay.  I'll ask you the same
7 question about Wesley.  Did Wesley have any
8 reputation that you know of in the community
9 for being violent or rowdy or unruly?
10     A.     Not that I recall.
11     Q.     And any criminal record that
12 you know of?
13     A.     I think he had been arrested,
14 but I don't recall for what.
15     Q.     Okay.  That's Wesley you're
16 talking about?
17     A.     Correct.
18     Q.     Okay.  Did you know Zanna
19 Bloodsworth?
20     A.     Yes.
21     Q.     How did you know her?
22     A.     I believe I associated her
23 with being Deidre's daughter, I think is how.

Page 104

1     Q.     And who is Deidre?
2     A.     Tim White's wife.
3     Q.     The EMT?
4     A.     Yes.
5     Q.     Another family tie, kind of?
6     A.     Yes, sir.  Yes.
7     Q.     And what did you know about
8 Zanna?
9     A.     She was with Wesley.
10     Q.     Did you know her to be a good
11 citizen, as far as you know?
12     A.     I don't really know anything
13 about her other than just when I see her.
14     Q.     Do you know any reason to
15 believe that she's not a good citizen?
16     A.     No, sir.
17     Q.     Okay.  Do you know Justin
18 Robinson?
19     A.     No, sir.
20     Q.     Don't have any knowledge of
21 him at all?
22     A.     Does not sound familiar to me
23 at all.

Page 105

1     Q.     Okay.  You don't know that he
2 was one of the people that was up -- that
3 followed Channing up the -- and Deputy Penny
4 up the road to your house the day of the
5 shooting?  You don't know that?
6     A.     I've been told that.
7     Q.     Okay.  You didn't know it --
8 You didn't know him at the time?
9     A.     Correct.
10     Q.     Okay.  Any time you need a
11 bathroom break or you just get tired,
12 whatever reason, if you want to take a break,
13 ask me for it and we can do that.
14     A.     No.  I'm good.
15         (Plaintiff's Exhibits 3
16          through 12 were marked
17          for identification
18          purposes.)
19     Q.     I'm going to show you a
20 series of photographs and ask you if you can
21 identify them for me, please, sir.  Bear with
22 me a minute.  I'm going to show you a series
23 of photographs and ask you if you can

27 (Pages 102 - 105)

Page 106

1  identify these photographs. They are labeled
2  Plaintiff's Exhibits 3 through 12 and ask you
3  if you can identify those.
4            MR. HOWARD: I'm going to
5  write that number on them just so I can keep
6  up.
7            MR. SIKES: Take your time and
8  do that, Rick.
9            MR. HOWARD: I'll look through
10  them so he can go through them quickly.
11           MR. SIKES: I think I kept
12  them in order, Rick.
13      Q.    (Mr. Sikes) Take as long as
14  you need to take a look at those photographs.
15  I think they will be familiar with you. What
16  I'd like you to do is identify them. I think
17  we can do it this way. Are those photographs
18  of either your house or the house that Wesley
19  Spivey and Zanna Bloodsworth and Channing
20  Spivey were living at and the roadway between
21  them?
22      A.    Yes, sir.
23      Q.    Okay. Do they all of them

Page 107

1  fairly and accurately, as best you can tell,
2  depict what they purport to be, either your
3  house or the Spivey house or the roadway
4  between them?
5       A.    Yes, sir.
6       Q.    Okay. And do you see
7  anything in those photographs that appears
8  different in any significant way from how
9  they appeared on the day of the shooting?
10      A.    Yes, sir.
11      Q.    What's different?
12      A.    The gate is closed here
13  (indicating) in the photographs going onto my
14  property.
15           MR. HOWARD: You just give him
16  a number, also.
17           MR. SIKES: That's okay.
18      Q.    (Mr. Sikes) Is it closed in
19  the photograph, and it was open on the day of
20  the shooting?
21      A.    Correct.
22      Q.    Okay. All right. Anything
23  else other than the fact the gate was open

Page 108

1  then and it's not open in those photographs?
2       A.    No, sir. I don't see
3  anything else.
4       Q.    Okay. So those photographs,
5  with the exception of the gate being open in
6  some of those, other than that, they fairly
7  and accurately depict both your house, the
8  Spivey house, and the roadway between them,
9  as far as you can tell?
10      A.    Yes.
11           (Plaintiff's Exhibits 13 &
12            14 were marked for
13            identification purposes.)
14      Q.    I'll also show you
15  Plaintiff's Exhibits 13 and 14. And I'll
16  represent to you that these are plats made by
17  a fellow named -- a fellow who does forensic
18  mapping. A fellow named JC Grant. He did
19  this -- Your lawyer, Mr. Howard, and I split
20  the cost of having this mapping done. Have
21  you seen those before?
22      A.    No, sir. I have not.
23      Q.    Okay. I'll represent to you

Page 109

1  those were what got produced by Mr. Grant as
2  paid for by your lawyer and me to map out
3  both. I think 13 shows both houses and the
4  roadway between them and 14, Plaintiff's
5  Exhibit 14 shows the roadway in front of your
6  driveway where the gate is located; correct?
7       A.    Yes, sir.
8       Q.    Okay. As far as you can
9  tell, do they look like they fairly and
10  accurately depict the arrangement of and the
11  relative distances between the house, the
12  road, the length of the placement of
13  vegetation, anything else that's depicted on
14  there? Does all that look like it's a fair
15  and accurate depiction of how the different
16  physical objects are depicted on Plaintiff's
17  Exhibit 13 and 14?
18      A.    Yes, sir.
19      Q.    See anything significant that
20  was different on 13 and 14 than how they
21  appeared on the date of the shooting?
22      A.    No, sir.
23      Q.    Okay. As a Luverne

28 (Pages 106 - 109)

Page 110

1 Policeman, where did you go every day to
2 report for police duty?
3     A.    I usually started my day
4 going to the police department.
5     Q.    Okay.  And how long had you
6 been doing that, in May of 2020?
7     A.    Since my employment started
8 in December '14.
9     Q.    And what was the route that
10 you took to get to the police station?
11     A.    Almost exclusively each day I
12 would leave my driveway, turn right going
13 north on Glenwood Road and travel into town.
14     Q.    So looking at Plaintiff's
15 Exhibit 13, you would come out of your house
16 as shown at the top -- Excuse me.  Your house
17 is shown at the bottom.  You would take a
18 right and you would pass directly by the
19 house that the Spiveys were living in with
20 Zanna Bloodsworth; correct?
21     A.    Correct.
22     Q.    You said that you would --
23 You would recognize Channing Spivey as

Page 111

1 depicted in the photograph in Plaintiff's
2 Exhibit 1, you would recognize him when you
3 saw him?
4     A.    Is that the one from before
5 his surgery?
6     Q.    Yes.  That's 1.
7     A.    Yes.  I would recognize him,
8 yes.
9     Q.    Did you have any reason to
10 dislike Channing Spivey?
11     A.    No.
12     Q.    Did you have any hard
13 feelings toward him?
14     A.    No.
15     Q.    Did you know anything about
16 Channing that caused you to fear him?
17     A.    No, sir.
18     Q.    Know anything about Channing
19 that would cause you distrust him?
20     A.    No, sir.
21     Q.    Your testimony is that before
22 the shooting, you didn't know that Channing
23 had undergone brain surgery for a brain

Page 112

1 tumor?
2     A.    Correct.
3     Q.    When did you first learn
4 this?
5     A.    That he had had the surgery
6 for a brain tumor?
7     Q.    Yes.
8     A.    Sometime after the shooting,
9 I want to believe.  I want to say that
10 evening.
11     Q.    I believe the evidence will
12 be that Channing had brain surgery, I
13 believe, on the first week of March in 2020.
14 So you shot him on May 27th, so that would be
15 about eleven or twelve weeks before the
16 shooting that he had brain surgery, if,
17 indeed, he had it in March; correct?
18     A.    Yes, sir.
19     Q.    And for all of that period of
20 time, you lived a hundred yards down the road
21 from Channing Spivey; correct?
22         MR. HOWARD:  Object to the
23 form as to distance.

Page 113

1         MR. SIKES:  I don't know what
2 it is.
3         MR. HOWARD:  It's two hundred
4 yards.
5         MR. SIKES:  I don't believe it
6 is.
7         MR. HOWARD:  The second map I
8 asked him to do, it's like one hundred and
9 eighty or something to the front of their
10 house and you go up to the house it's going
11 to be exactly two football fields.  That's
12 what he told me.  He said I was spot on with
13 my measurements.
14         MR. SIKES:  You're talking
15 about door to door.  I'm looking at the
16 roadway between them.  I took a road marker
17 out there.
18         MR. HOWARD:  The asphalt is
19 probably going to be about that.  I thought
20 your question asked how far away.
21         MR. SIKES:  Again, I'm not
22 talking about front door to front door.  I'm
23 talking about let's say driveway to driveway.

29 (Pages 110 - 113)

Page 114

```
1            MR. HOWARD: Mailbox to
2  mailbox, probably.
3            MR. SIKES: All right. That's
4  fine.
5      Q.    (Mr. Sikes) All during that
6  period, you were the closest neighbor to
7  Channing Spivey and you rode past his house
8  almost every day?
9      A.    Yes, sir.
10     Q.    And in those twelve weeks, is
11 it your testimony you had never seen Channing
12 Spivey?
13     A.    Not that I recall.
14     Q.    And you say you had never
15 seen Channing Spivey with a bandage on his
16 head?
17     A.    I don't ever recall seeing
18 him with a bandage on his head.
19           MR. HOWARD: Griff, you asked
20 if he's ever seen Channing Spivey. Earlier
21 he testified that he had. Did you mean while
22 he lived at the house?
23           MR. SIKES: Yeah.
```

Page 115

```
1            MR. HOWARD: Okay.
2      Q.    (Mr. Sikes) And Channing's
3  head was shaved for the brain surgery. You
4  had never seen him with his head shaved?
5      A.    Not that I recall.
6      Q.    Never seen him with a big red
7  incision where they had sawed into his skull
8  running from the top of his head to his
9  forehead?
10     A.    Not that I recall.
11     Q.    Do you know Brent Penny?
12     A.    Yes, I do.
13     Q.    How long have you known Brent
14 Penny?
15     A.    The entire time he worked at
16 Crenshaw County Sheriff's Office.
17     Q.    Again, what I'd like for you
18 to do is put it in years, if you would,
19 please, sir.
20     A.    I think he worked there a
21 year. I'm not sure.
22     Q.    You knew him a year, then?
23     A.    I would have to see what his
```

Page 116

```
1  employment time was. I just -- I don't
2  recall, sir.
3      Q.    I understand. Did you know
4  him before he worked there?
5      A.    No, sir.
6      Q.    Okay. So is it your
7  testimony you knew him beginning when he
8  started employment with the Crenshaw County
9  Sheriff's Department?
10     A.    Yes, sir.
11     Q.    Okay. And how did you know
12 him? What was the way that you had any
13 knowledge of him or interaction with him or
14 how did you come to know him?
15     A.    Just in the course of our
16 duties, we had met one another.
17     Q.    Had you ever worked with him
18 before on some law enforcement work?
19     A.    I believe we executed a
20 couple of arrest warrants around town,
21 possibly. Mr. Penny was not familiar with
22 the area, so sometimes he would ask me if I
23 knew a name or a location, things of that
```

Page 117

```
1  nature.
2      Q.    Okay. He was with one police
3  agency and you were with another at that
4  time?
5      A.    Correct.
6      Q.    Okay. But y'all interacted
7  with each other on occasion?
8      A.    Yes, sir.
9      Q.    And you think that was
10 approaching maybe a year?
11     A.    I believe so.
12     Q.    But whatever it was, it was
13 from whenever he began work or shortly after
14 he began work with the Crenshaw County
15 Sheriff's Department until the day of the
16 shooting that would be the period of time
17 that you knew him before the shooting;
18 correct?
19     A.    Correct.
20     Q.    Because you didn't know him
21 before he worked at the Crenshaw County
22 Sheriff's Department?
23     A.    Yes, sir. That's correct. I
```

30 (Pages 114 - 117)

Page 118

1  did not.
2      Q.     On how many different
3  occasions had you had interactions with
4  Deputy Penny? And I know you can't tell me
5  seventeen or thirty-seven or two, but in
6  general, what would you say the range of the
7  number of times you had had some sort of
8  interaction with him was?
9      A.     More than a hundred, less
10 than two hundred, maybe.
11     Q.     Oh, really?
12     A.     I come with that number
13 because I would say at least one time a shift
14 I would at least run into him and say hello.
15     Q.     Okay.
16     A.     And we worked a rotation that
17 amounts to half of the year.
18     Q.     Did you see him ever outside
19 of work?
20     A.     No, sir.
21     Q.     Did you form any judgment
22 about him during the period of time you
23 interacted with him a hundred to two hundred

