**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

**CASE NO.: 2:20-cv-598**

| | |
|---|---|
| **CHANDA CALLAWAY,** | : |
| **as Administrator of the Estate of** | : |
| **CHANNING LAMAR SPIVEY,** | : |
| **Deceased,** | : |
| | : |
| **Plaintiff** | : |
| **vs.** | : |
| | : |
| **MASON ADCOCK,** | : |
| | : |
| **Defendant.** | **/** |

**REPORT OF EXPERT WITNESS,**
**WILLIAM T. GAUT, PhD**

**CONTENTS**

| | | |
|---|---|---|
| I. | Expert Qualifications ………………………………………………….. | 2 |
| II. | Materials Considered…………………………………………………….. | 4 |
| III. | Methodology……………………………………………………………… | 5 |
| IV. | Factual Background ……………………………………………………… | 7 |
| V. | Opinions…………………………………………………………………….. | 8 |
| VI. | Bases For Opinions ……………………………………………………… | 8 |
| VII. | Conclusion……………………………………………………………….. | 19 |
| VIII. | Attachments……………………………………………………………… | 21 |
| Current Curriculum Vitae ……………………………………………… | | Attachment #1 |
| Current Fee Schedule …………………………………………………… | | Attachment #2 |
| Previous 5-Year History of Deposition/Trial Testimony .. ……………… | | Attachment #3 |

## I.        Expert Qualifications

A copy of my current curriculum vitae is attached (Attachment #1) reflecting my qualifications to speak to this matter.  I have testified as an expert in the discipline of police practices, to the principles of police use of force, and to the standards of vehicle pursuit.  A list of those cases in which I have given testimony as an expert at trial or by deposition in the preceding five years is attached (Attachment #3) and made a part of this report.  In approximately 60%-70% of cases, I have been retained by plaintiff attorneys, and in 30%-40% of cases by defense attorneys.

My general experience includes 25 years with a major municipal police department where I served in every capacity from Corrections Officer and Uniformed Patrol Officer to command-level supervisor; and two years as District Attorney's Director of Special Services as a sworn Alabama State Police Officer.  As a sworn police officer, I performed the duties of a uniformed patrol officer, a certified police academy instructor, a detective and detective sergeant, a police lieutenant assigned to the Chief's Administrative Staff, and police captain.  During my assignment to the Chief's Administrative Staff, I commanded the business aspect of the department, inspection of all operational divisions, wrote departmental policies, and coordinated the department's accreditation compliance.

My command-level experience includes that of Captain of Detectives where I supervised the daily activities of 120 investigators, and Patrol Precinct Captain/Commander, where I supervised the daily activities of 130 police Patrol Officers and mid-level supervisory Officers.  In my capacity as a State Police Officer with the Jefferson County District Attorney's Office, I designed and performed the initial public research project to determine the need for a Financial Crimes Unit and wrote the organization's Daily Operations Procedures.  I screened/hired the clerical and investigative staff.  I directly supervised the division's daily operations including supervision of investigative staff, purchasing, accounts payable, accounts receivable, payroll, case/trial preparation, case-filing system, courtroom litigation, computer system design, and marketing.

During my career as a police officer, I was responsible for knowing and regularly applying the law and to operational standards in daily situations so as not to violate the constitutional rights of

those I served. I did this by studying police procedures at a certified police academy, by taking Constitutional Law, and Criminal Law courses in college, by studying applicable Criminal Codes, by reviewing lower court, appellate court, and Supreme Court decisions, by making constitutionally valid arrests, and by acceptance of testimony in criminal and civil court cases.

Since I retired as a police officer, I have maintained my knowledge of constitutional principles and law enforcement standards through continuing education, through graduate coursework in pursuing my master and doctoral degrees, through my association with the Commission on Accreditation for Law Enforcement Agencies (CALEA), through regular studies of International Association of Chiefs of Police Training Keys and Model Policies, through regular reading of peer reviewed articles written for the National Sheriffs Association, through regular reading of Lexis-Nexis publications, through review of VerdictSearch archives, and through my work as a police practices expert.

My education consists of an Associate Degree in Criminal Justice, with a minor in Sociology; a Bachelor's Degree in Criminal Justice, with a minor in Psychology; a Master's Degree in Public and Private Management (MPA/MBA), and a PhD Degree in Criminal Justice.  I have completed specialty training from the Federal Bureau of Investigation, the Drug Enforcement Administration, the US Secret Service, the US Marshall's Service, Internal Revenue Service, U.S. Alcohol-Tobacco & Firearms Division, New York City Police Department, Los Angeles Police Department, Boston Police Department, and Texas Department of Public Safety, sometimes called the Texas Ranger Police Academy.

My teaching experience includes that of Certified Police Academy Master Instructor, guest lecturer in the field of Criminal Justice at major universities, and Adjunct College Professor in the field of Criminal Justice.  As an Adjunct Professor, I taught full courses in Homicide Investigation, Criminal Law, Fundamentals of Investigation, and Fundamentals of Criminal Justice.

My experience as a Police Academy Instructor includes (1) sitting on the original committee appointed by the Governor of Alabama to formulate minimum standards of training for all Alabama

police officers and (2) participating as a provider in the pilot project in the State of Louisiana to determine the minimum training standards for private and proprietary security officers. During my entire law enforcement career, I regularly taught Homicide Investigation and Fundamentals of Supervision at the Birmingham Police Academy. The courses were taught to rookie police officers, to newly promoted detectives, and to newly promoted basic and intermediate supervisors at the Sergeant and Lieutenant ranks.

My education and experience in forensic examinations and crime scene reconstruction includes extensive training in crime-scene evidence collection and analysis, field experience in forensic analysis, and college level coursework in evidence collection and analysis. I am an active member of the American Academy of Forensic Sciences, which require education and experience in forensic science for membership. By ACFEI proctored examination, I am a Certified Forensics Consultant and a Certified Level III Forensics Medical Investigator. I currently hold Board Certification Diplomat/Fellow status by the American Board of Forensic Examiners. My continuing education credits include multiple forensic and psychology courses at the doctoral level and certification courses at the Birmingham Police Academy.

In the field of psychology, I have been recognized as a Criminal Profiler and have some 640 classroom hours of formal psychology education, (16 courses/48 semester hours). In 2012, I was invited as a presenter before the American Psychological Association.

My fees for review and analysis of this case is included on the Fee Schedule, Attachment #2, and made a part of this report.

