

Deposition of:

**Brent Penny**

*February 8, 2021*

In the Matter of:

**Calloway, Chanda Vs. Adcock, Mason**

Veritext Legal Solutions
877.373.3660 | calendar-al@veritext.com | 800.808.4958



DEFENDANT'S EXHIBIT

Page 1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5  CIVIL ACTION NO.:  2:20-cv-598

6  CHANDA CALLOWAY, as Administrator

7  of the Estate of Channing Lamar

8  Spivey,

9        Plaintiff,

10       vs.

11  MASON ADCOCK,

12       Defendant.

13        S T I P U L A T I O N

14      IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Brent Penny may

17  be taken before Angela Smith McGalliard, RPR,

18  CRR, CCR, at the offices of Holtsford,

19  Gilliland, Higgins, Hitson & Howard, PC, at

20  4001 Carmichael Road, Suite 300, Montgomery,

21  Alabama 36106, on the 8th day of February,

22  2021.

23       DEPOSITION OF BRENT PENNY

Page 2

1     IT IS FURTHER STIPULATED AND AGREED
2 that the signature to and the reading of the
3 deposition by the witness is waived, the
4 deposition to have the same force and effect as
5 if full compliance had been had with all laws
6 and rules of Court relating to the taking of
7 depositions.
8     IT IS FURTHER STIPULATED AND AGREED
9 that it shall not be necessary for any
10 objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties may
13 make objections and assign grounds at the time
14 of the trial, or at the time said deposition is
15 offered in evidence, or prior thereto.
16     IT IS FURTHER STIPULATED AND AGREED
17 that the notice of filing of the deposition by
18 the Commissioner is waived.
19
20     * * * * * * * * * * * * *
21
22
23

Page 4

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4 CIVIL ACTION NO.: 2:20-cv-598
5 CHANDA CALLOWAY, as Administrator
6 of the Estate of Channing Lamar
7 Spivey,
8     Plaintiff,
9     vs.
10 MASON ADCOCK,
11     Defendant.
12 BEFORE:
13     Angela Smith McGalliard,
14     Commissioner.
15 APPEARANCES:
16     GRIFFIN SIKES, JR., ESQUIRE, 7515
17 Halcyon Pointe Drive, Montgomery, Alabama
18 36117, appearing on behalf of the Plaintiff.
19     RICK A. HOWARD, ESQUIRE, of
20 HOLTSFORD, GILLILAND, HIGGINS, HITSON & HOWARD,
21 PC, 4001 Carmichael Road, Suite 300,
22 Montgomery, Alabama 36106, appearing on behalf
23 of the Defendant, Mason Adcock.

Page 3

1     * * * * * * * * * * * * *
2     I N D E X
3     EXAMINATION
4         PAGE LINE
5 By Mr. Sikes......................... 7   1
6     PLAINTIFF'S EXHIBITS
7         PAGE LINE
8 Plaintiff's Exhibit 40 -
9     Resignation of B. Penny.... 28   15
10 Plaintiff's Exhibit 35 - SOPs
11     produced by Sheriff Mears.. 30   12
12 Plaintiff's Exhibit 36 - Excerpt
13     from deposition of M.
14 Adcock.................... 36   1
15 Plaintiff's Exhibits 13-A - Prior
16     Exhibit 13 with markings
17     by B. Penny................ 153   2
18 Plaintiff's Exhibit 14-A - Prior
19     Exhibit 14 with markings
20     by B. Penny................ 153   3
21     * * * * * * * * * * * * *
22
23

Page 5

1 APPEARANCES (continued):
2     APRIL MCKAY, ESQUIRE, of HOLTSFORD,
3 GILLILAND, HIGGINS, HITSON & HOWARD, PC, 4001
4 Carmichael Road, Suite 300, Montgomery, Alabama
5 36106, appearing on behalf of the Defendant,
6 Mason Adcock.
7     MICKEY MCDERMOTT, ESQUIRE, 138 Adams
8 Avenue, 2nd Floor, Montgomery, Alabama 36104,
9 appearing on behalf of the Defendant, Mason
10 Adcock.
11     W. CLAY TEAGUE, ESQUIRE, of 138 Adams
12 Avenue, 2nd Floor, Montgomery, Alabama 36104,
13 appearing, by telephone, on behalf of the
14 Deponent.
15     ALSO PRESENT:  Chanda Calloway
16     * * * * * *
17
18
19
20
21
22
23

2 (Pages 2 - 5)

Page 6

1    I, Angela Smith McGalliard,
2 Registered Professional Reporter, Certified
3 Realtime Reporter and Certified Shorthand
4 Reporter, State of Alabama at large, acting as
5 Commissioner, certify that on this date, as
6 provided by the Federal Rules of Civil
7 Procedure and the foregoing stipulation of
8 counsel, there came before me at the offices of
9 Holtsford, Gilliland, Higgins, Hitson & Howard,
10 PC, 4001 Carmichael Road, Suite 300,
11 Montgomery, Alabama 36106, beginning at 9:15
12 a.m., Brent Penny, witness in the above cause,
13 for oral examination, whereupon the following
14 proceedings were had:
15       BRENT PENNY,
16 being first duly sworn, was examined and
17 testified as follows:
18       COURT REPORTER:  Usual
19 stipulations?
20       MR. SIKES:  Yes.
21       MR. HOWARD:  Yes.
22       MR. MCDERMOTT:  Yes.
23       EXAMINATION

Page 7

1 BY MR. SIKES:
2    Q.    Mr. Penny, I'm Griffin Sikes; I
3 represent the Plaintiff in this matter, Chanda
4 Calloway.  She's sitting over here next to me.
5    A.    I'm listening.  I just asked if I
6 could take this off, that's all.  Because I see
7 everybody else has one on.
8    Q.    All right.  I'm going to be
9 asking you some questions today.
10    A.    Okay.
11    Q.    You understand you're under oath?
12    A.    Yes, sir.
13    Q.    And if at any time -- I'm going
14 to be wearing a mask.  If at any time you are
15 not able to hear me, if you can't understand
16 the question, stop me, and ask me to state it
17 again, and I'll ask the question again.
18       If you would speak up also a
19 little bit for us, please.
20    A.    Yes, sir.
21    Q.    If you answer the question, I'm
22 going to expect that you understood the
23 question; is that fair?

Page 8

1    A.    Yes, sir.
2    Q.    Again, I represent Ms. Calloway
3 here.  Ms. Calloway is the aunt of Channing
4 Spivey.  As you know, Channing Spivey was shot
5 and killed by Mason Adcock last May, May 27th
6 of last year.  That's what this lawsuit is
7 about, and that's why you've been subpoenaed
8 here to give testimony today.
9       First of all, sir, on behalf of
10 Ms. Calloway and me, we thank you for not
11 panicking on May 27th.  We believe you acted
12 lawfully that day, you kept your head, held
13 your fire, because Channing was unarmed, and
14 the worst thing he could do to you was assault
15 you with his fists.
16       MR. MCDERMOTT:  Object to the
17 narrative.  There's no question there.
18       MR. HOWARD:  Is that a speech or
19 a question?
20    Q.    You followed the law and the use
21 of force policies, which make it --
22       MR. HOWARD:  He's trying to frame
23 the testimony now.

Page 9

1    Q.    -- which make it unlawful --
2       MR. HOWARD:  He usually asks
3 questions, but he's not asking --
4       MR. SIKES:  She can't take but
5 one of us at a time.  Are you through?
6       MR. HOWARD:  I was objecting to
7 your monologue.
8       MR. SIKES:  You got your
9 objection.
10    Q.    We think you followed the law and
11 use of force policies which make it unlawful
12 for a law enforcement officer to use deadly
13 force unless there's an immediate threat of
14 death or serious injury.  Unfortunately, I
15 understand that because you followed the law
16 and held your fire you were forced to resign as
17 deputy.  Where on the other hand, Mason Adcock,
18 who violated the law and the use of force
19 policies --
20       MR. MCDERMOTT:  Objection to the
21 narrative.
22    Q.    -- remains as the Luverne
23 assistant police chief.

3 (Pages 6 - 9)

Page 10

1        I want to ask you about events
2   leading up to Channing's death and your
3   decision with regard to use of force.
4        Let's start with your name,
5   please, sir.  Give me your full name.
6        A.    Brent Stephen, that's spelled
7   with a P-H, S-T-E-P-H-E-N, Penny.
8        Q.    Where do you live, Mr. Penny?
9        A.    I live at ██████████████
10  ██████████
11       Q.    Who lives there with you, please,
12  sir?
13       A.    My wife.
14       Q.    Anyone else?
15       A.    My three children.  You should
16  know, you were there Friday.
17       Q.    They're all minors?
18       MR. HOWARD:  Wait.  Did you say
19  he was there Friday?
20       THE WITNESS:  Yes.
21       MR. MCDERMOTT:  Were you present?
22       THE WITNESS:  No.
23       MR. HOWARD:  Are you represented

Page 11

1   by counsel?
2        THE WITNESS:  No.  I am, but I
3   wasn't there.
4        MR. MCDERMOTT:  So the Record is
5   going to reflect that Mr. Sikes, counsel for
6   the plaintiffs, came to your home with your
7   permission or without your permission?
8        THE WITNESS:  I was unaware.  My
9   wife texted me.  And I was under the impression
10  because I'm still -- I got subpoenaed for grand
11  jury, for Crenshaw County grand jury, that it
12  was the special investigator who came and saw
13  me that day, who gave me my subpoena at my
14  work; and he said:  Well, I'll stop by later on
15  and give you the full details of what's -- you
16  know, when you're supposed to be there.
17       MR. MCDERMOTT:  Right.
18       THE WITNESS:  So I was under the
19  impression, I thought it was him.  And when I
20  said something to my wife, say is that Charlie,
21  because that was the investigator's first name,
22  she said no.  And then I heard a voice say,
23  well, who's Charlie.  And then -- And she

Page 12

1   asked:  Well, what's your name?  And then I
2   heard:  Griffin Sikes.
3        I'll be honest, I was with my
4   attorney, you know, because I'm -- and I let my
5   attorney know.  And my attorney was not happy.
6        MR. MCDERMOTT:  Okay.  Did you
7   know if your wife gave any information?
8        THE WITNESS:  No.  My wife
9   actually videoed it without him knowing it.
10       MR. MCDERMOTT:  Okay.  Will you
11  turn that video over to your attorney?
12       THE WITNESS:  Yes.  My wife did
13  text that video to my attorney.
14       MR. SIKES:  For the Record, I was
15  in Luverne, I came back through there.  I had
16  been trying to set up a meeting -- Mr. Teague
17  and I had been trying to set up a meeting all
18  of last week with regard to interviewing.  I
19  wanted to interview Mr. Penny.  I came by that
20  day to make a call to see Mr. Penny and to make
21  a call to Clay Teague to see if we could
22  arrange a meeting sometime that afternoon, that
23  Friday afternoon or Saturday or Sunday.  Mr.

Page 13

1   Penny was not there, and I left.
2        I mean, I had no conversation
3   with his -- with Mr. Penny's wife about
4   anything other than I had wanted to see Mr.
5   Penny to see if we could arrange to set up a
6   meeting between me, Mr. Penny, and his lawyer.
7        MR. MCDERMOTT:  Clay, we have put
8   all that on the Record.  Okay, Clay?
9        MR. TEAGUE:  I heard everything,
10  yes.
11       Q.    Your children that live with you
12  there, they are all minors, is that correct,
13  sir?
14       A.    Yes.  But what do my children
15  have to do with this?
16       Q.    Well, if they were of age, they
17  could be serving on a jury, sir.  I want to
18  make certain --
19       A.    I'm just asking.  Because, I
20  mean, this is getting really personal.  I'm
21  just hear to state my facts from start to
22  finish as to what happened.  That's it.  I
23  mean, my family -- And I'm going to be honest,

Page 14

1 my family and my children have nothing to do
2 with this.
3        MR. TEAGUE: Hey, Brent --
4        THE WITNESS: I'm sorry. Yes,
5 sir.
6        MR. TEAGUE: The only purpose for
7 asking those questions is if your children were
8 of age, they could possibly be on a jury, and
9 obviously he would want to know who they are.
10        THE WITNESS: Okay. I got you.
11        MR. TEAGUE: It's got nothing to
12 do with the case.
13        THE WITNESS: Okay, sir. I
14 appreciate that.
15     Q.     All I'm trying to do is establish
16 that your children are not of age, and they
17 would not be serving on a jury.
18     A.     No. Not even close.
19     Q.     Okay. You were employed as a
20 deputy sheriff of Crenshaw County in May of
21 last year, May of 2020; correct?
22     A.     Yes.
23     Q.     Are you presently employed?

Page 15

1     A.     Yes, I am.
2     Q.     Where are you employed?
3     A.     Maxwell Air Force Base, 46th
4 Security Forces Police.
5     Q.     How long have you been employed
6 there?
7     A.     Since November 23rd of last year.
8     Q.     Did you witness the shooting
9 death of Channing Spivey on May 27, 2020?
10     A.     Yes, I did.
11     Q.     Have you given anyone any
12 statements, any interviews about that shooting?
13     A.     Yes, I have.
14     Q.     Who all have you been interviewed
15 by?
16     A.     SBI.
17     Q.     Who?
18     A.     State Bureau of Investigation.
19     Q.     Do you recall the name of the
20 agent?
21     A.     Yes, I do. Lieutenant Carpenter.
22     Q.     All right. When did that occur?
23     A.     That occurred, I believe,

Page 16

1 sometime in June. I don't know the exact date,
2 but my attorney has it.
3     Q.     All right.
4        MR. TEAGUE: June 29th.
5     Q.     Did they tape-record that
6 statement?
7     A.     Yes, they did.
8     Q.     Were you -- Who all was present
9 when the statement was given, sir?
10     A.     Myself, Mr. Teague, Mr.
11 McDermott.
12     Q.     Mr. McDermott was there?
13     A.     Yes, sir. I brought my three
14 children because I was the only one watching
15 them, but they stayed outside.
16     Q.     Okay.
17     A.     And the agents were watching my
18 children for me.
19     Q.     In what role was Mr. McDermott
20 there?
21     A.     I can't answer that because I
22 don't know what his role was there.
23     Q.     Did you know that he also

Page 17

1 represents Mr. Adcock?
2     A.     Yes.
3     Q.     Did you know that at the time?
4     A.     Yes.
5     Q.     Well, you do know what capacity
6 he was there, then. He was there as Mr.
7 Adcock's lawyer; right?
8     A.     I guess so. I mean, I was there
9 to give a deposition.
10     Q.     Have you given a statement -- How
11 long is that statement, please, sir?
12     A.     How long is it?
13     Q.     Yes, sir.
14     A.     I couldn't tell you. I didn't
15 time it.
16     Q.     Do you -- Was it five minutes,
17 was it thirty minutes, was it two hours?
18     A.     I don't know.
19     Q.     You don't know whether it was
20 five minutes or two hours?
21     A.     I do not know, sir. It was a
22 good little bit. I mean, you can -- I -- I
23 don't know the exact time. It could have been

1  an hour.  I don't know.
2     Q.     Nobody asked you the exact time.
3     A.     No.
4     Q.     What's your best estimate of how
5  long the statement was?
6     A.     I don't know.  I mean, hour, hour
7  and a half, maybe.
8     Q.     Thank you.
9     A.     I don't know.
10    Q.     Did you know Channing Spivey
11 before May 27, 2020?
12    A.     No.
13    Q.     Never met him, never seen him?
14    A.     No.
15    Q.     Never knew of him?
16    A.     No.
17    Q.     Never heard anything about him?
18    A.     No.
19    Q.     I want to show you what's been
20 marked as Plaintiff's Exhibit 1 --
21    A.     Okay.
22    Q.     -- in an earlier deposition.  Do
23 you recognize that as Channing Spivey?

1     A.     I have no idea.  I didn't know
2  who he was until I seen the investigators and
3  they told me his name and everything about it.
4     Q.     Okay.  So you don't recognize him
5  from Plaintiff's Exhibit 1?
6     A.     No.
7     Q.     Who shot and killed Channing
8  Spivey?
9     A.     That would be Captain Mason
10 Adcock.
11    Q.     And where was Channing Spivey
12 shot and killed?
13    A.     In Mr. Adcock's front yard.
14    Q.     I'm going to show you a series of
15 photographs.
16    A.     Okay.
17    Q.     Look at photographs 8, 9, 10, 11,
18 12, there, if you would, please, sir.
19        MR. HOWARD:  Are these the
20 exhibits that you used in --
21        MR. SIKES:  Yes.  Uh-huh.
22        MR. HOWARD:  Okay.
23    A.     Okay.