Page 119

1  times?
2      A.     Yes, sir.
3      Q.     And what was that judgment?
4      A.     That I didn't necessarily
5  agree with the way he approached things from
6  time to time.
7      Q.     Can you tell me specifically
8  what you're talking about?
9      A.     Sometimes I didn't like how
10 he spoke to people or sometimes I didn't like
11 the way he approached a situation,
12 physically.
13     Q.     In what regard did you have
14 criticism of how he approached people? Was
15 he too aggressive? Was he too timid? I
16 don't know what all you might mean. What was
17 wrong with the way you saw him interact with
18 members of the general public?
19     A.     I seen him do both of those.
20 Sometimes I seen him be overaggressive.
21 Sometimes I had seen him to be too timid.
22     Q.     Any other specific instances
23 in way or ways in which you had a criticism

Page 120

1  or a difference of opinion about how he was
2  performing law enforcement duties?
3      A.     No, sir. Not really.
4      Q.     So the sole criticism you had
5  about him would be that at times he was too
6  overly aggressive and at sometimes he was too
7  timid, you thought?
8      A.     Yes, sir.
9      Q.     Nothing else comes to mind,
10 though?
11     A.     Not really, no, sir.
12     Q.     Was that the majority of time
13 or was that just on a few occasions?
14     A.     I would say occasions.
15     Q.     Okay. Overall, did you
16 believe that he was a good law enforcement
17 officer?
18     A.     I believed Deputy Penny was
19 proficient.
20     Q.     You had never worked with the
21 same law enforcement agency, though; correct?
22     A.     Correct.
23     Q.     And you didn't know him or

Page 121

1  have any relationship with him at all as a
2  personal friend or anything like that?
3      A.     No, sir.
4      Q.     And never had any
5  associations or interactions with him outside
6  of jointly cooperating on some sort of law
7  enforcement function?
8      A.     No, sir. No contacts with
9  him outside of work.
10     Q.     Did your opinion of Deputy
11 Penny change after the shooting?
12         MR. HOWARD: Don't answer
13 that. It's covered by the Fifth cause it
14 arises from that time frame is what you're
15 asking.
16         MR. SIKES: His opinion of
17 Penny might tend to incriminate him? I don't
18 think that's a proper objection.
19         MR. HOWARD: Okay. I do.
20         MR. SIKES: Are you
21 instructing him not to answer?
22         MR. HOWARD: Yes.
23     Q.     (Mr. Sikes) On advice of

31 (Pages 118 - 121)

Page 122

1  counsel, are you going to refrain from
2  answering that question?
3      A.     Correct.
4      Q.     Did you speak to Deputy Penny
5  on May 27, 2020?
6          MR. HOWARD:  Same objection.
7      Q.     I'm not asking you what you
8  said.  I'm asking did you speak with him?
9          MR. HOWARD:  That's fair.  You
10 can tell him yes or no if you spoke to him.
11     A.     Yes.
12     Q.     Okay.  Did you speak with him
13 before noon that day?
14     A.     No.
15     Q.     Did you speak with him before
16 the shooting?
17     A.     Yes.
18     Q.     And where was that?
19     A.     In my yard.
20     Q.     Okay.  And approximately how
21 long before the shooting was that that you
22 spoke with him in your yard?
23          MR. HOWARD:  We're going to

Page 123

1  take the Fifth on that one, too.  That's too
2  close to the facts in setting forth your
3  timeline.
4      Q.     Are you going to refuse to
5  answer that?  We need to do this for the
6  Record.  He can object to it and instruct
7  you, but it is you that has to refuse to
8  answer.
9      A.     Yes, sir.  On advice of
10 counsel.
11     Q.     You're going to decline to
12 answer that question?
13     A.     Yes.
14     Q.     Did you speak to Deputy Penny
15 after the shooting?
16     A.     Yes.
17     Q.     Okay.  And was that there at
18 your house?
19     A.     Yes.
20     Q.     Okay.  And what was that
21 conversation?
22          MR. HOWARD:  I advise you to
23 take the Fifth on that one.

Page 124

1      Q.     And you're going to decline
2  to answer that on the basis of the Fifth
3  Amendment?
4      A.     Correct.
5      Q.     Did you hear Deputy Penny say
6  anything to anyone else that day before the
7  shooting?
8      A.     I don't recall.
9      Q.     You don't recall him saying
10 anything to anybody else that day before the
11 shooting?
12     A.     Not that I can recall.
13     Q.     Okay.  What was the first
14 time that you saw Deputy Penny that day?
15     A.     As he was running up my
16 driveway.
17     Q.     And that would have been
18 within two or three minutes of the shooting?
19     A.     Yes.
20     Q.     Okay.  Never had seen him
21 before that?
22     A.     I had not seen Deputy Penny
23 the day of the shooting prior to him running

Page 125

1  up my driveway.
2      Q.     All right.  Now, you say you
3  spoke to Deputy Penny after the shooting that
4  day on the 27th; correct?
5      A.     Yes.
6      Q.     Have you spoken to Deputy
7  Penny since May 27 of 2020?
8      A.     No, sir, I have not.
9      Q.     Have you seen him?
10     A.     No, sir.
11     Q.     Do you have any reason to
12 believe that Deputy Penny would not be
13 truthful in relating what he knows about this
14 shooting?
15     A.     No, sir.
16     Q.     Do you have any reason in
17 general to believe that Deputy Penny would be
18 truthful about any matter that you know of?
19     A.     No, sir.  I don't think he
20 would be untruthful.
21     Q.     Okay.  Have you ever seen any
22 statement that Deputy Penny has ever given?
23     A.     In relation to the shooting?

Veritext Legal Solutions
877-373-3660                                          800.808.4958

Page 126

1    Q.    Yes, sir.
2    A.    No, sir.
3          (Plaintiff's Exhibit 21
4          was marked for
5          identification purposes.)
6    Q.    I'm going to show you what's
7  been marked as Plaintiff's Exhibit 21.  Do
8  you recognize those photographs, sir?
9    A.    Yes, sir, I do.
10    Q.    Those are a series of
11  eighteen photographs.  They are all
12  photographs of you; correct?
13    A.    Correct.
14    Q.    When were those photographs
15  taken?
16    A.    Some of these were taken at
17  different times.  I'm going to have to go
18  through.
19    Q.    Yeah.  Please sort them out.
20  Group them if you would; that would be fine.
21  Was there more than one occasion when they
22  were taken?
23    A.    Yes, sir.  Yes, sir.

Page 127

1    Q.    Excuse me.  Were there more
2  than two occasions when they were taken?
3    A.    No, sir.
4    Q.    Okay.  Check them over again
5  and make sure you've got them grouped
6  correctly, please, sir.
7    A.    Yes, sir.  So I incorrectly
8  stated it was two occasions.  It would have
9  been three.
10    Q.    Let's do it this way.  What
11  was the first occasion that you took the
12  photographs or the photographs were taken?
13    A.    These were taken --
14    Q.    Give me the two dates.
15    A.    May 27th, and then two
16  different times on May 28th.
17    Q.    All right.  Let's start with
18  on May 27th.  Tell me -- Hand me the
19  photographs that were taken on May 27th.
20    A.    (Witness complies.)
21    Q.    Are these all consecutive
22  numbered or do you know?
23    A.    I believe all those were

Page 128

1  taken in the back of the ambulance.
2          MR. HOWARD:  He just asked if
3  they're consecutively numbered.
4          THE WITNESS:  I'm sorry.  I
5  misunderstood.
6    Q.    (Mr. Sikes) Okay.  The first
7  group out of Plaintiff's Exhibit 21 are --
8  They run from 238 to 243 and 250 to 255.
9  Check to make sure that I've done that
10  correctly.  I have the first group you say
11  were taken on the 27th as being 238 to 243.
12    A.    Okay.
13    Q.    And 250 to 255?
14    A.    Correct.  Yes.
15    Q.    And the second group, they
16  were taken at two different times on May 28?
17    A.    Correct.
18    Q.    Okay.
19    A.    Number 244 was taken in the
20  a.m.
21    Q.    Is there just one that was
22  taken in the a.m.
23    A.    It appears that way.

Page 129

1    Q.    Okay.  And the others were
2  all taken on the afternoon on the 28th?
3    A.    Would have been that evening.
4    Q.    Give me those numbers.
5    A.    245 through 249.
6    Q.    Let's talk about -- Let me
7  see those all together.
8    A.    (Witness complies.)
9    Q.    Let's talk about those on the
10  27th, first.  What time were those
11  photographs taken?
12    A.    Approximately, 8:30.
13    Q.    This was about thirty
14  minutes, though, then after the shooting?
15    A.    Correct.  It might have been
16  less time than that.
17    Q.    Okay.  Say 8:20 to 8:30,
18  then.  That would be fair?
19    A.    That's reasonable.
20    Q.    Okay.  Who took the
21  photographs?
22    A.    Floyd Wright.
23    Q.    And how do you spell Wright?

33 (Pages 126 - 129)

Page 130

```
1     A.    W-R-I-G-H-T.
2     Q.    And he's with the Brantley
3  Rescue squad?
4     A.    Luverne Rescue.
5     Q.    Luverne Rescue. Whose idea
6  was it to take the photographs?
7     A.    Culmination of his and mine
8  and Tim White, because Tim wanted to clean me
9  up and make sure I didn't have any open
10 wounds.
11    Q.    This is Tim White, your
12 friend?
13    A.    Yes.
14    Q.    Or good friend, depending on
15 how you view it. You don't recall who first
16 came up with the idea?
17    A.    I think I -- I think Tim
18 wanted to clean me up and I told him we
19 needed to photograph and Floyd said he would
20 take care of it, and he started clicking.
21    Q.    Okay. And it was Floyd had
22 the camera?
23    A.    Yes. He's the one that took
```

Page 131

```
1  the pictures.
2     Q.    And it was his camera?
3     A.    I believe it was his phone.
4     Q.    You think he made it on his
5  phone. Okay. All right. Why did you think
6  it would be a good idea to take photographs?
7           MR. HOWARD: I'd advise you to
8  take the Fifth on that one.
9     A.    Under advice of Counsel, I'll
10 take the Fifth on that.
11    Q.    And refuse to answer?
12    A.    Correct.
13    Q.    What did you think the
14 possible benefit of the photographs to you
15 would be?
16          MR. HOWARD: Same.
17    A.    Under the advice of Counsel,
18 I'll go with the Fifth.
19    Q.    And refuse to answer?
20    A.    And refuse to answer.
21    Q.    Was the purpose of taking the
22 photographs to try to support the claim that
23 you suffered some sort of injury or
```

Page 132

```
1  significant injury on the day of the
2  shooting?
3           MR. HOWARD: Same thing.
4     A.    Under advice of Counsel, I'm
5  going to refuse to answer and take the Fifth.
6     Q.    What do you contend that
7  these photographs show? I'm talking about
8  the ones now taken on the 27th that we've
9  identified.
10          MR. HOWARD: Same thing.
11    A.    Under advice of Counsel, I
12 refuse to answer citing the Fifth.
13    Q.    Do any of those photographs
14 show that your skin is broken at any place?
15          MR. HOWARD: Same.
16    A.    Again, under advice of
17 Counsel, I refuse to answer citing the Fifth.
18    Q.    There are no cuts shown in
19 the photographs, are there?
20          MR. HOWARD: Same.
21    A.    Again, under advice of
22 Counsel, I refuse to answer citing the Fifth.
23    Q.    There are no puncture wounds
```

Page 133

```
1  shown in the photographs, are there?
2           MR. HOWARD: Same.
3     A.    Under advice of Counsel, I
4  refuse to answer citing the Fifth.
5     Q.    There are no lacerations
6  shown in the photographs, are there?
7           MR. HOWARD: Same.
8     A.    Under the advice of Counsel,
9  I'm going to refuse to answer citing the
10 Fifth.
11    Q.    Do you see any scabs in the
12 photographs?
13          MR. HOWARD: Same.
14    A.    Under the advice of Counsel,
15 I refuse to answer citing the Fifth.
16    Q.    Do you see any bruises in the
17 photographs?
18          MR. HOWARD: Same.
19    A.    Under advice of Counsel, I
20 refuse to answer citing the Fifth.
21    Q.    Do you see any swelling in
22 the photographs?
23    A.    Under the advice of Counsel,
```

34 (Pages 130 - 133)

Page 134

1 I'm going to refuse to answer citing the
2 Fifth.
3        Q.      Do you contend that there's
4 some debris or there's some dark color
5 material shown on the side of your neck
6 there, maybe some other places in the
7 photographs?  What do you contend that is?
8              MR. HOWARD:  Same.
9        A.      Citing Counsel, I'm going to
10 refuse to answer citing the Fifth.
11        Q.      Do you contend that they show
12 dried blood?
13              MR. HOWARD:  Same.
14        A.      Under advice of Counsel, I'm
15 going to refuse to answer citing the Fifth.
16        Q.      Do you believe that it was
17 blood?
18        A.      Under the advice of Counsel,
19 I'm going to refuse to answer citing the
20 Fifth.
21        Q.      If you do contend it was
22 blood, do you contend it was your blood or
23 Channing's blood or somebody else's blood?