## II.      Materials Considered

1. Attorney Correspondence/Notes,
2. Complaint; Answer to Complaint,
3. Plaintiff's Responses to Requests For Admissions Served November 11, 2020,
4. Defendant Mason Adcock's Interrogatories, Request For Production of Documents and Request To Admit To Plaintiff,

5. Plaintiff's Answers and Responses to Defendant's Interrogatories and Requests For Production,

6. Certified Letters of Admission,

7. Duplicate of #3,

8. Autopsy Report on Channing Lamar Spivey,

9. Photographs,

10. Luverne PD Policy and Procedures,

11. Media Articles,

12. ALEA Investigation Report/s,

13. Mason Adcock Statement to ALEA Investigator McDermott,

14. Zanna Bloodsworth Statement to ALEA Investigator Sam Redmon,

15. Robert Knight Statement to ALEA Investigators Robert Knight & Brian Harvin,

16. Brent Penny Statement to ALEA Investigator Lt. Heath Carpenter,

17. Justin Robinson Statement to ALEA Investigator Lt. Heath Carpenter,

18. Westley Spivey Statement to ALEA Investigator Lt. Heath Carpenter,

19. Timothy White Statement to ALEA Investigator Brian Harvin,

20. Mason Adcock Deposition; Volume I,

21. Westley Spivey Deposition,

22. Zanna Bloodsworth Deposition,

23. Adcock Deposition Exhibits,

24. Chanda Callaway Deposition,

25. Justin Robinson Deposition,

26. Mason Adcock Deposition, Volume II,

27. Brent Penny Deposition,


**III.    Methodology:**

In order to understand the allegations, I began my analysis by first reading the Complaint by Chandra Callaway.  After reading and understanding the allegations, I then read the case documents pertaining to exactly how Mr. Channing Lamar Spivey was injured/deceased.

After reading and understanding the allegations and the case documents, I conducted an analysis using law enforcement standards, applicable to the time period and promoted by professional law enforcement and Criminal Justice organizations including the International Association of Chiefs of Police (IACP), the National Sheriffs Association (NSA), and the Commission on Accreditation for Law Enforcement Agencies (CALEA). Law enforcement procedural standards written or promoted after the incident were not considered, in that law enforcement officers could not reasonably be expected to adhere to standards not yet in effect at the time of this case. Additionally, I considered standards set by the State of Alabama Law Enforcement Standards and Training Commission (APOSTC), and by textbooks typically used to train law enforcement patrol officers during the time-period relevant to this case.

Pertaining to my opinions about training standards, I examined the training standards set forth by the State of Alabama, the Commission on Accreditation for Law Enforcement Agencies (CALEA), with input from the International Association of Chiefs of Police, the National Sheriffs Association, the Police Executive Research Forum (PERF), and the National Organization of Black Law Enforcement Executives (NOBLE). I also used my experience as a Master Instructor at a Certified Police Academy as it relates to Homicide Investigation, and as the coordinator for national accreditation compliance for my own law enforcement agency, the Birmingham Police Department. I next compared the Policies and Procedures of the Luverne, Alabama Police Department to the above standards in order to render an objective opinion about the actions of Assistant Police Chief Mason Adcock in his use of deadly force, which resulted in the death of Channing Lamar Spivey.

Finally, I used in part my own education, training, and experience in the field of Criminal Justice, and specifically in the field of Patrol Operations and Use of Force as outlined in Section I, Expert Qualifications, of this report, and the attached Curriculum Vitae.

### III.    Factual Background

My understanding of facts is summarized as follows: In March of 2020, due to Mr. Spivey's exhibited mood changes, irritability, irrational thought process, seizures and erratic behavior, Mr. Spivey was medically diagnosed with, and underwent surgery to remove, a cancerous brain tumor. On the morning of May 27, 2020, Mr. Spivey drove his car onto an empty lot and crashed into a tree. He then proceeded to walk home. A neighbor saw Mr. Spivey walking along the roadway and offered him a ride, which Mr. Spivey declined. The neighbor then called Ms. Callaway, who called the Luverne Police Department.   She told the Luverne police operator about Mr. Spivey's cancer/brain surgery and her belief that Mr. Spivey was acting irrationally.  Ms. Callaway then called Sheriff Terry Mears directly and relayed the same information.

Zanna Bloodsworth, Mr. Spivey's girlfriend, later called 9-1-1 requesting an ambulance/EMT response. When EMT's arrived, Mr. Spivey, dressed only in a pair of bathing suit/shorts, refused treatment or transportation. Crenshaw County Deputy Sheriff Brent Penny arrived and used his TASER®.  Deputy Penny then displayed his gun at Mr. Spivey threatening, "I'm gonna shoot your ass."  Fearing that Deputy Penny was about to shoot Mr. Spivey, Ms. Bloodsworth ran to off-duty police chief Mason Adcock's house. Mr. Spivey advanced toward Deputy Penny, who retreated toward Chief Adcock's house. As Mr. Spivey and Deputy Penny walked up the driveway toward Mason Adcock's house, Chief Adcock came outside with his gun and was told by two of Mr. Spivey's family members not to shoot, that he (Spivey) was suffering from the effects of brain surgery and they would help to physically control Mr. Spivey.  Chief Adcock alleges he was attacked by Mr. Spivey, and suffered scratches to his neck and chest, a laceration to his lower lip, and a bruise to his head at the front hairline.  From a reported distance of "6 feet or more," Chief Adcock shot Mr. Spivey five (5) times, killing him. Chanda Callaway now brings a civil lawsuit against Assistant Chief Mason Adcock alleging excessive use of force.

As an expert in police procedures, I was retained by attorney Griffin Sikes, Jr. to examine the facts and opine as to whether or not Assistant Chief Mason Adcock acted in accordance with generally accepted law enforcement standards of police practices.

## IV.    Opinions

To a reasonable degree of professional certainty, based on my experience, documents reviewed, and industry standards, my opinion is:

Luverne Police Department Assistant Chief Mason Adcock's use of deadly force against Channing Lamar Spivey was not in keeping with generally accepted law enforcement standards, commonly called excessive force.