1     Q.     Do those photographs show the
2  house and the area outside it at which Adcock
3  shot and killed Channing Spivey?
4     A.     Yes.
5     Q.     Do they fairly and accurately
6  depict the house and the surroundings as you
7  remember them on May 27?
8     A.     Yes.
9     Q.     I'm going to show you also --
10 look at -- turn over to 14.
11    A.     (Witness complies.)  Okay.
12    Q.     That's a plat of an area around
13 the house at which Channing --
14        MR. SIKES:  You've got a copy of
15 your exhibits, don't you?  I didn't bring
16 another copy.
17        MR. HOWARD:  I'm checking.  I
18 don't think I had it delivered yet.  I don't
19 think we're printing the exhibits off.  Go
20 ahead.  I can stand here.
21        MR. SIKES:  I distributed them to
22 you at the deposition.
23        (Off-the-Record discussion

1        was held.)
2     Q.     All right.  Does that plat --
3  I'll represent to you that is a plat that we
4  had a surveyor, I went in half, Mr. Howard went
5  in half, and we had a commercial surveyor come
6  out and survey the area around his house and
7  the driveway and the roadway, Glenwood Road.
8  Does that look like to you that it accurately
9  depicts the house and surroundings as you
10 remember them on the 27th?
11    A.     Is that supposed to be the house?
12    Q.     Yes, sir.
13    A.     Okay.  I'm just making sure.
14    Q.     Yes.
15    A.     I'm not -- I'm just asking.
16    Q.     That's what the arrow says.  It
17 points to it and says Adcock's house.
18    A.     Okay.  I'm just making sure.
19 Yes.
20    Q.     Look also at Plaintiff's Exhibit
21 3 through 6 or 7, I believe it is.
22    A.     Okay.  3 through what?
23    Q.     I think it's 3 through -- it

6 (Pages 18 - 21)

Page 22

1 would be 7, I believe.
2        That's a series of photographs
3 that we've had taken and identified as -- that
4 is Channing Spivey's house and the roadway
5 between Channing Spivey's house and Mr.
6 Adcock's house.
7        Do you recognize that as
8 accurately depicting that roadway?
9    A.    Yes, sir.
10   Q.    Okay.  Do you see anything in
11 those photographs that's different from how it
12 appeared on the day of the shooting, that you
13 note?
14   A.    No.  Well, I mean, that trailer
15 wasn't there (indicating).
16   Q.    I'm sorry?
17   A.    That trailer wasn't there
18 (indicating).
19   Q.    Okay.  You're talking about the
20 trailer on Plaintiff's Exhibit 3, you're
21 talking about the trailer that's sitting right
22 there?
23   A.    Yeah.  The utility trailer that's

Page 23

1 sitting right there.
2    Q.    Just to the right of the mailbox?
3    A.    Right.  The trailer right there
4 was not sitting there.
5    Q.    Okay.  Anything else?
6    A.    Those other vehicles weren't
7 there (indicating).
8    Q.    Okay.
9    A.    I mean, the -- It looks like a
10 Ford and it looks like a BMW, white BMW, a gray
11 Ford and a white BMW --
12   Q.    Okay.
13   A.    -- those weren't there.
14   Q.    Other than the vehicles -- the
15 arrangement of the vehicles parked at the
16 house, anything else you see?
17   A.    No.
18   Q.    Okay.  I'm going to ask you to
19 take a look at Plaintiff's Exhibits 15, 16, and
20 17.
21   A.    Okay.
22   Q.    I will represent to you that
23 that's -- those photographs were taken from a

Page 24

1 video recording made that morning of May 27, by
2 a Luverne police officer named Marcus Green.
3    A.    Okay.
4    Q.    Do you know Officer Green?
5    A.    I know of him.
6    Q.    All right.  Now, the only piece
7 of clothing Channing was wearing that morning
8 was a pair of shorts or swim trunks; correct?
9    A.    That's what it looks like.
10   Q.    Were those shorts or swim trunks
11 the only thing that Channing was wearing at the
12 time he was shot and killed?
13   A.    It's the only -- Yeah.
14   Q.    Looks like the same swim trunks
15 to you, as far as you can tell?
16   A.    I don't remember exactly the swim
17 trunks he was wearing, but I know he just had
18 on a pair of shorts.
19   Q.    Okay.
20   A.    I mean, that's -- This happened
21 at like -- almost like dark, mostly at
22 nighttime, so I couldn't tell you what color
23 they were.  I know they were a pair of shorts.

Page 25

1    Q.    At the time that Channing was
2 shot and killed, do you notice anything about
3 his dress, his clothing, or his physical
4 appearance that was any difference than when
5 he'd gotten killed?
6    A.    Again, it was at nighttime, so I
7 couldn't really tell you if --
8    Q.    I'm asking if you saw anything
9 different.  Do you see anything different in
10 there?
11   A.    And I'm trying to tell you, sir.
12   Q.    Just answer that question, if you
13 would.
14   A.    and I'm trying to answer that
15 question, if you would allow me to.
16   Q.    You answered another question,
17 but I want that one answered.
18   A.    What I'm saying is, I can't tell
19 you any differently if he looked any different
20 now than he did back when this happened, due to
21 the fact of it was towards nighttime.  So, I
22 mean, I couldn't tell you if --
23   Q.    I didn't ask you that question.

7 (Pages 22 - 25)

Page 26

1  Do you see anything different?
2      A.     I couldn't tell you.
3      Q.     You don't see anything different?
4  Fine.
5            MR. HOWARD:  That's not what he
6  said.
7            MR. SIKES:  Yes, it is.
8      Q.     If you see anything different,
9  tell me right now what's different.
10     A.     Again, I can't tell you because
11 it was at nighttime.
12     Q.     So you can't tell me anything
13 different?
14     A.     I'm being honest, I don't --
15           MR. MCDERMOTT:  Asked and
16 answered.
17     A.     I mean, it was toward the
18 evening.  Nighttime.
19           MR. SIKES:  It has been.
20     Q.     Do you remember how many shots
21 Mason Adcock fired at Channing Spivey?
22     A.     Do not.
23     Q.     Don't have the slightest idea?

Page 27

1      A.     No, sir.
2      Q.     Don't know whether it was one or
3  sixteen?
4      A.     I know it was quite a few.
5      Q.     Any better judgment than that?
6      A.     No.  I know it was quite a bit.
7  I don't know how many, because I didn't -- I'm
8  not counting.
9      Q.     The autopsy report shows that
10 Channing Spivey was struck by five bullets.
11     A.     Okay.
12     Q.     Do you remember Mason Adcock
13 firing at least that many times?
14     A.     Oh, yes.
15     Q.     Did anyone else out there fire a
16 gun or weapon?
17     A.     No.
18     Q.     Adcock testified that he couldn't
19 state for certain that there wasn't another
20 shooter.  Do you know anything about that?
21     A.     No.
22     Q.     Was there another shooter,
23 besides Adcock?

Page 28

1      A.     No.
2      Q.     Did anyone, to your knowledge,
3  besides you and Mason Adcock, have a gun or
4  weapon out there?
5      A.     As far as like when the incident
6  happened, it was just me and him.
7      Q.     Did anybody else out there have a
8  weapon besides you and Mason Adcock to your
9  knowledge?
10     A.     To my knowledge, no.
11     Q.     Now, about five weeks after the
12 shooting you were forced to resign as Crenshaw
13 County deputy; correct?
14     A.     Roughly, yeah.
15           (Whereupon, Plaintiff's
16            Exhibit 40 was marked for
17            identification purposes.)
18     Q.     Let me show you what's been
19 marked as Plaintiff's Exhibit 40.  Can you
20 identify Plaintiff's Exhibit 40, please, sir?
21     A.     Yes, sir.  That is my letter of
22 resignation.
23     Q.     From the?

Page 29

1      A.     Officer involved shooting.
2      Q.     That's not your resignation from
3  the officer involved shooting, that's your
4  resignation from the Crenshaw County Sheriff's
5  Department; right?
6      A.     Right.  Yeah.  But it involved
7  that.
8      Q.     Again, we can do it a lot quicker
9  if you listen to what I ask and answer that
10 question --
11     A.     Yes, sir.
12     Q.     -- rather than something else.
13     A.     Okay.
14     Q.     That is your resignation letter
15 from the Crenshaw County Sheriff's Department;
16 correct?
17     A.     Yes.
18     Q.     And in it, do you state:  I was
19 forced to submit this resignation or be
20 terminated from my position due to an event of
21 an officer-involved shooting that included
22 myself and Luverne Police Department Captain
23 Adcock?

8 (Pages 26 - 29)

Page 30

1   A.   Yes.
2   Q.   It states repeatedly that you had
3   advised Sheriff Mears and Chief Deputy Joel
4   Dickey that you had done nothing wrong that
5   day?
6   A.   Yes.
7   Q.   As we sit here today, do you
8   believe that you did anything wrong in relation
9   to that shooting?
10   A.   No.
11   Q.   We agree with you, sir.
12        (Whereupon, Plaintiff's
13        Exhibit 35 was marked for
14        identification purposes.)
15   Q.   I'm going to show you Plaintiff's
16   Exhibit 35, which was produced by Sheriff
17   Mears, and ask you if you could identify that
18   document, please, sir and it's a portion of the
19   -- I'm going to call it, for ease of reference,
20   the SOPs.
21        Do you recognize those as a
22   portion of the standard operating procedures
23   for Crenshaw County Sheriff's Department?

Page 31

1   A.   No.
2   Q.   You don't recognize those?
3   A.   No.
4   Q.   Why do you say that isn't them?
5   A.   Well, because from the time that
6   I started, I kept asking for a SOP manual, and
7   they kept referring me back to the Crenshaw
8   County handbook when I was first hired in.
9   Q.   Okay.
10   A.   And that was about the extent of
11   it.
12   Q.   So you can't identify that as the
13   SOPs?
14   A.   Nope.
15   Q.   Had you worked in law enforcement
16   prior to working for the Crenshaw County
17   Sheriff's Department?
18   A.   Yes, sir.
19   Q.   Who did you work for?
20   A.   My career started out with
21   Montgomery County Sheriff's Office, I was there
22   for six years; and then from there, I left them
23   and tried -- went to the state trooper academy,

Page 32

1   I withdrew myself after about a week because it
2   just wasn't for me; and I applied for other
3   agencies and wasn't able to get on with them.
4   And then in August of 2019, I get a -- I get a
5   phone call from the Crenshaw County Sheriff's
6   Office and asked me if I was still unemployed,
7   I said yes; they said, would you like to come
8   in and interview; I went in and interviewed,
9   and I was hired.
10   Q.   At these other law enforcement
11   agencies, were you given a -- what's called
12   policies and procedures or standard operating
13   procedure book?
14   A.   Like I say, I wasn't there, I was
15   at the academy for the troopers.  But as far as
16   like for Montgomery County, yes, it was pretty
17   extensive.
18   Q.   Again, if you'll listen to my
19   question and answer that question.  At the
20   other law enforcement agencies that you worked
21   for, were you given standard operating
22   procedures?
23   A.   Yes.

Page 33

1   Q.   And they covered use of force?
2   A.   Yes.
3   Q.   Look at the Crenshaw County use
4   of force policies and procedures.  Do you see
5   them?  See that, and, particularly, the use of
6   deadly force?
7   A.   Okay.
8   Q.   Would you read that for us,
9   please, sir.
10   A.   It says:  Deadly force may be
11   used only in defense of life, either your life
12   or the life of another person.  Deadly force
13   shall be used when the other reasonable means
14   have been exhausted.
15   Q.   Is that consistent with the other
16   standard use of force, deadly force procedures,
17   and standard operating procedures and policies
18   and procedures that you know of?
19   A.   Honestly, I can't -- I mean, the
20   way these -- The way this is written and the
21   way another agency writes it, it's totally
22   different.
23   Q.   How do other agencies write it?

9 (Pages 30 - 33)

1    A.    I don't know, sir.  I can't
2  attest to that.
3    Q.    Well, if you don't know how they
4  wrote it, how can you say that they're
5  different?
6    A.    Sir, again, each agency is
7  different as to how they write their policies.
8  I cannot attest to what the difference between
9  Crenshaw County and what Montgomery County
10  wrote, because they constantly change --
11  Montgomery County constantly changes their
12  SOPs.  That's constantly evolving with them.
13    Q.    I'm not talking about the exact
14  wording, sir.  Is that, in general, what you
15  understand to be --
16    A.    Yes.
17    Q.    -- the law and the policies and
18  procedures that govern use of deadly force at
19  law enforcement agencies, generally?
20    A.    Mostly, yes.  Yes.
21    Q.    That procedure covers the use of
22  deadly force by a deputy employed by Crenshaw
23  County Sheriff's Department; correct?

1    A.    Yes.
2    Q.    And did so in May of 2020;
3  correct?
4    A.    Yes.
5    Q.    Although you say you have not
6  seen it?
7    A.    No.  I've never seen this.  This
8  is the first time -- You showing me this, this
9  is the first time I've ever seen it.
10    Q.    Is firing your weapon at a person
11  deadly force?
12    A.    Yes.
13    Q.    Do you interpret -- Look at
14  section 3.2 we just talked about.
15    A.    (Witness complies.)  Okay.
16    Q.    Do you interpret that to mean
17  that the only time that a law enforcement can
18  use deadly force is when his life or someone
19  else's life is seriously threatened?
20    A.    Yes.
21    Q.    Okay.  Channing Spivey was
22  unarmed on May 27, 2020; is that correct?
23    A.    Yes.

1        (Whereupon, Plaintiff's
2        Exhibit 36 was marked for
3        identification purposes.)
4    Q.    I'm going to show you Plaintiff's
5  Exhibit 36, I'll represent to you this is a
6  page taken from the deposition of Mason Adcock.
7    A.    Okay.
8    Q.    We took this deposition about a
9  week or so ago.  At his deposition, do you see
10  the question beginning on line --
11        MR. HOWARD:  Is this 42?
12        MR. SIKES:  This is 36.
13    Q.    Do you see the question that
14  begins at line four?
15    A.    Okay.
16    Q.    Question:  Before you shot, just
17  before you --
18        Question, line four:  Before you
19  shot, just before you shot Channing Spivey, did
20  you have any information or evidence that he,
21  and that's Channing Spivey, had a weapon or
22  anything that could be used as a weapon?
23        And what did Mason Adcock answer?

1    A.    It says:  No, I didn't.
2    Q.    Do you have any disagreement with
3  that?
4    A.    No.
5    Q.    Did you ever see Channing Spivey
6  in possession of a weapon or anything else that
7  could be used as a weapon on May 27th?
8    A.    No.
9    Q.    Do you have any -- Did you see
10  anything or have any information or evidence
11  that Channing had a weapon or access to a
12  weapon on May 27?
13    A.    No.
14    Q.    The only thing that Channing
15  could have used to harm you or Mason Adcock at
16  any time on May 27 was his hands or feet;
17  correct?
18    A.    His fists, yes.
19    Q.    I'm sorry?
20    A.    Yes.
21    Q.    Fists; correct?
22    A.    Yes.
23    Q.    Is the use of hands, is that a

10 (Pages 34 - 37)

1 use of force, is that deadly force --
2 considered deadly force?
3      A.      It just depends on the totality
4 of the circumstances, sir.
5      Q.      Is use of hands generally
6 considered the use of deadly force?
7           MR. MCDERMOTT: Objection. Calls
8 for speculation.
9      A.      I'm not a legal analyst. But,
10 again, it depends on the totality of the
11 circumstances of the person's demeanor and --
12 or, you know, the actions of the person at the
13 time that this happened, whether he's under the
14 influence of narcotics or if he's -- or
15 something is not right.
16      Q.      What difference would it make
17 whether he's under the influence of narcotics?
18 Listen, his hands are his hands, what more can
19 he do because he's under narcotics or whatever
20 else?
21      A.      Okay. If you let me elaborate, I
22 will tell you.
23      Q.      I don't want you to elaborate.

1      A.      When somebody is under the
2 influence of some type of narcotic, they have
3 what you call super human strength, excited
4 delirium, which, in turn, they turn around and
5 no matter what you do, they don't feel pain.
6           And which, in turn, since they
7 have a whole lot more -- I say super human
8 strength, and the fact that, you know, one
9 person is on -- by himself, I'm not going
10 to-to-toe with him.
11      Q.      Well, at the time, you wouldn't
12 have had to go toe-to-toe with him; Mason
13 Adcock was standing right there with you when
14 he shot him; correct?
15      A.      Yes, he was.
16      Q.      Okay. This super human strength,
17 can you cite me anything that substantiates
18 that?
19      A.      You know what, I'm just going --
20 Can I just tell the whole story? Because this
21 is -- This is -- Because, I mean -- because I'm
22 -- this is getting to be like -- I'm going to
23 be honest, this is getting to be a little bit

1 out there. It sounds like you're trying to
2 twist my words around, and it's not what it is.
3      Q.      No, sir. I want you to answer my
4 questions.
5      A.      And I'm trying to do that, but
6 you're cutting me off.
7      Q.      No, sir. I asked you about super
8 human strength, that's the question for you.
9      A.      When somebody is under the
10 influence --
11      Q.      Can you show me anything that
12 indicates that there is any basis for that --
13 Do you have any medical training, sir?
14      A.      No, sir.
15      Q.      Do you have any -- I don't know
16 what kind of training you would have to have.
17 Do you have any training that would authorize
18 you to give opinions with regard to super human
19 strength?
20      A.      No, sir.
21      Q.      Okay. Going back to deadly
22 force, it's only justified under your SOPs when
23 your life or somebody else's life is seriously

1 threatened; correct?
2           MR. MCDERMOTT: Objection. He's
3 already stated he had never seen an SOP?
4           MR. SIKES: I know. He's seen
5 them now.
6      Q.      Is that correct, under those
7 SOPs?
8           MR. MCDERMOTT: Nor has he had an
9 opportunity to review the document thoroughly.
10           MR. SIKES: Objection is one
11 thing, Mickey, testifying is another.
12      Q.      You can read it, it's two
13 sentences long. Look at that and read it
14 again, then.
15           Mr. McDermott wants to make
16 certain you've read it.
17      A.      I've read it.
18      Q.      Do you understand that to say
19 that use of force, deadly force, is only
20 justified when your life or somebody else's
21 life is seriously threatened; correct?
22      A.      Yes.
23      Q.      What was communicated to you

11 (Pages 38 - 41)

1 about the reason for your being forced to
2 resign?
3     A.     That I had run out of leave time
4 and that the -- according to -- I mean, it's
5 all in my resignation letter.  I run out of
6 leave time, and that I needed to find a new
7 employment opportunity.
8     Q.     Well, it says -- Your letter says
9 a good bit more than that, doesn't it?
10    A.     It says because of my leave time,
11 I then -- the sheriff goes on to say is because
12 of what the chief said how I acted on scene.
13    Q.     Right.
14    A.     And I put in the whole
15 conversation I had with the sheriff, along with
16 the whole conversation I had with the chief
17 deputy in my resignation letter, a week later.
18    Q.     And this is the letter you're
19 talking about right here?
20    A.     Yes, sir.
21    Q.     Was it -- Did you understand that
22 you were -- that it was thought that you should
23 have shot Channing Spivey on May 27?