Page 135

1        A.      Under the advice of Counsel,
2 I'm going to refuse to answer citing the
3 Fifth.
4        Q.      Have you ever asked anybody
5 that is qualified to examine that blood or
6 debris or whatever it is to identify it as
7 blood?
8              MR. HOWARD:  Same.
9        A.      Under the advice of Counsel,
10 I refuse to answer citing the Fifth.
11        Q.      Did you ever ask for, if it
12 is blood, for that blood to be typed?
13              MR. HOWARD:  Same.
14        A.      Under the advice of Counsel,
15 I refuse to answer citing the Fifth.
16        Q.      Now, you were blood type
17 O-negative; correct?
18              MR. HOWARD:  You can answer
19 your blood type.
20        A.      I am O-positive.
21        Q.      Okay.  I think there's some
22 records that show to you be O-negative.  But
23 if they show that, that's incorrect?

Page 136

1        A.      I am O-positive.
2        Q.      What I said is correct, then.
3 If they show something -- They show
4 O-negative, that's incorrect; correct?
5        A.      Correct.
6        Q.      Okay.  Do you know Channing
7 Spivey's blood type?
8        A.      No, I do not.
9        Q.      If you were trying to contend
10 that this is blood, and that also that this
11 is your blood, it would have been a good idea
12 to have that blood identified as blood and to
13 have it typed, wouldn't it?
14              MR. HOWARD:  Same.
15        A.      Under advice of Counsel, I'm
16 refusing to answer citing the Fifth.
17        Q.      But you didn't ask anybody to
18 identify this as blood, did you?
19              MR. HOWARD:  Same.
20        A.      Under advice of Counsel, I
21 refuse to answer citing the Fifth.
22        Q.      And you didn't ask if it was
23 blood, for that blood to be typed, did you?

Page 137

1        A.      Under advice of Counsel, I
2 refuse to answer that citing the Fifth.
3        Q.      You could have done that,
4 couldn't you?
5        A.      Under advice of Counsel, I
6 refuse to answer citing the Fifth.
7        Q.      Did you seek any medical
8 treatment or examination by any medical
9 professional after the May 27th shooting?
10              MR. HOWARD:  Same.
11        A.      Under advice of Counsel, I
12 refuse to answer citing the Fifth.
13        Q.      How about after May 27th?
14 Did you ever seek any medical treatment or
15 evaluation by any medically trained person
16 about any supposed or alleged injuries you
17 sustained?
18              MR. HOWARD:  Sustained in this
19 incident?
20              MR. SIKES:  Yes.
21              MR. HOWARD:  Okay.  Same.
22        A.      Under advice of Counsel, I'm
23 going to cite the Fifth.

35 (Pages 134 - 137)

Page 138

1    Q.    Do you have any medical
2 records regarding any treatment for any
3 alleged injury you sustained in the shooting
4 incident?
5    A.    No, I do not.
6    Q.    Are there any medical records
7 for any injuries that you claim to have
8 sustained on May 27th, that you know of?
9    A.    There would be a report by
10 Luverne Rescue for the treatment on the scene
11 that night.
12    Q.    Have you asked for that?
13    A.    No, I have not.
14    Q.    Has your lawyer asked for
15 that?
16    A.    I'm not aware if he has.
17    Q.    You could obtain that by
18 simply asking for it, couldn't you? They're
19 your medical records.
20    A.    I believe I could.
21    Q.    But you haven't done that?
22    A.    No, sir.
23    Q.    Nor has your lawyer, that you

Page 139

1 know of?
2    A.    Not that I'm aware of.
3         MR. HOWARD:  Let the Record
4 show that I have through a subpoena from
5 October, I think.
6    Q.    I assume your wife has makeup
7 at your house; correct?
8    A.    Possibly.
9    Q.    You were issued a police car;
10 correct?
11    A.    Yes.
12    Q.    What type and kind of police
13 car were you issued?
14    A.    Ford Crown Victoria.
15    Q.    What year?
16    A.    2011.
17    Q.    And does it have any -- Is it
18 assigned some number on the side, 314, or car
19 11?
20    A.    No, sir.
21    Q.    How do you identify -- How do
22 you tell one car from the other within the
23 police department?

Page 140

1    A.    I can just look at the car
2 and know it's the one I drive.
3    Q.    Okay.  You know most police
4 forces number them somehow and possibly
5 number them on the side or the front or back?
6    A.    Yes.
7    Q.    But Luverne Police Department
8 doesn't do that?
9    A.    Yes, we do.
10    Q.    What is your number?
11    A.    My car is not numbered.  Our
12 patrol fleet is numbered.
13    Q.    How many vehicles does the
14 Luverne Police Department have that aren't
15 numbered?
16    A.    Four, I believe.
17    Q.    And who drives those?
18    A.    Sergeant Powell drives one.
19 Officer Atkinson drives another one.  I drive
20 one, and then there's another Ford Crown
21 Victoria that is used as a spare at the
22 moment.
23    Q.    The chief doesn't have one?

Page 141

1    A.    The chief's vehicle has a
2 designation on it, a marking on it.
3    Q.    And what is that marking?
4    A.    I believe it's 202.
5    Q.    Okay.  Is there any
6 particular reason why these other four don't
7 have a number on them?
8    A.    They were purchased or
9 obtained without any markings, and we had no
10 reason to put them in patrol at the time, so
11 we didn't mark them.
12    Q.    Do you regularly patrol in
13 your vehicle or did you in May of 2020?
14    A.    My schedule is not regular.
15 It varies.
16    Q.    So some of the times you did,
17 and some of the times you didn't?
18    A.    Correct.  Sometimes
19 administrative duties and it sets at the
20 police department almost the entire day and
21 never moves.  And then other days it rides a
22 hundred miles.  It has no regularity to it.
23    Q.    In general during the year of

36 (Pages 138 - 141)

Page 142

1  2020, how much of the time were you engaged
2  in patrol work and how much of it were you
3  engaged in work that didn't involve you
4  patrolling in your police vehicle?  And I
5  know you can't tell me exactly.  Is it
6  one-third, two-thirds, is it about
7  fifty-fifty?  Is it twenty-eighty?  In round
8  terms, how much of the time did you spend
9  patrolling and how much of the time did you
10  spend on other duties?  I understand it
11  varies from time to time.
12      A.      Let's just give it a
13  fifty-fifty.
14      Q.      Is that the best you can
15  tell?  That would have been the case in May,
16  also?
17      A.      Yes, sir.
18      Q.      Did you have any particular
19  route or area within the city limits or
20  outside the city limits of Luverne that you
21  were assigned to patrol or would it vary from
22  time to time?
23      A.      No, sir.  Our city is small

Page 143

1  enough we don't break it down to districts or
2  areas.
3      Q.      You're all over?
4      A.      Yes.
5      Q.      All over town?
6      A.      Yes, sir.
7      Q.      Do you patrol outside city
8  limits?
9      A.      Very little into the
10  jurisdiction, yes.
11      Q.      And I think state law is that
12  municipalities, the local police force has
13  jurisdiction within.  And you see it on signs
14  sometimes, police jurisdiction signs that
15  extend maybe a half a mile or a mile out of
16  town, is that correct, as far as you know?
17      A.      Yes, sir.
18      Q.      Is that the case with
19  Luverne, also?
20      A.      Yes, sir.
21      Q.      Okay.  But for the most part
22  all of your patrolling would be done this 50
23  percent of the time that you were doing

Page 144

1  patrolling and while you were on duty would
2  have been done within this -- either within
3  the Luverne city limits or within a mile or a
4  half mile of the city limits?
5      A.      Yes, sir.  That's correct.
6      Q.      Where did the vehicle stay
7  when you were not using it?
8      A.      At my residence.
9      Q.      Okay.  Does the Luverne
10  Police Department have a garage?
11      A.      No, sir.
12      Q.      Does it have any other area
13  that it stores vehicles in?
14      A.      No, sir.
15      Q.      Okay.  Does it have a parking
16  lot?
17      A.      Yes, sir.
18      Q.      That's primarily for people
19  coming.  That's not primarily for storing the
20  police vehicles; correct?
21      A.      Usually the patrol cars park
22  on the back and the side of the building.
23  The officers that work there park either in

Page 145

1  the back with the patrol cars or on the side
2  with the patrol cars.  And the visiting
3  people that come in generally park in the
4  front of the building.
5      Q.      Where would you park your
6  vehicle when you were at the police office
7  doing administrative work or other work, not
8  patrolling?
9      A.      That varied a lot of times
10  depending on the time of the day it was, the
11  temperature outside, whether it was raining,
12  who was parked where.  I parked fairly
13  randomly.
14      Q.      You didn't have an assigned
15  parking place, then?
16      A.      No, sir.
17      Q.      But you were allowed to take
18  your vehicle home at night after your work
19  day ended?
20      A.      Correct.
21      Q.      And you generally did that?
22      A.      Correct.
23      Q.      Okay.  In fact, would you say

37 (Pages 142 - 145)

Page 146

1  it would be rare on the days after you got
2  off duty that you didn't drive home in your
3  vehicle and park it at your house?
4      A.    Correct.
5      Q.    Was it, in fact, parked at
6  your house on the day of the shooting?
7      A.    Yes.
8      Q.    Okay.  Where was it parked at
9  your house?
10     A.    Under the carport.
11     Q.    Okay.  Show me on Plaintiff's
12  Exhibit 14, I believe it is.  Where is it?
13     A.    That does not indicate my
14  carport, as it's detached from my residence
15  itself.
16     Q.    Where is it located,
17  generally speaking?
18         MR. HOWARD:  Can I make a
19  suggestion?  Can he point it out on the
20  photographs that he identified earlier, if
21  it's on there.
22         MR. SIKES:  Yeah.  That would
23  be good.

Page 147

1      Q.    (Mr. Sikes) Tell me if it's
2  on here.  If it helps you any, here's the
3  north, south, east, west.
4      A.    It's in this area right here
5  (indicating).
6      Q.    Okay.  So that would be
7  generally south and east of your house.  Do
8  you see the north, east, south, west here?
9      A.    Yes, sir.
10     Q.    That's south, and that's
11  east.  It would be southeast of your house;
12  correct?  If that's south and that's east, it
13  would have been southeast of your house;
14  correct?
15     A.    Yes, sir.
16     Q.    Okay.  All right.  Is it just
17  a sort of a covered shed or has it got walls
18  all the way down it or what?
19     A.    Walls on two and one third
20  side of two parking areas, and then there's
21  another third that's completely walled up on
22  the back of it.
23     Q.    And where was your vehicle

Page 148

1  generally kept?
2      A.    On the inside parking area.
3      Q.    Could you have readily gotten
4  to it from your house?
5      A.    Yes, sir.
6      Q.    There's no locked doors or
7  anything like that you have to go through?
8      A.    No, sir.
9         (Recess taken.)
10     Q.    (Mr. Sikes) Mr. Adcock, let
11  me go back and clear one other thing up
12  before we go forward.  I neglected to do this
13  earlier.  You said that I think currently the
14  Luverne Police Department has is twelve
15  members and it used to be thirteen?
16     A.    I believe that's right.  We
17  actually are a couple people short --
18  positions short.  That's why I was having
19  trouble counting them in my head.
20     Q.    What you named for me, I
21  think, was sworn police officers.  And that
22  is from the chief to you as the captain, the
23  lieutenant is open and three sergeants and