## V.    Bases for Opinions

The bases for these opinions are formed from my experience as both a line officer, intermediate supervisor, and command level supervisor at a major city police department; from my experience as a certified police academy instructor; from my experience as a police investigator; from the standards proffered in nationally recognized criminal justice textbooks; from reasonable and customary nationally recognized standards; including but not limited to, those of the International Association of Chiefs of Police; the Commission on Accreditation for Law Enforcement Agencies, and from those relevant case documents and materials previously identified.

As a background and explanation of methodology for my opinion in the area of Use of Force, I offer the following information.  A group of police chiefs founded the Commission on Accreditation for Law Enforcement Agencies in 1979 (CALEA, 2009).  The formation of accreditation standards resulted from the joint efforts of several law enforcement major executive associations including: (a) the International Association of Chiefs of Police (IACP), (b) the National Organization of Black Law Enforcement Executives (NOBLE), (c) the National Sheriffs Association (NSA), and (d) the Police Executive Research Forum (PERF), a division of the U.S. Department of Justice.

Police training involves three basic concepts.  First, officers must be given correct information by qualified instructors either in a classroom setting or by "on the job" training by supervisory explanation and example.  Second, officers must be tested to insure that the information

given was adequately received and understood.  Third, officers must be adequately supervised to insure that the training concepts are being correctly carried out.

I first examined the training given to all Alabama law enforcement officers pertaining to the use of force.  Pertaining to law enforcement training, legal terminology is used only in the vein of law enforcement training, and is not meant to provide legal opinions, or to invade the authority of the Court.  Any language pertaining to "facts" are only those that are supported by forensic evidence or authority.  In my review of this case, it is improper to, and I do not, opine about the credibility of witnesses, including civilians or the involved police officers.  Rather, I examine the evidence from a scientific and forensic or authoritative perspective and may opine whether or not the evidence does or does not support a particular allegation or statement.  Determination as to the authenticity of case facts is properly left to the jury.

Like most law enforcement agencies,[1] the use of force training in Alabama involves the concept of a "Use of Force Continuum."[2] That concept identifies a sliding scale of force, based on the actions of a citizen/offender. An example is presented by the National Institute of Justice:

- **Officer Presence — No force is used. Considered the best way to resolve a situation.**

    - The mere presence of a uniformed law enforcement officer works to deter crime or diffuse a situation.

    - Officers' attitudes should be professional and nonthreatening.

- **Verbalization — Force is non-physical.**

    - Officers issue calm, nonthreatening commands, such as "Let me see your identification and registration."

    - Officers may increase their volume and shorten commands in an attempt to gain compliance. Short commands might include "Stop," or "Don't move" or "Get on the Ground."

- **Empty-Hand Control — Officers use bodily force to gain control of a situation.**

---

[1] National Institute of Justice (NIJ) Study on Use of Force, 2011; National Consensus Policy on Use of Force, 2017.
[2] National Institute of Justice (NIJ) Use-of-Force Continuum.

- o    *Soft technique.* Officers use grabs, holds and joint locks to restrain an individual.

- o    *Hard technique.* Officers use punches, kicks and/or physical "take down" techniques to restrain/control an individual.

- **Less-Lethal Methods — Officers use less-lethal technologies to gain control of a situation.**

    - o    *Blunt impact.* Officers may use a baton, weaponized flashlights, or non-deadly projectiles to immobilize a combative person.

    - o    *Chemical.* Officers may use chemical sprays or projectiles embedded with chemicals to restrain an individual (e.g., pepper spray).

    - o    *Conducted Energy Devices (CEDs).* Officers may use CEDs to immobilize an individual. CEDs discharge a high-voltage, low-amperage jolt of electricity at a distance.

- **Lethal Force — Officers use lethal weapons to gain control of a situation or to stop a dedicated offender. Should only be used if a suspect poses a serious threat of great bodily harm or death to the officer or another individual.**

    - o    Officers use deadly weapons such as firearms to stop an individual's actions.

Similar to the NIJ example, the International Association of Chief of Police (IACP) presents a Model Policy on the Use of Force. That policy states,

**I.      PURPOSE**

The purpose of this policy is to provide law enforcement officers with guidelines for the use of deadly and nondeadly force.

**II.     POLICY**

It is the policy of this law enforcement agency that officers use only the force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the decision to use force is not a subjective determination and the decision is not left to the unfettered discretion of the involved officer. A use of force must be objectively reasonable. The officer must use only that force which a reasonably prudent officer would use under the same or similar circumstances.

## III.    DEFINITIONS

*Deadly Force:* Any use of force that creates a substantial risk of causing death or serious bodily harm.

*Nondeadly Force:* Any use of force other than that which is considered deadly force. This includes any physical effort used to control, restrain, or overcome the resistance of another.

*Objectively Reasonable:* This term means that, in determining the necessity for and appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community.

## IV.    PROCEDURES

A.    Use of Deadly Force

1. Law enforcement officers are authorized to use deadly force when one or both of the following apply:

   a. To protect the officer or others from what is reasonably believed to be a threat of death or serious bodily harm.

   b. To prevent the escape of a fleeing violent felon who the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others.

2. Where practicable prior to discharge of a firearm, the officer shall identify himself or herself as a law enforcement officer and warn of his or her intent to shoot.

B.    Deadly Force Restrictions

1. Warning shots are prohibited.

2. Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force. When possible, an officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants.

3. Firearms shall not be discharged from a moving vehicle.

4. Use of Nondeadly Force

5. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control.

6. Officers are authorized to use department-approved, nondeadly force techniques and issued equipment when one or more of the following apply:

7. To protect the officer or others from physical harm.

8. To restrain or subdue a resistant individual.

    9.   To bring an unlawful situation safely and effectively under control.

C.     Training

       In addition to training required for firearms qualification, officers shall receive agency-authorized training designed to simulate actual shooting situations and conditions and, as otherwise necessary, to enhance officers' discretion and judgment in using deadly and nondeadly force in accordance with this policy.

Chief Adcock is employed by the Luverne Police Department.  The LPD mirrors the IACP Use of Force policy stating,

Luverne Police Department

Rules: Use of Force

2.704.00 Procedures: Parameters for Use of Deadly Force

1.   Police officers are authorized to use deadly force in order to:
    a.   Protect the police officer or others from what is reasonably believed to be a threat of death or serious bodily harm; or.
    b.   Prevent the escape of a fleeing violent felon whom the officer has probable cause to believe will pose a threat to human life should escape occur.