1     A.     People talk.  And I heard, you
2 know -- that that's what I heard.
3     Q.     From who?
4     A.     From other deputies.  But, I
5 mean, everybody can Monday-night quarterback
6 what they want all day long.
7     Q.     Look at Plaintiff's Exhibit 14,
8 please.
9     A.     Okay.
10    Q.     Where was Mason Adcock located
11 when he -- when Adcock fired the first of those
12 shots at Channing Spivey?
13    A.     On the side of his house.
14    Q.     Let me give you a -- What I'm
15 going to give you is a blow-up of Plaintiff's
16 Exhibit 14.
17    A.     Okay.
18    Q.     Can you state -- put the point of
19 the pen down on where you believe he was, Mason
20 Adcock?
21    A.     (Witness complies.)
22    Q.     That's an X you made, not a
23 point, but that's fine.

1     A.     Okay.
2     Q.     Where were you standing, please,
3 sir?  If you would put a little circle.
4     A.     I was standing right here
5 (indicating).
6     Q.     All right.  And can you put a --
7 Put the initials CS, small CS, where Channing
8 Spivey was standing.
9     A.     Where he was standing?
10    Q.     Where he was located.
11    A.     Where he was located?
12    Q.     Yeah.
13    A.     Right here (indicating).
14    Q.     All right.  Put the CS.
15    A.     (Witness complies.)
16    Q.     Okay.  And you said -- When I
17 said where he was standing, was he not standing
18 when he was shot?
19    A.     Oh, he was standing after he
20 was -- when he was --
21    Q.     Why did you ask about standing,
22 then?
23    A.     I didn't ask nothing about

1 standing, you did.
2         MR. SIKES:  Read the question
3 back and answer please.
4     A.     I didn't say nothing about
5 standing.  You mentioned it twice already.
6         MR. SIKES:  Read the answer back,
7 please, and question.
8             (Requested portion of the
9             Record was read by the
10            Reporter.)
11    A.     I'm repeating what you're saying,
12 sir.
13    Q.     I know.  You asked:  Where he was
14 standing?  You questioned -- I infer from that
15 that he wasn't standing.  Was he standing or
16 not?
17    A.     Oh, he was standing.
18    Q.     Okay.  Was he standing throughout
19 the time that Mason Adcock fired at him or was
20 he down at some time?
21    A.     No.  He was standing.
22    Q.     Okay.  There was nothing in
23 either of his hands at the time; correct?

12 (Pages 42 - 45)

Page 46

1    A.    No.
2    Q.    Is that what I said correct?
3    A.    Correct.
4    Q.    Okay. How far away from Channing
5 was Mason Adcock when Mason Adcock began
6 firing?
7    A.    They were -- You couldn't put a
8 piece of paper between them.
9    Q.    Were they touching each other?
10   A.    Yes. Yep.
11   Q.    Okay. Was there anybody else in
12 the area at the time of the shooting?
13   A.    Nope.
14   Q.    Did you not see two individuals
15 in the driveway, coming into the area of the
16 house?
17   A.    Nope.
18   Q.    Did you ever see them come up
19 afterward?
20   A.    There was one gentleman who,
21 after it was all -- all over with, came running
22 in the driveway said: That's my brother. We
23 yelled at -- Me and Captain Adcock yelled at

Page 47

1 him to get out of here, and we never seen him
2 after that.
3    Q.    Did Channing ever strike or touch
4 Mason Adcock before Adcock began firing at
5 Channing?
6    A.    Yes.
7    Q.    And what parts of his body
8 touched Mason Adcock?
9    A.    His bloody fists, his fists.
10   Q.    Channing's bloody fists?
11   A.    Uh-huh.
12   Q.    Okay. Anything else?
13   A.    No.
14   Q.    All right. How many times did
15 Mason Adcock -- did Channing strike Mason
16 Adcock?
17   A.    I'd say at least two or three
18 times, easy.
19   Q.    And where did he strike him?
20   A.    In his head.
21   Q.    What part of his head?
22   A.    Well, I mean, Channing is a whole
23 lot taller than Mason, and Mason had his arm

Page 48

1 up, and he was striking him on his head right
2 here (indicating), right close to his temples.
3    Q.    Okay. Now, you say this occurred
4 about eight p.m., roughly?
5    A.    Yeah. Between eight, 8:30.
6    Q.    Was there enough light to see
7 clearly from those short distances what was
8 occurring?
9    A.    No.
10   Q.    Okay. So you didn't see it
11 clearly?
12   A.    Well, no, I was --
13   Q.    How long have you been a
14 policeman?
15   A.    I've been a policeman seven
16 years, sir.
17   Q.    Have you had to use force against
18 other citizens?
19   A.    Define what you mean by force.
20 Like using a taser?
21   Q.    Do you not understand use of
22 force? You're a policeman?
23   A.    Yes, sir, I do, sir.

Page 49

1    Q.    Have you ever had to use force
2 against a citizen?
3    A.    Use of force, sir, you can -- Use
4 of force is also considered using a taser, it's
5 called use of force as well. It's a less
6 lethal use of force, but it's still a use of
7 force. That's why I was asking would you
8 elaborate as to what you're asking.
9    Q.    I'm talking about -- Do you know
10 about the continuum of force?
11   A.    Yes, I do, sir.
12   Q.    Okay. That's what I -- Any part
13 of that continuum, you've used force against
14 citizens before?
15   A.    Yes.
16   Q.    We'll get through a lot quicker
17 if you listen to my question and answer that
18 question.
19   A.    I am, sir. But you're not
20 hearing me.
21   Q.    That's required in certain
22 circumstances of police officers to use force;
23 correct?

13 (Pages 46 - 49)

1    A.    Yes.
2    Q.    That's part of the job?
3    A.    Yes.
4    Q.    Have you ever had to fire your
5 weapon at another citizen?
6    A.    No.
7    Q.    Have you ever fired taser at
8 citizens?
9    A.    Yes.
10    Q.    Have you maced people or pepper
11 sprayed?
12    A.    I've never -- When I was with my
13 last agency, we never -- we didn't have pepper
14 spray.
15    Q.    I didn't ask you that, sir.
16 Again, we --
17    A.    No. No. No.
18    Q.    Okay. Any kind of chemical
19 agent?
20    A.    No.
21    Q.    All right. Have you struck
22 people with a baton or nightstick?
23    A.    No.

1    Q.    Have you struck people with your
2 fist or your feet or knees?
3    A.    No.
4    Q.    Have you wrestled people to the
5 ground to put handcuffs on them?
6    A.    Yes.
7    Q.    There are limits on what a police
8 officer can do and the use of force, aren't
9 there?
10    A.    Yes.
11    Q.    And there are limits on how much
12 force you can use, as well as types of force;
13 correct?
14    A.    Yes.
15    Q.    What were you taught or
16 instructed about the limits of force in your
17 police training?
18    A.    To use the necessary force only
19 -- the only necessary force that is reasonable
20 to get compliance.
21    Q.    Okay. And what are you taught
22 with regard to when you are authorized to use
23 -- when it's lawful to use deadly force to fire

1 a weapon at someone, what are the circumstances
2 -- what are the limited circumstances under
3 which that can be done?
4    A.    When you reasonably believe that
5 your life or the life of other -- of somebody
6 else is in jeopardy of serious physical injury
7 or death.
8    Q.    All right. Are you familiar with
9 the use of the term -- the term of phrase use
10 of force continuum?
11    A.    Yes.
12    Q.    Were you taught about that at
13 APOST?
14    A.    Yes.
15    Q.    Have you ever heard that phrase
16 used?
17    A.    Yes.
18    Q.    I'm going to ask you to look at
19 Plaintiff's Exhibit 23, please, sir. There's a
20 lot of photographs. It goes --
21    A.    Wow. I mean -- Okay.
22    Q.    I'll represent to you that is a
23 use of force continuum put out by the -- I

1 believe it's the National Institute for
2 Justice.
3        Is that document, is that
4 consistent with what you -- Take a minute and
5 look at it if you like. Is that consistent
6 with what you were taught about the use of
7 force continuum and your training as a police
8 officer?
9    A.    I'll have to read it for a
10 minute.
11    Q.    Please do.
12    A.    Okay.
13    Q.    Can you answer my question now?
14    A.    It looks like it, yes.
15    Q.    That's consistent with what you
16 understand about the use of force?
17    A.    Yes.
18    Q.    And that's used to guide police
19 officers with regard to how they are to
20 gradually increase the use of force until they
21 gain compliance?
22    A.    Yes.
23    Q.    Okay. And what's at the low end

14 (Pages 50 - 53)

Page 54

1  of physical force?
2      A.     Officer presence.
3      Q.     No, sir.  I'm -- Well, let's go
4  to actual use of force rather than verbal
5  commands.
6          MR. HOWARD:  Object to form.
7      Q.     Use of hands, is that the lowest
8  physical force that's listed there?
9      A.     No, sir.  It starts at officer
10 presence.
11     Q.     No, sir.  Physical force I'm
12 talking about.  I'm not talking about --
13     A.     You asked what was lowest, and I
14 was just answering that.
15     Q.     I said of physical force.  Verbal
16 is not physical, is it?
17     A.     No, sir.
18     Q.     Okay.  I'm asking you what's the
19 lowest form of physical force?
20     A.     Empty hand control.
21     Q.     Okay.  And what's the highest?
22     A.     That would be lethal force.
23     Q.     Okay.  Use of hands or fists is

Page 55

1  at the lowest end and use of deadly force,
2  firing a weapon at someone, is the highest;
3  correct?
4      A.     Yes.
5      Q.     Deadly force is sometimes called
6  lethal force; correct?
7      A.     Yes.
8      Q.     They are the same thing, aren't
9  they?
10     A.     Yes.
11     Q.     And firing a gun at a person is
12 deadly or lethal force?
13     A.     Yes.
14     Q.     When a policeman strikes -- or
15 another person strikes someone with a fist, is
16 that a use of deadly force?
17     A.     No.
18     Q.     Did you have any indication or
19 belief out there at any time on the afternoon
20 or evening of May 27th that the worst that was
21 going to happen here is that there's going to
22 be a fist fight or a wrestling match?
23     A.     In regards to that, sir, at that

Page 56

1  moment, I'm going to be honest, I was in fear
2  for my life.
3      Q.     I'm not asking you subjectively
4  what you --
5      A.     I'm not telling you subjectively.
6  I'm telling you honestly.  You want my honest
7  answer, I'm telling you.
8      Q.     No, sir.  The case law about that
9  is very clear, about the fact you got scared,
10 doesn't make it right to use deadly force.
11         MR. MCDERMOTT:  Objection.
12 That's not a question.
13         MR. HOWARD:  It's incorrect, too.
14     Q.     It's an objection -- I'm asking
15 you:  Did you have any indication or belief
16 that this was going to be anything other than a
17 fist fight or a wrestling match?
18     A.     At that moment?
19     Q.     Yes, sir.
20     A.     A fist fight or a wrestling
21 match?
22     Q.     Uh-huh.
23     A.     I couldn't say for certain.

Page 57

1      Q.     I know you couldn't say for
2  certain.  I'm asking you, the worst case
3  scenario out there would have been a fist fight
4  or a wrestling match; correct?
5      A.     Yes.
6      Q.     Is a black eye or bruise or loss
7  of a tooth, that's the usual limit of damage
8  that a person can do with his fists; correct?
9          MR. HOWARD:  Object to the form.
10     A.     No.
11     Q.     What is the limit of it?
12     A.     The limit is, they can basically,
13 in the middle of an altercation, could actually
14 do a lot more damage than just a black eye,
15 lost tooth, or anything; they could actually
16 kill you.
17     Q.     I understand rare occurrences
18 occur.
19     A.     That's not rare.
20     Q.     You've seen people -- You know of
21 people who have been killed by a fist blow?
22     A.     Sir, I --
23     Q.     Do you know of people who have

15 (Pages 54 - 57)

1 been killed by a fist blow, yes or no?
2     A.    No.  But when they take your head
3 and smash it into the concrete or pavement
4 repeatedly, and give you brain damage, then,
5 yeah.
6     Q.    Okay.  Nobody gets paralyzed in a
7 fist fight, do they?
8         MR. MCDERMOTT:  Objection.
9         MR. HOWARD:  Object to the form.
10    A.    I'm not a medical expert, sir.
11    Q.    Nobody loses an arm or leg or
12 hand in a fist fight, do they?
13        MR. MCDERMOTT:  Objection.
14        MR. HOWARD:  Object to the form.
15    A.    I'm not a medical expert.
16        (Off-the-Record discussion
17        was held.)
18    Q.    Let me do this.  Let's start and
19 do this.  Tell me -- Let me go back one second,
20 a second.
21        You said that Mason Adcock's
22 lawyer, Mr. McDermott, was at the interview
23 that you gave to the ABI Agent Carpenter back

1 in June?
2     A.    SBI, yes.
3     Q.    Okay.  And where was that held?
4     A.    That was in Dothan.
5     Q.    Where in Dothan?
6     A.    I believe it was at -- I mean,
7 it's an undisclosed location, I mean --
8     Q.    It was what?
9     A.    It's an undisclosed location
10 because it's their office.  I don't know the
11 address, it was in Dothan.
12    Q.    The police department has an
13 undisclosed --
14    A.    These are ABI agents.  The
15 building wasn't marked that said ALEA on it.
16 There was not a --
17    Q.    Okay.
18    A.    This was their office.
19    Q.    Is there any reason for secrecy?
20    A.    No.
21    Q.    Okay.
22    A.    I said undisclosed location
23 because there was no markings on the building

1 that even mentioned anything of offices -- of
2 whose offices those were.
3     Q.    Were you subpoenaed to come down
4 there?
5     A.    No.
6     Q.    Okay.  You went voluntarily?
7     A.    Because my attorney told me I
8 needed to give --
9     Q.    You went voluntarily?
10    A.    Uh-huh.
11    Q.    Is that a yes?
12    A.    Yes.
13    Q.    Okay.  Again, we can get through
14 it a lot quicker if you listen to what was
15 asked and answer that question?
16    A.    I'm trying to, sir, but you keep
17 cutting me off.
18    Q.    No, sir.  You keep answering -- I
19 asked:  Did you go voluntarily, and you said:
20 My lawyer -- I didn't ask you what your lawyer
21 advised you.  I asked you did you go
22 voluntarily.  You did; correct?
23    A.    Yes.

1     Q.    Did you assert the 5th Amendment
2 at any time in that interview?
3     A.    No.
4     Q.    You had spoken with your lawyer,
5 Mr. McDermott before you -- excuse me, Mr.
6 Teague before you went down there?
7     A.    Yes.
8     Q.    He didn't accompany you, though?
9     A.    He did.
10    Q.    Oh, he did.  He was present?
11    A.    He was present.  I don't do
12 anything without him.
13    Q.    It's you, Mr. Teague, Mr.
14 McDermott who represents Adcock; right?
15    A.    Yes.
16    Q.    And Lieutenant Carpenter.  And
17 who else?
18    A.    I might have to take my kids
19 there, but their agents were watching my kids.
20    Q.    I'm talking about in the
21 interview room?
22    A.    That was it.
23    Q.    So it was just the four of y'all

16 (Pages 58 - 61)

1 there?
2     A.     Yes.
3     Q.     And best judgment, and I know you
4 didn't put a stopwatch on it, an hour and a
5 half to two hours, I think is what you said
6 earlier; correct?
7     A.     No.  I said about an hour to
8 about an hour and a half, is what I said.
9     Q.     Okay.
10     A.     I don't know.  I wasn't timing
11 it.
12        THE WITNESS:  Can we take a break
13 so I can get me another coffee?
14        MR. HOWARD:  Sure.
15        MR. SIKES:  Sure.  Any time you
16 want to take a break, let us know.
17         (Recess taken.)
18     Q.     Do you understand, and you are
19 aware, that the ABI is conducting a criminal
20 investigation to determine whether Mason Adcock
21 will be indicted for any sort of criminal
22 offense arising out of this shooting?
23     A.     Yes.