Page 149

1  you throughout there were maybe seven or
2  eight sort of regular police officers, line
3  officers; correct?
4      A.    Yes, sir.
5      Q.    Okay.  What I'm wondering, is
6  there any other staff, unsworn employees of
7  the Luverne Police Department, other than
8  these officers we named?
9      A.    There's an office manager,
10  secretary.  I'm not really sure she has a
11  title.
12     Q.    Okay.  What's her name?
13     A.    Pam Lewis.
14     Q.    Pam Lewis.  Was she employed
15  there on the 27th of May?
16     A.    Yes, sir.
17     Q.    Okay.  Are there any other
18  people in -- that work at the Luverne Police
19  Department in May of 2020 other than Pam
20  Lewis and these -- the police officers that
21  we talked about?
22     A.    No, sir.  Nobody else.
23     Q.    Okay.  We were talking about

38 (Pages 146 - 149)

Page 150

1 this group of photographs.  And as I
2 understand it, the first grouping out of
3 Plaintiff's Exhibit 21, and I don't need to
4 go back and give the numbers again because
5 they're already on the Record, but that first
6 group was taken within minutes or so after
7 the shooting.  And they were taken by Floyd
8 Wright?
9    A.    Yes, sir.
10    Q.    With his camera, maybe his
11 phone.  And you had declined to tell us why
12 you had wanted them taken; correct?
13    A.    Yes, sir.
14    Q.    On the Fifth Amendment claim.
15          Let me ask you about the
16 second group of photographs.  I think you
17 told me that the first of those was taken in
18 the morning?
19    A.    Yes, sir.  I believe that's
20 correct.
21    Q.    And who took that photograph?
22    A.    I took that photograph.
23    Q.    Okay.  And what did you take

Page 151

1 it with?
2    A.    My phone.
3    Q.    Okay.  And was there anybody
4 present when you took it?
5    A.    No, I don't believe so.
6    Q.    And about what time in the
7 morning?
8    A.    Sometime after daylight, but
9 before lunch.  I really can't get any more
10 narrow than that.
11    Q.    That's fine.  Did anybody
12 suggest you take it?
13    A.    No, sir.
14    Q.    You decided to take it?
15    A.    Yes, sir.
16    Q.    Okay.  And, again, I'll ask
17 you what the purpose of taking it was?
18    A.    Based on advice of my
19 Counsel, I decline to answer.
20    Q.    On the Fifth Amendment?
21    A.    On the Fifth Amendment.
22    Q.    Let's look at the rest of the
23 photographs in that second group.  Take a

Page 152

1 look at those.  I think these would be 245 to
2 249.
3    A.    Correct.
4    Q.    When were they taken?
5    A.    Sometime in the afternoon or
6 evening of the 28th.
7    Q.    Where were they taken?
8    A.    My bathroom.
9    Q.    And who took them?
10    A.    I took all but the last one.
11    Q.    And who took that one?
12    A.    My wife would have taken that
13 one.
14    Q.    Okay.  And whose idea was it
15 to take those?
16    A.    Mine.
17    Q.    Okay.  And maybe I'm wrong, I
18 think I've already covered this, but just to
19 make sure.  You had never been to a medical
20 professional for any treatment or evaluation
21 of any claimed injury you sustained in this
22 accident -- or in this incident; correct?
23    A.    Correct.

Page 153

1    Q.    And there won't be any other
2 medical records other than you said the
3 ambulance records.  Other than that -- Why
4 did you ride in the ambulance?
5    A.    I didn't ride in the
6 ambulance.
7    Q.    Who was it that examined you
8 out of the ambulance?
9    A.    Tim White and Floyd Wright.
10    Q.    Was that their idea or your
11 idea?  Did you ask them to?
12          MR. HOWARD:  Object.  Asked
13 and answered.  You can answer it again.
14    A.    It was both.  It was, you
15 know, check over me.
16    Q.    Okay.
17          MR. SIKES:  Read me back the
18 last question before the break, ma'am.  I
19 think we were talking about this little
20 semidetached garage, I believe it's where we
21 were.  What's the last question?
22          (Requested portion of the
23          Record was read by the

39 (Pages 150 - 153)

Page 154

1          Reporter.)
2      Q.    (Mr. Sikes) And it was parked
3  there at the time of the shooting?
4      A.    Yes, sir.
5      Q.    Okay.  The Luverne Police
6  Department issues weapons or use-of-force
7  equipment to policemen, doesn't it?
8      A.    Yes, sir.
9      Q.    And you had been issued
10  weapons and use-of-force equipment; correct?
11      A.    Actually, no.
12      Q.    You hadn't been issued any?
13      A.    No, sir.
14      Q.    Did you have any?
15      A.    Yes, sir.
16      Q.    Where did they come from?
17      A.    Equipment I had prior to my
18  employment there.
19      Q.    From prior police employment?
20      A.    Yes, sir.
21      Q.    Okay.  Well, let's list for
22  me what equipment you had.
23      A.    I had --

Page 155

1      Q.    Let's start with your pistol.
2      A.    Yes, sir.
3      Q.    Okay.
4      A.    I had my own pistol.  What do
5  you mean?
6      Q.    It's a Glock.  It's a Sig
7  Sauer.
8      A.    Sig Sauer.
9      Q.    All right.  What caliber?
10      A.    .45.
11      Q.    I guess Sig Sauer makes
12  different types of .45s.  How is this
13  designated?
14      A.    1911 is the model.
15      Q.    You follow what I'm talking
16  about, don't you?
17      A.    I just want to make sure.
18          MR. HOWARD:  Just don't --
19  Make sure you're on the same page.  Don't
20  guess as to what he's asking.  If you don't
21  understand.
22      Q.    When I asked you what type of
23  weapon you've got, I'm asking for the

Page 156

1  details.  It's a Sig Sauer .45 caliber 1911
2  model.  Any other description of it?
3      A.    No, sir.
4      Q.    Any other specifications?
5      A.    No, sir.
6      Q.    If you wanted to go buy one,
7  could you buy the identical one, a 1911 Sig
8  Sauer 45 now?
9      A.    Yes, you could.
10      Q.    Okay.  And when did you
11  acquire it?
12      A.    Sometime in 2014.
13      Q.    All right.  And where did you
14  buy it?
15      A.    I bought it from a private
16  individual.
17      Q.    And who was that?
18      A.    I don't remember the
19  gentleman's name.
20      Q.    Where was he?
21      A.    He lived in Enterprise.
22      Q.    How did you know that he had
23  a pistol for sale?

Page 157

1      A.    I think a friend of mine had
2  contacts with this man and knew he had one
3  for sale.
4      Q.    Did you buy your own
5  ammunition or was that supplied to you by the
6  police department?
7      A.    Purchased my own.
8      Q.    All right.  And what kind of
9  ammunition did you purchase?
10      A.    Federal.
11      Q.    Give me -- Again, Federal
12  makes a lot of different kinds of ammunition.
13      A.    I'm trying to.
14      Q.    I'm sorry.  Go ahead.
15      A.    Federal Plus-P Hydra-Shok.
16      Q.    And where do you buy that?
17      A.    The last time I purchased
18  some, I believe it was at Academy Sporting
19  Goods.
20      Q.    In?
21      A.    Dothan, I believe.
22      Q.    Any particular reason for
23  buying that type of ammunition?

40 (Pages 154 - 157)

Page 158

1    A.    That falls in -- That
2 generally would be the type of duty ammo
3 that's carried by officers for a .45 caliber.
4    Q.    Are there different
5 variations in the bullets that are used in
6 the Federal Plus-P Hydra-Shok ammunition?
7    A.    I'm sure there's different
8 grains available.
9    Q.    What grain did you buy?
10    A.    230 grain.
11    Q.    Were they copper-jacketed,
12 hollow point? What type of -- What I want
13 you to do is tell me all of the
14 specifications for the particular type of
15 ammunition that you had in your gun on May
16 27, 2020.
17    A.    It's a copper core --
18 Correction. A lead core with a copper jacket
19 that has a design specific to that
20 designation being the Plus-P round. It's
21 just the way the nose is shaped and stuff.
22    Q.    Any other specification? If
23 I wanted to buy the identical ammunition,

Page 159

1 tell me what all other specifications it
2 would be so that I would have the exact same
3 ammunition that you had in your gun on the
4 27th.
5    A.    I believe that's probably all
6 you would need to find it. Federal Plus-P
7 Hydra-Shok, 230 grain.
8    Q.    With a lead core copper
9 jacket?
10    A.    Yes, sir. I'm not aware of
11 any other shape or type of materials in a
12 Plus-P Hydra-Shok.
13    Q.    And were these all -- These
14 were the bullets that you fired at Channing
15 Spivey?
16    A.    No, sir. That's not the
17 weapon I fired.
18    Q.    What weapon did you fire at
19 him?
20    A.    Springfield model XDS .45
21 caliber.
22    Q.    Springfield, give me all the
23 specifications for it.

Page 160

1    A.    XDS.
2    Q.    XDS.
3    A.    .45 caliber. That's it.
4 That's all that is.
5    Q.    Okay. And what type of
6 ammunition did you have for it?
7    A.    It was a Federal Hydra-Shok
8 but it was not a Plus-P, though, I don't
9 believe.
10    Q.    How many grains?
11    A.    230.
12    Q.    What's the number of grains
13 that that type of ammunition is issued in?
14    A.    It starts at 230 and goes
15 down, but I don't know all of them.
16    Q.    So this is the highest grain
17 that they give for that?
18    MR. HOWARD: Heaviest.
19    MR. SIKES: Heaviest, highest.
20    A.    Yes, sir. It's the heaviest
21 round.
22    Q.    Okay. Is it also a lead
23 core, copper-jacketed?

Page 161

1    A.    Yes, sir.
2    Q.    Okay. All right. Where was
3 the Sig Sauer at the time you shot and killed
4 Channing Spivey?
5    A.    In my bedroom.
6    Q.    In your bedroom?
7    A.    Yes, sir.
8    Q.    Okay. Where was the
9 Springfield XDS when you first retrieved it
10 to go outside? Did you do that; is that
11 correct?
12    A.    It was on my nightstand
13 beside my bed.
14    Q.    So both of them were there in
15 your bedroom?
16    A.    Yes, sir.
17    Q.    Is there a reason why one is
18 on your nightstand?
19    A.    That's just where I keep them
20 at.
21    Q.    All right. Is there a reason
22 why when you went -- You went and retrieved a
23 gun at some point before you went outside?

41 (Pages 158 - 161)

Page 162

1    A.    Yes, sir.
2    Q.    Okay. Is there a reason you
3 picked up the Springfield as opposed to the
4 Sig Sauer?
5    A.    The Springfield stays in a
6 holster that will attach to my pants quickly.
7 The Sig Sauer, I have two types of holsters.
8 One that I keep stored, and another one that
9 stays on my gun belt, my duty belt that I
10 wear for work.
11    Q.    And where was your duty belt
12 at this time?
13    A.    Hanging on the back of the
14 bedroom door.
15    Q.    Okay. And you say the reason
16 that you retrieved the Springfield weapon was
17 that it had a holster that would clip on
18 easier? Do I understand you correctly about
19 that?
20    A.    Yes, sir. It was in that
21 holster and that holster is easier to quickly
22 clip on my pants.
23    Q.    Is that an approved weapon

Page 163

1 for you?
2    A.    I have qualified it as a
3 backup weapon or an off-duty weapon.
4    Q.    I'm sorry?
5    A.    An off-duty weapon.
6    Q.    And a backup weapon?
7    A.    Either/or.
8    Q.    Okay. When were you last
9 qualified with either of these weapons prior
10 to the shooting?
11    A.    I would have to refer to the
12 dates.
13    Q.    I don't mean the exact date.
14 A month, two months, five months, six months
15 a year, in round terms as being your best
16 judgment?
17    A.    I truly -- Truly, I'm not
18 sure.
19    Q.    That's fine.
20       MR. SIKES: I'm going to let
21 it go, Rick. That's fine.
22    Q.    If I understand you
23 correctly, the Luverne Police Department had

Page 164

1 not issued you any weapons or use-of-force
2 equipment?
3    A.    No, sir.
4    Q.    What I said is correct?
5    A.    Correct. Yes.
6    Q.    We were talking about -- Do
7 you have more than these two handguns?
8    A.    Are you referring to for work
9 or just do I own?
10    Q.    Let's say forget shotguns and
11 rifles and all. I'm talking about handguns
12 now.
13    A.    I do own a Ruger .357 Magnum,
14 and a Heritage .22 pistol.
15    Q.    Any others?
16    A.    Not that I'm thinking of off
17 the top of my head.
18    Q.    How about any other
19 use-of-force equipment that you owned?
20    A.    I have a retractable baton
21 that I carry on my duty belt.
22    Q.    All right. And where was it
23 at the time of the shooting?