Next, since CALEA is the largest national law enforcement accreditation association, I considered the CALEA Standard 1.3 Use of Force, which states,

**1.3 Use of Force**

***1.3.1***   *A written directive states personnel will use only the force necessary to accomplish lawful objectives.*

**Commentary:** None. **(M M M M)**

***1.3.2***   *A written directive states that an officer may use deadly force only when the officer reasonably believes that the action is in defense of human life, including the officer's own life, or in defense of any person in imminent danger of serious physical injury. Definitions of conditional terms, such as those for reasonable belief, serious physical injury, or similarly used terms that are used to qualify the directive, shall be included.*

I next considered the Alabama Criminal Code 13A-3-23, pertaining to Self Defense.  From my experience in teaching [Alabama] Criminal Law at the university and police academy levels in

Alabama, and from more than twenty-five (25)  years of investigating and enforcing Criminal Homicide and Assault laws, I know, and have verified, the Code states:

> 13A-3-23. Self Defense – Defense of Others.
>
> (a) A person may use deadly physical force if the actor reasonably believes that such other person is:
>
> (1) Using or about to use unlawful deadly physical force; or
>
> (3) Committing or about to commit a kidnapping in any degree, assault in the first or second degree, burglary in any degree, robbery in any degree, forcible rape or forcible sodomy.

In arriving at my opinion, I used the facts most favorable to Chief Adcock that were known to him at the time he shot Mr. Spivey. In order to understand the circumstances of, the background for, and the situation existing at the time of the shooting, I necessarily reviewed the evidence and information about the actions and events of that day that preceded the fatal shooting.

However, I restricted my assessment and evaluation of Chief Adcock's use of deadly force to that information known by Chief Adcock at the time he fired his weapon at Mr. Spivey.  I did so, because it has been my experience in law enforcement that it is only the knowledge possessed by the shooting officer at the time of the shooting may be considered in determining the lawfulness of the shoot.  Facts or circumstances that are only learned by the officer after the shooting incident may not be used to evaluate the reasonableness of the shooting.

To form an opinion based on information unknown to the policeman would be to judge the officer with what has been called "20-20 hindsight," which I understand various courts have prohibited.  I understand from plaintiff's counsel that this limitation is also the law that is applicable to this case also: only information known to the police officer at the time the officer used deadly force can be used to assess whether that officer's use of force was reasonable or was excessive.

Limiting the assessment of the use of deadly force to only those facts and the information known to the officer at the time of the officer's use of deadly force sometimes helps justify the officer's actions and in other cases, as here, it makes the officer's actions unjustifiable.

Therefore, I did not consider the prior events of that day of which Chief Adcock had no knowledge, including those that occurred on the morning of the shooting and those that occurred at and around the Spivey home later that afternoon and early evening, beginning with the call by Zanna Bloodsworth for EMTs to come and attend to Channing Spivey.

A good starting point in evaluating Chief Adcock's use of deadly force is the Use of Force standards that are generally accepted law enforcement standards used across the nation by law enforcement agencies. Those standards almost always begin with the principle that police officers may use no more force than is reasonably necessary to bring the situation or the arrestee under control.[3]

The U.S. Supreme Court gave additional guidance to law enforcement agencies and to the public in the Graham v Connor case, which requires that the use of deadly force by police, like all uses of force, must be "objectively reasonable." In my experience, this term is consistently used in police training on use of force. I have known, based on my own experience as a command level law enforcement supervisor, and on my work as a police practices expert examining law enforcement policies in hundreds of cases, the term is widely accepted and incorporated into many police departments' policies on the use of force.

As I understand the "objectively reasonable" standard, a particular policeman's subjective beliefs or feelings at the time of his/her use of force are not relevant and should not be considered. Instead, the test is what an objectively reasonable officer in the same or similar situation, knowing only that which the policeman knew, would believe to be a reasonable use of force.

---

[3] IACP Model Policy on Use of Force

In making determinations of what is objectively reasonable, in the Graham case the U.S. Supreme Court reaffirmed its earlier holding in the Tennessee v. Garner case that the "totality of the circumstances" should be considered.  Three of the more important circumstances were singled out: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Throughout my career in law enforcement these factors are commonly referred to as the Graham Factors.

To apply those factors herein, two of them obviously weigh heavily against the use of deadly force.  First, as to "the severity of the crime at issue," the evidence I have seen indicates that Chief Adcock had no reason to believe that Mr. Spivey had committed any crime.  The only crime that I saw any evidence of was Mr. Spivey's breaking out the EMT vehicle or Sheriff's vehicle's windshield.  It is undisputed that Chief Adcock had no knowledge of those actions by Mr. Spivey.

Further, even if Chief Adcock had known Mr. Spivey had broken out a windshield, Mr. Spivey would have constituted a relatively minor, misdemeanor property crime, destruction of public property.  That is not in any sense, a "severe" crime.

Second, as to whether Mr. Spivey was "actively resisting arrest or attempting to evade arrest by flight," similarly there is no evidence or indication of either of these things.  I did not see in any of the evidence provided to me that Deputy Penny or Chief Adcock attempted to arrest Mr. Spivey, nor did I see any evidence that Mr. Spivey was fleeing from Deputy Penny or Chief Adcock in an attempt to evade arrest.

The third Graham factor also does not support the use of deadly force in this case, in my opinion.  The third Graham factor is "whether the suspect poses an immediate threat to the safety of officers or others."  This factor is used in evaluating the appropriateness and lawfulness of the use of force generally.  That is, the Graham factors apply in all uses of force by the police.

However, since Graham was decided, more specific and more stringent standards have been

adopted by police departments for the use of deadly force by police.   The national consensus on use of deadly force by police departments has also been developed based on Supreme Court opinions.

The consensus from across the nation's police department's policies on use of deadly force is that use of deadly force is not justified and is prohibited except in a situation in which the policeman reasonably believes a person poses an imminent or immediate threat of death or serious bodily harm to the officer or to others.

While I know this standard, or a close variant of this standard, to be the one used by the great majority of nations' police departments, and promoted by the two largest law enforcement professional and accreditation agencies in the United States, I also wanted to confirm the law.   I asked plaintiff's counsel whether this was the law applicable in this case to the use of deadly force and if so, to supply me with a case that stated the applicable standard.   In response, plaintiff counsel supplied the following case, *Gregory v. Miami-Dade Cty.*, 719 F. App'x 859 (11th Cir. 2017) and supplied the following quoted language from that case:

> An officer may only use deadly force against a person whom the officer reasonably perceives as posing an imminent threat of serious physical harm to the officer or others.