1     Q.     And that hasn't been presented to
2 the grand jury yet, has it?
3     A.     I couldn't tell you.  I don't
4 know.
5     Q.     Okay.  And you understand that --
6 that that was -- Your interview down there with
7 Lieutenant Carpenter, that was part of his
8 criminal investigation; correct?
9     A.     Yes.
10     Q.     Okay.  You've been involved in
11 law enforcement how many -- How many total
12 years have you got in law enforcement all
13 together, would you say?
14     A.     I previously mentioned, seven.
15     Q.     Okay.  And you're aware that,
16 generally, criminal investigations, they are --
17 there's a confidentiality with regard to the
18 investigation and evidence developed in it;
19 correct?
20     A.     Yes.
21     Q.     And the reason for that is that
22 you don't want the potential criminal defendant
23 to have access to what information you're

1 developing; is that correct?
2        MR. HOWARD:  Object to the form.
3     A.     I can't answer to that, because
4 I'm not a legal analyst.
5     Q.     Okay.  You don't know that?
6     A.     No.
7     Q.     Okay.  You know that it is not a
8 good idea for a potential criminal defendant to
9 have access to investigative files and
10 investigative materials, don't you?
11        MR. HOWARD:  Object to form.
12     A.     Again, I --
13     Q.     You don't know?
14     A.     I mean --
15     A.     If you don't know, say I don't.
16     A.     I don't know.  I don't know.
17     Q.     Okay.  Even though you've been a
18 law enforcement officer for seven years, and
19 you don't know that law enforcement
20 investigations are kept confidential to prevent
21 the defendant from learning what all
22 information is being developed against him?
23     A.     I've never been an investigator,

1 sir, so I couldn't tell you.
2     Q.     The answer is no, you don't know;
3 correct?
4     A.     You just answered for me.
5     Q.     I'm trying to get you to give me
6 a straightforward answer.
7     A.     And I'm trying to, sir, but you
8 don't --
9     Q.     No, you are not.
10     A.     You are trying to twist things
11 around.  And I just told you I don't know how
12 many times already.
13     Q.     Answer this question, please, yes
14 or no, if you can, and I think you can:  You
15 don't know that the -- generally speaking,
16 criminal investigative materials, and
17 investigative files, and evidence developed in
18 a criminal investigation is kept from the
19 criminal defendant in order to prevent him from
20 learning of it?
21        MR. HOWARD:  Object to the form.
22     Q.     You don't know that or you do
23 know that?

17 (Pages 62 - 65)

1    A.    You've asked that question like
2 three times already.
3    Q.    Can you give me a yes or no
4 answer?
5    A.    And I've done answered that
6 twice.
7    Q.    Answer it again, please, yes or
8 no?
9    A.    It's not -- My answer is not
10 going to change, sir.
11    Q.    Give me your answer.
12    A.    It's going to be the same.
13    Q.    And what is your answer?
14    A.    I don't know.
15    Q.    Now, the investigation that was
16 being conducted by Lieutenant Carpenter was of
17 Mason Adcock back in June when you went down to
18 Dothan to be interviewed; correct?
19    A.    As far as my understanding is, I
20 was there to give my deposition as to the
21 events that transpired for that day.
22        MR. SIKES:  Read my question
23 back, please.

1            (Requested portion of the
2            Record was read by the
3            Reporter.)
4    A.    Yes.
5    Q.    Thank you.
6        Did you not think it odd that
7 Mason Adcock's lawyer was allowed to sit in
8 your interview?
9    A.    I didn't think nothing of it.
10    Q.    Who would have been the victim if
11 there was a crime here?
12    A.    Who would have been the victim if
13 there was a crime?
14    Q.    Right.  If Mason Adcock had
15 criminally killed Channing Spivey, who was the
16 victim?
17    A.    That would be Mr. Spivey.
18    Q.    Right.  Was Mr. Spivey's lawyer
19 asked or invited or allowed to be present at
20 the meeting?
21    A.    I couldn't tell you, because I
22 wasn't -- I couldn't tell you.
23    Q.    Was there a representative of the

1 victim, Channing Spivey, at the meeting where
2 you were interviewed?
3    A.    No.
4    Q.    Okay.  You've been in law
5 enforcement for seven years, and that didn't
6 appear odd to you?
7        MR. HOWARD:  Object to the form.
8    A.    No.
9    Q.    Okay.  Earlier, and I -- You
10 correct me if I'm wrong about this, but what I
11 understood you to say earlier, that when Mason
12 Adcock fired the first of a number of rounds at
13 Channing Spivey, you couldn't have gotten a
14 piece of paper between them; is that correct?
15    A.    That's correct.
16    Q.    Okay.
17    A.    They were skin on skin.
18    Q.    And Mason Adcock fired another --
19 You say you don't know how many, but I think we
20 know it was at least five rounds exactly;
21 correct?
22    A.    Correct.
23    Q.    Okay.  Did the distance between

1 them change at any time during the firing?
2    A.    When it was over with, Mr.
3 Channing --
4    Q.    No, sir.  During the firing --
5    A.    No.
6    Q.    Thank you for a straightforward
7 answer.
8    A.    They were still skin on skin, and
9 he was still getting pummeled in the head.
10    Q.    You were close enough to see what
11 all went on there; correct?
12    A.    Yes.
13    Q.    How many feet away were you from
14 Mason Adcock?
15    A.    In all honesty --
16    Q.    I hope it's all going to be
17 honest today, sir?
18    A.    Everything I'm saying to you,
19 sir, is honest, but you're turning my words
20 around and you're starting to upset me.  From
21 me to Mr. McDermott is about the distance.
22    Q.    How many feet would you say that
23 is?

18 (Pages 66 - 69)

Page 70

1    A.    I don't know.  I mean, no more
2 than ten feet, fifteen feet.  I don't have a
3 ruler.
4    Q.    You and Mr. McDermott are fifteen
5 feet apart?
6    A.    I don't have a ruler, sir.  If
7 you like, we can get a ruler and measure this.
8    Q.    You don't know that you're
9 sitting about five or six or seven feet from
10 him?
11         MR. HOWARD:  We can get a
12 measuring tape.
13    A.    Let's get a measuring tape, so
14 you can stop this.
15         MR. HOWARD:  Seven feet.  Six and
16 a half to seven feet.
17    Q.    Okay.  So you were six and a
18 half, seven feet away, your best judgment is?
19    A.    As far as I can -- Yeah.
20 Approximately.
21    Q.    All right.  And, again, there was
22 nothing to obstruct your view of --
23    A.    No.

Page 71

1    Q.    -- Mr. Adcock or your view of
2 Channing Spivey?
3    A.    No.
4    Q.    And you said it was getting dark
5 or --
6    A.    It was dark.
7    Q.    Earlier there's been testimony
8 that it was dusk.  Would you disagree with
9 that?
10    A.    No.
11    Q.    Okay.  But there was enough light
12 for you to see what was occurring; correct?
13    A.    Yes.  Because he had -- He had an
14 overhead -- a driveway light that was on.
15    Q.    Okay.  Would you agree that while
16 rare, extraordinary circumstances can occur,
17 but in general you don't kill people by
18 striking them with your fist; correct?
19    A.    No.
20    Q.    What I said is true?  Yes?
21    A.    Can you repeat that, please?
22         MR. SIKES:  Read it back, please.
23         (Requested portion of the

Page 72

1         Record was read by the
2         Reporter.)
3    A.    Correct.
4    Q.    And generally, they get bruised
5 or they get a black eye, they lose a tooth,
6 bruise on your chest or something like that,
7 that's usually the limit of what you get --
8 kind of damage you can do with your fist;
9 correct?
10    A.    Depends on the totality of the
11 circumstances, sir.
12    Q.    I understand.  I'm talking about
13 in general, though.  Yes?
14    A.    I'm not a medical official, so I
15 couldn't tell you.
16    Q.    Would you disagree if Mason
17 Adcock testified that was the general limit of
18 what --
19    A.    I couldn't tell you what Mr.
20 Mason Adcock testified about.
21    Q.    I didn't ask you that.  I said
22 would you disagree with him if he testified to
23 that?

Page 73

1    A.    Again, I'm not a legal analyst,
2 so I --
3    Q.    I'm not asking if you're a legal
4 analyst.  I'm asking whether you disagree with
5 him or not about that?
6    A.    And I've answered.
7    Q.    No, sir, you haven't.
8         Did Channing Spivey ever threaten
9 you verbally?
10    A.    No.
11    Q.    Did he ever threaten Mason
12 Adcock, that you heard, verbally?
13    A.    No.
14    Q.    Let me ask you, who made first
15 contact with you, with regard to going out to
16 Glenwood Road that day?
17    A.    Who made first contact with me?
18    Q.    Yes, sir.
19    A.    That would be the dispatchers.
20    Q.    Does the dispatcher have a name?
21    A.    I don't know which one it was on
22 duty that night, there were two of them.
23    Q.    Who are the two dispatchers?

19 (Pages 70 - 73)

1    A.    I just said I don't know their
2  names.
3    Q.    You don't know the names of
4  either of your dispatchers?
5    A.    No, I don't.  I don't know --
6  When I get on shift, I don't go over to the 911
7  center and see who is on duty.  I just listen
8  to the radio and I answer my calls.  I don't
9  know who's --
10    Q.    This wasn't a sheriff's
11  dispatcher, then, this was a 911 dispatcher?
12    A.    Yes.
13    Q.    Okay.  That's what I'm trying to
14  get at.  I thought you were talking about your
15  sheriff's office dispatcher?
16    A.    No.  The sheriff's office
17  dispatch is also the Luverne dispatch, is also
18  the Brantley PD dispatch, is also all the other
19  PD dispatches.
20    Q.    Okay.  And what was your
21  recollection of the information you were given
22  when you were asked to go out there?
23    A.    When I got the call, I was in

1  Highland Home, and they said that -- dispatched
2  me to Glenwood Road.  They gave me the address.
3  I don't know, offhand, the exact address; I
4  know it was on Glenwood Road.  They said that
5  EMS is requesting your assistance for a
6  combative subject.
7    Q.    Okay.  That's the limit of what
8  you can recall?
9    A.    That's all I was told.
10    Q.    Okay.  So that's not only all you
11  can recall, you know that was all you were
12  told?
13    A.    That's all I was told.
14    Q.    Okay.  Did you get any other
15  information en route or between when you got
16  the dispatcher call and when you arrived on
17  scene?
18    A.    From my understanding -- Yeah.  I
19  had kept asking if there was any weapons; they
20  couldn't answer me because they said, we don't
21  know.  I said:  Well, find out.  And then also
22  they said something about he had -- Let's see.
23  He had broke a TV and punched holes in the

1  wall, and something about, I believe, he had a
2  brain tumor or something to that effect.  That
3  was it.
4    Q.    Okay.  Did they tell you he had
5  brain surgery?
6    A.    They said brain tumor.
7    Q.    Did they tell you he had brain
8  surgery?
9    A.    No.
10    Q.    Let me ask you:  There's
11  testimony that Ms. Calloway called earlier that
12  morning about an incident with her nephew,
13  Channing Spivey, being involved in an
14  automobile accident in an empty field out from
15  Luverne that morning, the morning of May 27th;
16  that she called after that accident, and called
17  Sheriff Mears and also called the Luverne
18  Police Department, and advised them that their
19  -- her nephew had had brain surgery and to be
20  very careful with him, he could be injured.
21        Did you ever receive any kind of
22  information to that effect from Sheriff Mears?
23    A.    No.

1    Q.    Okay.  If Sheriff Mears said --
2  Did you go by the sheriff's department that
3  day?
4    A.    Did I go by there?  I work night
5  shift, and so --
6    Q.    Can you answer -- If you will
7  answer my question:  Did you go to the
8  sheriff's department on the day of May 27th?
9    A.    Yes, I did.
10    Q.    When were you there?
11    A.    Probably sometime after -- When I
12  -- When I got on shift, I went over there.  And
13  then --
14    Q.    Can you come back and tell me
15  what time you were there?
16    A.    I don't know the exact time, sir.
17    Q.    I'm not asking the exact time.
18  I'm asking you approximately when were you
19  there and for how long were you there?
20    A.    I was only there for a few
21  minutes because I had grabbed papers to do
22  papers.  I don't know the exact time.
23    Q.    I didn't ask you the exact time.

20 (Pages 74 - 77)

Page 78

1    A.    You're asking me a time frame,
2 sir, and I'm telling you, I don't know the
3 exact time.
4    Q.    You don't know whether it was
5 twenty minutes before this call came in or you
6 don't remember --
7    A.    I was in Highland Home when this
8 call came in, sir.
9    Q.    We're not talking about when the
10 call came in. We're talking about when were
11 you at the sheriff's department in Luverne?
12    A.    Right after I got on shift.
13    Q.    And that was about what time did
14 you go on shift?
15    A.    I get on shift at six.
16    Q.    Thank you. Six o'clock. We can
17 make this as long as you -- We can make this as
18 long as you want to, if you want me to chase
19 you down to try to get an answer to a simple
20 question.
21    A.    Sir, but you're wanting me to
22 give the answers to what you want, as far as if
23 you're not getting your answer to your question

Page 79

1 that you want, now you're chasing some other
2 avenue and rewording the question.
3    MR. TEAGUE: Hey, both of y'all,
4 Griff, he's answered your question the best
5 that he can. You ask him and then you expect
6 -- you want the answer that you want, so you
7 repeat it. He's going to give one answer, and
8 that's it. Griff, stop arguing with him. Ask
9 him the question and just answer the question.
10    Q.    Yes, please do that.
11    So you were by the office
12 sometime around six a.m., is that what your
13 best judgment is; is that --
14    A.    No.
15    Q.    Six in the evening?
16    A.    This is the evening.
17    Q.    All right. I don't know.
18    Again, I'm not trying to get any
19 particular answer, I'm trying to get an answer.
20    An approximate hour that you were
21 there, I don't know whether it's six a.m. or
22 six p.m.
23    You were by the station about six

Page 80

1 p.m.?
2    A.    I didn't leave my house until
3 almost six.
4    Q.    I didn't ask you when you left
5 your house. Again, if --
6    A.    You just asked me when I got to
7 the station. I said I didn't -- I wasn't
8 there --
9    MR. TEAGUE: Griff, Griff, Griff.
10    MR. SIKES: No. Clay, Clay,
11 Clay.
12    MR. TEAGUE: This is my client
13 and I can speak to him. Brent, only answer the
14 question that is asked. If it's a yes or no
15 question, answer yes or no. That's it. Do not
16 elaborate, don't go to something else.
17    THE WITNESS: Yes, sir.
18    Q.    Were you at the Luverne police
19 station at any time on the 27th prior to going
20 by about six p.m.?
21    A.    I was never at the Luverne
22 station.
23    Q.    I'm sorry?

Page 81

1    A.    I was never at the Luverne police
2 station.
3    Q.    Where were you at six p.m.?
4    A.    I was heading to the Crenshaw
5 County Sheriff's Office, I never went to
6 Luverne Police station.
7    Q.    I'm sorry. I misspoke. pardon
8 me. I'm not talking about police station, I'm
9 talking about the sheriff's department.
10    Were you at the sheriff's
11 department at any time prior to about six
12 o'clock, six p.m., on the 27th?
13    A.    Yes.
14    Q.    And what time were you there?
15    A.    Between six and, what, 6:30?
16    Q.    No, sir. I said before --
17    A.    Okay.
18    Q.    Again --
19    A.    I'm trying to tell you, sir. But
20 you're wanting your answer, and I'm trying to
21 tell you -- I'm telling you my answer.
22    Q.    No, sir. I'm wanting an answer.
23    A.    I am. But you're getting upset

21 (Pages 78 - 81)

Page 82

1 and mad because I'm not telling you your
2 answer.
3     Q.     I'm asking you -- I understand
4 you were there about six p.m. to 6:30.  Is that
5 right?
6     A.     That's about five times you've
7 asked the same question.
8     Q.     Is that right?
9         MR. MCDERMOTT:  Answer it the
10 best you can.
11         THE WITNESS:  I did.
12     Q.     Is that right?
13     A.     Yes.
14     Q.     Okay.  Prior to about six p.m. to
15 6:30, were you at the sheriff's department any
16 time on the 27th before that?
17     A.     The day of, I was there between
18 six and 6:30, yes.
19     Q.     No, sir.  Before six to 6:30 --
20     A.     No.
21     Q.     Okay.
22     A.     I was at home.
23     Q.     What was the last time you had

Page 83

1 been at the sheriff's department prior to 6:30
2 or six o'clock, 6:30 on the 27th?
3     A.     The day prior.
4     Q.     About when -- When did you get
5 off?
6     A.     I got off at six o'clock in the
7 morning, that morning.
8     Q.     Okay.  You were at the sheriff's
9 department then on the 27th, before six p.m.?
10     A.     Yeah.
11     Q.     You were there at six a.m.?
12     A.     Yes.  Yes.  Yes.  Yes.  You know
13 what, I need to take a break, because you're
14 really starting to upset me.
15         (Recess taken.)
16     Q.     What weapons do you -- or use of
17 force, equipment, do you generally carry with
18 you or did you carry with you back in May of
19 2020 as a deputy sheriff for Crenshaw County?
20     A.     I had my taser, I had my ASP
21 baton.
22     Q.     Okay.
23     A.     It's called ASP baton, A-S-P,

Page 84

1 baton, and then I had the pepper spray, and I
2 also had my firearm.
3     Q.     Were they in your vehicle or were
4 they on your person?
5     A.     They were on my person.
6     Q.     Do you carry them on a belt?
7     A.     Yes.
8     Q.     Okay.  And how are they arranged?
9 Are you right-handed?
10     A.     Yes, I am.
11     Q.     And was your pistol carried on
12 your right hip, then?
13     A.     Yes, it was.
14     Q.     All right.  And where is the ASP,
15 or baton, carried?
16     A.     It was behind my pistol.
17     Q.     Again, on your right side behind
18 the pistol?
19     A.     Yes.
20     Q.     Where was the pepper spray?
21     A.     On my left side, right on my hip
22 (indicating).
23     Q.     Okay.  And the taser?