Page 165

1    A.    On my duty belt.
2    Q.    Hanging on the back of your
3 door?
4    A.    Correct.
5    Q.    Okay. Is that the door you
6 go into to get into your bedroom to go and
7 retrieve the gun off the nightstand?
8    A.    Yes, sir.
9    Q.    And is there a particular
10 make or type of baton you have?
11    A.    I don't recall the make --
12 the manufacturer of it.
13    Q.    Okay. And that's something
14 you carry every day?
15    A.    When I'm on duty, and wearing
16 my duty belt, yes, sir.
17    Q.    Okay. And what, other than a
18 baton?
19    A.    I don't have any other.
20    Q.    You don't have any Tasers?
21    A.    I don't carry a Taser, no,
22 sir.
23    Q.    You didn't have one available

42 (Pages 162 - 165)

1 to you?
2     A.     No, sir.
3     Q.     There wasn't one in the
4 house?
5     A.     No, sir.
6     Q.     Any other use-of-force
7 equipment?
8     A.     No, sir.
9     Q.     When you left the house just
10 prior to the shooting, you said you had
11 received a call from Tim White?
12     A.     Correct.
13     Q.     Did he inform you there was
14 trouble down the street at the Spivey house?
15     A.     Based on advice of my
16 attorney, I'm not going to answer citing the
17 Fifth.
18     Q.     Okay.  What information did
19 you have about Channing Spivey at the time
20 you came out of your house?
21     A.     On advice of my lawyer, I'm
22 going to cite the Fifth and not answer.
23     Q.     I'm not asking you what

1 information you had.  What were the sources
2 of information that you had?
3     A.     About Channing Spivey,
4 specifically?
5     Q.     Yeah.
6     A.     None.
7     Q.     Tim White didn't tell you
8 they were going down to Channing Spivey's
9 house -- to the Spivey house?
10         MR. HOWARD:  He already
11 answered, I think, none.
12     Q.     Why did you bring a gun out
13 of the house?
14     A.     Under advice from my lawyer,
15 I'm going to choose to not answer and plead
16 the Fifth.
17     Q.     Are you going to decline to
18 answer why you retrieved a gun off your
19 nightstand -- or bedroom nightstand before
20 you came out of your house?
21         MR. HOWARD:  Yes.  That's what
22 he -- Was that your last question?
23         MR. SIKES:  Yeah.

1         MR. HOWARD:  He objected to
2 that.
3     Q.     (Mr. Sikes) And you're not
4 going to answer that based on the Fifth
5 Amendment?
6     A.     Correct.
7     Q.     In getting the gun that you
8 did come out of the house with, the
9 Springfield XDS, that's the gun you came out
10 of the house with?
11     A.     Correct.
12     Q.     In doing that, you walked
13 past your retractable baton; correct?  It's
14 on the back of the door that you went in;
15 right?
16     A.     Yes, sir.
17     Q.     You had walked past it, then,
18 didn't you?
19     A.     Yes, sir.  It was on the
20 other side of the door.
21     Q.     Right.
22     A.     See the door was open.  I did
23 not swing it open.

1     Q.     The door was between you --
2 Because the door was open, it was on the back
3 of the door.  You walked past it.  It was on
4 the back of the door as you walked past the
5 door -- through the door?
6     A.     Yes, beside it.
7     Q.     Is there a reason you didn't
8 reach for the baton?
9     A.     Same advice from my lawyer.
10 I choose not to answer citing the Fifth.
11     Q.     But in any event, you didn't
12 pick up the baton also; correct?
13         MR. HOWARD:  Objection, asked
14 and answered.  You can answer it one more
15 time.
16     Q.     All right.  You're declining?
17     A.     Yes.  I'm declining to
18 answer.
19         MR. HOWARD:  The question was
20 did you walk by it, or you declined to pick
21 it up.  I objected to that.  You already
22 asked him that once.  I told him he could
23 answer that one again one time.

Page 170

1  Q.   Did you not have any kind of
2 chemical spray or mace or that sort of thing?
3  A.   No, sir.
4  Q.   You don't carry that?
5  A.   No, sir.
6  Q.   Does anybody at the police
7 department carry it?
8  A.   I'm sure some of them do.  I
9 don't know, off the top of my head.
10  Q.   Okay.  Is there a particular
11 reason why you don't carry it?
12  A.   I just don't.
13  Q.   That's not a reason.  You
14 don't like it?  You don't think it's
15 effective?
16  A.   I have not been recertified
17 in many years.  And when the last can I had
18 expired, my certification expired, I never
19 renewed any of that.
20  Q.   You were certified for a
21 Taser, though, weren't you?
22  A.   Correct.
23  Q.   In fact, you're certified as

Page 171

1 an instructor I believe, aren't you?
2  A.   I am now, yes.
3  Q.   Were you then?
4  A.   No, I was not.
5  Q.   When did you get the
6 certification for Taser?  It was after May --
7 It was after May 27th?
8  A.   Yes, sir.
9  Q.   The purpose of both the
10 baton, the pistol is to apply force to human
11 beings; correct?
12  A.   Apply force where needed.
13      MR. HOWARD:  Object to the
14 form.
15  Q.   Certainly.  I know.  A hammer
16 is to drive nails.  It's to drive nails when
17 needed.  That's sort of a ridiculous answer.
18 The purpose of it is to apply force to human
19 beings.  That's the reason you have it;
20 right?
21  A.   No, sir.
22  Q.   It is not to apply force to
23 human beings?

Page 172

1  A.   It's to apply force where
2 needed.
3  Q.   I understand that.
4  A.   I've been attacked by dogs,
5 sir, and I have used force there.
6  Q.   I understand, but one of the
7 reasons is to apply force to human beings;
8 correct?
9  A.   In that form, yes; correct.
10  Q.   Do you have a video recorder?
11  A.   My department-issued camera
12 is capable of recording videos.  It's a
13 camera and it will take a video, so, yes,
14 sir, I do have a video recorder.
15  Q.   The answer is yes, you do
16 have a video recorder?
17  A.   Yes, I do have one.
18  Q.   Again, we can do it a lot
19 quicker if I can get a straightforward
20 answer.
21      MR. HOWARD:  He answered the
22 question.
23  Q.   Do you have a video recorder?

Page 173

1 The answer is yes, you do; correct?
2  A.   Yes.
3  Q.   Where was it at the time of
4 the shooting?
5  A.   Either in a center console of
6 my patrol car or the trunk of my patrol car.
7  Q.   Okay.  I think we've covered
8 this.  I think you indicated earlier you were
9 acting as a police officer at the time of
10 this incident; correct?
11  A.   Yes.
12  Q.   All right.  Is there a
13 requirement that you were supposed to, when
14 you act as a police officer, that you carry
15 your video recorder and activate it?
16  A.   That's not a yes-or-no
17 answer, sir.
18  Q.   Give me your answer, then.
19  A.   There is a policy on file
20 with the police department that describes
21 certain times when it can be applicable and
22 not.
23  Q.   And in your opinion was the

44 (Pages 170 - 173)

Page 174

1 policy and procedure for the Luverne Police
2 Department applicable to this particular
3 instance?
4    A.    No.
5    Q.    And why was that?
6    A.    Because of the urgent nature,
7 for one. Second of all, administrative
8 personnel are not required to have it at all
9 times.
10   Q.    You weren't acting as an
11 administrative personnel here, were you?
12   A.    No, sir.
13   Q.    Okay. When you came out of
14 your house to confront Channing Spivey, the
15 pistol, the Springfield XDS pistol, was the
16 only weapon you had on you; correct?
17   A.    Yes, sir.
18   Q.    And that was by your choice
19 that you took only that weapon?
20   A.    Yes, sir.
21   Q.    You had the other weapon, in
22 particular, the baton available to you;
23 correct?

Page 175

1    A.    Yes, sir.
2    Q.    But you chose not to take it?
3          MR. HOWARD: Objection. Asked
4 and answered three times now. You can answer
5 it one more time.
6    A.    I chose not to take it.
7    Q.    You've been a sworn police
8 officer now since 2006 or so; correct?
9    A.    Correct.
10   Q.    And been with the Luverne
11 Police Department since is that '14, I
12 believe?
13   A.    December of '14.
14   Q.    Okay. Do you like the job of
15 a police officer?
16   A.    Yes, sir.
17   Q.    Did anyone force you to
18 become a police officer?
19   A.    No, sir.
20   Q.    You chose that?
21   A.    Yes, sir.
22   Q.    And the job of policeman
23 requires on occasion that you use force

Page 176

1 against other human beings; correct?
2    A.    Yes, sir.
3    Q.    And that's why you're issued
4 weapons, and that's why you carry weapons;
5 right?
6    A.    Yes, sir.
7    Q.    And you knew that when you
8 decided to go into law enforcement to become
9 a policeman?
10   A.    Yes, sir.
11   Q.    And you know that every day
12 when you get up and go to work as a
13 policeman, don't you?
14   A.    Yes, sir.
15   Q.    That I may, today, have to
16 use force; correct?
17   A.    Yes, sir.
18   Q.    In fact, using force against
19 citizens is one of the things that's unique
20 to being a policeman, isn't it?
21          MR. HOWARD: Object to the
22 form.
23   Q.    Can you name me another job

Page 177

1 that you're given a gun by your employer and
2 you're legally authorized to use it against
3 other citizens? Do you know of another job
4 that allows you to do that, sir?
5          MR. HOWARD: You changed the
6 question.
7    Q.    Do you know of another job
8 that allows you to do that?
9    A.    No, sir.
10   Q.    So, again, that would be
11 unique to law enforcement officers. They're
12 given a gun by their employer, and they have
13 a legal license, in certain circumstances, to
14 use it against other human beings; right?
15   A.    Yes, you can.
16   Q.    And there isn't another
17 profession or duty or job that you can think
18 of where you have that license and that right
19 and are issued a weapon to do that; correct?
20          MR. HOWARD: Object to the
21 form.
22   A.    Not that I can think of, no,
23 sir.

45 (Pages 174 - 177)

Page 178

1    Q.    Okay.  And you said about
2 half the time you go patrolling in and around
3 Luverne as part of your job; correct?
4    A.    Yes, sir.
5    Q.    And when you're out on
6 patrol, you are literally looking for trouble
7 and troublemakers, aren't you?
8    A.    Some of the time, yes, sir.
9    Q.    That's the purpose.  I'm
10 going to parade around and if I see somebody
11 up to no good, or I think is up to no good,
12 or there's some trouble over here, that's
13 what I'm out there looking for; isn't that
14 correct?
15         MR. HOWARD:  Object to the
16 form.
17    A.    As I say, sometimes, yes.
18    Q.    Sometimes you just turn your
19 eyes and you don't look for trouble?
20    A.    No, sir.  Sometimes I stop
21 and walk through the businesses to speak to
22 the management and see how they're doing, if
23 they need anything, if they have any concerns

Page 179

1 or needs.  And that's not looking for
2 troublemakers.
3    Q.    There is some bad people out
4 there, aren't there?
5    A.    There is.
6    Q.    And when you catch some of
7 them doing bad things, criminal things, some
8 of them are going to resist you correcting
9 them or trying to arrest them, aren't they?
10    A.    Yes.
11    Q.    And you knew and accepted
12 that you would have to use force against
13 people when you took the job?
14    A.    Yes, sir.  I knew that.
15    Q.    And you fired your weapon at
16 other citizens?
17    A.    Yes.
18    Q.    Have you ever fired a Taser
19 at other citizens?
20    A.    Yes.
21    Q.    Have you maced people?
22    A.    Yes.
23    Q.    Have you struck people with

Page 180

1 your baton or night stick?
2    A.    Yes.
3    Q.    Have you struck people with
4 your fist and your knees or your feet?
5    A.    Yes.
6    Q.    Wrestle people to the ground
7 to put handcuffs on them?
8    A.    Yes.
9    Q.    You're familiar with using
10 different kinds of force against citizens in
11 different situations, aren't you?
12    A.    Yes.
13    Q.    There's some limits on --
14 legal limits on when you can use force,
15 aren't there?
16    A.    Yes.
17    Q.    And there are legal limits on
18 how much force you can use; correct?
19    A.    Correct.
20    Q.    And if you exceed those legal
21 limits, there are legal consequences, aren't
22 there?
23    A.    Yes.