My assessment of whether Chief Adcock was justified in his use of deadly force against Mr. Spivey depends upon whether, based on what Chief Adcock knew at the time he fired his weapon at Mr. Spivey, an objectively reasonable police officer would believe that Mr. Spivey posed an imminent or immediate threat of death or serious bodily harm to the policeman or to others.

From any standpoint, I concluded that an objectively reasonable policeman would not believe Mr. Spivey posed such an imminent or immediate threat. One of the most important factors in my concluding that Mr. Spivey posed no threat of this type is the fact that Mr. Spivey was unarmed.

Almost as important as that fact is the fact that, as Chief Adcock repeatedly admitted in his deposition, Chief Adcock knew that Mr. Spivey had no weapon or any available access to a weapon.

16

Without a weapon, Mr. Spivey did not have the ability in these circumstances to inflict any life-threatening injuries on Chief Adcock or anyone else in the area.  Chief Adcock admitted this in his deposition: that use of fists or hands is not deadly force, that seldom do fist fights result in death or serious bodily injury, and that in fist fights the injuries are generally minor.

Another important factor in my determination that Ms. Spivey did not pose the required immediate threat is the number of persons available to Chief Adcock to bring Mr. Spivey under control.  The evidence was undisputed that there were four able bodied men available to physically restrain Mr. Spivey if he physically assaulted anyone with his hands, which were the only "weapons" available to Mr. Spivey.  Further, two of them, Westley Spivey and Justin Robinson, were loudly yelling from only a few dozen feet away from Chief Adcock, for him not to shoot, that the two of them were coming as back-up. Put simply, there was a 4 to 1 advantage by police officers and family members to physically control Mr. Spivey.

Even if their undisputed testimony is discounted and Chief Adcock's testimony that he did not see or hear them is credited, Adcock and Deputy Penny still had a two to one "strength of force" advantage. Further, both Chief Adcock and Deputy Penny were fully trained in the physical use of force used to subdue a subject. That training included, but not limited to, a course of Pressure Point Control Tactics (PPCT) and various weaponless "restraint holds" and "take down" maneuvers.

Another significant factor is that Chief Adcock knew Mr. Spivey.  He testified he had known Mr. Spivey for five to ten years and knew Mr. Spivey was not a violent person, had no criminal record and had no reputation for violent behavior.

Another factor in my assessment is that Deputy Penny was present, saw, heard and knew all that Chief Adcock had seen, heard or known and Mr. Spivey had been advancing on Deputy Penny for a much longer period of time than Chief Adcock, yet Deputy Penny did not fire his weapon. In the absence of any indication otherwise, I assume that Deputy Penny was a trained professional law enforcement officer and was a reasonably objective policeman.  Deputy Penny was pursued by

and advanced on by Mr. Spivey for the one hundred yards or so between the Spivey and Adcock houses.

For all of that one hundred yards, as I understand the evidence, Deputy Penny had his handgun drawn and aimed at Mr. Spivey and was telling Mr. Spivey to stop. Further, Deputy Penny was alone on that one hundred yards of roadway. By that, I mean that Deputy Penny did not have another armed law enforcement officer at his side, as Chief Adcock did when Mr. Spivey advanced a few feet toward Adcock. Yet, at no time during the one hundred yards that Mr. Spivey kept advancing on Deputy Penny, despite Deputy Penny telling him to stop, at no time did Deputy Penny decide to use deadly force on Mr. Spivey.

The test is what in the exact same circumstances, an objectively reasonable policeman would do. Deputy Penny was in the exact same circumstances. Deputy Penny, in the same circumstances as Chief Adcock, did not during any of that one hundred yards, despite being alone, decide that deadly force was justified and fire his weapon.

I also considered that Mr. Spivey had brain cancer and was treated with both radiation and chemotherapy, both of which are commonly known to physically weaken the patient. Chief Adcock admitted that he was aware that Mr. Spivey was suffering from brain cancer and was undergoing treatment.

There do not appear to be many disputes in the testimony. One of the disputes is whether Mr. Spivey ever struck or assaulted Chief Adcock. Two witnesses testified that Channing did not strike Chief Adcock (or at least that they were present, in a position to see such blows being struck if this occurred and they did not see Mr. Spivey strike Chief Adcock). Chief Adcock and Deputy Penny's testimony conflicts in other respects, but both testified that Mr. Spivey struck Chief Adcock.

I do not believe resolution of this issue is important to or affects my opinion that excessive force was used and that the use of deadly force by Chief Adcock was not warranted or was not

consistent with standards within the police community regarding use of deadly force. The issue of the reasonableness or appropriateness of the use of deadly force by Chief Adcock turns largely upon whether it was objectively reasonable for Chief Adcock to see Mr. Spivey as a person who had the ability to kill him or cause him serious bodily injury with only his hands.

Chief Adcock may have had his own subjective ideas about whether Mr. Spivey could have killed or caused Chief Adcock with his bare hands before the blows that Chief Adcock testified Mr. Spivey delivered. However, if those blows were inflicted on Chief Adcock, Chief Adcock would have known after they were struck, that Mr. Spivey lacked the ability to kill him or to cause him serious bodily injury.  The evidence strongly supports the conclusion that, if Chief Adcock was struck, he did not suffer any serious injury.[4]

## VI. Conclusion

The evidence shows Channing Spivey was barefoot and dressed only in bathing suit type shorts as he advanced toward Crenshaw County Deputy Brent Penny as he responded to a call for police service on an individual, Channing Spivey, who was suffering from a brain tumor and subsequent operation to remove it.  During the encounter, Mr. Spivey, in an agitated mental state, advanced toward Deputy Penny who first used a TASER® before drawing his firearm. Though alleging to being "in fear of his life," Deputy Penny simply retreated and did not resort to the use of deadly force.

After retreating some 100 yards, Deputy Penny and Mr. Spivey arrived in the driveway of Luverne Assistant Chief of Police, Mason Adcock, who was summoned for help by Zanna Bloodsworth.  Ms. Bloodsworth states she sought help from Chief Adcock, fearing that Deputy Penny might shoot Mr. Spivey.