Page 85

1     A.     Taser was to my left of my belt,
2 right in front.
3     Q.     Okay.  All right.  Were you --
4 Did you have all these weapons with you at the
5 time Channing Spivey was shot and killed?
6     A.     Yes.
7     Q.     Okay.  Had you pulled any of them
8 to use, other than the taser?
9     A.     Yes.
10     Q.     All right.  And what -- Other
11 than the taser and your gun, had you pulled any
12 of them?
13     A.     The ones I pulled were my taser
14 and my gun, yes.
15     Q.     Okay.  But they were there on
16 your right and left hip at the time the
17 shooting occurred?
18     A.     No.  MY taser was not on my hip.
19 It was right in front of my stomach to the left
20 on my belt.
21     Q.     Okay.  On your belt, then.  Okay.
22         Had you reloaded your taser?
23     A.     Can't.  I only had one cartridge.

22 (Pages 82 - 85)

1    Q.    Okay.  So it was not available to
2 you, then, the taser wasn't, at the time of the
3 shooting?
4    A.    Oh, it was available, and I used
5 it.  But after you do the one cartridge, you
6 don't have any --
7    Q.    At the time of the shooting, did
8 you have a taser available to you?
9    A.    No.
10    Q.    That's what I asked, sir.  Again,
11 if you will listen to the question and answer
12 that question, we can do this a lot quicker.
13 It will be as long as you want to as long as
14 you don't answer the question.
15         At the time of the shooting you
16 had available to you your weapon, you had
17 pepper spray, and you had your ASP.  And while
18 the taser might have been on your belt, you
19 didn't have a live cartridge for it; is what I
20 said correct?
21    A.    No.
22    Q.    What's incorrect about it?
23    A.    The taser was not back in my

1 holster after I used it.  I put the taser in
2 between my vest and my chest inside of my vest,
3 in the outer vest, due to the fact I couldn't
4 get it out, because the vest that I had at the
5 time wasn't properly fit for me.  It was
6 improper equipment that I was issued, that I
7 had to make that vest fit for me, it was too
8 big, which in turn covered my taser, and took
9 me three times to draw my taser; and on the
10 third time, I drew my taser, and I used it.
11    Q.    Let me come back and state it
12 again.  You had three of your weapons available
13 to you at the time of the shooting, that was
14 your service weapon, firearm -- What kind of
15 gun is that?
16    A.    It was, I believe, a Glock 17.
17    Q.    All right.  It was loaded?
18    A.    Yes.
19    Q.    You had it.  You had pepper
20 spray?
21    A.    Yes.
22    Q.    It was on your person, available
23 to you to reach for; correct?

1    A.    Yes.
2    Q.    And you had your ASP, or your
3 baton, it was on your belt and available to
4 you; correct?
5    A.    Yes.
6    Q.    Okay.  Your taser was not
7 available to you in any usable form because it
8 had already been fired once, and you didn't
9 have a reload cartridge; correct?
10    A.    Correct.
11    Q.    Okay.  Did you -- At the time
12 Mason Adcock shot -- fired the first shot at
13 Channing Spivey, did you have anything in your
14 hand?
15    A.    Yes, I did.
16    Q.    What did you have?
17    A.    My pistol.
18    Q.    Anything else?
19    A.    No.
20    Q.    Okay.  And how long had you had
21 your pistol in your hand?
22    A.    Let's see.  When I got up there,
23 turned around --

1    Q.    I don't know what when I got up
2 there means.
3    A.    Okay.  I'm recalling it, and I'm
4 trying to, sir, but you keep -- I'm trying to
5 explain it, but you're cutting me off.  Okay.
6 I'm trying to explain it, but you keep -- you
7 keep cutting me off.  And then you're repeating
8 a question that I'm trying to explain it to
9 you.
10    Q.    We can -- We can do this as long
11 as you want to, sir.
12    A.    This is frustrating.
13    Q.    Go ahead.
14         MR. MCDERMOTT:  Ask for the
15 question to be reread back and then answer the
16 question best you can
17         (Requested portion of the
18          Record was read by the
19          Reporter.)
20    A.    I didn't have my pistol when I
21 got up in the driveway.  I put my pistol in my
22 hand once I met up with Captain Adcock --
23    Q.    Okay.

23 (Pages 86 - 89)

Page 90

1    A.    -- which was probably a few
2  minutes.
3    Q.    Okay.  Had you drawn your pistol
4  before that time?
5    A.    Yes, I did.
6    Q.    When?
7    A.    When we were out on the street,
8  on Glenwood Road.
9    Q.    Out in front of the Spivey home?
10   A.    Yes.
11   Q.    Okay.  And you put it back in
12 your holster at some point?
13   A.    Yes.
14   Q.    When was that?
15   A.    That's when I turned and ran to
16 Captain Adcock's driveway.
17   Q.    Okay.  Let's go back and have you
18 retrace, if you would, from the start of -- You
19 had told us about getting a call while you were
20 in Highland Home, and that a fellow with a
21 brain tumor was being unruly or noncompliant,
22 and you were asked to assist at the residence
23 on Glenwood Road; is that accurate?

Page 91

1    A.    Yes.
2    Q.    Okay.  And you then went to
3  Glenwood Road?
4    A.    Yes.
5    Q.    You are in your cruiser or police
6  vehicle by yourself?
7    A.    Yes.
8    Q.    Okay.  And tell us the events
9  that occurred -- Let me back up a second.
10        I think earlier you said that you
11 had some communications en route, and largely,
12 they were, you were trying to find out whether
13 the subject who is noncompliant had a weapon;
14 correct?
15   A.    Yes.
16   Q.    And were you ever given an answer
17 about that?
18   A.    No.  Because they said no; they
19 said they didn't know.
20   Q.    Okay.  All right.  Anything else
21 that you can recall about the conversation with
22 anybody while you were en route?
23   A.    No.

Page 92

1    Q.    Okay.  So when you showed up, the
2  only information you had is, you've got a
3  noncompliant subject with a brain tumor that
4  may or may not have a weapon; is that correct?
5    A.    That's correct.
6    Q.    Any other information you had
7  when you got there, other than that?
8    A.    No.
9    Q.    You need to answer out loud.
10   A.    No.
11   Q.    Okay.  Tell us, if you would, and
12 again, I apologize, what I may -- As you go
13 through your narrative with it, I may stop you
14 and ask you something more specific about what
15 you're addressing right then.  I'm not trying
16 to be rude, I'm just trying to get as much
17 detail as I can about what occurred.
18        Let's start with, you pulled up
19 in your police -- your deputy vehicle.  What
20 kind of vehicle is that?
21   A.    That was a Ford Explorer.
22   Q.    Okay.  What did you see or
23 observe when you first pulled up?

Page 93

1    A.    A driveway full of people.  But
2  before that, if I can elaborate.
3    Q.    Sure.
4    A.    The dispatchers made me believe
5  that the EMS, in my mind, was actively fighting
6  the subject, which, in turn, that's why I was
7  doing about a hundred and ten, hundred and
8  five, hundred and ten miles an hour to get
9  there with emergency equipment activated.
10   Q.    Okay.
11   A.    When I got on Glenwood Road, and
12 I got close to the residence, I was unaware
13 that they had -- that the EMS crew had staged
14 down the street, on a side road.  It was a dirt
15 side road.
16   Q.    Uh-huh.
17   A.    I was unaware of that.
18   Q.    Okay.
19   A.    I get to the house, as I'm
20 passing by them, they flash their lights.  I
21 did not know that they were there.  I was
22 unaware.
23   Q.    When they flashed their lights,

24 (Pages 90 - 93)

1  would that indicate they were there?
2     A.     As I was passing them doing a
3  hundred and five miles an hour, yes.
4     Q.     Okay.
5     A.     Okay. I didn't think to occur to
6  me that they're not going to come in until the
7  scene is secured.
8     Q.     Okay.
9     A.     That's -- From my understanding,
10 that's a way a lot of EMS is. But when I got
11 to the scene, when I started pulling up, the
12 driveway was full, full of vehicles --
13    Q.     Okay.
14    A.     -- and people outside.
15    Q.     And if I understand you
16 correctly, the EMS folks were standing off
17 until the situation -- until you got there to
18 clear the situation; is that fair or not?
19    A.     That's pretty fair.
20    Q.     Okay. Anything wrong with that?
21    A.     No.
22    Q.     Okay. Who all were the people
23 standing there? How many people were there and

1  what -- did you know any of them?
2     A.     I knew nobody. I didn't -- I had
3  never been to that address before. I didn't
4  know of anybody. There was maybe approximately
5  -- approximately -- I'd say at least four or
6  five people, maybe.
7     Q.     Okay.
8     A.     And there was probably about the
9  same amount of vehicles. I mean, the driveway
10 and the -- Yeah, the driveway was pretty full.
11    Q.     All right. Let me let you look
12 at Plaintiff's Exhibit 13.
13    A.     Okay.
14    Q.     I'll represent to you, again,
15 this is a plat or map of the area between the
16 two houses -- the roadway between the two
17 houses. Does that look like it accurately
18 reflects the two houses and the roadway between
19 them?
20    A.     It looks like it, yes.
21    Q.     Okay. There's a guardrail there
22 between -- at some point --
23    A.     I can't recall.

1     Q.     -- on the roadway.
2            Don't remember that?
3     A.     I can't recall.
4     Q.     Okay. All right.
5            Do you recognize this as the
6  Spivey house up here at the top -- labeled the
7  Spivey house. The driveway you're talking
8  about is the -- an olive, sort of, tan there,
9  color; correct?
10    A.     Yes.
11    Q.     Okay. Which side, and if you'll
12 look, we'll call this (indicating) the west
13 side of the road; is that fair?
14    A.     Okay.
15    Q.     This will be the east side of the
16 road (indicating); is that fair?
17    A.     Okay.
18    Q.     All right. Where did you --
19 Where did you pull up and stop, on the east
20 side or the west side of the road?
21    A.     The west side, just past the
22 driveway.
23    Q.     Okay. Somewhere in that area?

1     A.     I'm just going to mark it
2  (indicating).
3     Q.     All right. You marked it on the
4  west side?
5     A.     I said west side.
6     Q.     Okay.
7     A.     I never said east side.
8     Q.     Okay. And the people were in the
9  driveway, then, behind your vehicle, if you
10 were coming from that direction?
11    A.     Yes.
12    Q.     All right. And what were they
13 doing?
14    A.     I don't know.
15    Q.     Well, you saw them, I mean --
16    A.     I didn't even -- Okay. I didn't
17 even get out of my vehicle yet, and my back
18 window shattered.
19    Q.     Okay. All right.
20    A.     I got my door maybe about four
21 inches open -- barely opened my door, then all
22 of the sudden my back window was shattered.
23    Q.     Okay. Do you know what shattered

Page 98

1 it?
2     A.     No.
3     Q.     Okay.  And so I just want to get
4 an accurate account of what all you said,
5 heard, did, during this process.
6           So far what I hear is, you pulled
7 in and parked here where we've put an X on
8 Plaintiff's Exhibit 13 (indicating).
9     A.     Uh-huh.
10    Q.     And that would be just sort of
11 south of the driveway.
12    A.     Okay.  Yeah.
13    Q.     All right.  And you observed four
14 or five people that you don't know what they
15 were doing, you just observed four or five
16 people there?
17    A.     Yes.
18    Q.     All right.  And the next thing
19 you recall occurring was that your back
20 windshield got shattered?
21    A.     Yes.
22    Q.     Don't know who did it or with
23 what; correct?

Page 99

1     A.     Correct.
2     Q.     What's the next thing that
3 occurred?
4     A.     When that happened, I said: Oh,
5 shit. Jumped out of my vehicle, shut the door,
6 and when I turned around, this tall person in
7 just a pair of shorts started rushing at me. I
8 turned around -- I was backing up, trying to
9 keep my reactionary gap, trying to reach for my
10 taser. And on the third try I was actually
11 able to get my taser out, because the vest was
12 covering -- my outer vest that I had was
13 covering my taser.
14    Q.     All right.  Did he say anything
15 to you?
16    A.     I cannot recall.
17    Q.     Okay.  During the whole encounter
18 down there at the Spivey household down here
19 (indicating), do you ever recall Channing
20 Spivey ever saying anything to you?
21    A.     That, I cannot recall.
22    Q.     Okay.  Is it that he may have,
23 but I don't remember -- listen to my question.

Page 100

1 He may have, but I don't remember it, or --
2     A.     I do not know.
3     Q.     Okay.  And, again, Mr. Spivey,
4 this is how he appeared in Plaintiff's Exhibit
5 15, 16, 17, we talked about earlier; correct?
6     A.     Just all I know, it was a pair of
7 shorts.
8     Q.     Okay.  Does that appear to be the
9 individual you were -- you confronted?
10    A.     It appears to be.
11    Q.     Okay.  15, 16, 17; correct?
12    A.     Okay.
13    Q.     All right.  What's the next thing
14 that occurred?
15    A.     I was backing up; and while I was
16 backing up, I drew my taser out; I'm hearing
17 commotion from the residence, people yelling
18 stop, don't do this, please stop, just pleading
19 with apparently Mr. Spivey there to stop what
20 he's doing.
21           And I told him, said, you know:
22 Get on the ground.  I kept giving verbal
23 commands.

Page 101

1     Q.     You were telling Spivey to get on
2 the ground?
3     A.     Yes, sir.
4     Q.     The people behind you, though,
5 they were saying what?
6     A.     Stop.  Stop.
7     Q.     They were not telling you to
8 stop, they were telling --
9     A.     No.  They were talking to him.
10    Q.     -- Channing Spivey to stop?
11    A.     Yes.
12    Q.     Okay.
13    A.     I told him to get on the ground.
14 When I got my taser out, when he refused verbal
15 commands, I tased him.
16    Q.     Okay.
17    A.     He went down, took the taser
18 ride.  After five seconds, I told him stay on
19 the ground, and he refused those verbal
20 commands; got back up.  I tried to tase him
21 again, but my taser did not go off.  And he's
22 walking back towards the residence, I tried to
23 tase him a third time.