Page 181

1    Q.    One of them is you can be
2 charged criminally; correct?
3    A.    Correct.
4    Q.    And that's what is being
5 investigated now by the ALEA; correct?
6    A.    Correct.
7    Q.    And you can be held legally
8 liable civilly to people you injured where
9 you exceed those limits; correct?
10    A.    Correct.
11    Q.    So you need to know the
12 limits of use of force, don't you?
13    A.    Yes.
14    Q.    And that's for your own
15 personal protection; that you know what you
16 can do, what's legal and what isn't legal;
17 correct?
18    A.    Correct.
19    Q.    Tell me what your
20 understanding of the law is with regard to
21 what's the legal limit of how much force you
22 can use in a particular situation.
23    A.    The circumstances that are

46 (Pages 178 - 181)

Page 182

1 presented and evidence that you have
2 available combined allow you to make a
3 decision on what level of force you can go
4 to.
5      Q.    I know.  What determines
6 that?  What determines when you can use what
7 level of force?  What are the factors?
8      A.    The information you have and
9 the evidence that you gathered at the time.
10     Q.    I know.  What standards do
11 you have?  What says you can fire a weapon at
12 somebody?  When is it authorized for that to
13 occur?  Do you know that?
14     A.    There can be many, many, many
15 different things that allow that to happen.
16     Q.    That's the best answer you
17 can give me?
18     A.    Because you have to have the
19 situation that's currently ongoing to make
20 the determination.
21     Q.    I know.  And what standards
22 do you apply when you do that?  What is your
23 understanding of where the legal line is when

Page 183

1 you can use deadly force and when you can't?
2      A.    I apologize.  I don't
3 understand.  I just don't understand what
4 you're wanting.
5      Q.    It's as simple as it can be.
6 In some instances, you are allowed to fire a
7 loaded weapon that can kill someone.
8 Sometimes that's legal to do that.  Sometimes
9 that isn't.  I'm asking you, you're supposed
10 to know when it's legal and when it isn't.
11 You don't have any answer for me about where
12 that dividing line is and how you draw that
13 line?
14     A.    I feel like I gave it to you,
15 sir.  It's the situation.  It's what you have
16 at hand that you make the decision with.
17     Q.    I know.  And measured against
18 what standard?
19     A.    I don't know what you're
20 asking me for.  I apologize.
21     Q.    You can do it any time you
22 feel like it?
23     A.    I guess you could.

Page 184

1      Q.    That's the best answer you
2 can give me?
3      A.    With my understanding of the
4 question from you, yes, it is.
5      Q.    And that's your full extent
6 of your understanding about the law with
7 regard to use of force and where the legal
8 limits are.  That's the best answer you can
9 give me?
10     A.    Again, if I understand what
11 you're asking me, yes.
12     Q.    What's hard to understand
13 about what I'm asking?  Help me out if what
14 I'm asking -- I think what I'm asking is very
15 simple.  Where is the line drawn on when use
16 of deadly force is legal and when is it
17 illegal?  What's the dividing line?  How do
18 you determine when it's lawful and when it
19 isn't?
20     A.    With the evidence that you
21 have at hand at the moment.
22     Q.    Again, that's the very best
23 answer you can give me?

Page 185

1      A.    Yes, sir.
2      Q.    Okay.  Were you taught or
3 instructed anything about these limits, legal
4 limits of use of force in your police
5 training at APOSTC?
6      A.    Yes, sir.
7      Q.    And what do you understand --
8 What do you recall of what you were trained?
9      A.    That you take the situation
10 that you're in and the evidence you have and
11 you make an evaluation and determine whether
12 you can or cannot.
13     Q.    And you're just getting to
14 decide on your own without any application of
15 anybody else's standards.  You just decide
16 when you think you can do it; right?  Is that
17 correct?
18     A.    Again, I'm not understanding
19 what you're wanting from me, sir.
20     Q.    I'm wanting an answer to my
21 question.  I don't think you know the legal
22 limits, do you?
23     A.    I think I gave you an answer

47 (Pages 182 - 185)

Page 186

1 every time you've asked me that same question
2 consistently.
3    Q.    I'm just trying to make sure
4 that that's the limit of what you know about
5 it. Just you look at the circumstances and
6 you decide whether to use deadly force or
7 not. Is that your answer?
8    A.    That's the one I gave you,
9 yes, sir.
10    Q.    I know. And that's the best
11 answer you can get. And that's the limit of
12 what you know about it?
13    A.    That's the answer I'm giving
14 you.
15    Q.    That's the limit of what you
16 know about it. If there's something more you
17 know about it, tell me.
18    A.    Again, I'm not sure what
19 you're asking me for more.
20    Q.    I don't know how to -- I've
21 stated it three or four or five times, and I
22 don't know how to state it any clearer.
23        When are you allowed to use

Page 187

1 deadly force and when is that not lawful?
2 And all you've told me is: I get to make up
3 my mind based on the circumstances. Is that
4 the best answer you can give me?
5    A.    Yes, sir, it is.
6    Q.    Okay. Deadly force and
7 lethal force are the same things, aren't
8 they?
9    A.    Yes, sir.
10    Q.    And firing a gun at a person
11 one time is a use of deadly force or lethal
12 force, isn't it?
13    A.    Yes, sir.
14    Q.    And that's the greatest or
15 highest amount of force that you can use as a
16 police officer; correct?
17    A.    Yes, sir.
18    Q.    When a policeman strikes a
19 person with his fist, that's not deadly force
20 or lethal force, is it?
21    A.    No, sir.
22    Q.    Because you don't -- you
23 don't -- It can happen in a rare instance,

Page 188

1 but for the most part, you don't kill people
2 by striking them with your fist; correct?
3    A.    Correct.
4    Q.    They get bruised or they get
5 a black eye or they lose a tooth or they get
6 a bruise on their chest. That's sort of the
7 limit of what you do with your fist; right?
8    A.    Yes, sir.
9    Q.    Did Channing Spivey threaten
10 to apply force to you?
11    A.    Based on advice of my lawyer,
12 I'm not answering that and plead the Fifth.
13    Q.    How many times did you fire
14 your weapon at Channing Spivey?
15    A.    Based on the advice of my
16 attorney, I'm not going to answer and plead
17 the Fifth.
18    Q.    Do you know how many times
19 your bullets struck Channing Spivey?
20    A.    Based on advice of my
21 attorney, I'm not going to answer and plead
22 the Fifth.
23    Q.    Does the City of Luverne have

Page 189

1 any policies and procedures about use of
2 force?
3    A.    Yes, sir.
4    Q.    What's the last time you've
5 seen them?
6    A.    I don't recall.
7    Q.    Within the last five years?
8    A.    Yes.
9    Q.    When?
10        MR. HOWARD: Objection. Asked
11 and answered.
12    A.    I don't recall.
13    Q.    What was the occasion for you
14 to look at them?
15    A.    I don't remember.
16    Q.    What do they say about the
17 use of force?
18    A.    That there's a continuum that
19 you must follow.
20        (Plaintiff's Exhibit 20
21        was marked for
22        identification purposes.)
23    Q.    Okay. I'm going to show you

48 (Pages 186 - 189)

Page 190

1 the autopsy report marked as Plaintiff's
2 Exhibit 20. Have you seen that before?
3      A.      Not that I can recall.
4      Q.      Look at the second page of
5 Plaintiff's Exhibit 20. I'll represent to
6 you again, this is the autopsy report
7 obtained from the Alabama Department of
8 Forensic Sciences regarding the autopsy
9 performed on Channing Spivey after you shot
10 and killed him. How many bullets does it
11 show struck Channing Spivey?
12      A.      It appears five.
13      Q.      Did anybody fire a gun at
14 Channing Spivey out there that evening other
15 than you?
16      A.      Based on advice of my
17 attorney, I'm going to choose not to answer.
18          MR. HOWARD: You can answer
19 that one. You can tell him.
20      A.      I did not see anybody else
21 fire at Channing Spivey.
22      Q.      Don't you know nobody else
23 shot Channing Spivey?

Page 191

1      A.      In my presence.
2          MR. HOWARD: Don't argue.
3 Don't get in a conversation with him. Just
4 simply answer his questions yes or no.
5      Q.      Don't you know that nobody
6 else besides you shot Channing Spivey that
7 evening? Don't you know that to a fact?
8      A.      No.
9      Q.      You think there was a mystery
10 shooter here; is that right? Is that your
11 testimony? Again, I'll remind you you're
12 under oath. You think there was some other
13 shooter?
14      A.      That's not what I said, no,
15 sir. I don't.
16      Q.      You think it's possible there
17 was another shooter?
18      A.      I don't know.
19      Q.      You don't know that there was
20 not another shooter. Don't you know that?
21      A.      No, sir.
22      Q.      Who else would it have been
23 that fired at him, other than you?

Page 192

1      A.      I don't know.
2      Q.      You don't know. Do you
3 contend that any of these five bullet wounds
4 were fired by anybody other than you?
5      A.      No.
6      Q.      Thank you, sir.
7          So you shot him at least five
8 times. You don't know how many more times
9 you fired; is that correct?
10      A.      Based on advice of my
11 attorney --
12      Q.      You don't know how many more
13 times -- You do or you don't know whether you
14 fired more than that?
15          MR. HOWARD: Same.
16      A.      Based on advice of my
17 attorney, I refuse to answer citing the
18 Fifth.
19      Q.      Had you been to the police --
20 Luverne Police station on the day of the
21 shooting?
22      A.      Yes.
23      Q.      And what was the occasion for

Page 193

1 you to be there?
2      A.      We had city court that day,
3 so I went by the office to pick up files for
4 that.
5      Q.      And what time were you at
6 city court?
7      A.      It started at two p.m.
8      Q.      And lasted until when?
9      A.      It varies, but I believe it
10 was around five p.m. that day when we got
11 done. Not exactly sure, though.
12      Q.      I think you said the shooting
13 occurred about eight o'clock?
14      A.      About, yes.
15      Q.      Was it dark then?
16      A.      It was dusk would be the way
17 I would describe it.
18      Q.      Okay. What time were you at
19 the police station? Just before two o'clock?
20 Just run in, run out. Is that all you did?
21      A.      Pretty much, yes.
22      Q.      Okay. Do you have a police
23 scanner?

49 (Pages 190 - 193)

Page 194

1    A.    No.
2    Q.    Do you have a police radio?
3    A.    Yes.
4    Q.    Okay. What's the difference
5 in a scanner and a radio?
6    A.    From my knowledge of it, the
7 radio I can talk on it and listen. On the
8 scanner, I would just be able to listen.
9    Q.    I see. Okay. Are there any
10 other kind of communicative devices available
11 to you as a police officer on May 27th of
12 2020?
13    A.    I have a fire department
14 radio that I use a lot of times when I'm at
15 work as a police officer.
16    Q.    And why do you use a fire
17 department radio?
18    A.    Law enforcement and
19 fire/rescue run on two different bands. One
20 runs on VHF and one runs on UHF. Therefore,
21 they can't talk to each other on the same
22 radio.
23    Q.    The communicative devices you

Page 195

1 had, you had a fire department radio?
2    A.    Yes, sir.
3    Q.    All right. And what form
4 does that take? Is it portable? Something
5 you hold in your hand, carry around with you?
6    A.    Yes, sir.
7    Q.    About the size of say a cell
8 phone?
9    A.    A little larger than that.
10 They're kind of older models.
11    Q.    Okay. All right. You had a
12 cell phone, I guess?
13    A.    Two.
14    Q.    Two cell phones?
15    A.    Yes.
16    Q.    Why do you have two?
17    A.    One is a personal phone and
18 one is issued by the Luverne Police
19 Department.
20    Q.    You have a police radio?
21    A.    Yes.
22    Q.    Okay. And what form does it
23 take?

Page 196

1    A.    Well, actually, I would have
2 two. One that's in my car that's mounted and
3 stays there at all times. And the second is
4 a hand-held device similar to the fire radio.
5 It's portable.
6    Q.    Where was it at the time of
7 the shooting?
8    A.    I believe both portable units
9 were in the bedroom on the chargers.
10    Q.    Okay. That's both the fire
11 department radio and the police radio?
12    A.    Correct.
13    Q.    Okay. Were they turned on?
14    A.    No, sir.
15    Q.    They weren't?
16    A.    No, sir.
17    Q.    All right. You've got a fire
18 department radio, a police radio in your car,
19 a handheld or portable police radio, and a
20 cell phone?
21    A.    Yes, sir.
22    Q.    Any other communicative
23 device?

Page 197

1    A.    No, sir.
2    Q.    In the hour prior to the
3 shooting, say from seven o'clock or
4 thereabouts until the shooting, did you
5 receive any communications? We know about
6 the communication from Tim White. Did you
7 receive any phone calls, radio calls, or any
8 other communication over any of these
9 devices?
10    A.    Not that I remember. I don't
11 remember getting any communications from
12 anybody about anything.
13    Q.    Well, you got one from Tim
14 White?
15    A.    Except for Tim calling.
16    Q.    Okay. Who is your cell phone
17 provider, your personal cell phone provider?
18    A.    Verizon.
19    Q.    Out of where?
20    A.    I don't know. My wife takes
21 care of those things.
22    Q.    All right. And what is that
23 phone number?