Chief Adcock left the house and found Deputy Penny pointing a gun at Mr. Spivey. As

---

[4] In the series of photographs that Chief Adcock took or had taken of himself, there is no obvious, evident injury.  If the photos show any injury, it is very minor.  There is no cut or break in Chief Adcock's skin, there are no obvious bruises, and Chief Adcock admitted that none of the flecks or spatters of blood on his neck or arms or anywhere else in the photos is his blood.  Chief Adcock sought no medical attention for any claimed injury that night from the paramedics, nor did he thereafter seek any medical treatment or even evaluation.

he approached closer, Justin Robinson and Wesley Spivey approached yelling for the officers not to shoot, that Mr. Spivey had a brain tumor, and that they would help control him (Spivey). Chief Adcock attempted to grab Mr. Spivey's arm and was not successful. Chief Adcock then backed up 6-10 feet and, as Spivey walked toward him, Chief Adcock shot Mr. Spivey five (5) times, killing him.

With two police officers present, one with a TASER®, and with 2 citizens in close proximity offering to help, and knowing Mr. Spivey was totally unarmed with no possibility of weapon concealment, Chief Adcock choose to use Deadly Force, in violation of generally accepted law enforcement practices. In my opinion, to the degree of professional certainty, and based on the known circumstances, Chief Mason Adcock's use of Deadly Force to shoot and kill Channing Lamar Spivey was objectively unreasonable and in violation of generally accepted law enforcement standards for the use of deadly force.

This concludes my findings and opinions in this case based on examination of documents to this date. I respectfully reserve the right to modify my opinions based on the receipt and examination of additional information.

_W. T. Gaut_____        _8/16/2021_____
William T. Gaut, PhD                          Date

Attachment #1

# CURRICULUM VITAE

## William T. Gaut, PhD

9063 Autumn Haze Drive
Naples, FL  34109-1501
Phone: 239-593-8033
E-Mail: wtgaut@aol.com

## Professional Experience:

| | |
|---|---|
| Current | **Criminal Justice Consultant**<br>Working in the fields of Criminal Justice and Private/Proprietary Security. |

| | |
|---|---|
| 1997-1999 | **Adjunct Professor** (Jefferson State Community College; Birmingham, AL)<br><br>Teaching the following subjects:<br>Criminal Law<br>Homicide Investigation<br>Fundamentals of Criminal Investigation<br>Fundamentals of Criminal Justice (Police Practices and Procedures) |
| 1994-1996 | **General Manager/CEO** (RaDiUs/Jasper Motorsports, Inc.; Denver, NC)<br><br>Business Manager and CEO of this NASCAR Racing organization. Managed the daily operations of the corporation including Security and Risk Management, Personnel, Purchasing, Accounts Payable, Accounts Receivable, Payroll, and Marketing. |
| 1992-1994 | **Administrator/Director**  (Jefferson County District Attorney=s Special Services Division; Birmingham, AL)<br><br>As a sworn Alabama State Police Officer, I designed and performed the initial public research project to determine the need for white-collar crime unit and wrote the organization's Daily Operations Procedures. I Screened/hired the clerical and investigative staff. Administered the division's daily operations including purchasing, accounts payable, accounts receivable, payroll, case/trial preparation, case filing system, courtroom litigation, computer system design and marketing. The District Attorney's Special Services Division specialized in the investigation, prosecution, and recovery of worthless checks, fraud, embezzlement and related white-collar financial crimes. |

**1968-1992     Birmingham Police Department; Birmingham, AL**
                **Rank at Retirement: Captain of Detectives**

Uniform Patrol Division

Police Academy Instructor (Sergeant)

Assisted in the development and implementation of the Alabama Minimum
Standards & Training Commission Curriculum, Policies and Procedures.

Detective Sergeant - Homicide Division

Lead investigator for literally hundreds of major felony cases of Homicide, Rape,
Felony Assault, and Kidnapping.

Lieutenant – Chief's Administrative Staff

Supervised the Business aspect of the department including purchasing of daily
supplies and equipment, Preparation, Implementation, Control of the annual $36
million budget, and Departmental Inspections. Responsibilities included licensing,
inspection and supervision of all Public Service Companies and City Emergency
Medical respondents.

Coordinated the Departmental Accreditation activities.

Captain - Precinct Commander  (East & North Precincts)

    Supervised the daily activities of 90-120 uniformed patrol officers in each
    precinct.

Detective Captain  (Detective Division Commander)

    Supervised the activities of 130 investigators.

## Other Professional Experience:

**1972-1990     Security Training Institute, Inc.**

CEO and majority stockholder of this multi-state, Subchapter-S corporation
operating in the States of Alabama, Georgia, and Louisiana. STI specialized in the
training and certification of private and proprietary security guards and security
management. We trained for virtually every industry including but not limited to
Hotels, Manufacturing, Banking, Private Security, Food Service, Retail
Department Stores, Public Police Officers, Public Utilities, Shopping Malls,

|  | public School Systems, and Major Universities. |
|---|---|
| 1985-Current | I have accepted Investigative/Expert Witness cases for attorneys including Civil/Criminal Investigation, Civil Wrongful Death, Homicide, premise liability, security operations evaluations, and Police Practices & Procedures. |
| 1972-1999 | I have regularly taught at the Birmingham Police Academy and Jefferson State Community College in the fields of Homicide Investigation, Criminal Investigation, Police Management, Emergency Response, and Fundamentals of Law Enforcement; and lectured in the fields of Criminal Justice, Security Fundamentals and Business Management at the following Universities: |

University of Alabama                    University of Alabama-Birmingham
Birmingham Southern College       Auburn University
Jefferson State Community College   Samford University

## Education:

PhD     Doctor of Philosophy in Criminal Justice
Dissertation: *Examining The Relationship Between Law Enforcement Accreditation and Citizen Complaints, Civil Lawsuits, and Adverse Civil Judgments*
Northcentral University

MA      Public & Private Management (MPA/MBA)
Birmingham Southern College

BS      Criminal Justice
University of Alabama-Birmingham

AS      Law Enforcement
Jefferson State Community College

## Certifications & Memberships:

Certified (Level III) Forensic Medical Investigator
Fellow Status by The American Board of Forensic Examiners
Certified Forensic Consultant
Certified Police Academy Instructor (former designation by the State of Alabama)
Certified Driving Instructor (former designation by the State of Florida)
Member National Sheriff's Association (NSA)
Member American Society of Industrial Security (ASIS)
Member American Academy of Forensic Sciences (AAFS)
Member American College of Forensic Examiners (ACFEI)
Member International Association of Chiefs of Police (IACP)
Member American Correctional Association (ACA)
Member National Emergency Number Association (NENA)
Member International Association for Identification (IAI)

Attachment #2

# William T. Gaut, PhD

**9063 Autumn Haze Drive**
**Naples, FL  34109-1501**

**Telephone:     (239) 593-8033**                    **Email: wtgaut@aol.com**
**Facsimile:     (239) 593-8033**                     **Web:   www.wtgaut.com**

## <u>FEE SCHEDULE</u>

Let's talk!  I encourage you to call to initially discuss the case. I am happy to confidentially discuss the general circumstances of the case, or my experience and qualifications at no charge.  Please understand that I accept only a limited number of active cases so that I might devote the necessary time to adequately review your case.