26 (Pages 98 - 101)

Page 102

1    Q.    He was not walking toward you, he
2  was going back towards the residence?
3    A.    Yes.  And I tried to tase him a
4  third time.  And the taser did not go off.  At
5  that time, I saw him pull the -- what you call
6  the probes out of his body.  And at that
7  moment, I was unaware that the ambulance crew
8  seen what was going on, that's my observation,
9  and started slowly rolling up with their lights
10  on.
11    Q.    Uh-huh.
12    A.    He turned and seen the
13  ambulance --
14    Q.    He, Spivey?
15    A.    Yes.  Mr. Spivey seen the
16  ambulance, and started jogging to the
17  ambulance.  At that time, I took my taser
18  cartridge off and threw it to my vehicle as
19  evidence.  Then I put my taser in between my
20  vest and my chest, on the inner part on my
21  right side.
22          Mr. Spivey -- As this is going
23  on, I'm radioing to dispatch what is going on

Page 103

1  and asking for assistance.  I am not getting
2  any reply back while I'm asking for the
3  assistance.
4          Mr. Spivey makes it to the
5  ambulance, jumps up on the hood, and proceeds
6  to start hitting the windshield with his bare
7  fists.
8    Q.    That's of the ambulance?
9    A.    Yes.  The ambulance windshield,
10  from -- I can hear it -- and he's a good
11  distance away, I can hear the windshield being
12  caved in with just his fist.
13    Q.    Uh-huh.
14    A.    It appears the ambulance crew --
15  the ambulance driver put the vehicle in
16  reverse, stepped on the gas -- it appeared the
17  ambulance driver put it in reverse, stepped on
18  the gas, that is when Mr. Spivey fell off the
19  hood.
20          During this whole ordeal, they
21  were still -- people at the residency was still
22  pleading him to stop what he was doing.  Stop
23  it, don't do this.  You need -- And everybody

Page 104

1  was pleading with him.  I heard a male voice
2  say:  Oh, he's knocked out.  He's not moving.
3  He's not moving, he's on the ground, he's
4  knocked out.
5          I made it about four or five
6  steps from my vehicle, the back of my vehicle,
7  Mr. Spivey jumps up, turns, and now he's
8  jogging at me.
9          His attention goes off of the
10  ambulance crew and back on to me.  At that
11  point I'm still on the radio hollering for
12  assistance.
13    Q.    All this time he has nothing in
14  his hand, either hand; correct?
15    A.    That's correct.
16    Q.    Okay.  Go ahead.
17    A.    So as he's running at me, I could
18  tell that something wasn't right.  By his
19  demeanor, he appeared to be under -- to my --
20  to what I believed to be, under the influence
21  of something.
22    Q.    Okay.
23    A.    And he's jogging at me.  As he's

Page 105

1  jogging at me, and I pulled my pistol out, and
2  going backwards, a female comes from around the
3  back of my vehicle, and said:  Mason lives up
4  the road.  And I told her:  Go see if he's
5  home.  She ran up there during this ordeal, and
6  I did not see her anymore after that.
7          As I'm going backwards, I'm
8  giving Mr. Spivey verbal commands to get on the
9  ground; get on the ground; I do not want to
10  shoot you; I do not want to shoot you.  That's
11  all I kept saying repeatedly, get on the
12  ground; I do not want to shoot you.
13          I stumbled backwards.  As I'm
14  going backwards, which, in turn, by looking at
15  his demeanor and his actions, that he had just
16  caved in the windshield of an ambulance with
17  his bare fist, something wasn't right with that
18  situation.  His fists were bloody, and as he's
19  running at me, I got I felt like I was close
20  enough to Captain Adcock's driveway, that I
21  holstered, turned, and took off running.  At
22  that time, when I made it to Captain Adcock's
23  driveway, I ran up the driveway, that's when I

27 (Pages 102 - 105)

1  saw -- heard Captain Adcock come out his back
2  door. He had a flashlight; he shined the
3  flashlight. I was yelling at him where I was,
4  he yelled back, as far as we were -- he
5  communicated to me. And then I made -- as I
6  was --
7      Q.     What did he say to you?
8      A.     What did he say to me?
9      Q.     Yes.
10     A.     He called out my name.
11     Q.     Okay. Anything else? Did you
12  know him?
13     A.     I knew -- I knew that was his
14  house.
15     Q.     Did you know him personally?
16     A.     Not off -- Not out of work, no.
17     Q.     How would he call your name if
18  y'all don't know each other?
19     A.     No. He called me Deputy Penny.
20     Q.     I know. How would he know your
21  name?
22     A.     Because we've interacted
23  throughout the -- when I'm working.

1      Q.     You do know him, then?
2      A.     Not personally. I know him
3  through the job.
4      Q.     You do know him through your job?
5      A.     That's it.
6      Q.     Okay.
7      A.     I don't go to his house, I don't
8  hang out, I don't have beers.
9      Q.     I didn't ask that. I asked did
10  you know him, and you said --
11     A.     Yes. Yeah. It was the way you
12  asked the question. You said do I know him, I
13  said not personally.
14     Q.     Go ahead.
15     A.     So after we -- After he had
16  called me -- I headed toward him, I could --
17  And when I turned around, I had seen Mr. Spivey
18  come around -- As I head towards there, Mr.
19  Spivey come around that little -- there's
20  bushes right here and there's little trees, and
21  then he started running up toward Mason.
22     Q.     Did you see anybody else there?
23     A.     No.

1      Q.     Okay.
2      A.     And when he made -- When he
3  started running up toward Mason, I heard Mason
4  was giving verbal commands: Get on the ground.
5  Get on the ground. So was I, I was giving
6  verbal commands. I had redrew my service
7  weapon.
8           And he had a flashlight right
9  here (indicating), he had the pistol right here
10  (indicating), he put his arm up because Mr.
11  Spivey kept coming at him, he was refusing all
12  verbal commands. And when he got to Mr.
13  Spivey -- I mean Mr. Spivey got to Captain
14  Adcock there, he started just punching him in
15  his head, and that's when -- But I know when he
16  put his arm up, he called him by name, but I
17  couldn't hear what the name was.
18     Q.     Adcock called Spivey by name?
19     A.     Yeah. He said: Don't -- Stop --
20  Don't. He said something after that, which I'm
21  thinking he called him by name.
22     Q.     The he's, are bothering me. When
23  you say that he, Adcock --

1      A.     Yes.
2      Q.     -- called Spivey by name?
3      A.     Yes.
4      Q.     Okay. All right. Go ahead.
5      A.     And then that's when Mr. Spivey
6  was throwing haymakers right at -- they were
7  touching. That's when -- he was pressing his
8  body against Captain Adcock, and that's when
9  Mr. Spivey was connecting with the top of his
10  -- you know, here (indicating). And that's
11  when the shots were fired repeatedly. Never --
12  There was never any pause.
13     Q.     Okay.
14     A.     And then Mr. Spivey fell
15  backwards, landed, you know, however he landed,
16  and was instantly stiff.
17     Q.     All right. Let me ask you: The
18  sequence of shots, what was the intervals
19  between them?
20     A.     There wasn't none.
21     Q.     It was however many shots he
22  fired, we know he fired at least five shots;
23  right?

28 (Pages 106 - 109)

Page 110

1    A.    Uh-huh.
2    Q.    All right.  It was bam, bam, bam,
3 bam, bam.
4    A.    There was never a pause, if
5 that's what you're asking.
6    Q.    It is.
7    A.    Yes.  There was never a pause.
8    Q.    Okay.  He just continually kept
9 firing until Spivey fell to the ground?
10    A.    At no -- When Mr. Spivey fell
11 backwards, that's when it stopped.
12    Q.    Okay.
13    A.    There was never a pause between
14 when shots started firing, there was never a
15 pause.  He didn't shoot, then wait, and start
16 shooting again.  No.  It was rapid succession.
17 As fast as you can pull the trigger.
18    Q.    Did -- At any time, did Spivey --
19 You said Spivey had nothing in his hands, you
20 had no indication that he had a weapon on him
21 at any time; correct?
22    A.    No.
23    Q.    What I said is correct?

Page 111

1    A.    Yes.
2    Q.    Okay.  And he never, like,
3 reached behind his back or grabbed for a weapon
4 anywhere that you saw?
5    A.    No.
6    Q.    Never, any time?
7    A.    No.
8    Q.    Correct?
9    A.    No.  Correct.
10    Q.    Okay.  And by that I mean, grab
11 for his weapon or grab for Mason's weapon;
12 correct?
13    A.    That's correct.
14    Q.    Okay.  All right.  I'm going to
15 come back, and we'll pick up with the narrative
16 again in a moment.
17       MR. SIKES:  Chanda, do you need
18 to take a break?
19       MS. CALLOWAY:  Yes.  Can we just
20 take a quick break?
21       MR. SIKES:  Sure.
22          (Recess taken.)
23    Q.    These four or five people that

Page 112

1 you say were there when you pulled up in the
2 driveway, did you ever learn the names of any
3 of them?
4    A.    Nope.
5    Q.    Okay.  Were they all male, were
6 some female, or did you know?
7    A.    I know of one to be female.
8    Q.    Okay.  And that was?
9    A.    The one who came from behind my
10 vehicle and ran up to Captain Adcock's
11 driveway.
12    Q.    Okay.  All right.  And how long
13 was that?  I'm trying to get an idea of the --
14 between the time you stopped your vehicle and
15 there was all of this activity down there that
16 you described in front of the Spivey household,
17 how long was it from the time you pulled up
18 until the time that the shooting occurred, in
19 round terms?
20    A.    Maybe approximately fifteen
21 minutes.
22    Q.    Okay.
23    A.    Roughly.

Page 113

1    Q.    Okay.
2    A.    I mean, I wasn't looking at my
3 watch.  I was --
4    Q.    And the -- The events you've
5 described down there at the Spivey household
6 occurred, you went up to the driveway at
7 Mason's house, and you at some point then
8 turned and ran towards Mason's house?
9    A.    When I felt like I was close
10 enough to his driveway, I didn't -- I wasn't
11 looking back, I was just trying to keep the gap
12 between me and Mr. Spivey.  But the more I was
13 trying to get that gap, the more he closed it,
14 so I wasn't gaining anything.  And in the
15 instance that I noticed beyond him was the
16 ambulance still sitting in the middle of the
17 roadway.
18    Q.    Did it ever occur to you to take
19 your pepper spray out and use it?
20    A.    No.
21    Q.    Did it ever occur to you to take
22 your baton out and use it?
23    A.    No.

29 (Pages 110 - 113)

1    Q.    And why is that?
2    A.    Because I could tell, at that
3 moment in time, that his demeanor, the way he
4 was acting, and I could tell by his actions
5 that with me being by myself, no backup, if I
6 would have went with an ASP -- I brought all
7 the weapons there.  I brought everything there.
8 I brought everything that was on my belt is
9 what I brought there.
10          And him being, from what I could
11 observe and the way he was, that if he would
12 have overpowered me, he had access to my
13 firearm, he had access to my baton, he had
14 accessing to everything that was on my belt.
15 So --
16    Q.    You were afraid?
17          MR. HOWARD:  Were you finished?
18    Q.    Yeah.  Go ahead.
19          THE WITNESS:  I was trying to
20 still finish.
21          MR. HOWARD:  Go ahead.
22    Q.    Please, go ahead and finish.
23    A.    So with all the weapons that I

1 brought to the -- to there, he had access, if
2 he was to overpower me and render me
3 unconscious, or used it on me, that my wife
4 right now and my children wouldn't have a
5 father and my wife would be a widow.
6          And I could tell he's refusing
7 all verbal commands.  And they're pleading with
8 him; during this whole ordeal, they're pleading
9 with him: Stop it.  Don't do this.  Stop what
10 you're doing.
11          They're pleading with him for him
12 to stop his actions.  At no point in time, did
13 anybody try to involve themselves to try to
14 assist me in any way, shape, or form.
15    Q.    Do you not recall them attempting
16 to help and you told them to get back?
17    A.    No.
18    Q.    That they'd get shot?
19    A.    No.
20    Q.    That didn't occur?
21    A.    No.  At no point in time did that
22 ever occur.
23    Q.    You were afraid?

1    A.    For my life, yes.
2    Q.    Okay.
3    A.    Because of, for one, his
4 demeanor; and I could tell just by the way he
5 was -- he was looking at me like, and -- like
6 he wanted to kill me.  And the fact that I
7 could not have engaged him, even if I had my
8 pistol out, I could not engage him because, for
9 one, the ambulance was in the middle of this
10 street right here (indicating).  They were in
11 the middle of the street.
12          My training told me to not engage
13 him.  Because ambulance is here (indicating),
14 right here (indicating) now -- the ambulance is
15 back there (indicating); people at the house
16 are here (indicating); here's my vehicle
17 (indicating).  If I would have engaged him
18 there was a chance -- slight chance that those
19 bullets would have hit the ambulance and/or
20 innocent bystanders in the road.  And I was not
21 taking that chance because of -- I relied on my
22 training, and my training said do not fire due
23 to the fact of there was -- obviously you have

1 to know what's beyond your target, and I have
2 to account for every round that comes out of
3 that gun.  That's why I did not engage him like
4 that.
5          Now, if they weren't there, I
6 would have engaged him.
7    Q.    How many blows did you see
8 Channing Spivey, you say, how many times did he
9 strike Adcock with any part of his body?
10          MR. HOWARD:  Objection.  Asked
11 and answered.
12    A.    I answered that earlier.  I said
13 at least two, three -- at least two to three
14 with his fists, with his bloody fists.
15    Q.    Okay.  Any other assault of any
16 sort other than striking two or three blows
17 with his fist?
18    A.    No.
19    Q.    I'm sorry?
20    A.    No.
21    Q.    Okay.  Were they full force
22 blows?
23    A.    Yes.

30 (Pages 114 - 117)

Page 118

1    Q.    Okay.  Other than firing his
2  weapon at Mr. Channing Spivey, did Adcock do
3  anything else to -- if you want to call -- to
4  fight back, resist what you say was Mr.
5  Spivey's attack on him?
6    A.    Nope.
7    Q.    Okay.  He didn't attempt to
8  strike any blows himself?
9    A.    Nope.
10    Q.    Didn't attempt to tackle him or
11  take him down?
12    A.    Nope.
13    Q.    You were right there available,
14  also, to have helped; correct?
15    A.    Not the way that happened, no.
16    Q.    You weren't there?
17    A.    Oh, I was there.  I was there.
18    Q.    Okay.
19    A.    But what I'm saying is, as far as
20  what you're referring to, no.
21    Q.    Wait a minute.  Wait a minute.
22  You weren't there --
23    A.    No, sir, I was --

Page 119

1    Q.    Listen to the question, please.
2  You weren't there, available to assist, if
3  there had been a physical altercation between
4  Adcock and Spivey?
5    A.    Okay.
6    Q.    Yes or no?  You were there or you
7  were not there to assist?
8    A.    Yes, I was there.
9    Q.    Okay.  Thank you.
10        Do you have a reason why you did
11  not assist?
12    A.    Well, yeah.
13    Q.    Why?
14    A.    Because from the time that Mr.
15  Spivey hit the driveway, it was over within
16  seconds, which, in turn, when they were so skin
17  to skin, and he was up like this (indicating),
18  he was like this (indicating), I'm not going to
19  intervene in between what's going on there,
20  because then there was a possibility that Mr.
21  -- excuse me, Captain Adcock would have shot
22  me.
23        It was over that quick.  There

Page 120

1  was no him way off and then started running,
2  no.  It was over that quick.  From the time he
3  hit the driveway until the time it was over,
4  I'd say less than thirty seconds.
5    Q.    Okay.  Tell me everything that
6  you heard said by anybody out there at the
7  scene, after Mr. Spivey came into the yard and
8  started to approach the two of y'all?
9    A.    I've already answered that.  I
10  told you, he told -- I told you we was giving
11  verbal commands to get on the ground --
12    Q.    Okay.
13    A.    -- both of us; he refused to do
14  so; and he's jogging up now, and he's refusing;
15  and then he just -- Mason put it like -- I keep
16  explaining this, put his arm up, said, no,
17  don't do it, don't do it, and then --
18    Q.    Who said don't do it?
19    A.    That would be Mason.
20    Q.    Okay.
21    A.    And I believe I heard him call
22  something, which, in turn, it was probably his
23  name.  And they were skin on skin, and then

Page 121

1  he's throwing -- hitting Mason as hard as he
2  can, and then the shots rang out.
3    Q.    Okay.
4    A.    And I couldn't have engaged him
5  in that aspect right there because of the
6  position of where I was, I was facing on a .45,
7  which, in turn, if I would have shot Mr.
8  Spivey, it would have went into his house where
9  his wife and children were.
10    Q.    That's a brick wall there,
11  there's no windows there, is there?
12    A.    It doesn't matter, sir.  That
13  brick wall, those rounds can still go through
14  brick.
15    Q.    Is the whole of that wall, that
16  would be the -- that would be the, I guess,
17  south-facing wall more or less?
18    A.    Right.
19    Q.    That whole wall there is brick;
20  right?
21    A.    I don't know.
22        MR. MCDERMOTT:  If you know, you
23  know.

31 (Pages 118 - 121)

Page 122

1    A.    I do not know.
2    Q.    Let's take a look at the
3 photographs. I'm showing you Plaintiff's
4 Exhibit 11. You're talking about out here
5 (indicating); correct?
6    A.    That's correct.
7    Q.    Okay. So that whole wall there
8 is a brick wall, right, and a chimney?
9    A.    That's what's it appears to be,
10 yes.
11    Q.    Is that correct?
12    A.    Yes.
13    Q.    Okay.
14    THE WITNESS: Is he still on the
15 phone?
16    MR. MCDERMOTT: Yep.
17    THE WITNESS: Okay.
18    Q.    I'm showing you Plaintiff's
19 Exhibit 11 again.
20    A.    Okay.
21    Q.    The area that you're talking
22 about where this occurred is in here
23 (indicating); correct?

Page 123

1    A.    No. Up here (indicating).
2    Q.    All right.
3    A.    Nowhere back here (indicating).
4    Q.    All right.
5    A.    It was more towards the back
6 porch.
7    Q.    Okay. Did you know -- You knew
8 Adcock before the shooting, of course; correct?
9    A.    Yes.
10    Q.    And but you only knew him through
11 interaction between the two law enforcement
12 agencies?
13    A.    Yes.
14    Q.    How many times had you dealt with
15 Adcock previously, would you estimate?
16    A.    Oh, I don't know. Dozens of
17 times.
18    Q.    Okay. Did you know him before
19 you went to work for the sheriff's department?
20    A.    No.
21    Q.    Okay. And the only way you knew
22 him through -- after you went to work for the
23 sheriff's department is through the

Page 124

1 interactions between the two agencies?
2    A.    Well, I mean, I had applied for
3 Luverne PD.
4    Q.    Okay.
5    A.    And he did my interview. But he
6 suggested that Crenshaw County was hiring. But
7 that was the only time I've ever -- that I saw
8 him before that.
9    Q.    Okay. Did you have any sort of
10 opinion about Mason Adcock as a police
11 officer --
12    A.    No.
13    Q.    -- before the shooting?
14    A.    No.
15    Q.    Okay. Did you have -- Forgive
16 me, I want to make certain I cover this. I
17 want to make certain I know this answer,
18 though. Did you speak to Adcock on May 27th,
19 the day of the shooting, before the shooting?
20    A.    No.
21    Q.    Okay. Did he speak to you, give
22 you any information, or speak to you before the
23 shooting?