Page 198

1    A.    334-235-5653.
2    Q.    Is there another number other
3 than that on the personal phone?
4    A.    No, sir.  That's the only one
5 I have.
6    Q.    One personal phone.  And it
7 only has one number?
8    A.    Correct.
9    Q.    And how about you have a cell
10 phone that's issued by the police department?
11   A.    Correct.
12   Q.    What is the phone number for
13 that?
14   A.    334-508-1020.
15   Q.    And who is the cell phone
16 provider there?
17   A.    I think it's Verizon also.
18   Q.    And the police radio, what
19 records are generated by calls on the police
20 radio?
21   A.    Crenshaw Central, which is a
22 911 center, all the radio traffic is recorded
23 there.

Page 199

1    Q.    Is there a particular -- Do
2 you have a call sign or call name?  If we
3 wanted to look through those records and
4 determine the calls over the radio coming or
5 going to you, how would you -- how would you
6 identify the ones coming or going to you or
7 from you?
8    A.    They can identify me either
9 by my name or a designation number of 102.
10   Q.    That's for the police radio?
11   A.    Correct.
12   Q.    How about for the fire
13 department radio?
14   A.    Fire department radio is
15 recorded similarly, but I have a different
16 call sign on the fire radio.  And it's 1104.
17   Q.    And those records are kept by
18 Crenshaw Central?
19   A.    Yes, sir.
20   Q.    Who heads Crenshaw Central?
21   A.    The director is Scott
22 Strickland.
23   Q.    Do you know Mr. Strickland?

Page 200

1    A.    Yes, I do.
2    Q.    Is he a friend?
3    A.    Yes.
4    Q.    Is he a good friend?
5    A.    Yes.
6    Q.    Socialize with him?
7    A.    From time to time.
8    Q.    Who is the lady at the police
9 station?  Can you give me her name again?
10   A.    Pam Lewis.
11   Q.    Did you speak to Pam Lewis at
12 any time on the 27th of May?
13   A.    I'm sure I did when I come in
14 that day.
15   Q.    I'm talking about talk to her
16 about other than: Hi, Pam.  Anything
17 substantive?
18   A.    Nothing that I remember.
19   Q.    How about the police chief?
20 Was he in the office that day?
21   A.    I believe he was.
22   Q.    Did you have any conversation
23 with the police chief that day?

Page 201

1    A.    Probably about the same as
2 Ms. Pam.
3    Q.    You don't recall anything
4 substantive with him?
5    A.    No, sir.
6    Q.    Are you and Mike Johnson
7 friends?
8    A.    Yes.
9    Q.    Do y'all socialize together?
10   A.    Actually, we don't spend any
11 time together off work, no, sir.
12   Q.    Did you know about Channing
13 having a car accident that morning?
14   A.    Not on May 27th.  I wasn't
15 aware that he had had an accident on May
16 27th.
17   Q.    You didn't know anything
18 about that?
19   A.    No, sir.
20   Q.    Okay.  When did you learn
21 about that?
22   A.    In the days after the
23 shooting, but I don't recall how soon.  I

Page 202

1  don't recall.
2      Q.      What was the source of the
3  information you had about that?
4      A.      I believe Chief Johnson is
5  the one that told me.
6      Q.      Okay.  Did you know
7  anything -- Did you have any conversations
8  with Officers Coggins or Green on the 27th
9  that you can recall?
10     A.      No, sir.
11     Q.      Ms. Callaway called both
12  Sheriff Mears and spoke to a lady at the
13  police department about her son's accident
14  that morning, and asked -- told the lady at
15  police department and told Sheriff Mears that
16  her son -- to be on the lookout for him, to
17  be worried about him.  Do you know anything
18  about that at all?
19     A.      On the day of May 27th, no,
20  sir, I wasn't aware of that.
21     Q.      Nobody passed any of that
22  information along to you?
23     A.      No, sir.

Page 203

1      Q.      Pam Lewis didn't?
2      A.      No, sir.
3      Q.      The sheriff didn't?
4      A.      No, sir.
5      Q.      The police chief didn't?
6      A.      No, sir.
7      Q.      Officer Coggins or Green
8  didn't?
9      A.      No, sir.
10     Q.      Nobody did?
11     A.      No, sir.
12     Q.      Do you know anything about
13  any video that was taken by, I believe it
14  was -- Is it Marcus Green?  Is that his first
15  name?
16     A.      Correct.  Marcus Green.
17     Q.      He's one of the Luverne
18  Police Department?
19     A.      Yes.
20     Q.      Do you know anything about
21  him taking a video that morning of Channing?
22     A.      I understand that there was
23  some body cam footage from during the --

Page 204

1  earlier on the day on May 27th, but I don't
2  know what's on it.
3      Q.      Did you know anything about
4  that on the 27th?
5      A.      No, sir.
6      Q.      I will represent to you that
7  we had what was produced to us as video taken
8  by, I think this is Marcus Green, on the
9  day -- on May 27, on the morning of May 27th.
10  I'm going to show you some photographs that
11  were taken from that videocam recording.
12  These are photographs of Channing Spivey
13  taken that morning, and ask you if you've
14  seen the video from which those were taken?
15          MR. HOWARD:  These are stills
16  from the video?
17          MR. SIKES:  Uh-huh.
18     A.      No, sir.
19     Q.      (Mr. Sikes) You've not seen
20  those before?
21     A.      No, sir.
22     Q.      Okay.  In those photographs,
23  Channing Spivey is wearing nothing but a pair

Page 205

1  of either shorts or swim trunks.  I don't
2  know what they are.  Do you see that?
3      A.      Yes, sir, I see.
4      Q.      Okay.  Was that how he was
5  dressed at the time you shot him?
6      A.      Yes, sir.
7      Q.      Have anything more on or any
8  less on at that time that you can -- as far
9  as you can recall?
10     A.      No, sir.
11          (Plaintiff's Exhibits 15,
12          16, 17 were marked for
13          identification purposes.)
14     Q.      Plaintiff's Exhibits 15, 16
15  and 17 -- Do the photographs 15, 16, and 17,
16  do they fairly and accurately depict how
17  Channing Spivey appeared at the time you shot
18  him?
19     A.      That's how he was dressed,
20  yes.
21     Q.      Anything different in his
22  appearance or anything different that you can
23  recall about how he appeared at the time you

Page 206

1  shot him as opposed to the time he's shown in
2  these photographs?
3        MR. HOWARD: Go ahead and
4  object. I think I've got questions, but go
5  ahead.
6     A.    Based on advice from my
7  attorney, I'm going to choose not to answer
8  that based on the Fifth.
9     Q.    I thought you already sort of
10 had answered it, that that's how he looked
11 when you shot him; correct?
12       MR. HOWARD: Well, you asked
13 if that was what his appearance was and he
14 said yes, but then you asked a question like
15 -- His answer could be he's going crazy, but
16 he can't get into that. You just asked about
17 his appearance. If you asked how he was
18 acting or how he looked.
19    Q.    All right. Did he look any
20 different, his physical appearance, was it
21 any different than how it appears in those
22 photographs?
23       MR. HOWARD: You can answer

Page 207

1  that. You've already answered that.
2     A.    Yeah. He did look different.
3        MR. HOWARD: He's talking
4  about did he have a shirt on? Did he have
5  pants on? Did he have those pants on.
6     A.    No. No, that's it.
7     Q.    Dressed exactly the same
8  thing?
9     A.    Yes.
10       MR. HOWARD: I know what
11 you're thinking. I know what his question.
12       THE WITNESS: I'm sorry.
13       MR. HOWARD: He just wants to
14 know is that what he had on, all those
15 clothes.
16       THE WITNESS: That's what he
17 was dressed like.
18    Q.    (Mr. Sikes) The only piece of
19 clothing Channing was wearing as far as you
20 could tell was that same pair of shorts or
21 swim trunks at the time you shot him?
22    A.    I believe that was the same
23 shorts, yes.

Page 208

1     Q.    That was the only thing he
2  was wearing at the time; right?
3     A.    Correct.
4     Q.    Before you shot -- Just
5  before you shot Channing Spivey, did you have
6  any information or evidence that he had a
7  weapon or anything that could be used as a
8  weapon?
9     A.    No, I didn't.
10    Q.    Okay. Did you see anything
11 or hear anything -- Strike that.
12       (Off-the-Record discussion
13       was held.)
14    Q.    (Mr. Sikes) At what distance
15 from you was Channing Spivey when you fired
16 the first shot at him?
17    A.    Based on the advice of my
18 attorney, I'm refusing to answer that citing
19 the Fifth.
20    Q.    What was the closest distance
21 between you and Channing Spivey while you
22 were firing at him?
23       MR. HOWARD: Same.

Page 209

1     A.    Based on the advice of my
2  attorney, I'm refusing to answer that citing
3  the Fifth.
4     Q.    When you came out of your
5  house and looked toward the road and first
6  saw Channing Spivey, how many other people
7  did you see at that time?
8     A.    One.
9     Q.    Who was that?
10    A.    Deputy Penny.
11    Q.    Do you recall seeing Wesley
12 Spivey?
13    A.    Not at that time, no, sir.
14    Q.    Did you see him -- How long
15 after that did you see him?
16    A.    After the shooting, I seen
17 somebody down there at the gate, and I
18 believe it was Wesley but don't know.
19    Q.    Did you see more than one
20 person down there?
21    A.    No, sir.
22    Q.    Do you recall Zanna
23 Bloodsworth coming to your house?

53 (Pages 206 - 209)

Page 210

1    A.    Yes.
2    Q.    How long before the shooting
3 did Zanna Bloodsworth come to your house?
4    A.    Between one and two minutes,
5 maybe.
6    Q.    What did Zanna Bloodsworth
7 say to you when she got to your house?
8    A.    Based on advice of my
9 attorney, I'm going to refuse to answer
10 citing the Fifth.
11    Q.    What did you say to Ms.
12 Bloodsworth when she came to your house?
13    A.    Based on advice of my
14 attorney, I'm refusing to answer and citing
15 the Fifth.
16    Q.    Your wife Xanthe and your
17 stepson were inside the house at the time of
18 the shooting; correct?
19    A.    Correct.
20    Q.    And the shooting occurred --
21 This is a blow-up of 14, Plaintiff's Exhibit
22 14. Do you recognize that?
23    A.    Yes, sir.

Page 211

1    Q.    Can you show me where you
2 were standing when you started firing at
3 Channing?
4    A.    Based on my lawyer's advice,
5 I'm going to refuse to answer and plead the
6 Fifth.
7    Q.    Where was Channing standing
8 at the time you started to fire at him?
9        MR. HOWARD:  Same.
10    A.    Based on my attorney's
11 advice, I'm going to not answer and plead the
12 Fifth.
13    Q.    Where was Deputy Penny
14 standing when you started firing at Channing?
15        MR. HOWARD:  Same.
16    A.    Based on my attorney's
17 advice, I'm going to refuse to answer and
18 plead the Fifth.
19        MR. SIKES:  This is --
20        MR. HOWARD:  Is it altered?
21        MR. SIKES:  No.  It's 6 and 4.
22        MR. HOWARD:  What's the number
23 on that?  4 and 6.

Page 212

1        MR. SIKES:  This is 4 right
2 here.
3        MR. HOWARD:  I don't disagree.
4        MR. SIKES:  That's Plaintiff's
5 Exhibit 14 right there (indicating).
6        MR. HOWARD:  Right.  I can't
7 remember --
8        THE WITNESS:  Flower bed.
9        MR. HOWARD:  That's what that
10 is.  I just didn't remember what was there
11 because I didn't think anything took place
12 there.  What in the world is the dot on
13 there?
14    Q.    (Mr. Sikes) And I'm going to
15 show you a photograph, Plaintiff's Exhibit
16 12.  Can you show me where on there you were
17 standing when you started firing?
18    A.    Based on my attorney's
19 advice, I'm going to refuse to answer and
20 plead the Fifth.
21    Q.    And you've said that your
22 wife Xanthe was inside the house at the time
23 of the shooting?