➢ **Retainer:**

Should you choose to retain my services, I require a non-refundable $2,500.00 retainer per case in advance (**<u>Waived for governmental agencies</u>**).  Research, review, and consultation is billed at $250.00 per hour against the retainer.  If the retainer is depleted, monthly statements will be mailed with payment expected upon receipt of the statement.

➢ **\*Deposition/Trial testimony held <u>in Collier or Lee County, Florida</u>: $2,000.00 per day or any portion thereof, per case.**

➢ **\*Travel and/or Deposition/Trial testimony held <u>outside of Collier or Lee County, Florida</u>: $3,500.00 per day or any portion thereof, per case.**

➢ **\*Out-Of-Pocket Expenses:**

Hotel and Air Fare @ Business Class rate.

**\*NOTE:        <u>Deposition/Travel Fee & Deposition Out-of-Pocket Expense must be paid at least 72 hours in advance</u>.**

24

Experience has shown that the typical case takes 24-30 hours, excluding Travel, Deposition, and/or Court time.  However, there is no guarantee that the review of your case will be completed within this average time-period.  This is simply a guideline, which you may use to estimate expenses.

It is understood I am retained by the attorney or governmental entity unless there is a specific agreement otherwise.  Therefore, the retaining attorney or governmental entity is responsible for payment for my services.  I do not use a written contract for services except by request.  In that case, I will be happy to provide a Memorandum of Services for your review and approval.

**As always, retention of my services does not guarantee a report favorable to your client.**

Best Regards,

Dr. William T. Gaut

Attachment #3

**Year**

| Year | Name | Address | City | State | Zip | Phone | Case | Court | Role | | | | Case Number |
|------|------|---------|------|-------|-----|-------|------|-------|------|---|---|---|-------------|
| 2015 | Benjamin Crump | 240 N. Magnolia Drive | Tallahassee | FL | 32301 | 850-222-3333 | Tolan v Cotton (Bellaire, TX) | Fed | Plaintiff | yes | yes | | 4:09-1324 |
| 2015 | Brian Mosholder | 923 Stage Road | Auburn | AL | 36803 | 334-321-0880 | Davidson v. City of Opelika | Fed | Plaintiff | yes | yes | | 3:14-v-323 |
| 2015 | Robert F. McKee | 1718 E. 7th Ave | Tampa | FL | 33605 | 813-248-6400 | Florence v. City of Lakeland | Fed | Plaintiff | yes | yes | | 8:13-cv-683 |
| 2015 | Christy Runkles | 2455 E. Sunrise Blvd. | Ft. Lauderdale | FL | 33304 | 954-462-3200 | McNeeley v. Charlotte Co et al | Fed | Defendant | yes | yes | | 2:12-cv-488 |
| 2015 | Jay Emerson | 405 Franklin Street | Huntsville | AL | 35801 | 256-533-3251 | Zinn v. Limestone County | State | Plaintiff | yes | yes | | 10:11-cv-11-238 |
| 2015 | Joe Jackson | 5184 Caldwell Mill Rd. | Birmingham | AL | 35244 | 205-910-1076 | Emery v. Talladega College | Fed | Plaintiff | yes | yes | | 1:14-cv-00880 |
| 2015 | Thomas Jerla | 100 S.E. 3rd Avenue, #900 | Ft. Lauderdale | FL | 33394 | 954-761-8600 | Esposito v. Spring Hill Lanes | State | Defendant | no | Yes | yes | Unknown |
| 2015 | John Peterson | 200 E. College Avenue | Appleton | WI | 54912 | 920-831-0300 | Weinmann v. Waupaca County | Fed | Plaintiff | Yes | yes | yes | 2013-CV-88 |
| 2015 | John Peterson | 200 E. College Avenue | Appleton | WI | 54912 | 920-831-0300 | Wolford v. Schlossteon | Fed | Plaintiff | yes | yes | | 2014-CV-1482 |
| 2015 | Kimberly Parmer | 181 Summers Street | Charleston | WV | 25301 | 304-342-3106 | Weigle v. Pifer/Vienna PD | Fed | Plaintiff | yes | no | yes | 2:14-15087 |
| 2015 | Gayle Horn | 312 N. May St., Ste 100 | Chicago | IL | 60607 | 312-243-5900 | Sanders v Chicago Heights | Fed | Plaintiff | yes | yes | no | 13-cv-221 |
| 2015 | Gary Oldehoff | 1900 Glades Road, St251 | Boca Raton | FL | 33431 | 561-826-2800 | Asia v Miami Gardens, et al | Fed | Defendant | yes | yes | | 1:14-cv-20117 |
| 2015 | Peter Delahunty | 14241 US Hwy 1 | Juno Beach | FL | 33408 | 561-799-7340 | Rankin v. Park One Holding | State | Defendant | | yes | yes | 10-62143-CA-20 |
| 2015 | Damon Wright | 575 7th Street, NW | Washington | DC | 20004 | 202-344-4000 | Woods v. Alabama | State | Plaintiff | yes | no | yes | CC-96-108.60 |
| 2015 | Joel S. Magolnick | 3001 SW 3rd Avenue | Miami | FL | 33129 | 305-285-2000 | Zelaya v. Gavanna Club | State | Plaintiff | yes | yes | | 12-30402 CA 13 |
| 2016 | Jason Bell | 2819 Ring Road, #101 | Elizabethtown | KY | 42701 | 270-765-4196 | Hurt v KSP (Jones & Wise) | Fed | Defendant | yes | yes | | 3:14-cv-92-JMS-WGH |
| 2016 | William McKenney | 1349 W. Peachtree | Atlanta | GA | 30309 | 404-881-1111 | Gray v. Fulton County | Fed | Plaintiff | Yes | yes | | 2014-cv-244469 |
| 2016 | William McKenney | 1349 W. Peachtree | Atlanta | GA | 30309 | 404-881-1111 | Georgia v. Weems | State | Defendant | Yes | yes | yes | Criminal Case |
| 2016 | Joel Robbins | 301 E. Bethany Home Rd | Phoenix | AZ | 85012 | 602-285-0100 | Rizzo v. City of Phoenix | State | Plaintiff | yes | yes | | CV-2015-005312 |
| 2016 | Elizabeth Mazur | 311 N. Aberdeen | Chicago | IL | 60607 | 312-243-5900 | Coleman v. City of Peoria | Fed | Plaintiff | yes | yes | | 15-cv-1100-SLD-TSH |
| 2016 | Ashley Rich (DA) | 205 Government St. | Mobile | AL | 36644 | 251-574-8400 | Grand Jury - Officer Hurst | State | Dist Atty | yes | Grand Jury | yes | |
| 2016 | Mike Anderson | 537 Market St. | Chattanooga | TN | 37402 | 423-756-7117 | Gardner v. Rhea County | Fed | Plaintiff | yes | yes | | 1:15-cv-00256 |
| 2017 | Jeffrey Turnage | 215 5th St N. | Columbus | MS | 39703 | 662-245-5130 | Boykin v. City of Columbus | Fed | Defendant | yes | yes | | 1:16-cv-25-SA-DAS |
| 2017 | Brian Monico | 161 N. Clark Street | Chicago | IL | 60601 | 312-580-2040 | Padilla v. Chicago | State | Plaintiff | yes | yes | | 2013-L-8136 |
| 2017 | Kirk D. Holman | 4600 Madison Avenue | Kansas City | MO | 64112 | 816-283-8738 | Brown v. Fast Stop | State | Plaintiff | yes | yes | | Need Case Number |
| 2017 | Cory Chastang | 310 E. Main Street | Bartow | FL | 33830 | 863-533-8556 | Florida v. Powell | State | Defendant | yes | yes | | 53-2013-cf-004885 |
| 2017 | Richard Orloski | 111 N. Cedar Crest Blvd | Allentown | PA | 17104 | 610-433-2363 | Ochse v. Busch (Allentown PD) | Fed | Plaintiff | yes | yes | | 16-cv-04269 |
| 2017 | Thomas K. Barnard | 100 Light Street | Baltimore | MD | 21202 | 410-347-7385 | Burgess v. Baltimore | Fed | Defendant | yes | yes | | RDB-15-0834 |
| 2017 | Moses Kim | 3340 Peachtree Road | Atlanta | GA | 30326 | 404-721-1050 | Wade v Jasper County | Fed | Plaintiff | yes | yes | | 5:16-cv-00176 |
| 2017 | Brian Monico | 161 N. Clark Street | Chicago | IL | 60601 | 312-580-2040 | Padilla v. Chicago | State | Plaintiff | yes | yes | | 2013-L-8136 |
| 2018 | Thomas K. Barnard | 100 Light Street | Baltimore | MD | 21202 | 410-347-7385 | Burgess v. Baltimore | Fed | Defendant | yes | yes | | RDB-15-0834 |
| 2018 | Roy L. Mason | 502 Washington St | Towson | MD | 21204 | 410-269-6620 | Sparrow v. City of Annapolis | Fed | Plaintiff | yes | no | yes | 1:16-CV-01394-WMN |