Page 125

1    A.    No.
2    Q.    Okay. And you've told me already
3 about everything that you heard Mason Adcock
4 say after he came out of his house just before
5 the shooting; correct?
6    A.    Yes.
7    Q.    And if I recall, that's only
8 telling him to get down and then saying don't
9 do it a couple of times?
10    A.    We were giving verbal commands to
11 get on the ground.
12    Q.    Get on the ground.
13    A.    And he's refusing verbal
14 commands. And he kept -- He charged at Captain
15 Adcock. And then there was skin on skin, and
16 when he put his arm up, he's saying, don't do
17 it, don't do it, and that's when the shots rang
18 out.
19    Q.    Okay.
20    A.    And it was over in less than
21 thirty seconds from the time he hit the
22 driveway.
23    Q.    Again, you said you couldn't get

32 (Pages 122 - 125)

Page 126

1 a piece of paper between them.  Adcock shot him
2 at point-blank range, would you say?
3     A.     Yeah.
4     Q.     Okay.  And you didn't hear
5 Channing Spivey say anything after he came up
6 the driveway and began to approach?
7     A.     Nothing was said.
8     Q.     Okay.  Did you speak to Adcock on
9 May 27, the day of the shooting, after the
10 shooting?
11     A.     After the shooting was over, he
12 fell to his knees, and I looked at him and
13 said: I'm so sorry, you know, and he said:
14 Why didn't you take care of this out there?
15 Why did you bring it to my house?  And that was
16 all that he said.  Then he told me to shut up.
17         And I called -- At that point, I
18 got on the phone with my PBA representative --
19 Actually, I called PBA, and they sent a
20 representative out.  But after the shooting
21 happened, I got on the radio and said:  Shots
22 fired.  Shots fired.  Subject is down.  I need
23 EMS, is what I said.

Page 127

1         And I never -- I don't think I
2 even heard any reply to that because of the
3 area of where we were in, the radios that they
4 have were outdated.  Bad area for radios.
5     Q.     Did you hear Adcock say anything
6 to anyone else after the shooting?
7     A.     I was never near him after that.
8     Q.     How long were you in his presence
9 after the shooting?
10     A.     Maybe a minute or two.
11     Q.     Where did he go and where did you
12 go?
13     A.     I walked off over by his garage,
14 and we got on the phone with PBA.
15     Q.     Where did he go?
16     A.     I couldn't tell you.
17     Q.     Did you ever see him again that
18 night?
19     A.     When SBI showed up on scene, I
20 don't know the agent's name who was there, said
21 we need to get you and Captain Adcock out of
22 here.  And so that's when we all -- and I had
23 to wait for my attorney, Mr. Teague, and that's

Page 128

1 when we all went to the sheriff's office and
2 gave our accounts of what happened.  But I was
3 in a separate room, nowhere near Mr. Adcock.
4     Q.     Did you give a statement down
5 there?
6     A.     I gave -- Talked to my PBA
7 attorney --
8     Q.     Mr. Teague?
9     A.     -- Mr. William Clay Teague.  And
10 he asked me what happened, and I told him the
11 chain of events that happened.
12     Q.     Only to your attorney, you didn't
13 give anybody else a statement?
14     A.     No.
15     Q.     What I said is correct?
16     A.     Except for SBI, yes, that's it.
17     Q.     SBI a month later down in --
18     A.     Yes.
19     Q.     Okay.
20     A.     Just my attorney and SBI.
21     Q.     All right.  Let me let you look
22 at photographs -- the Plaintiff's Exhibits --
23 I'll turn to them again for you.

Page 129

1         Look at that series of
2 photographs (indicating).
3     A.     Okay.
4     Q.     That's photographs of Adcock.
5     A.     Okay.
6     Q.     Look at those, I think there's
7 about eighteen photos there.  Will you take a
8 look at those, and tell me when you've had a
9 chance to review them.
10     A.     (Witness complies.)  Okay.
11     Q.     Adcock testified that he took
12 these -- some of these photographs immediately
13 after the shooting.  Did you see those
14 photographs being taken?
15     A.     Yes.
16     Q.     Okay.  Who was taking them?
17     A.     I believe that was Mr. McDermott.
18     Q.     And where was that?
19     A.     At the sheriff's office.
20     Q.     Okay.  He testified that he took
21 the photographs -- or the photographs were
22 taken by a Luverne rescue squad member.  You
23 don't recall that?

33 (Pages 126 - 129)

1    A.    I couldn't tell you.

2    Q.    Okay.  But you remember Mr.

3 McDermott taking some photographs?

4    A.    Yes.

5    Q.    Okay.  And how long after that

6 was that?

7    A.    I -- Honestly, I couldn't tell

8 you.  Because the fact that when Chief Deputy

9 Dickey showed up on scene, he instructed me to

10 start a crime scene log, and so that's what I

11 was doing.  I was doing as I was instructed to

12 do by my chain of command, so I wasn't paying

13 attention as to who was where.

14    Q.    But you saw Mr. McDermott on-site

15 taking the photographs?

16    A.    He was at the sheriff's office,

17 yes.

18    Q.    This was after y'all were removed

19 from the scene?

20    A.    Yes.

21    Q.    All right.  Do you know how long

22 after the incident, the shooting incident,

23 those photographs were taken that you just

1 looked at?

2    A.    No.

3    Q.    I'm sorry?

4    A.    No.  I wasn't looking at -- I

5 wasn't looking at a watch.  I was preoccupied

6 with doing what I was advised to do.

7    Q.    Do you see any serious injuries

8 to Mason Adcock in those photographs?

9    A.    I see -- From what I saw, I mean,

10 I saw blood on his forehead, on the side of his

11 head right here (indicating), close to his

12 temple; and I saw blood on the side of his

13 neck.

14    Q.    I asked you did you see any

15 serious injuries to Mason Adcock?

16    A.    No.

17    Q.    Did you see any injuries to Mason

18 Adcock in those photographs?

19        MR. MCDERMOTT:  Object to the

20 form.  Asked and answered.

21    A.    All I saw was it looked like,

22 from when he pulled down a bloody lip, I guess.

23    Q.    Other than that, did you see any

1 injuries to Mason Adcock in the photographs?

2    A.    No.

3    Q.    Not any cuts shown in the

4 photographs?

5    A.    I mean he had a Band-Aid on his

6 finger.

7    Q.    Okay.  Are there any puncture

8 wounds in the photographs that you saw?

9    A.    I don't see nothing.

10    Q.    Did you see any laceration wounds

11 in the photographs that you saw?

12    A.    I couldn't tell by photographs.

13    Q.    Did you see anything that you

14 identified as a laceration wound in the

15 photographs?

16    A.    No.

17    Q.    Did you see any incision wounds

18 in the photographs?

19    A.    No.

20    Q.    Do any of the photographs show

21 Adcock's skin having been broken?

22    A.    He had a Band-Aid on the finger.

23 I don't --

1    Q.    Other than that?

2    A.    I can't tell by photographs.

3    Q.    Did you see any scabs?

4    A.    I can't tell.  I mean --

5    Q.    Did you see any bruises?

6    A.    The blood could look like scabs,

7 I don't know.

8    Q.    Do you know whose blood that was?

9    A.    I'm guessing Mr. Spivey's.

10    Q.    Okay.

11    A.    His hands were bloody, his fists

12 were bloody, because he just punched -- caved

13 in the windshield of an ambulance.

14    Q.    Did you see -- You didn't see any

15 bruises on Mason Adcock?

16    A.    I'm not a medical expert, but I

17 didn't -- I mean -- I didn't inspect him, so I

18 couldn't have --

19    Q.    You can't testify that you saw

20 any bruises?

21    A.    I can't testify to anything what

22 you're asking.

23    Q.    About any bruises?

34 (Pages 130 - 133)

Page 134

1    A.    I'm not a medical expert.
2    Q.    Does it take a medical expert to
3  identify a bruise?
4    A.    Well, sir, I'm --
5    Q.    Does it take a medical expert --
6    A.    No.
7    Q.    Okay.  Did you see a bruise?
8    A.    I wasn't looking at Mr. Adcock.
9    Q.    You didn't see one, then?
10   A.    I wasn't looking at him.
11   Q.    Well, you looked at those
12 photographs, do you see any bruise in that
13 photograph?
14   A.    I see a bruised, bloody lip.
15   Q.    Other than that?
16   A.    I mean, and then blood on his
17 face and neck.
18   Q.    I asked you about bruises.
19   A.    I don't see bruises, sir.
20   Q.    Okay.  Good.  And you didn't see
21 blood, other than what you think was likely to
22 have been Channing Spivey's blood?
23   A.    Well, his fists were dripping

Page 135

1  blood, so, yeah, I would say so.
2    Q.    Okay.  Did you see any injury at
3  all to Mason Adcock?
4    A.    As far as photographs?
5    Q.    Or out there at the scene at the
6  time, or in the photographs.
7    A.    Again, at the scene, I was not
8  that close to Captain Adcock.  We separated.  I
9  went over to do what I had to do, and he did
10 whatever he was doing; I was not near him at
11 any point in time until I was advised that SBI
12 showed up on scene and said we need to get
13 y'all out of here in case media shows up.
14   Q.    So the answer to my question is
15 no, you never saw any injuries to Mason Adcock?
16   A.    I wasn't paying attention --
17   Q.    I didn't ask you whether you were
18 paying attention.  I asked you did you see --
19   A.    I just answered that.
20   Q.    You didn't see any, did you?
21   A.    I wasn't looking at him.
22   Q.    I didn't ask you whether you were
23 looking or not.  Did you see any --

Page 136

1    A.    For me to see, sir, Mr. Sikes, I
2  would have to actually be looking at him, to be
3  able to see any injuries on him.
4    Q.    So the answer is no, you didn't
5  see any?
6    A.    I was not looking at him.
7    Q.    I know.  So you didn't see any,
8  did you?
9    A.    It was dark.
10   Q.    Again --
11   A.    When the situation was over, it
12 was dark.
13   Q.    So the answer is, you did not
14 observe any injuries to Mason Adcock?
15   A.    No.  Because it was dark.
16   Q.    Okay.  Are you in good health,
17 sir?
18   A.    Yes.
19   Q.    How old -- Again, what's your
20 date of birth, please, sir?
21   A.    September 8, 1974.
22   Q.    So you would have been forty-six
23 years old?

Page 137

1    A.    At the time of this incident, I
2  was forty-five.
3    Q.    Okay.  Not quite forty-six, okay.
4         How long after the shooting was
5  it before anyone else came up there in the area
6  where the shooting occurred?
7    A.    I wasn't -- I wasn't even really
8  paying attention.  I was off --
9    Q.    Who was the first person that
10 came up there after the shooting?
11   A.    I couldn't tell you.
12   Q.    Who is the first person you
13 remember being there after the shooting?
14   A.    First one that I seen was -- I
15 mean, the only -- I mean, was Chief Dickey.
16   Q.    That would have been how long
17 after, in round terms?
18   A.    I don't know.  I mean, I was off
19 on the phone with -- trying to get PBA -- my
20 PBA attorney.  I was not -- I was preoccupied
21 with myself.
22   Q.    Okay.
23   A.    Okay.  I wasn't paying attention

35 (Pages 134 - 137)

1 to what was going on beyond myself.

2 Q. Who called EMS?

3 A. I requested EMS. But the thing

4 was, EMS couldn't respond because they were in

5 the middle of the road disabled because of Mr.

6 Spivey's actions and put -- when he was caving

7 in the windshield with his fist, glass shards

8 went into the paramedic driver's eyes and he

9 could not see, he was blind, so he couldn't

10 even drive the vehicle to even get there after

11 it was over. They had a second EMS --

12 Actually, they made it up there, but they went

13 real slow. They made it to the driveway, and

14 then a second EMS showed up after the fact, and

15 they were attending to the driver of the EMS

16 vehicle because he had glass shards in his

17 eyes.

18 Q. You called Mr. McDermott or you

19 called PBA?

20 A. I called the 800-number on my

21 PBA.

22 Q. Okay. What phone did you make

23 that call on?

1 A. My cell phone.

2 Q. Is that one that's issued to you

3 by the sheriff's department or is that your

4 personal phone?

5 A. That was my -- I believe that was

6 going to be the one from the sheriff's office.

7 Q. What's the number for the

8 sheriff's office?

9 A. I don't know.

10 Q. You don't know your phone number?

11 A. I had to give it back, sir.

12 Q. I understand that.

13 A. I don't know the number for it

14 offhand. It's been a minute. I don't --

15 Q. I'll give you a minute to think

16 about it.

17 A. I don't know the number. You can

18 ask the sheriff, the sheriff would know.

19 Because all my equipment and everything got

20 reassigned to the new person that they hired.

21 Q. Who is the sheriff's -- Who is

22 their cell phone provider?

23 A. As far as -- I don't know. I

1 really don't. I don't know.

2 Q. You started to say a name, as far

3 as you --

4 A. No. I don't know. Because, I'm

5 not -- I mean --

6 Q. Do you have a personal cell

7 phone?

8 A. Yes, I do.

9 Q. Did you have it with you at the

10 time?

11 A. Yes.

12 Q. What is your phone number?

13 A. 334-208-2484.

14 Q. 334 what?

15 A. 208-2484.

16 Q. Do you have more than one cell

17 phone number?

18 A. No.

19 Q. Okay. And who is your cell phone

20 provider?

21 A. Verizon.

22 Q. Did you call -- After the -- You

23 made, we know, at least two calls after the

1 shooting incident; correct?

2 A. I don't know. I wasn't -- I

3 really don't know.

4 Q. You told us about two.

5 A. I know I called the PBA.

6 Q. I know.

7 A. That's all I remember.

8 Q. I thought you said you called EMS

9 also?

10 A. On my radio.

11 Q. Okay. On your radio?

12 A. I called my dispatch, and

13 requested EMS after the shooting.

14 Q. Okay.

15 A. I didn't use the phone. I called

16 EMS by radio. I requested EMS by radio.

17 Q. But that was after you called

18 your PBA representative?

19 A. No. That was before. When the

20 shooting was done, I said: Shots fired.

21 Subject's down. I need EMS. And then I went

22 and called my PBA rep.

23 Q. Okay. Did you make any calls on

36 (Pages 138 - 141)

Page 142

1  your radio or on your phones, either of your
2  phones, to anybody else?
3      A.    Not to my knowledge.
4      Q.    Who else did you speak to that
5  night after the shooting?
6      A.    Only one that I talked to was
7  Chief Dickey.
8      Q.    Did he record your conversation?
9      A.    No.
10     Q.    Where did that conversation
11  occur?
12     A.    After he checked on --
13     Q.    No. Where?
14     A.    It was at the scene.
15     Q.    Back around on the side of
16  Mason's house?
17     A.    Well, yeah, no. It was in the
18  driveway.
19     Q.    Okay. Was anyone else there
20  present with you and Chief Dickey?
21     A.    There was Lieutenant Crowley.
22     Q.    Okay. Anybody else?
23     A.    You had the ambulance crew.