Page 213

1    A.    Correct.
2    Q.    She did not see the shooting,
3 did she?
4    A.    No.
5    Q.    And your stepson didn't see
6 the shooting either; correct?
7    A.    Correct.
8    Q.    So neither one of them are
9 witnesses to the shooting?
10    A.    Correct.
11    Q.    Earlier you said something
12 about continuum of force, or something like
13 that; is that correct?
14    A.    Yes.
15    Q.    And what did you mean by
16 that?  What are you talking about?
17    A.    Just there's steps that you
18 take starting with -- starting at verbal
19 commands and ending at deadly force.
20    Q.    And these are to govern the
21 use of force?
22    A.    Yes.
23        (Recess taken.)

54 (Pages 210 - 213)

Page 214

```
 1              (Plaintiff's Exhibit 33
 2              was marked for
 3              identification purposes.)
 4       Q.    (Mr. Sikes) I'm just going to
 5  mark these.  This is a copy of your driver's
 6  license you gave me earlier?
 7       A.    Yes, sir.
 8       Q.    The information on there is
 9  correct?
10       A.    Right.
11       MR. SIKES:  I'll offer 33.
12              (Plaintiff's Exhibit 34
13              was marked for
14              identification purposes.)
15       Q.    Also, you indicated that you
16  have gotten some subsequent training as a
17  police officer at these seminars.  Sometimes
18  a day, a day or two, or three or four.  I
19  think earlier this was taken out of something
20  you'd already given me, but I neglected to
21  see at the time.  But I'm going to mark this
22  as Plaintiff's Exhibit 34.  Is this a listing
23  of some of the continuing education courses
```

Page 215

```
 1  you have gotten as a police officer,
 2  Plaintiff's Exhibit 34?
 3       A.    Yes, sir.
 4       Q.    You took and attended those
 5  courses and got little certifications or
 6  degrees -- or completion of course
 7  certificates from those or most of those?
 8       A.    Yes, sir.
 9       Q.    And on the left -- Excuse me,
10  on the right-hand side, in addition to the
11  name, it gives the number of hours there that
12  was spent at that particular teaching
13  session; correct?
14       A.    Correct.
15       Q.    Okay.  And it shows, I think,
16  that -- I counted three different Taser
17  seminars you've gotten.  A Taser recert, a
18  Taser certification, and Taser instructor
19  certificates.  Do you see all those on there
20  that you've gotten?
21       A.    Yes, sir.
22       Q.    Again, your testimony is you
23  didn't have a Taser, though, with you or
```

Page 216

```
 1  don't carry one or don't use one; is that
 2  right now?
 3       A.    Correct.
 4       Q.    And didn't in May of 2020?
 5       A.    Correct.
 6       Q.    Okay.  There's also on there
 7  a Officer Survival and Winning.  It's on the
 8  first page.  Do you see that?  Or maybe it's
 9  on the second page.
10       A.    Yes, sir.
11       Q.    Do you recall that seminar or
12  that -- what you got taught there?
13       A.    No, sir, not right off.
14       Q.    Okay.  Who gave it, do you
15  know?
16       A.    It says it was done in Ozark,
17  Alabama, but I --
18       Q.    Don't know who put it on?
19       A.    No, sir.
20              (Plaintiff's Exhibit 26
21              was marked for
22              identification purposes.)
23       Q.    I'm going to show you
```

Page 217

```
 1  Plaintiff's Exhibit 26.  This is part of the
 2  documents also you produced.  Plaintiff's
 3  Exhibit 26 is a certificate you got for
 4  that's a -- You were certified as a Taser
 5  instructor; correct?
 6       A.    Correct.
 7       MR. HOWARD:  This is out of
 8  your personnel file.
 9       THE WITNESS:  Yes.  Yes.  I
10  recognize it.  Yes.
11              (Plaintiff's Exhibit 27
12              was marked for
13              identification purposes.)
14       Q.    (Mr. Sikes) Let me show you
15  also Plaintiff's Exhibit 27, also out of your
16  personnel file.  That's a PPCT Defensive
17  Tactics Certification; correct?
18       A.    Yes.
19       Q.    What is PPCT Defensive
20  Tactics?
21       A.    I believe that's --
22       Q.    Pressure Point Control?
23       A.    Control techniques.  Pressure
```

55 (Pages 214 - 217)

Page 218

1 Point Control Technique defensive tactics,
2 yes.
3    Q.    The purpose of that is to be
4 able to use your hands as a weapon to control
5 an unruly or rowdy subject; correct?
6    A.    Correct.
7    Q.    And the idea that if you
8 applied pressure at a particular point on
9 somebody's chest or neck or jaw line or some
10 other place on the body, you can use that as
11 a pressure point to control that subject
12 where you don't have to use a more harmful
13 weapon against them; correct?
14    A.    Correct.
15    Q.    Okay. Why did you not use
16 your hands as you were trained to do against
17 Mr. Spivey?
18    A.    Based on advice from my
19 attorney, I choose not to answer that citing
20 the Fifth.
21        (Plaintiff's Exhibit 28
22        was marked for
23        identification purposes.)

Page 219

1    Q.    Okay. I'm going to show you
2 also Plaintiff's Exhibit 28. Do you recall
3 that? That was just June of '19.
4    A.    Yes, sir.
5    Q.    Do you recall that seminar?
6    A.    Yes, sir.
7    Q.    What business do the police
8 have in managing medical examiners?
9    A.    This was a webinar. And what
10 it is is when it's speaking of managing your
11 medical examiner, it's talking about the
12 relationship you have and how you're
13 exchanging your evidence back and forth.
14    Q.    The medical examiner is who
15 writes up autopsies and injuries to persons
16 that have been inflicted by police officers;
17 correct?
18        MR. HOWARD: Object to the
19 form.
20    A.    Yes.
21    Q.    Aren't they supposed to be
22 independent of the police department?
23    A.    Yes, they are.

Page 220

1    Q.    What business have y'all
2 got -- the police got managing them?
3    A.    We're not managing them.
4    Q.    That's what the title of the
5 seminar is; isn't it?
6    A.    Yes, sir.
7    Q.    If you could manage your
8 medical examiner, you could distort the
9 evidence, couldn't you?
10    A.    Yes, sir.
11    Q.    Okay. Do you know the
12 medical examiner that did the autopsy in this
13 case?
14    A.    What is his name? I
15 didn't --
16        MR. HOWARD: Just do you know
17 who he is or not? He's asking you a
18 yes-or-no question.
19    A.    No, I don't know.
20    Q.    Do you try to manage him in
21 any way?
22    A.    No, sir.
23    Q.    But you got trained to?

Page 221

1        MR. HOWARD: If that's what
2 that title means as you said.
3    Q.    That's what it says. I mean,
4 I don't have to -- managing.
5        MR. HOWARD: There's another
6 interpretation to the way you got it.
7        MR. SIKES: Okay. I'll let
8 you supply that.
9        (Plaintiff's Exhibit 23
10        was marked for
11        identification purposes.)
12    Q.    (Mr. Sikes) I'm going to show
13 you what's been marked -- I've marked as
14 Plaintiff's Exhibit 23. Do you recognize The
15 Use-of-Force Continuum. You indicated
16 earlier -- You use that term, I believe?
17    A.    Yes, sir.
18    Q.    This is put out by the
19 National Institute of Justice. Are you
20 familiar with that organization or not?
21    A.    I am.
22    Q.    Okay. Is it a reputable
23 entity that provides information and

56 (Pages 218 - 221)

Page 222

1 standards for law enforcement agencies across
2 the country?
3    A.    Yes, it does.
4    Q.    Is it a reliable source of
5 that kind of information?
6    A.    I would say so.
7    Q.    Okay. That's their
8 use-of-force continuum; correct?
9    A.    It appears so.
10    Q.    Take a look at it a second.
11 Do you agree with that? Is that what you
12 understand to be when you talked about the
13 word continuum of force -- continuum of use
14 of force? Is it consistent with what you
15 know about that?
16    A.    Yes.
17    Q.    It shows the range of the
18 types of force that are available for
19 policeman to use against other citizens;
20 correct?
21    A.    Correct.
22    Q.    And the range goes from
23 completely nonviolent or no force, physical

Page 223

1 force, all the way up to the highest rank and
2 that's deadly force; correct?
3    A.    Yes.
4    Q.    And firing a gun at a person
5 is the greatest or the highest amount of
6 force you can use against another person;
7 correct?
8    A.    Yes.
9    Q.    What use of force, other than
10 his hands, did Channing Spivey ever threaten
11 or use against you?
12    MR. HOWARD: Objection.
13    A.    Based on recommendation from
14 Counsel, I'm going to choose not to answer
15 that citing the Fifth.
16    Q.    You asserted the Fifth
17 Amendment again in answer to that. You've
18 told us that you've already given a full
19 statement of how this happened to Officer
20 Carpenter with ALEA; correct?
21    A.    Correct.
22    Q.    And you didn't assert any
23 claim of Fifth Amendment privilege there when

Page 224

1 he was questioning you, did you?
2    A.    I did not.
3    Q.    But you're asserting it here;
4 correct?
5    A.    Correct.
6    Q.    Why haven't you -- Why
7 haven't you waived your right to claim the
8 Fifth Amendment by giving testimony or giving
9 evidence or giving information to Deputy or
10 Lieutenant Carpenter?
11    MR. HOWARD: Object to the
12 form, based on the legal conclusion. If
13 you're comfortable discussing the Supreme
14 Court of the 11th Circuit case law on waiving
15 the Fifth, you can answer.
16    MR. SIKES: I'm not asking him
17 to go to law school.
18    MR. HOWARD: Read your
19 question back. Let's see what was the
20 question.
21    Q.    (Mr. Sikes) Why haven't you
22 waived it?
23    MR. HOWARD: Okay. That's a

Page 225

1 legal question. You don't have to answer
2 that.
3    Q.    Is it your position that you
4 can selectively choose when to assert the
5 Fifth Amendment?
6    MR. HOWARD: You don't have to
7 answer. It's a legal question.
8    THE WITNESS: Okay.
9    MR. SIKES: That's not covered
10 by the Fifth Amendment. I want an answer out
11 of that.
12    MR. HOWARD: You're not
13 getting one because I told him not to,
14 cause you're asking him a legal theory
15 question. He's not qualified to answer that.
16    Q.    (Mr. Sikes) Does that appear
17 fair to you that you can assert the privilege
18 in one place and you can waive it in another?
19    MR. HOWARD: Don't answer it.
20    Q.    Does that seem fair to you?
21    MR. HOWARD: Don't answer it.
22 If he wants to file something, that's fine.
23    MR. SIKES: You're going to

57 (Pages 222 - 225)

Page 226

1 decline to answer that question?
2       MR. HOWARD:  Yes.
3    A.    Yes.
4    Q.    On advice of Counsel, based
5 on what?
6       MR. HOWARD:  Based on I just
7 told him that that's a legal question and you
8 know good and well it is.
9    Q.    I'm not asking you law now.
10 I'm asking does that appear fair to you?
11       MR. HOWARD:  Unless you know
12 the case law, you don't know if it's fair or
13 not.  Don't answer it.
14    Q.    I'm not asking you case law.
15 I'm asking you whether you think that's fair
16 that you can selectively assert it?
17       MR. HOWARD:  You don't have to
18 answer that.
19       MR. SIKES:  And you're not
20 going to answer that?
21       MR. HOWARD:  Correct.
22       MR. SIKES:  I think we're
23 through, subject to recall.  I'm going to

Page 227

1 challenge some of these Fifth Amendment
2 assertions.  And assuming that -- Well,
3 depending on whether you're indicted or not,
4 we will resume this deposition.
5       MR. HOWARD:  It looks like
6 we've used about at least over half the time
7 that you're allotted.  Just put that on the
8 Record.
9
10
11
12 (The deposition was concluded at 1:55 p.m.,
13 January 28th, 2021.)
14
15
16
17
18
19
20
21
22
23

Page 228

1       REPORTER'S CERTIFICATE
2 STATE OF ALABAMA,
3 MONTGOMERY COUNTY,
4    I, Sara Wilson, Certified Court
5 Reporter and Commissioner for the State of
6 Alabama at Large, do hereby certify that the
7 above and foregoing proceeding was taken down
8 by me by stenographic means, and that the
9 content herein was produced in transcript
10 form by computer aid under my supervision,
11 and that the foregoing represents, to the
12 best of my ability, a true and correct
13 transcript of the proceedings occurring on
14 said date and at said time.
15    I further certify that I am neither
16 of kin nor of counsel to the parties to the
17 action; nor in any manner interested in the
18 result of said case.
19
     Signed the 2nd of February, 2021.
20
21
          *Sara Wilson*
22      Sara Wilson, CCR
      ACCR #420 Expires 9/30/21
23      Notary Expiration 8/13/23