| Year | Name | Address | City | State | Zip | Phone | Case | Court | Side | | | | Case Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | Brian Monico | 161 N. Clark Street | Chicago | IL | 60601 | 312-580-2040 | Pearson v. Chicago | State | Plaintiff | yes | yes | | 2016-L-2961 |
| 2019 | Martin Lucas | 180 N. LaSalle St. | Chicago | IL | 60601 | 312-229-5555 | Hill v. Dordies & Chicago | State | Plaintiff | yes | yes | | 16 L-8290 |
| 2019 | J. Blake Hendrix | 3700 Cantrel Road | Little Rock | AR | 72202 | 501-374-0200 | Arkansas v. Breshears | State | Defendant | Yes | no | yes | 2017-087764 |
| 2019 | Sandra Denton | 1900 Plaza Drive | Louisville | CO | 80027 | 303-673-9600 | Jones v. Norton, et al | Fed | Plaintiff | yes | yes | | 2:09-cv-00730-TC-SA |
| 2019 | Brett Bloch, Esq | 2700 N Military Tr, #150 | Boca Raton | FL | 33431 | 561-241-2323 | Usher v. Steinger & Iscoe | State | Defendant | yes | no | yes | 50-2017-CA-013836 |
| 2019 | Barry Beck | 308 West Burke St. | Martinsburg | WV | 25401 | 304-264-8870 | Ennis v. Martinsburg S.O. | PrsBd | Plaintiff | yes | no | yes | Civil Service Hearing |
| 2019 | Terry Nofsinger | 161 North Clark St. | Chicago | IL | 60601 | 312-888-7000 | Hicks v. Village ofRiverdale | State | Plaintiff | yes | yes | | 2017-L-000034 |
| 2019 | Jason Hollon | 201 East Main St, Ste 900 | Lexington | KY | 40507 | 859-231-8780 | Gaddis v. Harrison | Fed | Defendant | yes | yes | | 3:17-cv-00755 |
| 2019 | Edward Ricci | 2139 Palm Bch Lakes Blvd | W Palm Bch | FL | 33409 | 561-686-6300 | Washington v. Riviera Beach | State | Plaintiff | yes | yes | | 50 2018 ca 012089 |
| 2019 | Sandra Michaels | 1099 Saint Louis PL NE | Atlanta | GA | 30306 | 404-312-5781 | Paynes v. Johns (Atlanta) | Fed | Defendant | yes | yes | | 1:17-cv-04850 |
| 2020 | Matthew Hess | 2819 Ring Road #101 | Elizabethtown | KY | 42702 | 270-765-4196 | Boerste v. City of Springville | Fed | Defendant | yes | yes | | 3:17-cv-298-JRW |
| 2020 | Olga Butkevich | 222 Lake Ave | W Palm Beach | FL | 33401 | 561-383-9257 | Almaraz v. Boardwalk M H Park | State | Defendant | No | yes | | 2018-021296-CA-01 |