Page 143

1      Q.    Was this the ambulance crew
2  from --
3      A.    There were two ambulance crews
4  there.
5      Q.    Hold on a second.
6          Was the ambulance crew that was
7  there when this conversation was occurring, was
8  that the original ambulance crew that came or
9  was that the ambulance crew, the second one
10  that came?
11     A.    Nope. The original. And then
12  the second one came right after the fact.
13     Q.    All right. Do you know the names
14  of anybody on the ambulance crew?
15     A.    Not offhand. I know one by a
16  nickname of Tiny. Kind of big black guy with
17  dreads, that's all I know. He was the driver.
18  I just know him by the nickname of Tiny.
19     Q.    And you didn't know the other --
20  other guy?
21     A.    No. I mean, I've interacted with
22  him throughout my work shifts as far as when
23  they would respond to things, but I don't

Page 144

1  recall his name.
2      Q.    Is his name Tim White, by any
3  chance?
4      A.    That could be it.
5      Q.    Okay. All right. Did the
6  Crenshaw County Sheriff's Department ever make
7  any sort of investigation of the shooting
8  incident?
9      A.    I don't know.
10     Q.    Did they ever ask you any
11  questions about it?
12     A.    No.
13     Q.    Who generally handles that for
14  the sheriff's department?
15     A.    That would be Lieutenant Crowley.
16     Q.    But you were never interviewed by
17  Lieutenant Crowley?
18     A.    No.
19     Q.    The four or five people that
20  you're talking about that you say were in the
21  driveway there, I believe there's going to be
22  testimony that one of them was Channing
23  Spivey's brother, Wesley. Did you know Wesley

Page 145

1  Spivey?
2      A.    I don't know -- You asked me that
3  earlier. I know nobody. I knew nobody. I've
4  never interacted with nobody at that residence
5  before.
6      Q.    There's going to be testimony
7  also that there was one of the folks that was
8  there was Justin Robinson. Do you know Mr.
9  Robinson?
10     A.    I already answered that. I don't
11  know anybody. Nobody. Nobody that lives at
12  the residence, I didn't know who was there. I
13  know nobody.
14         All I know is there was some
15  folks there that were at that residence,
16  sitting -- standing and sitting outside. I
17  don't know anybody.
18     Q.    The woman that you identified
19  that had came out and went down to -- and told
20  you that Mason Adcock lives down the street,
21  there will be testimony her name was Zanna
22  Bloodsworth. Did you know her prior to the --
23     A.    I just testified to that. I just

37 (Pages 142 - 145)

1 staid I didn't know anybody.  You've asked that
2 same question with three different people, and
3 I've answered it the same way three different
4 times -- three of the same times.
5          I didn't know anybody.  If you
6 asked me if she was there, I couldn't tell you,
7 because I don't know.
8     Q.     Tell me when you're through.
9     A.     I'm waiting on you.
10    Q.     No, sir.  You were going on at
11 length about complaining.
12    A.     No.  No.  No.  I'm not.  I've
13 said it like -- You asked me the same question
14 about these individual people at the residence,
15 and I've already said, I did not know anybody.
16 Never dealt with nobody.
17    Q.     Tell me when you're through.
18    A.     Same thing is you keep asking me
19 the same questions about other people.
20    Q.     Tell me when you're through.
21    A.     I've been through.  It's getting
22 repetitive.
23    Q.     Did you ever -- Was there ever

1 any sort of indication of hostility from any of
2 these people that you say were there in the
3 driveway?
4     A.     I wasn't paying attention.
5     Q.     Did you ever -- Did you note any
6 of the hostility?
7     A.     Only Mr. Spivey.
8     Q.     Okay.  But all of what you did
9 hear is that they were trying to dissuade or
10 cause Mr. Spivey to cease any kind of offensive
11 behavior toward you or anybody else; correct?
12    A.     Yes.
13    Q.     Okay.  Did you have any reason to
14 believe that they would not help had you sought
15 their help?
16    A.     Yes.
17    Q.     What was that?
18    A.     Because if they would have
19 intervened, we wouldn't be sitting here right
20 now.
21    Q.     No, sir.  That wasn't my
22 question.
23          Did they say anything to indicate

1 to you that they would not help?
2     A.     There was nothing indicated, no.
3     Q.     Okay.  Have you had any
4 conversation with Mason Adcock since the day of
5 the shooting?
6     A.     No.
7     Q.     Have you seen him?
8     A.     No.
9     Q.     Okay.  The job you have now, is
10 that a law enforcement job?
11    A.     Yes.
12    Q.     And give me, again, it's Air
13 Force?
14    A.     Maxwell Air Force Base.
15    Q.     Okay.  What's your title, job
16 title?
17    A.     I'm a police officer.
18    Q.     And I think you said you've been
19 a police officer for about seven years?
20    A.     Yes.
21    Q.     Do you like the job?
22    A.     Yes.
23    Q.     Did anyone force you to become a

1 policeman?
2     A.     No.
3     Q.     You chose that yourself; correct?
4     A.     Yes.
5     Q.     And the job of policeman, you
6 knew, requires, on occasion, you've got to use
7 force against other human beings; correct?
8     A.     Yes.
9     Q.     And there's a variety of
10 different ways -- We talked about that in the
11 continuum of force, there's a variety of
12 different ways that force is applied; correct?
13    A.     Yes.
14    Q.     And you named some of the weapons
15 or the equipment that you applied that force
16 with, pepper spray, taser, baton, and a
17 firearm?
18    A.     Yeah.  That's what I had that
19 day.
20    Q.     Okay.  And when you decided to go
21 into law enforcement, and since you've stayed
22 in law enforcement, you know that that's part
23 of the job, that on occasion you're going to

38 (Pages 146 - 149)

Page 150

1  run into noncompliant, unruly, rowdy, sometimes
2  violent people; correct?
3      A.    Correct.
4      Q.    And the right to legally use
5  force against other citizens is one of the
6  things that's unique to being a policeman,
7  isn't it?
8      A.    Yes.
9      Q.    Can you name me another job where
10  you're given a gun by your employer, and you're
11  legally authorized to use it against other
12  citizens?
13          MR. MCDERMOTT:  Objection.
14  Relevance.
15          MR. HOWARD:  Object to the form.
16      Q.    Can you name me another
17  profession?
18      A.    Armored car driver.
19      Q.    You think armored car drivers are
20  licensed to use a weapon against other
21  citizens?
22      A.    If they try to rob them, yeah.
23      Q.    Every citizen has got that right

Page 151

1  if you're trying to be robbed.  I'm talking
2  about in circumstances where they are not
3  assaulted or attempting to be robbed, is there
4  another job you're given a gun by your employer
5  and you're legally authorized to use it against
6  other citizens.  Can you think of one?
7      A.    There is armed security.  I mean,
8  that's -- that's --
9      Q.    Anything else you want to try to
10  name?
11      A.    No.
12      Q.    Part of the job as a sheriff's
13  deputy is you do patrolling; correct?
14      A.    Yes.
15      Q.    How much of your job was taken up
16  in the spring and May of 2020 was going on
17  patrol, patrolling?
18      A.    The entire time.
19      Q.    Okay.  And literally patrolling
20  is that you were going out looking for trouble
21  and troublemakers; correct?
22      A.    Not always.
23      Q.    What else are you doing on

Page 152

1  patrol?
2      A.    You're just driving around making
3  your presence known --
4      Q.    Right.
5      A.    -- trying to deter any type of
6  criminal activity.
7      Q.    That's exactly right.  You're
8  looking for trouble out there and
9  troublemakers; correct?
10      A.    Trying to deter any criminal
11  activity.
12      Q.    Exactly.  And where you see it,
13  your job is to intercede; correct?
14      A.    Yes.
15      Q.    And that requires the use of
16  force, correct, a lot of times?
17      A.    If it requires it.
18      Q.    Okay.
19          MR. HOWARD:  Griff, lunch is
20  here.
21          MR. SIKES:  All right.  Do you
22  want to do that?
23          MR. HOWARD:  That will be fine.

Page 153

1          (Recess taken.)
2          (Whereupon, Plaintiff's
3          Exhibits 13-A and 14-A were
4          marked for identification
5          purposes.)
6          MR. SIKES:  For the Record, I'm
7  going to put in -- I identified these two
8  exhibits that had been used earlier, I've got
9  blow-ups of them here, they were 13 and 14.
10  And Mr. Penny has marked on them, and I'm going
11  to make them exhibits to his deposition as 14-A
12  and 13-A.  And I'll have them blown down to be
13  able to put them in a regular letter size.
14          COURT REPORTER:  And you're going
15  to retain the full size?
16          MR. SIKES:  Yes.  Uh-huh.
17      Q.    During the -- all these events,
18  on the evening of May 27, Mr. Spivey's head had
19  been shaved, and there was the remainder of a
20  scar running from the top of his head to right
21  about the start of his forehead there.
22          Do you recall seeing that in any
23  of this?

39 (Pages 150 - 153)

1     A.     No.

2     Q.     Have you ever had any
3 psychiatric/psychological treatment, consulted
4 a counselor?

5     A.     For this incident, yes.

6     Q.     Before that time?

7     A.     No.

8     Q.     Okay.  But you've seen a
9 counselor since this?

10     A.     Yes.  I was advised to from the
11 sheriff.  He set it up.

12     Q.     All right.  And what is the name
13 of the counselor?  Who is the counselor?

14     A.     That was a Mr. Tim Faulk, who is
15 a certified trauma specialist.

16     Q.     And how many times have you seen
17 him?

18     A.     I'd say four, maybe five times.

19     Q.     All right.  And when was the last
20 time?

21     A.     It was the Tuesday of -- I think
22 it was July 6, whichever the -- Let me look.  I
23 think it was July -- Might have been July 6,

1 July 7, let me see.

2     Q.     Was that the date of the day
3 where you had the interview in Dothan?

4     A.     No.

5     Q.     What was that -- July 6th, what
6 was that date?

7     A.     It was a Monday, I saw him --

8     Q.     Something else, I thought,
9 occurred on July 6, we talked about earlier?

10     A.     No.  It was in June.  June 29 is
11 when I had my deposition with SBI.

12     Q.     Okay.  And you saw --

13     A.     Last time I saw Mr. Faulk was on
14 July 7th.

15     Q.     Okay.  Let me get you to do this,
16 if you would, please, sir.  I have remarked
17 what was Plaintiff's Exhibit 14, I have
18 remarked it as 14-A.  If I understood your
19 testimony earlier, it was -- you tried to -- as
20 you came down from the Spivey house, you came
21 down Glenwood, you came down and were trying to
22 keep a constant distance -- or a distance
23 between you and Channing Spivey; correct?

1     A.     Correct.

2     Q.     And you came on down and turned
3 in to Mr. Adcock's driveway?

4     A.     I didn't turn when I got to the
5 driveway.  I felt like I was close enough to
6 the driveway that I turned and took off
7 running.  So I ran for a second.  I mean, I
8 didn't just turn into the driveway, if that's
9 what you're asking.

10     I was backing up, and when I felt
11 like I was close enough to captain Adcock's
12 driveway, I turned my entire body and ran to
13 the driveway.

14     Q.     I guess I'm having a hard time
15 understanding the difference between what I
16 said and what you said.

17     Let me show you -- In any event,
18 you came down Glenwood Road, and at some point
19 you stopped and turned around and ran --

20     A.     I was still walking backwards.

21     Q.     I heard that.

22     A.     Then I holstered my weapon,
23 turned, and took off running.

1     Q.     I thought that's what I just
2 said.  But, again --

3     A.     You said you were confused.

4     Q.     I am confused.  But I say
5 something that I think you have just told me,
6 and then you say the same thing to me again.

7     All right.  Let's do it this way:
8 Do you recognize Plaintiff's Exhibit 5 and 6?
9 Is that the roadway that you came down, up the
10 hill toward Mr. -- there's a slight rise there
11 up toward Adcock's house?

12     A.     Yes.

13     Q.     Okay.  You see there's a
14 guardrail along there, on the sides, both sides
15 of the road?

16     A.     Yes.

17     Q.     Okay.  What I'd like for you to
18 do, if you would, please, sir, here is
19 Plaintiff's Exhibit 14-A (indicating).

20     A.     Okay.

21     Q.     Take this marker and, again,
22 trace the route -- Were you coming down on --
23 This would be the -- again, this would be the

40 (Pages 154 - 157)

Page 158

1  -- it looks like the east side of the road
2  (indicating) and west side (indicating) of the
3  road here.  Were you coming down the east side
4  or the west side?
5      A.    I was in the middle of the
6  street.
7      Q.    Oh.  You came down the middle of
8  the street or road?
9      A.    Yes.  I was facing -- As you're
10 looking at your little map there, I was facing
11 directly toward Luverne, and I had my back
12 toward the City of Glenwood.
13     Q.    Okay.
14     A.    And I was in the middle of the
15 street.
16     Q.    All right.  Where did you stop
17 and turn and run?
18     A.    I can't tell you that.
19     Q.    Approximately?
20     A.    I couldn't tell you.  It was
21 dark.  I don't know.
22     Q.    Okay.
23     A.    I just, in the heat of the

Page 159

1  moment, turned and took off running.
2      Q.    All right.  What is the route
3  that you took from the roadway to the house?
4  Can you trace that for me?
5      A.    Straight up the driveway.  And I
6  got past here (indicating) and went straight
7  over this way (indicating).  That's essentially
8  where I was.
9      Q.    All right.  Draw that in there
10 and trace the route you took.
11     A.    Okay.  (Witness indicates.)  And
12 then straight up this way.
13     Q.    I'm going to make this a little
14 darker where it will show up better, if that's
15 all right.
16           Is that all right?
17     A.    (Witness indicates.)
18     Q.    All right.  And I think the
19 circle right there, that's your position when
20 the shooting occurred; is that right?
21     A.    Yes.
22     Q.    And the X that is shown right
23 there, that was where Adcock was standing when

Page 160

1  the firing started; correct?
2      A.    Yes.
3      Q.    Okay.  I had asked you to put CS
4  there, and it looks like the C kind of got
5  closed, it looks a little more like OS.  But
6  the CS or OS right there, that's where Channing
7  Spivey was when the shooting began; correct?
8      A.    Correct.
9      Q.    How long after Adcock came out of
10 his house did the shooting begin?
11     A.    Less than thirty seconds.
12     Q.    Okay.  What was the distance
13 between you and Channing Spivey?  You said you
14 tried to maintain a sort of buffer distance
15 between the two of you as you came up the
16 roadway?
17     A.    Yes, sir.
18     Q.    Five yards, ten yards, twenty
19 yards?
20     A.    I -- I couldn't tell you.  I
21 mean, it was probably from me to the gentleman
22 down there.
23     Q.    Okay.  All right.  And that --

Page 161

1  that maintained --
2      A.    No.  The more I was trying to get
3  distance away, the more he was --
4      Q.    He kept closing the gap?
5      A.    He kept closing it.
6      Q.    All right.  Okay.
7            Did you turn and run from the
8  roadway or were you in the driveway when you
9  turned?
10     A.    From the roadway.
11     Q.    Somewhere in the road?
12     A.    Somewhere in the road I felt like
13 I was close enough to his driveway, that I
14 turned and took off running, in the roadway.
15     Q.    And where were you along the
16 driveway when Adcock came out of the house, do
17 you know?
18     A.    I do not know.
19     Q.    Okay.
20     A.    Maybe right where that bush is.
21     Q.    Okay.  About where this -- the
22 smaller of the bushes right here (indicating)?
23     A.    There was probably a couple of

41 (Pages 158 - 161)

Page 162

```
 1  small trees right there.
 2      Q.    All right.
 3            (Off-the-Record discussion
 4             was held.)
 5      Q.    What is the route that Channing
 6  Spivey took?  Is it the same route that you
 7  took?
 8      A.    No.
 9      Q.    All right.  I'm going to ask you
10  to draw in green, show me the route, as you
11  recollect, that Channing Spivey came from the
12  roadway, trace his path from the roadway to
13  the --
14      A.    I'll try to -- I mean, when I
15  turned around, I seen him come in the driveway
16  and he went around here (indicating), and came
17  straight up (indicating).
18      Q.    Okay.  His route is shown in
19  green?
20      A.    (Witness nods head in the
21  affirmative.)
22      Q.    Yes?
23      A.    Yes.
```

Page 164

```
 1  afternoon prior to the shooting?
 2      A.    No.
 3      Q.    I think you told me you did not;
 4  correct?
 5      A.    No.
 6      Q.    That's not by radio, not by
 7  phone, not in person?
 8      A.    Nope.  Nope.  I don't have his
 9  phone number.
10            MR. SIKES:  Okay.  I think that's
11  all.
12            MR. HOWARD:  I don't have any.
13            MR. MCDERMOTT:  I don't have any.
14            Clay, do you have any questions?
15            MR. TEAGUE:  I don't.
16  (The deposition was concluded at 1:23 p.m.,
17   February 8, 2021.)
18
19
20
21
22
23
```

Page 163

```
 1      Q.    Okay.  Earlier you had said there
 2  was no difference in the intervals of the shots
 3  that Mason Adcock fired; correct?
 4      A.    Correct.
 5      Q.    And the fact that there wasn't
 6  any pause between them -- Is that what you
 7  meant, there was no pause between them?
 8      A.    That's exactly what I said.
 9      Q.    Okay.  So it was as quickly as
10  you can pull the trigger, sort of, that was how
11  the shots were fired?
12      A.    Yes.
13      Q.    And an automatic, you can fire
14  bam, bam, bam, bam, bam, like that?
15      A.    Semi-automatic --
16            MR. HOWARD:  Object to the form
17  as to automatic.
18      Q.    Yeah, semi-automatic.
19      A.    Semi-automatic.  Automatic is
20  illegal.
21      Q.    I want to make sure I'm clear
22  about this.  I think I asked you:  Did you
23  speak with Mason Adcock at any time that
```

Page 165

```
 1       REPORTER'S CERTIFICATE
 2  STATE OF ALABAMA,
 3  MONTGOMERY COUNTY,
 4       I, Angela Smith McGalliard, Registered
 5  Professional Reporter, Certified Realtime
 6  Reporter, Certified Court Reporter and
 7  Commissioner for the State of Alabama at Large,
 8  do hereby certify that the above and foregoing
 9  proceeding was taken down by me by stenographic
10  means, and that the transcript was produced by
11  computer aid under my supervision, and that the
12  foregoing represents a true and correct
13  transcript of the proceedings occurring on said
14  date and at said time.
15       I further certify that I am neither of
16  kin nor of counsel to the parties to the
17  action; nor in any manner interested in the
18  result of said case.
19       Signed the 10th day of February, 2021.
20
21
    ANGELA SMITH MCGALLIARD, RPR, CRR, CCR
22  AL CCR Lic. No. 98, Expires 9/30/2021
    Notary Expiration 8/13/2023
23
```