# Deposition of Westly Spivey

## February 10, 2021

## Callaway, etc. v. Adcock

## 2:20-cv-598-ECM-SRW

# Cite

866.993.0207
info@citedepos.com
www.citedepos.com



Westly Spivey

2/10/2021
1 (1 - 4)



Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3   NORTHERN DIVISION

4

5   CHANDA CALLOWAY, as Administrator
    of the Estate of Channing Lamar
6   Spivey, deceased,

7       Plaintiff,

8   Vs.                    CIVIL ACTION NO.
                           2:20-cv-598
9   MASON ADCOCK,

10      Defendant.

11

12      * * * * * * * * * * * * *

13

14      DEPOSITION OF WESTLY SPIVEY, taken pursuant to

15  stipulation and agreement before Pamela Wilbanks Owens,

16  Registered Professional Reporter, ACCR #391, and

17  Commissioner for the State of Alabama at Large, in the

18  Law Offices of Holtsford, Gilliland, Hitson, Higgins &

19  Howard, 4001 Carmichael Road, Suite 300, Montgomery,

20  Alabama, on Wednesday, February 10, 2020, commencing at

21  approximately 9:05 a.m.

22

23      * * * * * * * * * * * * *

Page 2

2       APPEARANCES

3

4   FOR THE PLAINTIFF:

5   Mr. Griffin Sikes, Jr.
    Attorney at Law
6   7515 Halcyon Pointe Drive
    Montgomery, Alabama  36117
7
    FOR THE DEFENDANT:
8
    Mr. Rick A. Howard
9   HOLTSFORD, GILLILAND, HIGGINS, HITSON & HOWARD
    Attorneys at Law
10  4001 Carmichael Road, Suite 300
    Montgomery, Alabama
11
    Mr. M. J. (Mickey) McDermott
12  THE LAW OFFICES OF MICKEY MCDERMOTT
    Attorney at Law
13  441 High Street
    Montgomery, Alabama  36104
14
    ALSO PRESENT:
15
    Ms. Chanda Calloway
16

17      * * * * * * * * * * * * *

18      EXAMINATION INDEX

19  BY MR. HOWARD . . . . . . . . . . . . . . . . 5

20      * * * * * * * * * * * * *

21

22

23

Page 3

1       PLAINTIFF'S EXHIBIT INDEX

2   1   10-page document from Alacourt with attached
        sections and rules from the Alabama Code    147

3

4       DEFENDANT'S EXHIBIT INDEX

5   1   Alacourt list of charges for Westly Spivey    26

6   2   Drawing of scene                             88

7   3   Photo of Mason's house and yard previously   123
        marked PX-10

8

    4   Photo of Mason's house and yard previously   123
9       marked PX-8

10  5   Photo of Mason's house and yard previously   123
        marked PX-11

11

12  6   Photo of Mason's house and yard previously   123
        marked PX-9

13

14      * * * * * * * * * * * *

15

16      STIPULATION

17      It is hereby stipulated and agreed by and

18  between counsel representing the parties that the

19  deposition of WESTLY SPIVEY is taken pursuant to

20  Federal Rules of Civil Procedure and that said

21  deposition may be taken before Pamela Wilbanks Owens,

22  Registered Professional Reporter, ACCR #391, and

23  Commissioner for the State of Alabama at Large, without

Page 4

1   the formality of a commission, that objections to

2   questions other than objections as to the form of the

3   question need not be made at this time but may be

4   reserved for a ruling at such time as the said

5   deposition may be offered in evidence or used for any

6   other purpose by either party provided for by the

7   Statute.

8       It is further stipulated and agreed by and

9   between counsel representing the parties in this case

10  that the filing of said deposition is hereby waived and

11  may be introduced at the trial of this case or used in

12  any other manner by either party hereto provided for by

13  the Statute regardless of the waiving of the filing of

14  the same.

15      It is further stipulated and agreed by and

16  between the parties hereto and the witness that the

17  signature of the witness to this deposition is hereby

18  waived.

19      * * * * * * * * * * * *

20      COURT REPORTER:  Is this going to be

21      usual stipulations?

22  MR. HOWARD:  Sure.

23  MR. SIKES:  Sure.

Page 5

1              (Witness sworn.)
2          * * * * * * * * * * * * *
3              WESTLY SPIVEY
4          * * * * * * * * * * * * *
5          The witness, after having first been duly sworn
6   to speak the truth, the whole truth and nothing but the
7   truth testified as follows:
8              EXAMINATION
9   BY MR. HOWARD:
10   Q.  Westly, my name is Rick Howard, and I represent
11       Mason Adcock.  You have the option to read and
12       sign your deposition.  Read and sign means you
13       take it and read it and make sure the names are
14       correct.  Can't really change any facts.  Or you
15       can just let the court reporter get it down.
16       Which would you like to do?
17          MR. SIKES:  I'm not his lawyer, but,
18          again, I'm the lawyer for his aunt
19          and his -- really sort of his
20          mother.
21              The rules of evidence allow
22          you to read over it and check it
23          for accuracy, the deposition.

Page 6

1          Most people waive it.  Those folks
2          are so accurate they don't make
3          mistakes much.  If they do, they
4          usually are spelling errors or
5          grammatical errors, so the
6          substance of what you say is going
7          to be accurate, so I --
8          THE WITNESS:  I'll waive it.
9   Q.  Okay.  Do you know if Justin is going to be here
10       today?
11   A.  I do not.  I'm not sure.  He should be.
12   Q.  Okay.
13   A.  He was subpoenaed to be here, so I feel like --
14   Q.  Well --
15          MR. SIKES:  And we told him last we
16          spoke with him --
17   Q.  Have you spoken to him about the deposition?
18   A.  No, sir.
19   Q.  What all have you reviewed to prepare for
20       today's deposition?
21   A.  Nothing.  Just talk.
22   Q.  Did you review anybody's deposition transcript?
23   A.  (Witness shakes head negatively.)

Page 7

1   Q.  Did you review any --
2          MR. SIKES:  You need to answer out
3          loud.
4   A.  No, sir.
5   Q.  And I should have told you that.  That's my
6       fault.  When you answer -- when my wife asks me
7       a question, I go huh-uh or uh-huh.  She can't
8       get that down.  It has to be a clear yes or no
9       or --
10   A.  Okay.
11   Q.  -- words.
12          MR. SIKES:  She can get it down, but
13          uh-huh and huh-uh look the same
14          when you write them out.
15   Q.  Have you reviewed any photographs?
16   A.  No, sir.
17   Q.  If you could, please list for me all the
18       irrational behavior that you observed from
19       Channing Spivey leading up to the shooting.
20   A.  Talking loud.  Some things he said really didn't
21       make sense, like as in blaming people for things
22       he knew didn't happen and all -- and stuff like
23       that.  But -- let's see.  That's really the

Page 8

1       biggest part of it was just -- oh, he -- I mean,
2       he -- just the biggest thing, blaming people for
3       things that didn't -- I mean, that he knew
4       didn't happen, like blamed Justin for something
5       about my mom or something like that.  I don't
6       know.
7          (Brief interruption followed by a
8          brief recess.)
9   Q.  (Continuing by Mr. Howard) The last thing you
10       said before Justin came was --
11   A.  Before Justin?  Oh.  Came in.  Okay.  I'm sorry.
12   Q.  Before Justin came and knocked on the door.
13       -- he was blaming other people --
14   A.  For things that --
15   Q.  -- for things that --
16   A.  -- he knew never happened.  He would --
17   Q.  And he was not making sense?
18   A.  Yes, sir.  He was just -- he wasn't making sense
19       at all.  I mean, he was in and out making sense.
20       Like, he would get calm and talk like normal for
21       a minute, and then all of a sudden, like, he
22       would just say something really off the wall.
23   Q.  What about emotional outbursts?

Westly Spivey

Page 9

1  A.  He would walk outside by hisself, like, on the
2      back side of the property, and he was, like,
3      praying aloud, like, talking to God.  But, I
4      mean, he prayed.  He just never really done it
5      aloud like that.
6  Q.  What about breaking things?
7  A.  He punched a hole in the ceiling.
8  Q.  And threatened a TV?
9  A.  Oh, he did.  Yes, sir.  He did threaten a TV.
10     Then he said the air conditioner was bad.
11 Q.  Zana said something about an altercation right
12     before she called.  What was that about?
13 A.  That's whenever he was blaming people for things
14     that didn't happen.  And he just tried to swing
15     and he missed, and we just held him back.
16 Q.  Have you ever been arrested before?
17 A.  I don't think that has anything to do with this.
18     If you don't mind, I'd rather not answer it.
19 Q.  Well, I'm sorry.
20        MR. SIKES:  Well, no.  Here.  I have
21        printed out -- that's his criminal
22        record from Alacourt.  I don't
23        have records -- you can ask him

Page 10

1      about any convictions outside the
2      state of Alabama because I don't
3      know about those.  But here's --
4  Q.  When was the last time you were arrested?  He's
5      not your lawyer.
6  A.  I know, but I'd rather not answer.  I mean, it
7      has nothing to do with the case.  I mean, if you
8      would like me to answer it, you know, we can go
9      to the judge about it.
10 Q.  Okay.  That's fair.
11 A.  Yes, sir.
12 Q.  Have you ever been convicted of a felony?
13 A.  No, sir.
14 Q.  When was the last -- your testifying against a
15     police officer has very much to do with your
16     interaction with the police officers in the
17     past.  That's very relevant.
18 A.  Okay.
19 Q.  So I want to go through every arrest.  And if
20     you're telling me that you're not going to do
21     it, I will file a motion with the judge.  And
22     the next time we come to our deposition, I'll
23     ask you those questions.

Page 11

1  A.  That's fine.  You can go ahead and file.
2  Q.  Okay.  What I'm going to do is I'm going to keep
3      the deposition open until I get your
4      statement --
5  A.  Yes, sir.
6  Q.  -- from ALEA.
7        MR. SIKES:  You're going to try to
8        keep the deposition open until the
9        judge says it's reopened.  If the
10       judge says --
11 A.  So we're probably going to come back.
12       MR. SIKES:  Listen.  You're talking
13       over me.
14 Q.  Okay?
15       MR. HOWARD:  No.  You interrupted me.
16       MR. SIKES:  No.  No, I didn't.  If the
17       judge tells him -- you misstated
18       it, that you're going to hold it
19       open.  You're not going to hold it
20       open.  You can try to reserve your
21       right to reconvene the deposition.
22       If the judge says that you can,
23       then you can.

Page 12

1        MR. HOWARD:  So are you going to try
2        to hold Mason's open?
3        MR. SIKES:  Huh?
4        MR. HOWARD:  Are you planning to hold
5        Mason's deposition open?
6        MR. SIKES:  We've done that by
7        agreement.  He took the Fifth
8        Amendment.  If the judge -- if you
9        want me to file a motion to
10       reconvene it when and after there
11       is a criminal indictment or there
12       isn't one, then we'll go to the
13       judge about it then.
14 Q.  Well, let me tell you --
15       MR. SIKES:  You can go to the judge --
16 Q.  -- what's going to happen.
17       MR. SIKES:  You can go to the judge
18       also about that.
19 Q.  The judge may or may not let --
20       MR. SIKES:  Again you're talking over
21       me and interrupting.
22 Q.  -- so we're going to file it.  We may be back.
23     We may not.  He may make you come back and talk

Westly Spivey

Page 13

1  about your arrests. I don't know.
2  A. Okay. That's fine.
3  Q. But I do think it's relevant, and that's my
4     position.
5        Have you ever had any interaction with the
6     City of Luverne police officers?
7  A. No, sir.
8  Q. Speeding tickets or anything like that?
9  A. Never had a speeding ticket. I mean, I've had,
10    I think, one speeding ticket in my life.
11    Never -- in Luverne I haven't.
12 Q. How about the Crenshaw County sheriffs?
13 A. The sheriffs? Not to my knowledge. Whenever I
14    was, I think, 18 for -- let me think. No. I've
15    never had any interaction with the sheriffs. I
16    never had a ticket or anything.
17 Q. How about Brundidge police officers?
18 A. Brundidge?
19 Q. Brundidge.
20       MR. SIKES: What's the relevance of
21       Brundidge police officers or
22       Oneonta --
23       MR. HOWARD: Oh, my word.

Page 14

1        MR. SIKES: Well, again, if you want
2        to make a showing of relevance ...
3        MR. HOWARD: Relevance is not even an
4        issue in a deposition. I can ask
5        him anything that might lead to
6        admissible evidence, so please be
7        quiet.
8        MR. SIKES: I'll be quiet when --
9  A. I don't never go to Brundidge.
10 Q. Okay. What about Troy?
11 A. Troy? Never had any altercations.
12 Q. How many times has a police officer put you in
13    handcuffs?
14 A. Does that have any relevance?
15 Q. Yes. Because you're going to be testifying --
16       MR. SIKES: You can --
17 Q. -- against police officers --
18       MR. SIKES: You can --
19 Q. -- so it shows bias, or it could.
20       MR. SIKES: You can decide whether you
21       want to answer that or not.
22       MR. HOWARD: You're doing a lot of
23       objections for somebody that's not

Page 15

1        your witness --
2        MR. SIKES: I'm advising him --
3        MR. HOWARD: -- not your client.
4        MR. SIKES: Again, you abused the
5        discovery process yesterday.
6        You're not going to do it today.
7        If the judge says you can abuse
8        it, then we'll allow it.
9           By the way, if you want to,
10       here is -- those are the
11       convictions that he has. There
12       are two misdemeanor convictions
13       there. One is for personal
14       possession of marijuana, a
15       misdemeanor. The other is for the
16       sale or distribution of an
17       imitation controlled substance.
18       That's a misdemeanor.
19          Here are the two rules of
20       evidence: Rule 609, Rule 404.
21       They are the only basis for why
22       this could possibly lead to
23       discoverable evidence. Neither

Page 16

1        one of them applies here
2        because -- 609 is the most
3        relevant of them to what we're
4        talking about here. It allows
5        introduction of evidence of
6        convictions, but only if the
7        conviction is for more than a
8        year. These are both
9        misdemeanors. Here's the Alabama
10       Code on misdemeanor convictions.
11       They are for less than -- a year
12       or less is all the sentence that
13       can be imposed. If you want to
14       see any of this, you're welcome to
15       it.
16       MR. HOWARD: I would like to see the
17       rules of evidence for lying about
18       it and bias.
19       MR. SIKES: For what?
20       MR. HOWARD: Lying about an arrest and
21       bias. Do you have those?
22       MR. SIKES: You don't have any
23       evidence that he lied about an

Westly Spivey

Page 17

```
1    arrest.
2         MR. HOWARD: No. Because you're not
3         letting me ask my questions.
4         MR. SIKES: No. I'm telling you --
5         you already have the evidence
6         about --
7         MR. HOWARD: Are you certifying that
8         that's correct and --
9         MR. SIKES: That came off -- I am
10        certifying that's what came off of
11        Alacourt.
12        MR. HOWARD: What about the Jeep?
13        MR. SIKES: I don't know about the
14        Jeep.
15        MR. HOWARD: Well, then I'll ask him
16        about it.
17        MR. SIKES: No.
18   Q.  I understand that you --
19        MR. SIKES: Again, if you want to
20        answer these questions, you can.
21        If you don't want to, you don't
22        have to.
23   Q.  Zana told us that you were involved in an
```

Page 18

```
1    accident with her. You went to a Troy police
2    officer's house for help, and you were
3    subsequently arrested for that. Why were you
4    arrested?
5         MR. SIKES: You can answer that if you
6         want, but you don't have to.
7    A.  I mean, I'd rather not go in -- I was arrested,
8    but I'd rather not go into detail about it.
9    Q.  What's the status of those charges now?
10   A.  Still ongoing.
11   Q.  What county is that in?
12   A.  Crenshaw.
13   Q.  Who arrested you for that?
14        MR. SIKES: Again, if you want to
15        answer these questions, you can.
16        You're not required to.
17   A.  Yeah. I'd just rather not talk about it.
18   Q.  Did you have meth on you?
19   A.  I'd rather not talk about anything to do with
20   that case.
21   Q.  Who is your criminal lawyer?
22   A.  Like I said, I'd rather not talk about it. If
23   the judge thinks I should, then we'll come back
```

Page 19

```
1    and talk about it another time.
2    Q.  Okay. Let's talk about the wreck. Where were
3    you?
4    A.  That has nothing to do with this case. So if
5    the judge thinks that we should talk about it,
6    then I will come back at another time and talk
7    about it. That's fine with me.
8    Q.  Did any police officers come to the scene?
9    A.  Like I just said, I'd rather not talk about
10   anything to do with the wreck or any of my past
11   cases that have nothing to do with this
12   ongoing -- I mean, with this. Unless the judge
13   thinks that it has something to do with it, I'd
14   rather not discuss it.
15   Q.  Do you think you've ever been treated unfairly
16   by being arrested?
17        MR. SIKES: Again, you don't have to
18        answer that if you don't want to.
19   A.  Not --
20        MR. SIKES: Rick, if you will make
21        some proffer of how you believe
22        that this has some relevance, I
23        will possibly amend the advice
```

Page 20

```
1    that I've given him about whether
2    he has to testify about this.
3    Q.  If you will, tell me everything that Mr. Sikes
4    has told you about this case.
5    A.  About this case?
6    Q.  Yes.
7    A.  Just the basics. Just -- actually, I told him.
8    We just went over the details of what happened.
9    Q.  When did you do that?
10   A.  I don't know the exact date. It was maybe a
11   month ago, a month and a half ago.
12   Q.  Where were you?
13   A.  In Luverne at my house where -- right up the
14   road from where it happened.
15   Q.  I believe that's North Glenwood?
16   A.  It is.
17   Q.  Where do you work?
18   A.  I do landscaping with Blue Ridge Enterprises.
19   Q.  Is that Justin's business?
20   A.  It is.
21   Q.  How long have you worked for Justin or with
22   Justin?
23   A.  Going on two years.
```

Westly Spivey

2/10/2021
6 (21 - 24)

Page 21

1  Q.  What's your relationship with Tim White?

2  A.  With Tim White?  I have no relationship with Tim

3     White outside of I know him through my

4     girlfriend.

5  Q.  Have you ever talked to him about this case?

6  A.  Never.

7  Q.  Have you ever argued with him about anything?

8  A.  Never.

9  Q.  Do you ever go over to his house and socialize

10    with him?

11 A.  I do not.

12 Q.  Do you know any police officers in Luverne?

13 A.  Not from just seeing them.  I work in Luverne so

14    they often ride by and stuff like -- where I

15    work at is the main part of town.  So outside of

16    that, I don't even know any by name for real.

17 Q.  Okay.  How about any of the deputies?

18 A.  None.

19 Q.  Do you know any employees at the City of

20    Luverne?

21 A.  Well, we done landscaping for the City of

22    Luverne, so I know, like, the city engineer.  I

23    know people that are not necessarily employees

Page 22

1     but are -- they're part of like the Town Hall --

2     I don't know -- over the gardening club and all

3     that whatnot.

4  Q.  The horticulture folks?

5  A.  Yeah.  That's all.

6  Q.  Have you talked to anybody at the City of

7     Luverne about the shooting or this case?

8  A.  No, sir.

9  Q.  What's your educational background?

10 A.  Graduated high school.  I got HVAC.  I'm a

11    certified HVAC.  I went to Auburn for

12    engineering, and I did not finish.

13 Q.  How many years did you get in?

14 A.  Three.

15        MR. HOWARD:  Does the list that you

16        gave me have his most recent

17        arrest on it, Griff?

18     MR. SIKES:  I'm sorry?

19     MR. HOWARD:  Does the list that you

20        gave me for your non-client's

21        arrest have the most recent arrest

22        on it?

23     MR. SIKES:  I don't know whether it

Page 23

1     does or not.  These are --

2     MR. HOWARD:  Look at it and see.  I

3        don't see anything --

4     MR. SIKES:  I'm familiar with it.

5        This is exactly what came off of

6        Alacourt.  If he's got a municipal

7        charge from the City, as you know,

8        those aren't -- municipal cases

9        aren't listed on there because

10       they don't have jurisdiction for

11       felonies.  Alacourt lists the

12       state court offenses which has --

13       those are those that have -- the

14       State of Alabama prosecutes.

15    MR. HOWARD:  So I guess your answer is

16       no?

17    MR. SIKES:  If the City of Troy or

18       Oneonta or Fort Deposit or anybody

19       else is prosecuting him in a

20       municipal court, then those

21       arrests would not show up there.

22 Q.  Who is prosecuting for your most recent arrest?

23    MR. SIKES:  If you know, you can tell

Page 24

1     him.

2  A.  It was through -- it was through Luverne, but it

3     moved to Greenville, and it's -- the DA in

4     Greenville I guess is who is over it now.

5  Q.  Oh, so it's county.  District attorney?

6     MR. SIKES:  Do you know?

7  A.  I mean, I'm not sure of that.  But, I mean, I

8     believe.  I'm not sure, though.  I have no idea.

9  Q.  Are you confident that the district attorney is

10    handling it now?

11 A.  I haven't spoke with anybody.  I just assumed

12    that's how it went.

13    MR. HOWARD:  So I guess that list does

14       not have the most recent on it.

15    MR. SIKES:  If it's -- again, I can't

16       vouch for Alacourt.  That's what

17       came off of there.  Pull it up

18       yourself if you'd like to, but

19       that's what's listed on Alacourt

20       for state court offenses.  From

21       that he's talking about another

22       arrest.  If there's a charge

23       pending somewhere else, it

Westly Spivey

2/10/2021
7 (25 - 28)

Page 25

1  apparently either must be from a
2  municipal court or Alacourt has
3  got it wrong. Again, you can
4  verify it if you like.
5  MR. HOWARD: We both agree that the
6  most recent arrest is not on
7  there, whether it's municipal
8  court or --
9  MR. SIKES: I don't -- no. I don't
10  know about that. No.
11  MR. HOWARD: So you're saying it could
12  be on there?
13  MR. SIKES: No. I said --
14  MR. HOWARD: All I'm saying is we
15  agree that the most recent is not
16  on here because it may be -- it's
17  not on Alacourt or it may be
18  municipal --
19  MR. SIKES: I've never seen any
20  evidence that there has ever been
21  another arrest or there's another
22  prosecution by --
23  MR. HOWARD: I'll put that as

Page 26

1  plaintiff's --
2  MR. SIKES: -- municipal court or not.
3  MR. HOWARD: -- attorney's testimony
4  as Defendant's Exhibit 1.
5  (Defendant's Exhibit 1 marked for
6  identification.)
7  MR. SIKES: Again, you're welcome to
8  verify. You've got --
9  Q. All right. Tell me about --
10  MR. SIKES: You have --
11  Q. -- the Sunday --
12  MR. SIKES: You have access --
13  Q. -- before the shooting.
14  MR. SIKES: You have access to
15  Alacourt also, don't you?
16  MR. HOWARD: Of course I do.
17  MR. SIKES: Okay. Well, again --
18  MR. HOWARD: I also have access to
19  this witness that you're not
20  letting me talk to.
21  MR. SIKES: You can talk to him about
22  anything --
23  Q. Talk to me about --

Page 27

1  MR. SIKES: -- that's relevant or may
2  lead to the discovery of relevant
3  evidence.
4  MR. HOWARD: Is it your position that
5  bias against a police officer or
6  untruthfulness against an arrest
7  is not relevant?
8  MR. SIKES: I didn't say that.
9  MR. HOWARD: Okay. I didn't think you
10  did because you know I'm right.
11  Q. Let's talk about the Sunday leading up before
12  the shooting. Okay?
13  A. Okay.
14  Q. I understand that -- well, there's been some
15  testimony that Channing did not want to take his
16  medication or didn't for some reason. Can you
17  tell me about that?
18  A. He just decided he just didn't want to take it
19  anymore. He was -- it made him feel bad.
20  Q. Do you know what kind of medications he was on?
21  A. I do not. It was just a bunch -- it was a lot
22  of them.
23  Q. Do you know where --

Page 28

1  A. Cancer treatments.
2  Q. Do you know where he got the medication from?
3  A. As in like who prescribed it or ...
4  Q. Probably who prescribed it and --
5  A. The cancer treatment place prescribed it, but he
6  got it from -- locally.
7  Q. Do you know which pharmacy he used?
8  A. I do not.
9  Q. Did you ever go to the doctor with him in
10  Alabama?
11  A. The cancer treatments, yes. The radiation, I
12  did.
13  Q. That was Andalusia?
14  A. Yes, sir.
15  Q. What was the name of that?
16  A. I have no idea.
17  Q. How many times did you go to the --
18  A. Three.
19  Q. Did you ever talk to Channing about the need to
20  take his medicine?
21  A. I questioned him about it, but outside of that,
22  I couldn't force him to take it. And he didn't
23  want to take it.

Westly Spivey

Page 29

1  Q.  Did you do anything other than talk to him about
2      it?  Did you talk to Chanda about it?  Talk to
3      Zana about it, like what are we going to do?
4  A.  I mean, I worried about it.  I mean, me and Zana
5      spoke about it, but not necessarily in detail.
6      I mean, it happened so fast.  There really
7      wasn't enough time to -- no one would ever guess
8      that getting off his medicine for five days --
9      for three or four days, however long it was,
10     would do something.
11 Q.  How many days was he off his
12     medication before --
13 A.  I'm not exactly sure.  Like I said, three or
14     four.
15 Q.  You said something happened fast.  What happened
16     fast?
17 A.  Oh, just his mind-set.  Like, he was all there,
18     and then he just started have the outbreak -- I
19     mean the outburst.
20 Q.  Okay.  I understand what you're saying is in the
21     three or four days before the shooting, he --
22 A.  No.  Well, it was -- actually, it wasn't like
23     three or four days.  That's how long he was off

Page 30

1      of his medicine.
2  Q.  Well, let me finish.
3  A.  Oh, I'm sorry.  Yes, sir.
4  Q.  In the three or four days, it appeared that he
5      might have come off his medication.  But in the
6      five or six days, he appeared perfectly fine.
7      And what happened fast was his decline.  Is that
8      what you're saying?
9  A.  Well, no -- yes.  But it wasn't three or four
10     days.  It was really like two days maybe that
11     you could see the decline.  Like, it happened
12     that fast.  Like, he had told me that he wasn't
13     taking his medicine because he didn't want to
14     go to -- he skipped his last cancer treatment --
15     his last radiation treatment.
16 Q.  Do you think he was giving up?
17 A.  I think he was having a hard time with it.  I
18     do.
19 Q.  Did you see any of his posts that he made on
20     Facebook?
21 A.  I do not.  I did not.  I don't do social media,
22     and I have not talked to anybody about it.
23 Q.  Did he ever say anything about death?

Page 31

1  A.  To me, no.
2  Q.  Did you see him post any videos?
3  A.  Like I said -- I'm sorry -- I don't do social
4      media.  I didn't see any of it.  Never after or
5      before.
6  Q.  Did you see him post any videos in the two hours
7      or three-hour period leading up to the shooting?
8  A.  I'm sorry.  I saw him post -- I'm not sure -- I
9      think it was the day before whenever he was --
10     or -- well, I'm not exactly sure the time, but
11     whenever he shaved his head, I saw him doing a
12     post in the mirror -- like a video in the
13     mirror, but that's really the only time.  I was
14     working most of the time.
15 Q.  When did he shave his head?
16 A.  A few -- I don't know the exact time.  I don't
17     want to be wrong about it, but within a week of
18     all of it.
19 Q.  Was it between Sunday and Wednesday or --
20 A.  No, sir.  It was before that.
21 Q.  Okay.  How much hair had grown back after the
22     surgery?
23 A.  Well, after the surgery I'm not even sure

Page 32

1      really.  I guess the only spots that were even
2      bald was where they cut it out and shaved it
3      then.  So, I mean, he's a tall guy.  I really
4      never ...
5  Q.  I've got ya.  I was just under the impression
6      that the cancer treatment made his hair fall
7      out, and that's why he was bald.
8  A.  Oh, no, sir.  He went ahead and shaved it.  He
9      was only on cancer treatment for a few weeks.
10 Q.  Do you know somebody named Gina Long?
11 A.  I do not.
12 Q.  There's some crazy posts on his Facebook page,
13     and I was just looking at that.  And it looks
14     like her posting is now deleted.
15 A.  I have no idea who she is.
16 Q.  Did he say anything -- that somebody was going
17     to have to kill him?
18 A.  Did he say that?
19 Q.  Yes.  Did you hear him say anything -- that
20     somebody has got to kill me?
21 A.  No.
22 Q.  Did you hear him say anything -- that I can't
23     die?

Westly Spivey

Page 33

1   A.  No, sir.

2   Q.  Do you think he was suicidal?

3   A.  No, sir.

4   Q.  Tell me about -- we've talked about some

5       irrational behavior; the ceiling and the TV.

6       Tell me about the two hours leading up to the

7       first time Zana called 911.  What was going on?

8       Where was everybody at?

9   A.  We was all sitting in the living room watching a

10      movie.  And he started -- like, he was listening

11      to music on his phone, and he started just

12      playing it louder than -- like over the TV but

13      never enough to bother us.  It was just

14      noticeable.  And he was walking in and out of

15      the house, like, yelling like talking to the

16      Lord.  But he was going through a hard time.

17  Q.  I agree.

18          After he came back in from being outside,

19      did he just come in and get into an altercation

20      with you?

21  A.  No.  He was just saying that this is of the

22      devil, like talking about the TV, the nonsense

23      TV has.  Then he said the same thing about the

Page 34

1       AC.  And we was like, Channing, calm down.  And

2       he punched a hole in the roof -- in the ceiling.

3       Then he got quiet again.

4   Q.  I understand he was six-three.

5   A.  Six-four.

6   Q.  Six-four.

7   A.  I say six-four.  But I say I'm six-four, but I'm

8       really like six-three, so ...

9   Q.  He wasn't small.

10  A.  No.

11  Q.  He could reach the ceiling.

12  A.  He was tall.

13  Q.  Okay.  Did he pick the TV up and threaten to

14      break it or hit it?

15  A.  He threatened to throw it down, but I don't --

16      he didn't pick it up.  I don't think he did.  He

17      might have picked it up, but ...

18  Q.  Which room was he in when he punched the hole in

19      the ceiling?

20  A.  The living room.

21  Q.  Is that one room where the front door goes

22      into?

23  A.  Yes, sir.

Page 35

1   Q.  And who all was at the house at that time?

2   A.  Me, Justin, Zana, and Channing.

3   Q.  Do you know how long it was from the time that

4       he punched a hole in the ceiling till Zana

5       called 911 the first time?  And I'll tell you

6       what.  I'm just trying to put together the

7       timeline from the three or four hours before the

8       shooting.  I've got a lot of Facebook posts.

9   A.  Yes, sir.

10  Q.  So I'm just trying to put together what

11      happened.

12  A.  I'm not exactly sure the times and all.  It just

13      really happened real fast.  Like, all of it was

14      like -- the speed was just like -- it felt like

15      it was so fast, and it felt like it took forever

16      at the same time.  So I'm not exactly sure the

17      timing, but it wasn't long.  I know he took a

18      nap that afternoon as well, so ...

19  Q.  Were you involved in the events that happened

20      earlier when he crashed the car into the tree?

21  A.  Was I involved?  Was I there?

22  Q.  Well, I know you weren't with him.

23  A.  Yes, sir.

Page 36

1   Q.  But did you go to the scene?

2   A.  Yes, sir.

3   Q.  Tell me your involvement in the car crashing.

4   A.  Well, he came walking up to the house, and he

5       told us that he had ran into a tree -- I mean,

6       he was doing donuts and ran into a tree.  So we

7       went to town, and we was just looking to see if

8       we could see where it happened at because he

9       left the truck on the side of the road.  And we

10      saw it and we pulled up there, and there was two

11      officers there.  And we just got out and talked

12      to them about it and gave them our information.

13  Q.  Did you tell the officers he was acting

14      irrational or give them some background?

15  A.  Well, I told them that he had had -- that he had

16      had brain surgery, like, within -- not long

17      before that, and I was just sorry.

18  Q.  Were the officers kind to you?

19  A.  They were.

20  Q.  Polite?

21  A.  They were.

22  Q.  Did you know those officers before?

23  A.  Never seen them before.

**Page 37**

1  Q.  Have you talked to them since?
2  A.  No, sir.
3  Q.  Have you seen any video from that interaction?
4  A.  Yes, sir.
5  Q.  Where did you see that video?
6  A.  In a meeting with -- we had a meeting with
7      Mr. Sikes, and we saw the video.
8  Q.  Has Mr. Sikes ever sent you any emails?
9  A.  Yes.  But I haven't checked them.  I don't
10     really get on my email, so ...
11 Q.  I'm going to send a subpoena.  I'll need a copy
12     of those emails that he sent to you, so I'll
13     send that to you pretty soon.
14 A.  Okay.  How do I -- I'll figure that out.
15 Q.  Zana said she could do it.  I probably
16     couldn't --
17 A.  Okay.  Okay.
18 Q.  -- but she said she could.
19 A.  Okay.
20 Q.  Whose idea was it to call 911 the first time?
21 A.  Zana.
22 Q.  Did he do anything to her?
23 A.  No.

**Page 38**

1  Q.  Has he ever touched her?
2  A.  No.
3  Q.  Has he ever touched you or taken a swing at you?
4  A.  Never.
5  Q.  Who did he take a swing at that day?  Justin?
6  A.  That was -- no.  Me.  That was the first time
7      he's ever swung at me ever.
8  Q.  I suspect that it surprised you.
9  A.  No.  He clearly missed.
10 Q.  Well, did it surprise you that he would take a
11     swing at you?
12 A.  Being at that moment he was acting out and he
13     said off-the-wall things, it -- I was kind of
14     ready for anything.
15 Q.  And I guess my question was, based on the --
16     well, let me back up.
17     It was surprising that he was acting like
18     that, I'm sure, because it had probably been an
19     emotional 48 hours for you at that point; is
20     that correct?
21 A.  Well, not necessarily 48 hours.  It was really
22     that day that was really the only day that he
23     acted out like that.

**Page 39**

1  Q.  Okay.
2  A.  I mean, like, he was walking around, you know,
3      talking -- like, praying out loud.  But I really
4      didn't think nothing outside of that besides,
5      you know, going -- you know, he had to shave his
6      head.  He didn't like how he looked-type thing.
7  Q.  Did Zana tell you she was going to call 911 or
8      just pick up the phone and start dialing?
9  A.  I knew she told me one time.  I guess it was the
10     last -- the second time, because I got mad about
11     it the first time.
12 Q.  Why did you get mad?
13 A.  Well, not necessarily mad, but I just didn't
14     like her doing that because Channing -- I didn't
15     want Channing to have to go sit in a hospital,
16     because he didn't want to be there, and he was a
17     grown man.  And just because he was acting
18     irrational, he was still there.  And I didn't
19     see where he was of harm to us at the time.
20 Q.  Okay.  Do you think he was a potential harm to
21     you during the day on Wednesday?
22 A.  No.
23 Q.  Do you think he was a harm to anybody?

**Page 40**

1  A.  Himself.
2  Q.  Are you the one that talked her out of calling
3      911 the first time?
4  A.  Yes.
5  Q.  Did Justin say anything about 911?
6  A.  Not to my knowledge.
7  Q.  How familiar was Justin to the irrational
8      behavior?
9  A.  He saw the same things I did.
10 Q.  Was he over there on Sunday, Monday, and Tuesday
11     leading up to Wednesday, or did he get there
12     Wednesday and this was a complete surprise?
13 A.  Well, like I said, we work together, so nothing
14     was really a surprise because I would have
15     talked -- I would have talked -- you know,
16     discussed it with him to get it off my head, my
17     thoughts on it.  But -- so he was -- it really
18     wasn't a surprise outside of what had happened
19     right there before the law -- I mean, she called
20     911.  That's the only surprising part, if I had
21     to guess for it, because -- that's, like, really
22     my only surprise.  Outside of that I just knew
23     he was having a rough time.

Page 41

1   Q.   She actually calls 911 the first time, and then
2        she says never mind.  Where were you when she
3        was calling?  And I can tell you what she said.
4        She said she was outside.
5   A.   **I was going to say I think I might have been**
6        **outside, but I wasn't sure.  I knew we were**
7        **outside for probably an hour -- probably at**
8        **least 30 minutes to an hour before, and Channing**
9        **was around back of the house.**
10  Q.   Do you know what he was doing back there?
11  A.   **Praying.**
12  Q.   Was he shouting and screaming?
13  A.   **Shouting.**
14  Q.   Could you understand anything that he was
15       saying?
16  A.   **Yes, I could understand it.  But I really**
17       **wasn't, you know, trying -- like, listening.  I**
18       **heard what he was saying but not enough for me**
19       **to just -- nothing really caught my eye or my**
20       **ear, I guess.**
21  Q.   The way Zana described it yesterday was that you
22       could understand the words he was saying, but
23       the words that he was saying really didn't go

Page 42

1        together.  It just was --
2   A.   **I'm not sure either way on that.**
3   Q.   Okay.
4   A.   **I don't want to say whether or not because I'm**
5        **not sure on that part.**
6   Q.   Okay.  How long was it from the time that Zana
7        hung up with 911 the first time until she called
8        again?
9   A.   **Definitely within the hour.  Definitely within**
10       **the hour.**
11  Q.   She said yesterday she wasn't sure, so I'm still
12       trying to put my timeline together.
13  A.   **It was within the hour.**
14  Q.   What happened in that time from when she hung up
15       with 911 until she decided to call again?
16  A.   **Channing came around the house.  And I'm not --**
17       **I don't even remember exactly how it all**
18       **started.  I guess it was just kind of an**
19       **off-the-wall thing where he said something off**
20       **the wall.  He blamed Justin -- what did he blame**
21       **him for?  He blamed Justin for something to do**
22       **with my mother's death, like -- but it was**
23       **something really off the wall.**

Page 43

1   Q.   How did your mother die?
2   A.   **Suicide.**
3   Q.   Okay.  How old were you then?
4   A.   **I was 13 or -- yes, 13.**
5   Q.   Is that when Chanda --
6   A.   **That's when -- yes, sir.**
7   Q.   Were you living in Crenshaw County then?
8   A.   **Yes, sir.  Living in Brantley.**
9   Q.   What did Justin do when Channing said that to
10       him?
11  A.   **He was just like, no, man.  No.  He was just**
12       **like, no, I didn't do that.  And Channing came**
13       **at him or, like, started stepping towards him,**
14       **and he just kind of backed off.  He never really**
15       **made a motion towards anything.  He was just --**
16       **I mean -- and he understood.  So he understood**
17       **that it was, you know -- so ...**
18  Q.   How long have you known Justin?
19  A.   **Since -- we knew of each other because he lived**
20       **in Crenshaw County.  We played sports against**
21       **one another.  But as in being friends, since**
22       **2010.**
23  Q.   Okay.  So he's been around for the last ten

Page 44

1        years?
2   A.   **Oh, yes, sir.**
3   Q.   What sports did you play?
4   A.   **I played baseball, football, and basketball.**
5   Q.   All of them?
6   A.   **Yes, sir.**
7   Q.   Six-four.  That's pretty good.  The coaches
8        probably wanted you.
9   A.   **I like to think so.**
10  Q.   Would you say that things got worse from the
11       time Zana hung up with 911 the first time until
12       she called the second time?
13  A.   **Yes, being that she felt the need to call.  But**
14       **I think it was just a quick outburst, and she**
15       **was worried that -- I'm not sure what she was**
16       **worried about.**
17  Q.   Was she scared?
18  A.   **Not for herself, I wouldn't think so, but I'm**
19       **not sure.**
20  Q.   What made you think she was scared?  I know you
21       can't --
22  A.   **Speak for her.**
23  Q.   You can't speak for her, but --

Westly Spivey

2/10/2021
12 (45 - 48)

Page 45

1   A.  Her calling --
2   Q.  -- you perceived that something was wrong.
3   A.  Her calling 911 after I asked her not to.  But
4       after Channing made -- after Channing said that
5       towards Justin and, like, kind of went at --
6       kind of like was -- kind of went to charge him
7       or whatnot, that's -- I think that's when she
8       called, because of the altercation.
9   Q.  Did you disagree with her decision to call 911
10      the second time?
11  A.  I did not disagree with her decision.
12  Q.  Would you have called 911 if she had not been
13      there?
14  A.  No.  Unless things began to get worse, I would
15      not have called.  Because when he swung at me,
16      he -- I clearly ducked him and grabbed him and
17      held him down.  Like, it wasn't even hard.  So I
18      wouldn't -- personally, I would not have called,
19      but I did -- whenever she called, I knew she was
20      calling, so ...
21  Q.  Tell me about when you grabbed him and held him
22      down.  Where were you?  What happened and --
23  A.  In the front yard in the driveway.  It's

Page 46

1       whenever he went towards Justin.  And Justin
2       kind of backed up, and we was trying to break
3       them up.  And he grabbed -- Channing grabbed me
4       and held me there, and I didn't really even
5       fight it because it wasn't hurting me.  So I
6       really wasn't fighting him off then, and Zana
7       sprayed him with a water hose.
8   Q.  Zana sprayed who with a water hose?
9   A.  Channing and me with a water hose.
10  Q.  Did she say why?
11  A.  Just trying -- she didn't know what to do.
12          And he ended up letting me go.  And after
13      that I'm not sure -- I don't even think there
14      was anything that set him off.  I think he
15      just -- whenever he got up -- I mean, whenever
16      he just, I guess, not even relaxed but, I
17      guess -- I'm not sure.  But then he just looked
18      at me and just swung.  And then I just held him
19      down until he just, you know, kind of just
20      relaxed.
21  Q.  How long after the swing did Zana call 911 the
22      second time?
23  A.  Right after.  Right after.  And after he got up,

Page 47

1       he just walked away like he had been doing
2       earlier.
3   Q.  Did you hear her 911 call?
4   A.  I can't --
5   Q.  Well, that's a bad question.  I need to ask, did
6       you hear her talk to 911 on that Wednesday?
7   A.  I knew she did, but I really didn't listen -- I
8       really wasn't sitting there listening to it, so
9       I'm not sure what she actually said to them.
10      But I was around.
11  Q.  Okay.  And the next question is, have you
12      listened to the 911 tape?
13  A.  No.
14  Q.  Okay.  She calls 911.  Channing gets up and
15      walks off?
16  A.  Channing walked off right after -- after he got
17      relaxed and he stood up, he just walked off when
18      she called 911.  He was unaware of it.
19  Q.  She said that he may not willingly go with the
20      EMTs or --
21  A.  Yeah.  He didn't want to go to the hospital
22      because they would have tried to hold him, and
23      that's another -- I didn't want him -- them to

Page 48

1       think he needed to be held for psych reasons,
2       being that he was already going through all that
3       already.
4   Q.  Had a doctor told you that he could be held for
5       psych reasons, or was that just what you
6       thought?
7   A.  No, sir.  That's just what I thought.
8   Q.  Did anything happen from the time that she
9       called 911 until -- let me back up.
10          Did you know when the ambulance arrived?
11  A.  I saw when -- they never made it to the house.
12      They stopped on top of the hill before the house
13      on the road, and I saw them stopped, yes.
14  Q.  What happened from the time that she called 911
15      until you saw the ambulance up on the hill?
16  A.  I think we just were sitting up there talking
17      just about what had happened just then.  And I
18      asked Justin to stick around and hang out.
19  Q.  Was Channing around back --
20  A.  Yes, sir.
21  Q.  -- at that time?
22          Praying and talking?
23  A.  Yes, sir.

Page 49

1  Q.  How long was it from the time you saw the
2      ambulance up the hill until Deputy Penny
3      arrived?
4  A.  I believe within minutes.  Within five or ten
5      minutes.  It wasn't too long.
6  Q.  Okay.  And I say Deputy Penny arrived.  Did you
7      know Deputy Penny before he came to your house?
8  A.  No, sir.
9  Q.  Have you now come to learn that the deputy that
10     arrived was named Penny?
11 A.  Penny.
12 Q.  So when I mentioned Deputy Penny --
13 A.  I knew who you were talking about.
14 Q.  -- you knew exactly who I was talking about.
15     Did you wonder why the ambulance was parked
16     up the hill and not coming to your house?
17 A.  I did wonder that.  I did.
18 Q.  What did you think about that?  It's like, I can
19     see them, but they are not coming down here.
20     What's going on.
21 A.  That's exactly what I thought.  Why are they not
22     coming.
23 Q.  Did you try to call anybody to find out?

Page 50

1  A.  No, sir.
2  Q.  It was like they made it all that way, but they
3      can't come the last 200 feet.
4  A.  I didn't call anybody.  I didn't know if they
5      didn't know where they were going or what the
6      deal was.  I was unsure until the officer
7      arrived.
8  Q.  Did you know that Tim White was in the
9      ambulance?
10 A.  No idea.
11 Q.  Where were the four of you when Deputy Penny
12     pulled up in front your house?
13 A.  Us -- me -- I think, me, Channing -- I mean me,
14     Zana, and Justin were all around front.  And
15     Channing was walking from around back to the
16     front when he -- as he pulled up.
17 Q.  Okay.  Deputy Penny pulls up and gets out of his
18     car.  What happens?
19 A.  Channing just kind of, like, charges over
20     towards the vehicle and slaps the back glass.
21 Q.  With his right hand?
22 A.  I don't know.  I feel like since he was coming
23     from this way, he would have done it with his

Page 51

1      left, but he could have done it with his right.
2      I'm not sure on that.
3  Q.  Okay.  And --
4  A.  He did it with one of his hands -- open hand,
5      so ...
6  Q.  Which side of the car was he standing on when he
7      slapped the rear window?
8  A.  He was coming from the passenger's side, and
9      Deputy Penny was on the farther side.
10 Q.  Channing was coming around back or around front?
11 A.  The back side.
12 Q.  Okay.  So he slapped.  The window breaks.  Where
13     was Zana at when the window in the deputy's car
14     broke?
15 A.  I have no idea.  She -- behind -- I mean, she
16     was behind me, I believe, and I was -- I was
17     within 15, 20 feet from it.
18 Q.  Was there any way Zana could have been between
19     the deputy and Channing --
20 A.  No.
21 Q.  -- when the window broke?
22 A.  It's impossible.  The deputy was at the driver's
23     side right outside the door, and he was at the

Page 52

1      back glass.  She would have been in the middle
2      of the road on the other side, so ...
3  Q.  Did she have a cup in her hand?
4  A.  A cup?  Maybe.
5  Q.  Where was Justin at when the deputy's window
6      broke?
7  A.  Right there beside me somewhere.
8  Q.  Were you able to observe Deputy Penny's actions
9      when the window broke?
10 A.  No, sir.  The vehicle was in between me and
11     Deputy Penny.
12 Q.  Was it a car or truck?
13 A.  It was an SUV.
14 Q.  What kind?
15 A.  Just the sheriff's --
16 Q.  Like a -- well, what I guess my question is, was
17     it one of those small SUVs --
18 A.  Yes, sir.
19 Q.  -- or a bigger one?
20 A.  The smaller ones.
21 Q.  Okay.  Could you see any part of Deputy Penny's
22     body?
23 A.  Yeah.  I saw probably from shoulders up at

Westly Spivey

Page 53

1    least.  I mean, I was more or less focused on
2    Channing, but I could -- whenever he got out and
3    he stood up, I could see him.
4    Q.  How far was -- well, was Deputy Penny standing
5        beside his car when the rear window broke on the
6        deputy's SUV?
7    A.  Yes, sir.  He was either already standing there
8        or he was getting out of the vehicle in motion
9        to stand there.
10   Q.  And yesterday I learned that the window just
11       didn't crack.  The whole thing shattered.
12   A.  Yes, sir.
13   Q.  Is that correct?
14   A.  That's correct.
15   Q.  What's the next thing that you observed Deputy
16       Penny do that you could see?
17   A.  Shot him with the Taser.
18   Q.  Okay.  Where was Zana when Deputy Penny shot --
19   A.  I was focused --
20   Q.  -- Channing with the Taser?
21   A.  -- on them two.  She would have had to been
22       behind me somewhere.
23   Q.  Did you see the wires come out?

Page 54

1    A.  I saw -- I didn't see them actually come out of
2        the Taser, but I saw them hit Channing.
3    Q.  How far away was Deputy Penny when he shot his
4        Taser at Channing?
5    A.  No further than the length of the vehicle.
6    Q.  15, 20 feet?  Something like that?
7    A.  At the furthest, yes, sir.
8    Q.  What happened to Channing when he got shot by
9        the Taser?
10   A.  He fell to the ground.  Then he got up and
11       started walking towards the house and snatched
12       them off as he was walking.
13   Q.  Snatched the Taser wires off?
14   A.  Yes, sir.
15   Q.  Is that correct?
16       Did you see -- my understanding of how a
17       Taser works, it's got the wires and it's got
18       little barbs on the end of it.  Sometimes
19       plaintiff's lawyers call them harpoons.
20   A.  Okay.
21   Q.  Did you see those harpoons that came out?
22   A.  I did not.
23   Q.  Okay.  Is that what he pulled out of his body

Page 55

1    that you know of?
2    A.  I'm not sure.
3    Q.  Okay.
4    A.  I just know he snatched off the wires, so ...
5    Q.  I was just wondering if -- were those prongs
6        still in him and the wires broke -- because they
7        break frequently -- or did he just pull it all
8        out?
9    A.  He could have pulled it all out.  I'm not sure.
10       I didn't notice it throughout the rest of the
11       time, so -- I'm assuming it came out, but I'm
12       not sure of that.
13   Q.  A full load of a Taser is five seconds.  Do you
14       know if Channing was on the ground for five
15       seconds or how long he was on the ground?
16           MR. SIKES:  Object to testifying.
17           MR. HOWARD:  What did I testify to?
18           MR. SIKES:  It lasts five seconds.  I
19           don't know that's a fact.
20           Nobody's -- there's no evidence
21           about that.
22           MR. HOWARD:  Okay.  Read up on it.
23   Q.  It's my understanding that the regular five

Page 56

1    second load is five seconds --
2           MR. SIKES:  Same objection.
3    Q.  It's my understanding that the Taser trigger
4        pull is five seconds.
5           MR. SIKES:  Object to the same -- same
6           objection.
7    Q.  Do you know if he was on the ground for longer
8        than five seconds, less than five seconds, or do
9        you know how long he was on the ground?
10   A.  I'm not sure.  It was fast.
11   Q.  Did it look like his body locked up and he fell,
12       or did he just kind of sit down?
13   A.  It didn't necessarily look like his body locked
14       up, but it's like it hit him and he got pushed
15       over almost.
16   Q.  Did Deputy Penny touch him in any way while he
17       was being tased?
18   A.  No.
19   Q.  Did anybody touch him?
20   A.  No.
21   Q.  Were you able to see what Deputy Penny did after
22       Channing pulled the wires away from him?
23   A.  No, sir.  I wasn't looking towards Deputy Penny.

Page 57

1  Q.  Did you ever see Deputy Penny put the Taser up?
2  A.  No, sir.
3  Q.  Did you ever see Deputy Penny take the cartridge
4     off the end of the Taser?
5  A.  No, sir, I didn't see that.
6  Q.  Do you know what a Taser cartridge is?
7  A.  No, sir.
8  Q.  Let me ask that question a little bit better.
9     Did you ever see him take the Taser parts
10    apart?
11  A.  I did not.  I wasn't looking towards him.
12  Q.  What was Zana doing -- or let me -- where was
13    she when, if you know, he pulled the prongs out?
14  A.  She would have had to have been out of my line
15    of view.
16  Q.  At some point did the ambulance start pulling
17    towards the action?
18  A.  If so, they were just creeping very slowly.  And
19    maybe once the Taser was shot, they started
20    creeping towards it.
21  Q.  When you saw the ambulance the first time, were
22    they in the road or pulled off on the side of
23    the road?

Page 58

1  A.  In the road.
2  Q.  When you saw the ambulance --
3  A.  In the -- I'm sorry.  Go ahead.
4  Q.  The second time after the tasing, were they
5     still in the road?
6  A.  Yes, sir.  They were -- I feel like they were at
7     the bottom of the hill rather than the top of
8     the hill.
9  Q.  Okay.  Maybe just rolling down towards the
10    action?
11  A.  Yes, sir.
12  Q.  He pulls the Taser wires away from his body, and
13    you said he starts coming towards you --
14  A.  Like -- well --
15  Q.  -- or towards the house?
16  A.  Towards the house.  I was in between him and the
17    house, so ...
18  Q.  Did he make it all the way to the house?
19  A.  No, sir.
20  Q.  Did he make it all the way to you?
21  A.  No, sir.
22  Q.  What happened?
23  A.  He started walking that way.  I guess he noticed

Page 59

1     the ambulance creeping, and he started, like,
2     not running but walking fast towards the
3     ambulance.
4  Q.  When he started walking towards the ambulance,
5     how far away was the ambulance from him?
6  A.  A few hundred feet.  Probably the size of a
7     football field.
8  Q.  Okay.  Did he say anything that you could hear
9     as he walked towards the ambulance?
10  A.  If he did, I don't remember anything that was
11    said.  I'm not even sure if he was yelling or
12    anything.  I knew I was yelling at him.
13  Q.  If you could, list for me the things that you
14    remember Deputy Penny saying.
15  A.  I don't remember anything that he said exactly.
16    I don't really -- I'm not sure what he was
17    saying.  I was focused on my brother.
18  Q.  Do you remember Deputy Penny saying anything
19    about a gun?
20  A.  At that moment, no, I don't.
21  Q.  Do you remember Deputy Penny saying anything
22    about I'm going to shoot you?
23  A.  At that moment, I took off and ran -- I was

Page 60

1     running towards Channing, and I was far away
2     from him.  I was over there where they were at
3     because they -- my brother was on the ground.
4  Q.  Is it your testimony that you didn't hear Deputy
5     Penny say anything?
6  A.  At that moment, no, sir.
7  Q.  When is the first time you heard Deputy Penny
8     say something?
9  A.  After the altercation with the ambulance.
10  Q.  Okay.
11  A.  I mean, I heard him speak.  I just don't know
12    what he was saying, so I'm not -- I know that he
13    was saying something, but I wasn't paying him
14    any attention because I was trying -- I was
15    focused on my brother, so I'm not sure of
16    anything that was said.
17  Q.  Did you hear anybody say to Channing get on the
18    ground?
19  A.  Get on the ground?  I don't remember.
20  Q.  Were you saying anything to Channing?
21  A.  I was yelling at him.
22  Q.  What were you yelling?
23  A.  Channing, what are you doing.  Stop.

Westly Spivey

Page 61

1  Q.  And I understand what you're saying is after the
2      tasing, Channing walked to the house and towards
3      you.  But at some point the ambulance that was
4      maybe a football field or so away caught his
5      attention, and he started walking towards the
6      ambulance.
7  A.  Yes, sir.  He was, like, going towards the
8      house, and he just all of a sudden veered and
9      went straight to the ambulance.
10 Q.  Did you follow him to the ambulance?
11 A.  Not -- I might have been creeping that way, but
12     not until he got thrown off into the side of the
13     road.  And that's when I ran towards ...
14 Q.  Would the ambulance -- well, I can't ask you
15     what they were thinking.
16     At some point did the ambulance start
17     backing up?
18 A.  Yes.  Whenever he got -- started getting closer
19     to the ambulance, they started backing up.
20 Q.  Was the first thing that Channing did was to
21     kick the brush guard?
22 A.  I don't remember that.
23 Q.  Did he get on top of the hood of the ambulance

Page 62

1      at some point?
2  A.  He did.
3  Q.  Tell me about that.
4  A.  He jumped on the hood of it.  Then I want to say
5      that -- I'm not sure if he slapped it or open
6      hand -- I think he hit the windshield.  Then
7      they started -- they were backing up as he was
8      doing it, and they started swerving, and it
9      slung him off into the side of the road.
10 Q.  Could you describe the ambulance for me?
11 A.  Just a regular ambulance.  Red and white.
12     Nothing that I can -- no detail about it outside
13     of just being an ambulance.
14 Q.  Was he banging his fist on the top of the
15     ambulance, the cab?
16 A.  Not that I recall.  I know that he was
17     hitting -- I think he hit the windshield.  I'm
18     not even sure how many times or whatnot.
19 Q.  Do you know if he hit the windshield with his
20     head?
21 A.  I'm not sure about that.  I thought he done it
22     with his hand, but I'm not sure about that.
23 Q.  Do you know if he hit the windshield with his

Page 63

1      face?
2  A.  Not to my knowledge.
3  Q.  Since then have you heard that he hit the
4      windshield with his head or face?
5  A.  I heard someone say that.
6  Q.  Who said that?
7  A.  I think Zana maybe.
8  Q.  What was the damage to the windshield?
9  A.  I didn't see it -- I didn't see it for myself.
10     I'm not sure.
11 Q.  Where were you when the windshield on the
12     ambulance broke?
13 A.  I mean, as far away as, you know, from -- a
14     football field away almost.  Like maybe 250,
15     300 -- it was close to about 300 feet, because
16     they started backing up.
17 Q.  Okay.  How close did you come to the ambulance
18     during any of this?
19 A.  I'm not -- within probably a hundred feet.  But
20     that's when my brother was on the side of the
21     road, and I was going towards him, and they were
22     backing up that way.  So I'm not exactly sure
23     how far away I got -- I mean how close I got to

Page 64

1      them, but probably around a hundred feet or so.
2      Maybe a little closer.  I don't know.
3  Q.  I understand he was on top of the ambulance.
4      Hit the windshield.  The ambulance backed up,
5      and Channing came off the ambulance.
6  A.  Well, they were already backing up, and Channing
7      was, like, on it holding on, and that's when he
8      hit it.  But they started swerving -- I guess
9      once he hit it and they started swerving, it
10     slung him off into the ditch.
11 Q.  The ambulance is backing up.  Did he go into the
12     ditch on the driver's side of the ambulance or
13     the passenger's side?
14 A.  Driver's.
15 Q.  Did he get up and start hitting the mirror on
16     the ambulance?
17 A.  No.
18 Q.  What happened after he went into the ditch?
19 A.  That's when I ran over there towards him, and he
20     got up -- I think he got up as I was getting to
21     him.  And he started -- I'm not sure.  I was
22     like, Channing, what are you doing?  And he
23     didn't even really even notice me.  He just

Westly Spivey

Page 65

1    started walking towards Penny -- like walking
2    towards -- back towards the house where the
3    officer was and all that.
4    Q.  Okay.  Earlier you testified that you grabbed
5    him and held him down, and it wasn't that
6    difficult.  Did you try to do that again?
7    A.  Well, no, sir.  But, I mean, I was sitting there
8    yelling at him and talking to him.  I didn't try
9    to grab him at that moment.
10   Q.  Any particular reason you did not?
11   A.  No, sir.  I don't think so.
12   Q.  How close did you come to touching him, or how
13   far away were you from him?
14   A.  At that moment?
15   Q.  Yes, sir.
16   A.  At that moment I was right there with him up
17   until -- up until Penny had a gun and was
18   telling him to stop.  And he was saying that he
19   was going to have to shoot, and I was right
20   there.
21   Q.  Okay.  Let me go back and get some background.
22       I know that Channing came off the ambulance
23   and went into the ditch.

Page 66

1    A.  Yes, sir.
2    Q.  And then you ran or walked up to Channing and
3    got close to him, correct?
4    A.  Correct.
5    Q.  How far away were you from Penny when you were
6    sitting there with Channing?
7    A.  We was walking back towards the house, so
8    between him and the ambulance, probably half --
9    probably a hundred, 150 feet, something like
10   that.  I'm not sure.  Probably about 150 feet.
11   Q.  Had Penny moved at all from beside the car?
12   A.  I think he had started backing up, like, to the
13   front of his car like a little bit past it.  But
14   up until Channing -- up until Channing got
15   closer, he really hadn't moved that much.
16   Q.  Okay.  Did you walk beside Channing as Channing
17   went back to Penny?
18   A.  Yes.  I was just sitting there yelling at him
19   trying to talk him down.
20   Q.  Did you ever see Zana go talk to Penny?
21   A.  No.
22   Q.  Did you know that Zana went up to Mason's house?
23   A.  At that time it was all kind of a blur.  But, I

Page 67

1    mean, I know it from hearing about it later.
2    But at that moment, it was just a blur.
3    Q.  I understand.  Did you know Mason?
4    A.  Mason?  Knew of him.  Like, just seen him
5    before, like, where my brother worked at, and I
6    helped out there sometimes.  But outside of
7    that -- we met him the day that we moved in.
8    Q.  Okay.  I heard that he -- there was testimony
9    that he came down to say hi.
10   A.  Yes, sir, he did.
11   Q.  Since the day that he came to say hi to you on
12   move-in day, have you talked to him any?
13   A.  No, sir.  Just waved as they passed.
14   Q.  We have you and Channing walking towards Penny,
15   and Penny has his gun out, correct?
16   A.  I can't say either way.  I was -- like I say, I
17   was focused on my brother up until I heard stay
18   back or I'm going to have to shoot or something
19   like -- I don't know the exact wording -- to
20   that nature.  That's whenever I noticed that he
21   was -- had his gun out.  Like, had it up, out,
22   whatever.
23   Q.  Let's talk about that.

Page 68

1    A.  Okay.
2    Q.  There's several ways to pull a gun out.  One is
3    low ready and then ready to go.  Can you tell me
4    if Penny had his gun out aiming it at Channing,
5    or how was Penny holding the gun?
6    A.  I don't want to say -- I'm not sure either way.
7    I knew that he had it out, and I knew that the
8    reason that I backed off is because he seemed
9    nervous.
10   Q.  Who seemed nervous?
11   A.  Penny seemed nervous.
12   Q.  Okay.
13   A.  So it made me feel uneasy about standing right
14   there, because he was saying stay back or I'm
15   going to have to shoot.
16   Q.  Do you know if Penny was talking to you or to
17   Channing when he said stay back; he's got to
18   shoot?
19   A.  I'm assuming Channing, but ...
20   Q.  Did you ever think Penny told you not to get
21   involved?
22   A.  Yes.  Whenever we was trying to -- me and Justin
23   were trying to help.  And we was like, we

Westly Spivey

Page 69

1   can get him or -- I don't remember the exact
2   words. But we told him we can help; we can
3   help. And he told us to stay back.
4   Q. Okay. We just haven't gotten there yet in
5   our --
6   A. Okay.
7   Q. So you're walking towards Penny along with
8   Channing. Penny has got his gun out saying he
9   might shoot.
10  A. Stay back. Stay back.
11  Q. Stay back.
12      And then you kind of step to the side or
13  stay back?
14  A. Not necessarily -- not when he said stay back.
15  I was still walking with Channing. But I had
16  glanced up, and he was just -- and he was
17  yelling and -- I think right before that he made
18  a call. And, like, right as we were walking --
19  I mean, whenever me and Channing started going
20  down there, he called and told everybody to come
21  for backup.
22      MR. SIKES: When you say call, you
23      mean a radio call?

Page 70

1       MR. HOWARD: I'm going to get there if
2       you'll let me.
3       MR. SIKES: Okay.
4   Q. Did he call on a radio or cell phone?
5   A. Radio.
6   Q. What did he say?
7   A. And he was just like, send anybody. Send
8   everybody.
9   Q. Did he use the word "backup"?
10  A. Send -- maybe backup, yes. Maybe backup. Send
11  backup. Anybody, everybody. But from what he
12  said then is -- that along with him saying stay
13  back or I'll shoot is what made me nervous --
14  made me think he was nervous, just how he said
15  send anybody, everybody.
16  Q. Okay.
17  A. Like, that's why I thought maybe he was nervous.
18  Q. I understand. Did you ever see Penny call
19  someone on his cell phone?
20  A. No, sir.
21  Q. When you saw Penny, did he have both hands on
22  his gun or just one?
23  A. I feel like he had both hands on his gun.

Page 71

1   Q. You kind of back off a little bit. What happens
2   next?
3   A. Channing continues walking towards him, and
4   Penny started backing up.
5   Q. Was Penny backing up fast?
6   A. His pace went along with Channing's. If
7   Channing -- you know, Channing never ran, but he
8   was walking, you know, kind of fast. He was
9   speed-walking backwards, if I had to say.
10  Q. How close did Channing ever get to Penny
11  in this whole situation?
12  A. 15 feet -- 10, 15 feet. Something like that.
13  Q. Did Penny walk backwards all the way to Mason's
14  house?
15  A. He did.
16  Q. Did he start screaming Mason, Mason?
17  A. Not that I know of.
18  Q. On the 911 there's some shouts, Mason, and I
19  don't know who was doing it. I assumed it was
20  Penny.
21  A. He might have. I'm unsure. We were yelling.
22  We were yelling, too, so -- I'm unsure of that
23  because we were staying back -- I mean, we were

Page 72

1   still back over there closer to the house, and
2   they had made it a little bit up the road.
3   Q. How far away were you from Penny and Channing as
4   all of you were walking towards Mason's house?
5   A. Well, they were walking towards it. And once
6   they got kind of close, we started easing over,
7   because we was on the side of the road -- they
8   was on one side, and we was on the opposite side
9   because, like I said, we didn't know if he was
10  going to shoot or anything like that. And we
11  was yelling that we can help; we can help. And
12  up until they turned the corner, we didn't get
13  as close to them. But once they turned the
14  corner and went up toward's Mason's driveway, we
15  took off.
16  Q. Let me make sure the record is clear.
17      When you say they turned the corner, you're
18  talking about --
19  A. Channing and --
20  Q. Hang on.
21  A. I'm sorry.
22  Q. When they turned the corner, you're talking
23  about Channing and Penny turned to go into

Westly Spivey

Page 73

1    Mason's driveway?

2    A.  Yes, sir.

3    Q.  That corner?

4    A.  Yes, sir.

5    Q.  I think there's a guardrail on one side of the

6        road and a little swamp back in there and then

7        Mason's driveway.

8    A.  Yes, sir.

9    Q.  Were you able to see Penny and Channing as they

10       walked up to Mason's house?

11   A.  No, sir.

12   Q.  Were you aware that Zana was already at Mason's

13       house when you were walking to Mason's house?

14   A.  I didn't know where she was.

15   Q.  Do you know what Justin was doing?

16   A.  He was right next to me.

17   Q.  What were you and Justin screaming?

18   A.  Don't shoot.  We can help.  Don't shoot.  We can

19       help.  We're coming backup.  We're backup.

20       Don't shoot.

21   Q.  Do you know if Penny ever addressed you talking

22       to you, or was Penny just saying stuff?

23   A.  I don't know if he ever just necessarily

Page 74

1        addressed me.

2    Q.  Did you understand that he was meaning for you

3        and Justin to back off when he said -- well, let

4        me back up.

5        You told me that you informed Penny that you

6        were there to help, correct?

7    A.  We were yelling it as we were running up to --

8        because they had turned to go into Mason's

9        driveway, and he was out of sight from them.  So

10       that's whenever we started yelling we can help,

11       and we was running up to their driveway.

12   Q.  Did Penny respond to your --

13   A.  No, sir.

14   Q.  -- statements?

15   A.  Not to my knowledge.

16   Q.  Okay.

17   A.  We didn't hear -- I mean -- I say "we." I

18       didn't hear nobody after that.

19   Q.  Okay.  Earlier you said that Penny told you to

20       stay back.  Where was Penny when he --

21   A.  That's --

22   Q.  -- made that statement?

23   A.  -- as they were backing up.

Page 75

1    Q.  Is that when he had his gun drawn?

2    A.  Yes, sir.

3    Q.  Did he --

4    A.  And I felt like he was speaking to us.  I'm not

5        sure if it's because he looked towards us or

6        what it was, but I know we were trying to -- we

7        was going to try to grab Channing.  But -- and I

8        guess -- I really can't say what made me feel

9        that way.  I guess maybe he looked over towards

10       us or something, but I'm unsure of that.

11       Something made me feel like we shouldn't have

12       done it or that he was speaking when he said

13       stay back to me.

14   Q.  Could he have been saying that to Channing?

15   A.  It's possible.

16   Q.  Did Penny ever acknowledge that you were at the

17       scene, or was his focus solely on Channing?

18            MR. SIKES:  Do you understand the

19            question?

20            Read the question back again,

21            please.

22            MR. HOWARD:  Well --

23            MR. SIKES:  No.  No.  Would you read

Page 76

1        the question back, please.

2            MR. HOWARD:  Just skip that question.

3            MR. SIKES:  Okay.

4    Q.  Did Penny ever specifically make a statement or

5        address you?

6    A.  No.

7    Q.  Did he ever make a statement or specifically

8        address Justin?

9    A.  Not when I was around him.

10   Q.  Could everything that Penny said pertain to

11       Channing only?

12   A.  It's possible.  Outside of when he made the

13       call.

14   Q.  Yes, that's correct.  Yes.  And what I'm talking

15       about, the statements that Penny was shouting --

16   A.  Yes.

17   Q.  -- it seems to me it's hard to tell who he was

18       shouting at.

19   A.  Yes, sir.

20   Q.  I think we have just a bunch of commands, and we

21       have three people they could all apply to --

22   A.  Yes, sir.

23   Q.  -- and we don't know; is that correct?

Westly Spivey

**Page 77**

1   A.  Yes, sir.

2   Q.  Okay.  They turned the corner.

3       Do you need a break?  We've been going for

4   about an hour and 15 minutes.  We've got Coke,

5   water, coffee.  No biscuits.

6       MR. SIKES:  Anytime you need a break,

7           you can take one.  Men's room

8           or --

9       THE WITNESS:  It don't matter.

10      MR. HOWARD:  Okay.  Well, let's take

11          just a short one.

12      THE WITNESS:  Yes, sir.

13      MR. HOWARD:  I don't want to -- this

14          is not a marathon.  We'll come

15          back in about five or ten minutes.

16      THE WITNESS:  All right.

17          (A brief recess was taken.)

18      MR. HOWARD:  Okay.  We're back on.

19  Q.  (Continuing by Mr. Howard) I want to go back and

20  talk to you about your deposition preparation.

21      Did you talk to Mr. Sikes this week about

22  this deposition?

23  A.  No, sir.

**Page 78**

1   Q.  Did you talk to him last week about the

2   deposition?

3   A.  No, sir.

4   Q.  Did he tell you what anybody had said during

5   their deposition?

6   A.  I haven't talked to him.

7   Q.  How about today?

8   A.  This morning.

9   Q.  When did you talk to him this morning?

10  A.  When we got here.

11  Q.  What did he say?

12  A.  Just told me that he wasn't my lawyer and

13  that -- he just told me that if I didn't want to

14  answer anything that I didn't feel comfortable

15  answering, I didn't have to.

16  Q.  Did he tell you anything else like that?

17  A.  That's all.  I mean, it was just --

18  Q.  Did he say anything about your criminal

19  background or questions regarding your criminal

20  background?

21  A.  I mean, that's what it was pertaining to.

22  Q.  What did he specifically say about your criminal

23  background?

**Page 79**

1   A.  That it was all misdemeanors, and I didn't have

2   to say anything about it.  I didn't have to go

3   into detail about it if I didn't feel the need

4   to.

5   Q.  Did he say why?

6   A.  I mean, I just -- I was already -- he just said

7   what I already was thinking anyway, so ...

8   Q.  Did you talk to Chanda about the depositions

9   yesterday?

10  A.  Huh-uh (negative response).

11  Q.  Is that a "no"?

12  A.  No.

13  Q.  What about Zana?

14  A.  She talked to me about it.

15  Q.  What did she say?

16  A.  She just told me that y'all hounded her about

17  it.

18  Q.  Sir?

19  A.  That she was hounded about it.

20  Q.  Hounded about what?

21  A.  Just my past.

22  Q.  At the break I pulled up your Facebook page.

23      When is the last time you posted on Facebook?

**Page 80**

1   A.  Oh, I don't even know.  I don't even have

2   Facebook now.  Well, I guess I still do being

3   that you got on it.  But I don't know my

4   password to it, so I don't even get on it.

5   Q.  Zana said you had two Facebook pages.

6   A.  I have like ten.  Every time I wanted to talk to

7   somebody on Facebook or something, I would make

8   a new one because I always forgot my old

9   passwords.

10  Q.  Did you talk to Mr. Sikes about Channing's

11  Facebook page?

12  A.  Not -- I mean, I've had people say something to

13  me.  I don't believe me and Mr. Sikes have

14  talked about it at all.  Like, whenever -- right

15  when my brother died, people were saying things

16  about it.  And I just -- I told them I didn't

17  feel like listening to it because I already

18  heard it, and I didn't want to ...

19  Q.  What did they say about it?

20  A.  They were just trying to say, like, whatever he

21  was posting and stuff.  I'm not sure.  Like I

22  said, I didn't want to hear about it.  I didn't

23  go and look for myself.  None of it mattered to

Westly Spivey

Page 81

1    me because it wasn't Channing.

2  Q.  Did you ever go back and watch any of the videos

3       that was posted in the two or three hours before

4       the shooting?

5  A.  No, sir.  I had one pop up on my Facebook, but I

6       didn't watch it.

7  Q.  When did it pop up?

8  A.  After it had happened sometime.

9  Q.  In one of the videos, it shows an injury to the

10      forehead of Channing.

11 A.  I believe that's from surgery.

12 Q.  No.  You could see the surgery scar.  This was

13      like a fresh wound with blood on it.

14 A.  Oh, I don't know that.

15 Q.  Did you see any injuries to Channing before he

16      went to the ambulance?

17 A.  It may have happened whenever he wrecked his

18      vehicle that morning.

19 Q.  Well, I don't want you to guess.

20 A.  Well, I'm not sure.  I don't recall whether or

21      not he was -- I don't remember him bleeding.

22 Q.  Okay.  Do you remember any injuries on his body

23      after he went over to the ambulance?

Page 82

1  A.  I do not.

2  Q.  Okay.  They turned the corner, and I'm talking

3       about --

4  A.  Channing.

5  Q.  -- Channing and Penny --

6  A.  Yes, sir.

7  Q.  -- at Mason's driveway.  And how long were they

8       out of your sight?

9  A.  Couldn't have been long.  Because once they

10      turned the corner, we took off, not running full

11      speed but a good pace towards there.  So within

12      maybe a minute, two minutes.  It couldn't have

13      been no longer than that.

14 Q.  Okay.  What's the first thing that you saw when

15      you got to the corner and could see Mason's

16      house?

17 A.  I saw Channing and Mason and Penny.  It was

18      Channing in between --

19 Q.  Hang on.

20 A.  Okay.  I'm sorry.

21 Q.  No.  No.  You're fine.  I just -- I want to make

22      sure I understand exactly what you're saying.

23 A.  All right.

Page 83

1  Q.  I'm going to give you that piece of paper right

2       there.

3  A.  Draw it out?

4  Q.  Draw a picture.

5  A.  All right.  This is the house.

6  Q.  Can you put Mason's house on there?  Just

7       "Mason's house."

8  A.  All right.

9  Q.  Could you draw his driveway down to the street?

10 A.  Down to the street?  Yeah.  I guess they were

11      standing about right there, and the driveway was

12      over here going up that way.

13 Q.  Can you put "driveway" on that?

14 A.  Okay.  Yeah.

15 Q.  Just so when we're getting ready for trial in a

16      few months, we'll know exactly what we're

17      talking about.

18 A.  All right.

19 Q.  Could you put an M where -- well, let me back

20      up.

21      Did you see Mason when you turned the

22      corner?

23 A.  I saw all three of them.

Page 84

1  Q.  Put an M where you saw Mason.

2  A.  (Witness complies.)

3  Q.  Okay.  Put a C where you saw Channing.

4  A.  (Witness complies.)

5  Q.  And put a P where you saw Deputy Penny.

6  A.  (Witness complies.)

7  Q.  How far was Penny from Channing?

8  A.  They all were -- they was within like a

9       triangle.  Like 10 feet of each other everywhere

10      probably 10 feet.

11 Q.  Okay.  My next question was going to ask you how

12      far everybody was.  But if they were in a

13      triangle, everybody is 10 feet from everybody?

14 A.  Yeah.  I mean, they could have tipped fingers.

15      I mean, Mason and Penny might could have tipped

16      fingers.  I ain't going to say they could.

17      Possibly.  And Channing, he was probably 10 feet

18      from them.

19      MR. SIKES:  By tipped fingers, you

20      mean if they both --

21      THE WITNESS:  Yeah.  If their arms --

22      MR. SIKES:  -- put their arms out --

23      THE WITNESS:  -- were both stretched

Westly Spivey

Page 85

1       all the way out, they could
2           probably have tipped fingers.
3   Q.  Okay.  Were you still on North Glenwood Street
4       at this point?
5   A.  I had come right here.
6   Q.  Okay.
7   A.  It was Westly and Justin.
8           MR. SIKES:  For the record --
9   Q.  What -- is there a bush or something there?
10          MR. SIKES:  Pardon me.  For the
11              record, there is a plat of this
12              that you could use in this that
13              would make it a lot clearer and a
14              lot better.  But, again, if you
15              want to do it -- it's your
16              deposition.  Do as you like.
17          MR. HOWARD:  I appreciate your legal
18              tips.  I'll take that under
19              advisement.
20          MR. SIKES:  It wasn't a tip.  It was
21              just an idea --
22   Q.  Is there a bush or something right there?
23          MR. SIKES:  -- that you could probably

Page 86

1       do this a lot better --
2   A.  Me and Justin --
3           MR. SIKES:  -- and a lot clearer.
4           MR. HOWARD:  Well, I appreciate your
5               help.
6   A.  That's me and Justin.
7           MR. SIKES:  You're welcome.
8   A.  Here's the tree lines right here.
9   Q.  Okay.  Is that where the swamp is at down there
10      in the bottom?
11   A.  Swamp is right here.
12   Q.  Okay.
13   A.  It's probably a little bit further over, the
14      swamp itself.  But the tree line stops like
15      right here somewhere.  Right at the driveway.
16   Q.  How far away were you from the asphalt?
17   A.  From the asphalt?  From the driveway?
18   Q.  Well, when I say asphalt, I'm talking about
19      North Glenwood.
20   A.  Okay.  I was about to say -- because I don't
21      remember it being --
22   Q.  No.  His driveway does not have asphalt.
23   A.  Yeah, that's what I was thinking.

Page 87

1   Q.  So I want to get how far away you were from the
2       road so we can use Mr. Sikes' map to see how far
3       away you were from the action.
4   A.  Let's see.  I mean, you've got the road.  Then
5       you've got the driveway.  Probably 20 feet in --
6       20, 30 feet in tops.  Maybe 20 feet in --
7   Q.  Okay.  Twenty --
8   A.  -- feet, like, from the asphalt up inside the
9       drive.  We had made it inside the drive and
10      right there to the left of the driveway.
11   Q.  There's, like, some grass --
12   A.  There's some shrubs right here -- some little
13      shrubs right there going along the side of the
14      drive.
15   Q.  Okay.
16   A.  And we were -- I was to the left of that.
17   Q.  Okay.  Were you saying anything while you were
18      in Mason's yard?
19   A.  We were yelling as we ran up.  But once we got
20      there, we really didn't say anything.  Mason
21      told us to stay back.  I say Mason.  I'm not
22      sure.  Somebody said stay back.
23   Q.  Don't know who that was?

Page 88

1   A.  I'm not sure.  I ain't going to say one way or
2       another.
3   Q.  I understand from the testimony that Zana,
4       Mason's wife, and Mason's son were in the house.
5       Did you see them at all?
6   A.  No, sir.
7   Q.  If you could --
8           MR. HOWARD:  I'm going to mark your
9               picture there as Defendant's
10              Exhibit 2.
11   A.  Sign it?
12   Q.  If you could sign it for me, please.
13   A.  All right.
14          (Defendant's Exhibit 2 marked for
15          identification.)
16   Q.  We've marked your position there by a W and J,
17      and we know how far that is from the road.  Did
18      you get any closer to where Mason, Channing, and
19      Penny were prior to the shots being fired?
20   A.  No, sir.
21   Q.  Okay.  Did you get closer to where Mason,
22      Channing, and Penny were after the shots were
23      fired?

Cite, LLC

Westly Spivey

2/10/2021
23 (89 − 92)

Page 89

1  A.  I started running towards it.
2  Q.  Okay.  I want to talk about from the time that
3      you got established where -- on Defendant's
4      Exhibit 2 until the shots were fired.
5          You get in your spot there, and you see them
6      standing in a triangle.  Did you hear anything
7      that Mason said?
8  A.  There was commotion.  I'm not sure who was
9      speaking.
10  Q.  Okay.  We know somebody said stay back.  We just
11      don't know who it was.  Is that fair?
12  A.  Yes, sir.
13  Q.  Did you hear anything that Mason specifically
14      said other than what could have been stay back?
15  A.  Not specifics.
16  Q.  Okay.  How about Penny?
17  A.  No, sir.
18  Q.  How about Channing?
19  A.  No, sir.
20  Q.  They are in a triangle.  What happens next?
21  A.  Channing steps toward, like -- starts moving
22      towards them, like --
23  Q.  Them being Mason and --

Page 90

1  A.  Mason --
2  Q.  -- Penny?
3  A.  -- and Penny, yes, sir.
4          Channing starts moving towards them, and
5      then they shoot him or -- Mason shoots him.
6  Q.  Okay.  How far away was Mason from Channing when
7      the shots were fired?
8  A.  Probably 5 feet.
9  Q.  How far was Penny from Mason when the shots were
10      fired?
11  A.  How far was Penny from Channing?  Is that what
12      you said?
13  Q.  Well, first I want to know how far Penny was
14      from Mason.
15  A.  Okay.
16  Q.  We started out with a triangle --
17  A.  Yes, sir.
18  Q.  -- and then it looks --
19  A.  Still --
20  Q.  Hang on.
21  A.  I'm sorry.
22  Q.  We started out with a triangle, and it looks
23      like Channing closed the gap towards Mason.  So

Page 91

1      that left Penny somewhere out there, and I'm
2      just trying to get his distance to --
3  A.  Still about the same distance as before.
4      Probably about, you know, 10 feet tops.
5  Q.  Okay.  Is it fair to say that Penny was about 10
6      feet away from both Mason and Channing when the
7      shots were fired?
8  A.  Yes, sir.
9  Q.  And your testimony is there was 5 feet distance
10      between Mason and Channing when the shots were
11      fired?
12  A.  It looked to be.
13  Q.  Was Channing still walking at that point?
14  A.  Once they were fired?
15  Q.  No, not when they were fired.  About a
16      nanosecond before they were fired.
17  A.  He was making -- he was moving that way.
18  Q.  Okay.  When the bullets went into Channing's
19      body, was Channing moving?
20  A.  Channing just dropped straight down.
21  Q.  How about just before the bullets went into him?
22      Was he moving when he was shot?
23  A.  I mean, he was walking towards them, and they

Page 92

1      shot and -- or Mason shot, and Channing just
2      dropped.
3  Q.  Okay.  Did you have any difficulty telling from
4      which gun the bullets came from?
5  A.  No.  No.
6  Q.  Anything stand out in your mind that you knew
7      that was Mason's gun?
8  A.  I knew that it was Mason.
9  Q.  How did you know that?
10  A.  I mean, I clearly could see it, and that's who
11      Channing was walking toward.
12  Q.  Okay.  Well, I asked that because we've had some
13      testimony about the lighting that was out there.
14      I know it was lit well enough so you could walk
15      down the road.  But how -- was it dusk?  Was it
16      dark?  Was it light in your opinion?
17  A.  It was dusk for sure, but we were standing next
18      to Mason's house.  I'm not sure if there was an
19      outdoor light or anything out there, but it
20      could have been.
21  Q.  Okay.  Were there any streetlights on North
22      Glenwood?
23  A.  Yes, sir.  Outside my house there's four.

Cite, LLC

Westly Spivey

Page 93

1  Q.  Okay.  About what time was this?  Do you know?
2  A.  Right before dark.  Because I'm talking about --
3     it was right at dark, so right before dark.
4  Q.  Shots were fired.  What does Penny do?
5  A.  I have no idea.  I stand there.  I'm not sure if
6     he done anything.
7  Q.  Did you see Penny, I don't want to say, run away
8     but back off fairly quickly and get on a cell
9     phone?
10 A.  No, sir.  Because I ran towards -- I ran towards
11    it, and Mason said stay back, so I stood back.
12    Then Mason started yelling at Penny, and we felt
13    uncomfortable, so we took off running.
14 Q.  What did Mason yell at Penny?
15 A.  I don't know if this is the exact words, but
16    something of this nature.  Why in the eff did
17    you bring him over to my property?  This is my
18    house.  Something like that.  I'm not exactly
19    sure, but it was to that nature of why did you
20    bring him over here.
21 Q.  Did he say something about he thought he was
22    going to get killed?
23 A.  Who?  Penny?  Did Penny say that or did Mason?

Page 94

1  Q.  Did Mason say that to Penny?
2  A.  Not to my knowledge.
3  Q.  Okay.  Did you hear anything else that Mason
4     said?
5  A.  That's about as far as I've heard, because we
6     took off running after that.
7  Q.  Based on what I think you're telling me, you
8     heard somebody say stay back.  We're not sure if
9     that was Mason or Penny.
10 A.  No.  That was Mason that said that.  I'm sure.
11    No.  Because I was walking toward them, and
12    Mason was -- Channing was on the ground, and
13    Mason was right here, and I was looking right at
14    that.  And he clearly was speaking to me.
15 Q.  Yeah.  I asked you a bad question.
16 A.  Okay.  I'm sorry.
17 Q.  I understand that you were told to stay back
18    twice.  First you don't know who said it.
19 A.  Yes, sir.
20 Q.  Second Mason said it.
21 A.  Yes, sir.
22 Q.  And then you heard Mason tell Penny why did you
23    bring him to my property or something along

Page 95

1     those lines?
2  A.  Yes, sir.
3  Q.  Did you hear Mason say anything else?
4  A.  I did not.
5  Q.  Did you hear Penny say anything else?
6  A.  I did not.
7  Q.  Did you say anything while you were on Mason's
8     property?
9  A.  No, I did not.  Me and -- I mean, I might have
10    said let's go or something.  Justin might have
11    said -- I'm not sure.  One of us -- we both felt
12    uncomfortable, so one of us just said it and we
13    ran.
14 Q.  Where did you run to?
15 A.  My house.
16 Q.  Did you know that Zana was at his house --
17    Mason's house?
18 A.  At the time I did not.  I didn't know that until
19    we got back to my house.
20 Q.  How did you find that out?
21 A.  Because her phone and everything was sitting on
22    the porch.  And I asked Justin -- I'm like,
23    where is Zana at?  And he said, she went up to

Page 96

1     Mason's to call or get help or something like
2     that.
3  Q.  Have you been told what Zana told Mason when she
4     arrived at his house?
5  A.  I haven't been told -- like, if there's an exact
6     or anything, I haven't been told anything.  But
7     I've heard her say what she said.
8  Q.  What did she tell you?
9  A.  Just that there's -- help, help, help.
10    Somebody's got a gun or something like that.
11    I'm not exactly sure, but it was trying to get
12    help.
13 Q.  Okay.  Every time she's told you what happened,
14    did she say that she told Mason somebody had a
15    gun?
16       MR. SIKES:  That's not what he
17          testified.
18       MR. HOWARD:  Well, I'm asking a new
19          question, then.
20       MR. SIKES:  Okay.
21 A.  Honestly, just like throughout the whole time,
22    like, I really -- I'm kind of pushed away from
23    it, and I don't even like talking about it.

Westly Spivey

Page 97

1    That's why I never cared about the depositions.
2    I never read over any of it. It's just --
3    I know what I seen and what happened, and that's
4    what I'm going of off. I'm not exactly -- she's
5    talked to me about it, but everything she said,
6    I don't know the exact words.
7    Q.  Okay. Has Zana told you anything that she heard
8        Mason say?
9    A.  Possibly just talking. I mean, just trying to
10       explain to me everything, but she likes to give
11       explanations.
12   Q.  What explanations has she given you regarding
13       Mason's actions?
14   A.  I mean, not any that stand out that I can even
15       think of outside of -- you know, she got help
16       and he took her inside and told her to stay
17       there.
18   Q.  Okay. Did she give you any indication that
19       Mason told her to go in the house for her
20       protection?
21   A.  Yes. Stay with his wife and kid.
22   Q.  Did Zana tell you that Mason's wife got the gun?
23   A.  No.

Page 98

1    Q.  Did she tell you that Mason's son got the radio?
2    A.  No.
3    Q.  Did she tell you anything that she observed
4        while she was in Mason's house?
5    A.  No. She overheard something, but -- I mean,
6        overheard -- she said she thinks she overheard a
7        radio or something like that. But nothing
8        like -- she didn't explain anything, like, that
9        was in there. Nothing -- I think she said
10       Xantha told her it will be okay and that
11       somebody looked out a window or something. I'm
12       not sure. I'm not sure. Like I said, I really
13       didn't -- she likes to give detailed
14       explanations, and I'm just kind of --
15   Q.  I understand.
16   A.  -- backed off from it.
17   Q.  Did she say anything that she heard about a Life
18       Flight? I think she said that yesterday. She
19       heard something about Life Flight on the radio.
20   A.  She mentioned that. I remember her mentioning
21       something about Life Flight but not that I even
22       remembered until you said it.
23   Q.  Okay. How long after the shots were fired did

Page 99

1        you immediately leave?
2    A.  Oh, within -- probably within a minute. Like
3        when the shots were fired, I immediately took
4        off. And he said stay back and I stopped. And
5        whenever he started yelling toward -- when Mason
6        started yelling at Penny, I started backing up.
7        And me and Justin -- I don't know if we said
8        something or just looked at each other, and we
9        both just took off running.
10   Q.  Have you ever been employed as a police officer?
11   A.  No, sir.
12   Q.  Have you ever had any police training?
13   A.  No, sir.
14   Q.  Have you ever researched anything to do after a
15       police shooting?
16   A.  No, sir.
17   Q.  Have you spoken to any experts or police
18       officers about this incident?
19   A.  No, sir.
20   Q.  Before you left did you see Mason get on a radio
21       or his cell phone?
22   A.  No, sir.
23   Q.  Do you know whether or not Mason called the

Page 100

1        ambulance?
2    A.  No, sir.
3    Q.  As you were going back home, what was the
4        ambulance doing that was sitting in the middle
5        of the road?
6    A.  I didn't even notice them. I didn't notice them
7        until they came by and went in and actually
8        pulled in.
9    Q.  Okay. Do you know the EMT named E-Bay?
10   A.  I've heard his name from Zana, but that's as far
11       as I know.
12   Q.  You told me that you had never spoken to Tim
13       about this, correct?
14   A.  Yes, sir. I don't talk to Tim.
15   Q.  Did you see another ambulance come to the scene?
16   A.  After that I was just kind of just -- everything
17       was really a blur, especially after that had
18       happened. I was -- just sat on the porch. I
19       don't even know if I was looking up.
20   Q.  Did you call Chanda?
21   A.  I did call my aunt:
22   Q.  What did you tell her happened?
23   A.  That Channing had just been shot.

Westly Spivey

Page 101

1  Q.  Anything else?

2  A.  To come.  And she was on her way.

3  Q.  I'd imagine that telephone call didn't last very

4      long.

5  A.  Not at all.

6  Q.  And she was there very quick?

7  A.  Very quick.

8  Q.  And she testified that she came to your house

9      and pretty much stayed there.

10 A.  She did.  Until, like, three or four that

11     morning.

12 Q.  Did you see her leave and come back at any time?

13 A.  No.  She left at, like, three or four that

14     morning and came back the next day.

15 Q.  That was a bad question.

16     From the time that she got there until she

17     left at two or three in the morning, did you see

18     her walk up to Mason's house?

19 A.  No.  She went to sleep.

20 Q.  At what point did Zana come back home?

21 A.  Probably at least an hour later.

22 Q.  What did she tell you when you first saw her?

23 A.  That they wouldn't let her leave.  I guess due

Page 102

1      to the scene and all that.

2  Q.  Who is "they"?

3  A.  Maybe it was his wife, you know, didn't want her

4      going out and seeing any -- I'm not sure.  She

5      just said that they didn't want me to leave

6      because of what happened.

7  Q.  By the time she got back home, were all the

8      police officers on the scene --

9  A.  Yes, sir.

10 Q.  -- and a full investigation going on?

11 A.  Yes, sir.  I think one of the -- yeah.  One of

12     the investigators dropped her off at the house.

13     The SBI or whatnot.

14 Q.  Did you talk to the SBI?

15 A.  They came and -- a guy came and asked where the

16     ambulance was at during the time of it all

17     occurring, and I walked up there and showed him

18     where it had happened at.

19 Q.  Was there glass in the road?

20 A.  Where he had done it at the police officer's --

21     sheriff's car, there was glass in the road.  But

22     up the road it was dark, and I couldn't ...

23 Q.  It was dark by this time, right?

Page 103

1  A.  Yes, sir.

2  Q.  Did you give a statement to the SBI?

3  A.  No, sir.  Not until later on.  It was like three

4      or four weeks or two or three weeks later,

5      something like that.

6  Q.  Other than asking you where the ambulance was

7      when that action took place, did they say

8      anything to you that night?

9  A.  No, sir.  They had somebody come over there and

10     talk to us about my brother's death, like the

11     grave -- I mean, about the -- I think it was the

12     guy that -- I mean the funeral home guy.  I

13     think that's the only other person that came

14     over there and talked to us outside of -- the

15     sheriff came over there, and he said something.

16     I don't even know what he was talking about.

17     He was just trying to, I guess -- trying to be

18     nice, you know, comfort us.

19 Q.  And I think Channing --

20 A.  I think he was talking to Channing.

21 Q.  Channing knew the sheriff.

22 A.  Yeah.  I knew of him, but I never really talked

23     to him before.  I just, I guess, because --

Page 104

1      heard him.  Small county.

2  Q.  I understand.  Did the SBI say we're going to

3      call you later to get a statement, or did they

4      just call you out of the blue weeks later?

5  A.  I think the guy that I walked with told me that

6      they'd have someone come talk to us.

7  Q.  Okay.  The guy that you walked with?

8  A.  Well, no.  There was an SBI guy that came later

9      on and spoke to us for a second.

10         THE WITNESS:  Because he said he liked

11         your car.

12         MS. CALLOWAY:  Uh-huh (positive

13         response).

14 Q.  Is that the BMW?

15 A.  Yeah.

16 Q.  Yeah, I like it too.

17 A.  Yeah.  He said -- I remember that.  And I think

18     that's who told us that we'd have somebody

19     come -- I mean, we'd have someone get in touch

20     and question us or, you know, go over the entire

21     thing with you at some point.

22 Q.  You said the guy that you walked with.  What did

23     you mean?

Westly Spivey

Page 105

1  A.  The SBI agent that came then, he was a younger
2     guy.  He was just trying to figure out where it
3     occurred at.
4  Q.  I understand.  You were walking with him to see
5     where the ambulance activity took place?
6  A.  Yeah.  I just walked up the road and just showed
7     him.
8  Q.  This is not a guy that you meet to walk with
9     every afternoon?
10 A.  This guy?  I don't know who he is.
11 Q.  I understand.  The way you said it sounded like
12    you have planned exercise with him or something.
13    I just wanted to rule that out.  This is just
14    the SBI guy?
15 A.  This is just the agent that came over there and
16    asked me to show him where this occurred --
17    where the ambulance was at exactly, if I could
18    tell him.
19 Q.  Tell me about when you went to the SBI to give
20    your statement.
21 A.  They came to me.
22 Q.  Tell me about that.
23 A.  We just met and he just went over the whole -- I

Page 106

1     mean, just tried to go over it in detail, over
2     everything that happened, just like me and you
3     are doing right now.
4  Q.  Did you sign anything?
5  A.  I don't -- maybe.  Not that I remember.  I don't
6     want to say yea or nay that I did.  I don't
7     know.  Not that I remember.
8  Q.  Did they give you anything other than a business
9     card?
10 A.  No.
11 Q.  Did they tell you that you could get a copy of
12    your statement?
13 A.  Not that I recall.
14 Q.  Did he turn a recorder on?
15 A.  Yes.
16 Q.  Was the recorder audio or video or both?
17 A.  Audio.
18 Q.  Is he the only one that took a statement that
19    day from you?
20 A.  Yes, sir.
21 Q.  Do you know if he took a statement from Justin?
22 A.  Before, yes.
23 Q.  Before yours?

Page 107

1  A.  Yes.
2  Q.  Same day?
3  A.  No.
4  Q.  Okay.  Do you know where he took Justin's
5     statement at?
6  A.  In Montgomery.
7  Q.  Okay.  How long did the meeting with you and the
8     SBI last?
9  A.  Probably about two-and-a-half hours.
10 Q.  Did he get anything from you other than the
11    conversation?
12 A.  Medication.
13 Q.  Did he get any medical documents in addition to
14    the medication?
15 A.  Yeah.  I believe that we gave him all -- we gave
16    him all the stuff that we had left over.
17 Q.  Did he take pictures while he was there?
18 A.  Of the stuff?  I knew that he took -- that he
19    wrote down -- like, he made a thing for all of
20    it, like a log.  He logged all of it in.  But
21    outside of that, I don't know if he took
22    pictures or anything.
23 Q.  The medication bottles that the SBI got or saw,

Page 108

1     did he take them with him?
2  A.  I think he just logged all of it in actually.  I
3     don't think he took any of it except -- there
4     was one of them that was illegal.  I mean, not
5     illegal for Channing, but it was --
6  Q.  It was a narcotic?
7  A.  It was a narcotic.  So he might have took that.
8     I'm not even sure if he took that, but he might
9     have took that one.
10 Q.  Okay.  And that was for Channing's medical
11    problem?
12 A.  Yes, sir.  That was for the cancer treatment.
13 Q.  Okay.  On the medicine bottles, does it say how
14    much you're supposed to take when?
15 A.  I'm sure it does.
16 Q.  Do you still have the medicine bottles?
17 A.  I don't.
18 Q.  Do you know if anybody does?
19       THE WITNESS:  Aunt Chanda, did I give
20          them to you?
21 Q.  Well, I can get with them later on that one.
22 A.  Okay.
23 Q.  Are they at your house?

Cite, LLC

Westly Spivey

Page 109

1   A.  No.
2   Q.  Okay.  And so if I ask you for them, you don't
3       have them to give them to me?
4   A.  Oh, no, sir.
5   Q.  What all did the SBI guy look at other than the
6       medication?
7   A.  That's all.
8   Q.  Did he take any measurements while he was there?
9   A.  No.  They done something that night.  That's why
10      it lasted till four.  They done some kind of
11      little -- they sat out some thing that took --
12      that took all the measurements -- like, laser
13      measurements or something.
14  Q.  They mapped the scene is what --
15  A.  They done -- yes, sir.  They done it the night
16      of the shooting.
17  Q.  The first time 911 was called, whose cars were
18      at your house?
19  A.  Justin's and -- that's it.
20  Q.  Do you have a car?
21  A.  No, sir.  My girlfriend does, but hers wasn't --
22      she didn't have it at the time.
23  Q.  Were there any cars that were there that were

Page 110

1       not being used?
2   A.  No, sir.  It was just Justin's in the driveway.
3   Q.  I noticed when I was there at the inspection
4       that there were a lot of plants outside.
5   A.  Yes, sir.
6   Q.  Were those there at that time?
7   A.  Yes, sir.
8   Q.  And I took it that that was part of your
9       landscaping business?
10  A.  Yes, sir.
11  Q.  Like a greenhouse?
12  A.  Well, yes, sir.  We're starting a nursery.
13          (Brief interruption by the court
14            reporter for clarification.)
15  Q.  What kind of car did Justin have that day?
16  A.  Avalanche.
17  Q.  Where was it parked at in relation -- well, let
18      me -- what I'm trying to do is I'm trying to get
19      a timeline, and I'm putting everything together
20      with the SBI's mapping.  And they probably
21      didn't map the cars that were there before
22      because a lot came up.  But where was Justin's
23      car in relation to Deputy Penny's car?

Page 111

1   A.  Okay.  Deputy Penny --
2           MR. SIKES:  At the time of the
3             shooting?
4           MR. HOWARD:  Sure.  That's the only
5             time Deputy Penny was there,
6             wasn't he?
7   A.  The car was there for a while, I think.
8   Q.  That's what I'm thinking.
9   A.  Yeah.  It was --
10  Q.  Well, let me ask -- they didn't let anybody move
11      a car after they got there, did they?
12  A.  No, sir.
13  Q.  Deputy Penny's car, we know, is parked in front
14      of your house.
15  A.  In the --
16  Q.  Where was Justin's car?
17  A.  At the end of the driveway.  Like, right there
18      at the road was Deputy Penny's, and Justin's was
19      in the drive.  Probably 10, 15 feet.  Not far.
20  Q.  And Justin's was parked facing the house?
21  A.  Yes, sir.
22  Q.  What did Channing have on that day and night?
23  A.  A pair of swimming trunks and some sandals, but

Page 112

1       they came off at some point because they were in
2       the yard.  He might have had a bandana on.  I
3       don't know.  He wore the same thing for, like,
4       two days.
5   Q.  Yesterday I learned that Channing missed his
6       doctor's appointment on Tuesday and Wednesday;
7       is that correct?
8   A.  Well, all this was going down that Wednesday,
9       so, yeah, he definitely did Wednesday.  And
10      Tuesday he did.  He decided not to go, so yes,
11      sir.
12  Q.  And I understand Monday was a holiday --
13  A.  Yes, sir.
14  Q.  -- and they were closed.
15          I think the doctor contacted Chanda about
16      the missed doctor's appointments.  Did she tell
17      you about that conversation?
18  A.  Maybe.  I mean, she did, I think, that she
19      talked to the doctor from Florida, I believe it
20      was, that had contacted her.  But I don't
21      remember exactly what it was about, but she
22      talked to the doctor from Florida.
23  Q.  Is Channing the one that was kind of

Westly Spivey

Page 113

1    coordinating his medical --
2    A.  Yes, sir.  He quit taking his medicine -- like,
3         the pain medicine that was left over, like, he
4         had quit taking it that probably Sunday or
5         Monday, and he still had it.  So he chose -- I
6         mean, he chose to do that, so ...
7    Q.  When you go to a doctor, they ask you can this
8         person see my medical records or somebody else.
9         Was Chanda the one that was allowed to see
10       Channing's medical records, or were you on that
11       list also?
12   A.  I don't -- I have no idea who was on it.
13   Q.  I want to take you back to where you're standing
14       in Mason's yard down there by the street.
15   A.  By the bushes.
16   Q.  By the bushes.
17            At any time did you see Deputy Penny do
18       anything after the shooting?
19   A.  Not that I -- not that caught my attention.
20   Q.  Okay.  I've asked you if he went over and talked
21       on the cell phone, but I did not ask you what
22       did you see.
23   A.  I didn't even see him move.  I ain't saying

Page 114

1         that he didn't take a step anyway.  I just -- it
2         was -- it just was all -- like, he wasn't even
3         in my line of sight or -- I mean, he was, but I
4         just wasn't paying him no attention at all.
5    Q.  Look, I understand.  It's your brother.
6    A.  Yes, sir.
7    Q.  I get it.  Other than Mason telling you to stay
8         back, did you see him do anything?
9    A.  Not outside of he turned towards Penny and just
10       started shouting.  That's it.
11   Q.  Okay.  After the shots what did Mason do with
12       the gun?
13   A.  I'm not sure.
14   Q.  Did you see what Penny did with his gun while
15       the shots were being fired?
16   A.  I didn't, no, sir.  I didn't even notice Penny.
17   Q.  Do you think Penny should have stopped him down
18       there at your house?
19   A.  I don't really -- you know, I have a lot of
20       thoughts on it, but I think that -- I think that
21       Penny was kind of doing the right thing, but I
22       think he was really nervous about it, and I
23       think that his training just wasn't -- he just

Page 115

1         wasn't prepared for it, because I feel like we
2         could have set it up where, you know, all three
3         of us could have took him down without a
4         problem.  But I wasn't going to go over there
5         and grab my brother and slam him on the ground
6         when he just had brain cancer surgery and he has
7         staples -- you know what I'm saying -- all in
8         his head.  I wasn't going to go slam him on the
9         ground.
10            MR. SIKES:  Had what in his head?
11            THE WITNESS:  Staples.
12   A.  But I wasn't going to go slam him on the ground
13       due to that.  But I feel like it could have went
14       a different way the whole time.  I feel -- yeah.
15       But I'm not an officer.  I never had training,
16       so I don't know what they're trained to do.
17   Q.  When you went into Mason's yard, you stopped at
18       the bush, and you did not move until after the
19       shots were fired.  Why did you not go up there
20       to where Mason --
21   A.  They told us to stay back.
22   Q.  Okay.  I remember.  It was said, but you don't
23       know who said it.

Page 116

1            MR. SIKES:  No.  After the shots were
2            fired, he did know who said it.
3            THE WITNESS:  No.  Before.
4            MR. HOWARD:  No.  Before.
5            MR. SIKES:  Okay.  Before.
6            THE WITNESS:  Before.
7    Q.  I remember you telling me that.
8            Did you take photographs of anything that
9         had to do with the shooting?
10   A.  Huh-uh (negative response).
11   Q.  Is that a "no"?
12   A.  No, sir.
13   Q.  And she'll have to get all that down.
14   A.  No, sir, I didn't.
15   Q.  That's hard to remember.
16            Did you take photographs of Penny's car?
17   A.  I didn't take photographs of anything.
18   Q.  Do you know anybody that did other than SBI?
19   A.  No, sir.
20   Q.  Do you know if Chanda took any photographs?
21   A.  Not to my knowledge.
22   Q.  How many shots were fired?
23   A.  Five.

Westly Spivey

2/10/2021
30 (117 – 120)

Page 117

1    Q.   Did you see Mason's gun?

2    A.   I did not.

3    Q.   Was Channing's back to you?

4    A.   It was.

5    Q.   Was his back to you while he was walking towards

6         Mason?

7    A.   It was.

8    Q.   Could you see the front of Mason or just the

9         side of Mason?

10   A.   The front.

11   Q.   Could you see the gun?

12   A.   It was -- I mean, not -- not clear -- not enough

13        to tell you anything about it.  I couldn't

14        explain it.  I was far off.  It was a handgun, I

15        mean, so ...

16   Q.   I just figured the way you drew the picture that

17        Channing was standing between you and Mason.

18   A.   Well, he was, but, you know, it could have been

19        offset.  Like, Channing might have been dead in

20        between them two and Mason right here, and

21        Channing just started walking towards him.

22   Q.   Okay.

23   A.   I could clearly see Mason's face, but the gun

Page 118

1         and stuff, I can't tell you what kind it was or

2         anything like that.  The reason I know he had a

3         gun is because he shot him.

4    Q.   Did you see the gun before he shot him?

5    A.   Not that I recall.

6    Q.   Did you see Mason pull his gun?

7    A.   I don't remember if I saw him pull it.  I feel

8         like he would already have had to have it out,

9         but I'm not sure on that either, so ...

10   Q.   Okay.  Now, Penny had his out, right?

11   A.   Once I got there, outside of just seeing them,

12        like, running up there and seeing both of them,

13        I really don't remember.  I think Penny

14        had his -- I knew he had it out before, so I'm

15        assuming he didn't put it back in the holster,

16        but I don't know this.  I'm assuming that he had

17        his out, too.  I don't know, though.  But, like

18        I said, like, I was really -- I was right there

19        looking at Channing the whole time, and so ...

20   Q.   I understand.  Penny testified that he had body

21        armor on, a vest, that was too big.  And he

22        couldn't get his Taser into his pants, so he

23        stuck it into his vest.  Did you see Penny do

Page 119

1         anything with a Taser after he shot the Taser?

2    A.   No, sir.

3    Q.   How long did Justin stay at your house after the

4         shooting?

5    A.   He didn't leave until maybe right before Aunt

6         Chanda left, so it was late.  I mean, SBI, they

7         made us all go inside and stay in there until

8         they got done.  And then it was -- probably

9         right when they got done, he probably went ahead

10        and went home.

11   Q.   How often did Channing go to the doctor?  Was it

12        every day or every other day?

13   A.   I think it was three or four times a week.

14        Three times -- I think it was three times a week

15        maybe.  Maybe four.  Four days a week, yeah.

16   Q.   I'm going to see if I have a picture of the

17        bushes.

18             Have you talked to Mason or anybody in his

19        family since the shooting?

20   A.   No, sir.

21   Q.   Have you been to his house for any reason?

22   A.   No, sir.

23   Q.   You said the sheriff came by, correct?

Page 120

1    A.   I guess he just walked over from the scene.  I

2         don't know.

3    Q.   Okay.  Did he talk -- or let me say -- did you

4         hear him say anything about the shooting, or was

5         it just talking to Chanda?

6    A.   Just -- I feel like it was just comforting

7         Chanda.

8    Q.   I'm going to show you what's been marked as

9         Plaintiff's Exhibits 8, 9, and 10.

10            MR. SIKES:  He can look at these if

11            you want where you can look at

12            them if you want.

13            MR. HOWARD:  He can look at those, or

14            we can share.

15            MR. SIKES:  Okay.

16   Q.   Can you circle the bushes you were talking about

17        if they are on there?

18   A.   Right here.  The gate wasn't shut.  The gate was

19        open at the time.  But the bushes are right

20        here, and I was right there.

21   Q.   Is that the pampas grass?  Is that what that is?

22   A.   No.  I think that's just bushes, I guess.  I

23        don't know.  Maybe it is pampas grass.  Yeah,

Westly Spivey

Page 121

1    that's pampas grass.
2    Q.  Let me show you Number 11.
3    A.  All right.  Yeah.  I mean, that's where I said
4        bushes.  I ain't never even looked at his house
5        since then.
6    Q.  Okay.
7    A.  And I was right here.  I came in and went right
8        there.  I was right there, and Justin was right
9        there.
10   Q.  I'll tell you what.  That pen is not very -- I'm
11       going to go get you a Sharpie, and we'll --
12           MR. HOWARD:  There you go.
13   Q.  If you could circle on Plaintiff's Exhibit 11
14       where you and Justin were standing.
15   A.  Do you want me to circle it or do W. J.?
16   Q.  W. J.  That will be fine.
17   A.  To the side right there, the pampas grass.
18   Q.  Okay.  Now let's move to the other exhibits so
19       we're consistent.
20           Which one do we have there?  Nine?
21   A.  We've got 8, 9, and 10.
22   Q.  Okay.  Do it on -- draw it on 8 if you can see
23       it.

Page 122

1    A.  (Witness complies.)
2    Q.  Okay.  How about 9.
3    A.  (Witness complies.)
4    Q.  How far away were you from the pampas grass?
5    A.  I mean, not too far because I just -- when we
6        ran into the driveway, we went right on the
7        other side of it and -- so less than 10 feet
8        probably.
9    Q.  Were you on the driveway side of the pampas
10       grass or the other side?
11   A.  Other side.  I was on the side that the house is
12       on.
13   Q.  You were on the side the tree is on, I guess?
14   A.  Yes.
15   Q.  I've got ya.  Did Zana ever tell you which door
16       she went in?
17   A.  No, sir.
18   Q.  Do you know which door Mason came out of?
19   A.  No idea.
20   Q.  Did you hear any radio traffic while you were in
21       Mason's yard?
22   A.  I did not.
23   Q.  Are you a member of any rescue squad or

Page 123

1    volunteer rescue squad?
2    A.  I'm not.
3    Q.  Have you spoken to anybody at the Luverne Rescue
4        Squad about this incident?
5    A.  No, sir.
6    Q.  Have you spoken to --
7    A.  I haven't talked to anybody outside of my aunt
8        and Zana and Justin.
9    Q.  And Mr --
10   A.  And Mr. Sikes.
11   Q.  -- Sikes.  Okay.
12           MR. HOWARD:  I'm going to me remark
13           these as Defendant's Exhibits 3,
14           4, 5, and 6.
15           (Defendant's Exhibits 3, 4, 5, and 6
16           marked for identification.)
17           MR. SIKES:  Why don't you -- so that
18           we won't be confused, why don't
19           you just do them as Plaintiff's
20           11 -- you don't have to match them
21           up that way.
22           MR. HOWARD:  Because there won't be
23           any confusion this way.  I've got

Page 124

1        new numbers.
2            MR. SIKES:  I know.  That will cause
3            the confusion.
4            MR. HOWARD:  What would be ambiguous
5            is to have markings on one and the
6            picture on another.
7            MR. SIKES:  Well, let's see.  Let's
8            match up -- Defendant's Exhibit 8,
9            which one is that on Plaintiff's
10           Exhibit --
11           MR. HOWARD:  They're on there.  I'm
12           going to leave them.  It's as
13           clear as it can be right there.
14           MR. SIKES:  Just don't like to be
15           agreeable, do you?
16   Q.  The coroner came to your house, correct?
17   A.  That night, yes, sir.
18   Q.  Can you tell me everything that he said, or have
19       you told me everything that you heard him say?
20   A.  I can't -- I really can't tell you much of
21       anything outside of just -- I know how he acted,
22       but I understand that he does this all the time,
23       that he can't be showing emotion.  Like, he just

Westly Spivey

2/10/2021
32 (125 - 128)

Page 125

1    kind of acted, like, emotionless, and that's all
2    I remember.  I don't remember what he said.
3    I -- just how I felt about it.  But I understand
4    why too.  If you had to talk about people dying
5    every day, you would kind of, you know -- so ...
6    Q.  It would be a tough job.
7        I know that Sheriff Mears and the coroner
8    came to your house.  The SBI agent that dropped
9    off Zana --
10   A.  I'm not sure about that.
11   Q.  Okay.  It wasn't the same guy?
12   A.  No, sir.  I don't know who dropped her off.
13   Q.  Okay.
14   A.  I just knew that -- I was told that an SBI agent
15   dropped her off.
16   Q.  I was thinking the guy that came to talk to you
17   was the guy that dropped her off.
18   A.  I don't think so.
19   Q.  Okay.  So we know the sheriff, the coroner, and
20   at least one SBI agent came to your house after
21   the shooting.
22   A.  One of them came over there, and I showed him
23   where the --

Page 126

1    Q.  Right.
2    A.  Okay.
3    Q.  That's the one I was talking about.
4    A.  Oh, no.  Then a different one came and spoke to
5    me and Aunt Chanda and Justin and told us that
6    we would have to give our statements and all
7    that in the future, and that's the one that said
8    something about her car being nice.
9    Q.  Okay.
10   A.  It was a really young guy that came the first
11   time.
12   Q.  Okay.  So at least two SBI agents came to your
13   house immediately after the shooting?
14   A.  No.  No.  One of them was probably an hour or
15   longer after.  And the other one, he was
16   probably three hours after.
17   Q.  Let's just call it that night.
18   A.  That night, yes.  Both of them came that night.
19   Q.  Yeah.  Just to make sure we know what we're
20   talking about.  I said immediately.  That could
21   be construed as a minute or five hours.  I don't
22   know.
23   A.  Both of them came that night.

Page 127

1    Q.  So we have the sheriff, the coroner, and at
2    least two SBI agents that came that night.
3        Can you think of anybody else that came over
4    to your house?
5    A.  Justin's mother.
6    Q.  What's her name?
7    A.  Debbie.  Deborah might be her real name, but --
8    Q.  What's her last name?
9    A.  What's her husband's name?  Mosely.
10   Q.  What did she come over there for?
11   A.  Justin.  He called her.
12   Q.  He asked her to come over there and --
13   A.  Just comfort.  I think she brought maybe food or
14   something.  I'm not sure.
15   Q.  Do you know if Debbie and Chanda were friends or
16   they know each other?
17   A.  I mean, they knew each other.
18   Q.  Anybody else that came over?
19   A.  Matthew Morgan.
20   Q.  What did he come over there for?
21   A.  Comfort.
22   Q.  Whose friend --
23   A.  Brother Matthew, he loves everybody.  He's

Page 128

1    everybody's friend.
2    Q.  Brother Matthew?  Is he a preacher?
3    A.  No.  He should be.  He preaches everywhere he
4    goes, but he just come to say -- you know,
5    comfort.  He's just a really, really good guy.
6    Q.  Anybody else?
7    A.  I don't think so.
8    Q.  I want to go back and ask you about Channing
9    before we knew he had brain cancer.  I know that
10   he was working as an electrician or
11   electrician's apprentice --
12   A.  Yes, sir.
13   Q.  -- in Panama City.
14   A.  Yes, sir.
15   Q.  How long had he been in Panama City and outside
16   of Alabama?
17   A.  For probably at least a year.
18   Q.  What did he do or where did he work while he was
19   in Alabama?
20   A.  He done pest control and -- he done pest control
21   and he done -- after that he worked at Stephens
22   Auto Body or Stephens Garage.  Sorry.  Yeah,
23   Stephens Garage.  Then after that is when he

Westly Spivey

Page 129

1     went to Panama City.

2 Q.  Did he know somebody down there or just got a

3     job?

4 **A.  He just went.**

5 Q.  Did he have a job before he left?

6 **A.  Nope.**

7 Q.  That's bold.

8     Was he living with anyone in Panama City?

9 **A.  At first for the first few months, no. But he**

10     **moved in with another electrician.**

11 Q.  Roommate?

12 **A.  Yes, sir.**

13 Q.  What company was he working with down there?

14 **A.  I have no idea the name.**

15 Q.  What do you know about how -- I think he fell

16     off a ladder --

17 **A.  Yes, sir.**

18 Q.  -- and they found out about the cancer.

19 **A.  That's what I was told.**

20 Q.  Tell me what you know about that.

21 **A.  I was just told he fell off a ladder and he had**

22     **a seizure. And whenever they got -- I mean,**

23     **whenever he went to the hospital, they -- I**

Page 130

1     **don't know -- ran tests, and they found out that**

2     **had brain cancer or, no, a tumor on his brain.**

3 Q.  Did you ever go to Panama City with him?

4 **A.  I did.**

5 Q.  When did you go down there?

6 **A.  I was there for the -- throughout the surgery**

7     **and stayed there. I was there until he left.**

8     (Brief interruption by the court

9     reporter for clarification.)

10 Q.  Until --

11 **A.  I was there up until -- from the surgery until**

12     **they released him.**

13 Q.  Okay. And I understand that he came back

14     home --

15 **A.  Oh, actually, I came home I think maybe the day**

16     **before they released him. Yeah, I came home the**

17     **day before they released him.**

18 Q.  And after he got out of surgery is when he came

19     back to Alabama?

20 **A.  Yes, sir. Well, it was -- they held him there**

21     **for like a week.**

22 Q.  Soon thereafter he came to Alabama?

23 **A.  Yes, sir. When he left the hospital, he came**

Page 131

1     straight back to Alabama.

2 Q.  And I understand that he came back to Alabama

3     because he needed help. I mean --

4 **A.  Yes, sir. Especially right after. He couldn't**

5     **work. He couldn't really -- so ... He didn't**

6     **have a way to have money.**

7 Q.  Got ya. And I'm understanding that his medical

8     condition -- he was having trouble -- I mean,

9     that's a tough surgery, so there's going to be

10     some recovery time; is that correct?

11 **A.  Yeah. Putting his thoughts in order, you know.**

12     **He knew what he was thinking. He just couldn't**

13     **really make it out in words for probably the**

14     **first couple of weeks maybe.**

15 Q.  Other than the words, did he have any problems

16     with his motor skills: walking? running? moving

17     his arms?

18 **A.  No. I feel like I was more worried than he was**

19     **about them. He never -- he didn't go to running**

20     **or anything, but he made sure that he got up and**

21     **walked, like, around outside and stuff like that**

22     **a good bit. He really -- he just didn't like**

23     **talking that much.**

Page 132

1 Q.  When he came back to Alabama, did he go straight

2     to the house on Glenwood, or did he go to

3     Chanda's house for a while?

4 **A.  Chanda's.**

5 Q.  How long did he live at -- were you living at

6     Chanda's house also?

7 **A.  I was there.**

8 Q.  And Zana was there?

9 **A.  Yes, sir.**

10 Q.  How long was it before, I guess, you three left

11     to go to North Glenwood?

12 **A.  Yes, sir.**

13 Q.  Well, did you -- did Channing live there a few

14     months before moving?

15 **A.  A month. No. At Aunt Chanda's? Maybe a little**

16     **bit over a month. Then he lived about a month**

17     **at North Glenwood.**

18 Q.  He moved to North Glenwood in early 2020; is

19     that right?

20 **A.  After --**

21 Q.  Or at the end of 2019, somewhere in there?

22 **A.  I don't even -- I don't even know when it**

23     **happened. After his surgery, within three**

Westly Spivey

Page 133

1     months, he was at North Glenwood.

2 Q. Okay.

3 A. Because it wasn't, like, three -- four months

4     later is whenever it happened -- it occurred --

5     he got shot, so ...

6 Q. Okay. Did Channing have any children?

7 A. No.

8 Q. Did he have any ex-wives?

9 A. Yes.

10 Q. Who is that?

11 A. Candace. I don't know her maiden name.

12 Q. Okay. When did they divorce?

13 A. Maybe 2018 -- '17. I'm not sure exactly.

14 Q. In the last five years?

15 A. Yes, sir.

16 Q. And he had no children?

17 A. No, sir.

18 Q. What was your total time standing at the bush?

19     I mean, I know I asked you how long you stayed

20     there afterwards, but now I'm asking you to put

21     before the shooting and after the shooting

22     together.

23 A. It wasn't long. From the time I got next to the

Page 134

1     bush until I left, it wasn't longer than five

2     minutes. It was probably less than five

3     minutes. It all happened just boom, boom, boom,

4     boom, immediately.

5 Q. And when you came out, they were standing in a

6     triangle next to Mason's house?

7 A. Yes, sir.

8          MR. HOWARD: Let me take a break and

9          look over my notes. I think we're

10          close to being finished.

11          THE WITNESS: All right.

12          (A brief recess was taken.)

13 Q. (Continuing by Mr. Howard) Did you see Channing

14     touch Mason at all?

15 A. I did not.

16 Q. Did you see Mason touch Channing at all?

17 A. I did not.

18 Q. Did you see Penny touch Channing at all?

19 A. No, sir.

20 Q. Including down there in front of your house and

21     at Mason's house.

22 A. I don't think anybody touched anybody throughout

23     the whole thing. I don't remember -- I don't

Page 135

1     remember Channing and -- I know that Penny

2     stayed back from Channing the whole time.

3     And -- no, sir, I don't think anybody touched --

4     like, physically hand-touched anybody.

5 Q. Do you know anything about injuries to Mason's

6     head?

7 A. I do not.

8 Q. Did Channing have any marijuana the day of the

9     shooting?

10 A. He did not.

11 Q. How about the three days before the shooting?

12 A. Maybe. I know that he quit -- I know that --

13     that was something kind of weird, too, that he

14     didn't even want to smoke. I know for a fact

15     that day and maybe the day before. But prior to

16     it, he has smoked before. But he quit smoking

17     and he quit eating. I know that. The last,

18     like, two days, he really wouldn't even eat

19     much. It was probably because he quit smoking.

20 Q. When was the last time you saw Channing smoke

21     marijuana?

22 A. Prior to it. A few days prior to it. I

23     remember he ran out, and then he didn't want --

Page 136

1     he didn't have no money. He just didn't -- he

2     didn't want to be bumming off anybody. He

3     didn't want -- he was just content.

4 Q. How about drugs other than --

5 A. He didn't do drugs other than marijuana.

6 Q. So the tox screen should have no drugs in his

7     system --

8 A. Other than marijuana.

9 Q. -- other than what was prescribed or marijuana?

10 A. They will not.

11 Q. Did you have any marijuana that day?

12 A. I don't even know if that matters, but I don't

13     think so. Maybe. I might have. I might not

14     have. I don't know. I mean, I don't think so,

15     but I don't smoke -- I don't smoke now. I

16     passed a drug test, so ...

17 Q. Is that your answer for if you had marijuana

18     that day?

19 A. I mean, I don't think so. I don't know. I

20     don't guess I did, but I wasn't keeping up with

21     it. Like, I honestly -- I really don't know. I

22     know my brother wasn't smoking, so there's a

23     good chance that we didn't -- there wasn't none

Westly Spivey

2/10/2021
35 (137 - 140)

Page 137

1    to smoke.
2    Q.    What about Justin?
3    A.    I don't guess so.  Not to my knowledge.  We
4          worked that day -- earlier in the day, so I know
5          we didn't then anyway.  If we would have, it
6          would have been in between all that, so I doubt
7          we did, but we might have.  I really -- just
8          really don't know.
9    Q.    What time did you get off work that day?
10   A.    A little bit after lunch.
11   Q.    So if you smoked marijuana, it would be between
12         twelve and the shooting, correct?
13   A.    Correct.  Well, it would have had to have been
14         between twelve and when the altercation even
15         started, because I was out there the whole time
16         with that.
17   Q.    Is that something Justin does is come over to
18         your house to smoke marijuana?
19   A.    No, he don't come to my house to smoke.
20   Q.    Have you ever seen him smoke marijuana at your
21         house?
22   A.    I have seen him smoke marijuana.
23   Q.    How often?

Page 138

1    A.    Just every now and then, I guess.  I mean, it
2          would have been with me.  I mean, he just didn't
3          come over to my house and start smoking weed.
4    Q.    Well, that's what I'm asking.  If it would be
5          with you, you should know how often.
6    A.    I mean, like, if we ever had it.  Like, it ain't
7          just like a regular thing that we did, but ...
8    Q.    You got off work about twelve.  What did you do
9          after you got off work?
10   A.    Came home.
11   Q.    What time did you get home?
12   A.    Sometime around -- a little bit after lunch.
13   Q.    12:15?  12:30?
14   A.    Somewhere in there.  I don't know.  I mean, I
15         wasn't looking at my watch during the time for
16         real, but I knew it was a little bit after
17         lunch.
18   Q.    Who was there when you got there?
19   A.    Channing and Zana.
20   Q.    What did y'all do from then until six?
21   A.    We -- oh, we watched a movie.  Channing fell
22         asleep during it, and we were just sitting over
23         there chilling.  And Channing started playing

Page 139

1    the music.  When he got up and started playing
2    music over the phone -- I mean, over the movie,
3    that's when that happened.  We just turned it
4    off.  That's when it all started escalating, I
5    guess.  I'm not even sure that we worked that
6    day, now.  Is that the same day that we --
7    that's the same day that he wrecked that
8    morning, yeah.  No.  We didn't even go to work
9    because we went and got a tire changed on the
10   work truck.  We went and got a tire changed that
11   day, so we didn't even work that day actually.
12   Q.    Channing posted something at 1:07, and then the
13         next post is at 5:50.  Is that probably when he
14         took a nap between those times?
15   A.    He didn't take one for near that long.
16   Q.    No, I'm not saying he did.  Just --
17   A.    In between --
18   Q.    -- if there was a nap, it would be --
19   A.    Oh, yes, sir.
20   Q.    -- in between those times.
21   A.    Maybe.  It would have been in between those
22         times probably, because I know that -- we didn't
23         work that day.  I was wrong about that.  I'm

Page 140

1    sorry.  We went and got a tire changed on the
2    work truck that day.  And we was up there for a
3    little bit because they couldn't get it fixed.
4    And then I think -- I guess it was around lunch
5    when we got back to the house, though, so he
6    would have had to have taken a nap in between
7    then.
8    Q.    Where did you get the tire fixed at?
9    A.    Stephens Garage.
10   Q.    Any particular person there that you would have
11         spoken to?
12   A.    Well, all of them, because they couldn't -- they
13         were trying to get the spare tire out from under
14         the truck, and it was -- none of -- like, two or
15         three different people tried to get it, and they
16         couldn't.  Then the owner actually came out
17         there and got it out.  But it was -- it was
18         because -- it was weird, like, because it had
19         some kind of little key thing that goes up under
20         it -- like goes in and under it, and there
21         was -- like, you could flip it around -- no.
22         You could pull it out and swap it over, and it
23         was one that was made from multiple, and they

Page 141

1   didn't know it.  But it was something weird.
2   They sat there for like two hours trying to do
3   it.
4   Q.  Okay.  If I tried to get that receipt to see
5   exactly what time you cashed out at Stephens
6   Garage, what was the company's name?
7   A.  Stephens Garage.
8   Q.  And what was the landscaping's name at the time
9   that they fixed the tire?
10  A.  It might have been Landscaping Recreations.
11  Q.  We know the date.  We know the year.
12  Approximate time, twelve to two?
13  A.  That we were there doing the -- no.  It would
14  have been before twelve.  Probably say between
15  nine and twelve.  Because I think we talked to
16  the cops on the scene -- it was right after we
17  left from talking to the cops where he wrecked
18  the vehicle.
19  Q.  So you were at the tire place and then went and
20  saw the cops --
21  A.  No.
22  Q.  -- at the wreck?
23  A.  We stopped and saw the cops on the way to the

Page 142

1   tire place.  Like, it was in between our house
2   and where the tire shop is.  And we saw the
3   vehicle, so we pulled over there.  And there was
4   two officers there, and they were just taking --
5   I mean, just recording whatever.
6   Q.  So you went to the tire place after the wreck --
7   A.  Yes, sir.
8   Q.  -- cleaned up?
9   A.  Well, after we talked to them for a second.
10  Then we went just straight to the tire place.
11  Q.  Who is the owner of the property where the wreck
12  took place?
13  A.  Jimmy Mason.
14  Q.  And he's a family friend?
15  A.  I mean, small town.  I've known him my whole
16  life.
17  Q.  Was there any particular serviceman that worked
18  on the truck that day, if they separate the
19  tickets by worker?
20  A.  Well, a younger guy did, and -- I think he was
21  just like a part-time summer help or something.
22  And another guy came over there and helped him,
23  but I don't remember which one it was.  Not

Page 143

1   anybody that I can -- outside of the owner
2   coming out there and doing it, I don't remember
3   anybody in particular besides that young guy
4   that was -- I think he was part-time.  He might
5   still be there, though.
6   Q.  What time did Justin usually pick you up on a
7   workday from your house?
8   A.  Anywhere between five and eight.  Just depends
9   where we had to go to for the job.
10  Q.  Were you allowed to drive a car?
11  A.  Yes.  I got my license.
12  Q.  Are you allowed to drive a car now?
13  A.  Yes.  I have my license.  I just -- I never
14  really got one after I got in the wreck.
15  Q.  Do you get notifications when Channing posts
16  something on Facebook?
17  A.  No.
18  Q.  When you were having the conversation about
19  Channing's Facebook postings, did you see how
20  frequently he was posting?
21  A.  I normally would cut them off and tell them that
22  I didn't really even care to know.
23  Q.  Did anybody mention to you how frequently he was

Page 144

1   posting during the two hours prior to the
2   shooting?
3   A.  No.  But they -- people mentioned how frequently
4   he had been posting in general.  Just that he
5   was always posting.
6   Q.  There was one lady that responded and said that
7   this is not the Channing we know.  Let me see if
8   I can find that and see if you know her.
9       Phyllis Owens, do you know her?
10  A.  I have no idea.  I don't even know if I've even
11  heard her name before.
12  Q.  Well, I'm not a Facebook expert, but it's got
13  Phyllis J. K. Owens.
14  A.  I don't know who that is.
15      MR. HOWARD:  That's all the questions
16      I have for you.  I appreciate it.
17      THE WITNESS:  Yes, sir.
18      MR. SIKES:  And, again, we'll keep
19      your deposition open until I get
20      the ABI --
21      THE WITNESS:  All right.
22      MR. HOWARD:  -- or the SBI --
23      MR. SIKES:  You can make that claim.

Page 145

1     For the record --
2     MR. HOWARD: I just did.
3     MR. SIKES: I know.
4         We're going to offer
5     Plaintiff's Exhibit 1 to
6     Channing's Spivey's deposition.
7     It is a ten-page document. The
8     first page is a download taken
9     this morning from Alacourt
10    summarizing all of what shows on
11    Alacourt as either criminal
12    charges or -- of any type
13    including, traffic offenses, for
14    either Westly Spivey or Westly
15    Reed Spivey. Got his social
16    security number on here and date
17    of birth.
18        The second, third, fourth
19    pages are the dispositions of the
20    only four criminal offenses other
21    than traffic offenses that show up
22    on the first page. And they show
23    convictions of two misdemeanors,

Page 146

1     first for possession of marijuana
2     in the second degree. That's for
3     personal use. And the other
4     conviction is of -- a conviction
5     for distribution or possession of
6     an imitation controlled substance
7     under Section 20-2-143 of the
8     Alabama Code. Then the next page
9     is a -- is Section 13A-1-2
10    (phonetic) which is the definition
11    section of the code, a portion of
12    it, which shows what the maximum
13    offense for a misdemeanor is of
14    not in excess of one year. And
15    the last two pages are Rules 609
16    of the Federal Rules of Evidence
17    and Rule 404 of the Federal Rules
18    of Evidence. We offer those
19    solely for the purpose of review
20    should it become necessary of
21    Westly Spivey's declination to be
22    deposed about his criminal
23    arrests, prosecutions, and

Page 147

1     convictions.
2         (Plaintiff's Exhibit 1 marked for
3     identification.)
4         MR. HOWARD: Okay. I've got a lot of
5     questions about those on
6     cross-examination.
7  Q. (Continuing by Mr. Howard) What is this
8     imitation stuff that he's talking about?
9         MR. SIKES: Again, you can answer that
10        if you want.
11 A. I thought we was already done.
12 Q. Well, we're not.
13 A. Okay. That's fine.
14        MR. SIKES: I think we are at --
15 Q. Let me ask you this: He's not your lawyer.
16 A. Okay.
17 Q. Correct?
18 A. Yeah, I understand. But I'm still -- unless the
19    judge says, I really don't want to talk about
20    that.
21 Q. I understand. But let me --
22 A. Go ahead.
23 Q. He's just put a lot of exhibits into evidence,

Page 148

1     and you're saying that I can't cross-examine you
2     about those.
3  A. No. You're fine. I didn't say anything. I
4     just thought we were done because you said it
5     before, so I thought we was done, and then he
6     done that. But feel free. But you can study
7     them, go over them.
8  Q. What is this imitation? Is that spice?
9     Synthetic drugs?
10        MR. SIKES: Again, if you want --
11 A. I don't know why it says imitation. I'm not
12    sure.
13 Q. Well, it says you were trafficking synthetic
14    drugs. Tell me about that.
15        MR. SIKES: Object to the form of the
16        question.
17 A. Like, I'm not going to -- I just don't want to
18    talk about that. It has nothing to do with the
19    case. And if the judge says it does, then I'll
20    be happy to come back and sit back again.
21 Q. Okay. Tell me about all the interactions you've
22    had with the police when they charged you with
23    trafficking synthetic drugs.

Westly Spivey

Page 149

1  A.  Like I just said, if the judge says that we

2      should -- that is something we should talk

3      about, then I don't mind coming back and sitting

4      through another deposition with you.

5  Q.  Okay.  Another document that your attorney --

6          MR. SIKES:  He's not my -- I'm not

7          his --

8  Q.  -- pseudo attorney put into evidence was --

9          MR. SIKES:  I'm not his pseudo

10         attorney.

11 Q.  -- possession of drug paraphernalia sometime in

12     2011.  Please tell me about that.

13 A.  Like I said, I don't feel like talking about any

14     previous drug charges.  None of that has to do

15     with anything going on.  But if the judge says

16     that he thinks that we should, then I don't mind

17     coming back and explaining and going over every

18     bit of it with you.

19 Q.  Can you tell --

20 A.  But you can look up everything, you know.  It's

21     free to the public at the courthouse.

22         MR. SIKES:  It's right there --

23 Q.  Well, we also know that --

Page 150

1          MR. SIKES:  It's right there in

2          front --

3  Q.  -- you have -- you were charged criminally --

4          MR. SIKES:  It's right there in front

5          of you also.

6  Q.  -- for this wreck.

7          MR. SIKES:  There is a record here,

8          Alacourt.  It gives you the

9          disposition of the charges.  It

10         tells you what it is.  I've also

11         included for the things he's been

12         convicted of -- there are the code

13         sections that specify what this is

14         about, so -- he's not a lawyer.

15         He doesn't know what imitation of

16         a controlled substance --

17         MR. HOWARD:  Are you telling me he's

18         not --

19         MR. SIKES:  -- charge is.

20         MR. HOWARD:  -- smart enough to tell

21         me about his interaction with the

22         police officers when he was

23         arrested?

Page 151

1          MR. SIKES:  I'm not telling you that.

2          I'm telling you about the

3          questions you asked earlier, about

4          what's this stuff about --

5          MR. HOWARD:  And you're about three

6          questions behind.

7          MR. SIKES:  And you're interrupting

8          again

9              -- about what is this stuff

10         about imitation of controlled

11         substance.  Again, if you want to

12         know about it, you can read about

13         it right here, Section 20-2-143.

14         MR. HOWARD:  Okay.  Let's do that.

15         MR. SIKES:  There's the code section.

16 Q.  This code section says manufacture,

17     distribution, possession, advertisement,

18     immunity.

19         Can you tell me about your interaction --

20         MR. SIKES:  That's part of what it

21         says.

22 Q.  -- with the police officers when you were

23     arrested for distributing or trafficking drugs?

Page 152

1          MR. SIKES:  That's not what he's

2          charged with there.

3          MR. HOWARD:  Well, it says trafficking

4          synthetic drugs.  What do you mean

5          he's not charged with that?

6          MR. SIKES:  If you'll read the code

7          statute he's charged with, it

8          isn't synthetic drugs.  It is, I

9          think -- what does it state?

10         Imitation controlled substance.

11         MR. HOWARD:  Well, what did you hand

12         me that said trafficking synthetic

13         drugs?

14         MR. SIKES:  Again, if you'll look and

15         see on there, that charge was

16         dismissed.

17         MR. HOWARD:  Thank you.  But --

18         MR. SIKES:  You're welcome.

19 Q.  Were you charged with trafficking synthetic

20     drugs that was ultimately dismissed?

21         MR. HOWARD:  Again, you can answer if

22         you'd like.

23 A.  What's the synthetic drug?

Westly Spivey

Page 153

1  Q.  Were you ever --
2      MR. SIKES:  You can decline if you
3          want to.
4  Q.  -- charged for trafficking?
5  A.  Oh.  No, I was never charged.
6  Q.  You were not charged with trafficking?
7      MR. SIKES:  Again, you have a right to
8          decline to answer.
9  A.  Yeah.  I'm just going to decline because I'm not
10     sure.  I'm not sure what you're asking.  I'm
11     just going to decline.  I really don't feel like
12     talking about it anyway.
13 Q.  Well, the document that was put into evidence
14     has got your name on it with trafficking --
15 A.  I don't understand --
16 Q.  -- synthetic --
17 A.  -- exactly the law -- how y'all --
18 Q.  You don't even know my question yet.
19 A.  I mean, I ain't talking about the question.  I'm
20     talking about the document itself.  I don't
21     understand everything about it.  But, like I
22     said, I don't want to talk about it.
23     MR. MCDERMOTT:  If he's objecting to

Page 154

1          it, then we should object to its
2          admission.
3      MR. HOWARD:  Yeah, I guess so.  If
4          he's -- you're right.
5      MR. SIKES:  You can object to it,
6          sure.  Object to it.  Fine.
7  Q.  What was your interaction with the police
8      officers when you were charged with trafficking
9      synthetic drugs?
10 A.  I'd rather not talk about it.
11 Q.  Okay.  What was your interaction with the police
12     officers when you were charged with possession
13     of drug paraphernalia?
14 A.  Like I said, I'd rather not talk about any of
15     them.  But if the judge wants us to, I'll be
16     happy to come back.
17 Q.  What was your interaction with the police
18     officers when you were charged with imitation
19     drug manufacturing and distribution?
20 A.  I thought you also asked me that.
21 Q.  Well, I didn't.  This one says synthetic drugs,
22     and then he whips out some statute that talks
23     about imitation, so I'm not sure what he was

Page 155

1      talking about.
2      MR. SIKES:  Nobody has whipped out
3          anything.  I put them into
4          evidence.
5  A.  But I'd rather -- still, I'd rather not talk
6      about any of it -- any of my ...
7  Q.  Okay.  Have you ever been arrested in any state
8      other than Alabama?
9  A.  Like I said, I'd rather not even talk about it.
10 Q.  Well, I think you can tell me if you've been
11     arrested in --
12 A.  No, I have not.
13 Q.  He handed me some kind of definition about
14     clandestine laboratory operations.  Have you
15     ever --
16     MR. SIKES:  I didn't hand those to
17         you.  I gave them -- I put them
18         into evidence with the court
19         reporter.
20 Q.  Well, he put them into evidence with the court
21     reporter.
22 A.  I have no idea what that even means.  But, no,
23     I'd rather not talk about it.  I mean ...

Page 156

1  Q.  Okay.  He also gave me this list of criminal
2      violations --
3      MR. SIKES:  Charges.
4  Q.  -- charges.  That does not include the recent
5      charges that were levied against you following
6      the wreck, does it?
7  A.  I'm not sure.
8  Q.  Well --
9  A.  No, I don't think.
10 Q.  -- when was -- what year did the wreck happen?
11 A.  '17 or '18.  One of them.
12 Q.  Okay.
13 A.  A couple of years ago.  Three years ago.  I'm
14     not sure.
15 Q.  And you don't know the status of that right now.
16     Is that what your testimony was?
17 A.  I mean, I don't know it, and I'd rather not talk
18     about that either.
19 Q.  Okay.  Possession of marijuana second, guilty
20     plea.  What was your interaction with the police
21     officers at this charge --
22 A.  I'd rather not --
23 Q.  -- and conviction?

Westly Spivey

2/10/2021
40 (157 – 160)

Page 157

1   A.   I'd rather not talk about any of them.  Unless

2       the judge says that he thinks we should, then

3       I'll be happy to come back and explain every bit

4       of it.

5   Q.  Every bit of it?

6   A.  I mean, if the judge thinks I should.  I mean,

7       it's all up for -- you can look it up --

8   Q.  Okay.

9   A.  -- so --

10          MR. SIKES:  Knock yourself out, Rick.

11          MR. HOWARD:  Thank you, sir.  I

12          appreciate it.

13          THE WITNESS:  Yes, sir.  Are we done?

14          MR. SIKES:  We are done now, unless

15          he's going to put something else

16          into evidence that I'm going to

17          ask you about.

18          THE WITNESS:  All right.

19          MR. HOWARD:  Are you done?

20          MR. SIKES:  I'm not going to put

21          anything else -- offer anything

22          else into evidence, no.

23          (Deposition concluded at approximately

Page 158

1          11:52 a.m.)

2

3          * * * * * * * * * * * * *

4          FURTHER DEPONENT SAITH NOT

5          * * * * * * * * * * * * *

6          REPORTER'S CERTIFICATE

7   STATE OF ALABAMA:

8   MONTGOMERY COUNTY:

9          I, Pamela Wilbanks Owens, Registered

10  Professional Reporter, ACCR #391, and Commissioner for

11  the State of Alabama at Large, do hereby certify that I

12  reported the deposition of:

13          WESTLY SPIVEY

14  who was first duly sworn by me to speak the truth, the

15  whole truth and nothing but the truth, in the matter of:

16          CHANDA CALLOWAY, as Administrator

17          of the Estate of Channing Spivey,

18          deceased,

19          Plaintiff,

20          Vs.

21          MASON ADCOCK,

22          Defendant.

23          In the U.S. District Court

Page 159

1   for the Middle District of Alabama

2   Northern Division

3   2:20-cv-598

4   on Wednesday, February 10, 2021.

5          The foregoing 157 computer printed pages

6   contain a true and correct transcript of the examination

7   of said witness by counsel for the parties set out

8   herein.  The reading and signing of same is hereby

9   waived.

10          I further certify that I am neither of kin nor

11  of counsel to the parties to said cause nor in any

12  manner interested in the results thereof.

13          This 24th day of February 2021.

14

15

16

17

18          *Pam Owens*

19          Pamela Wilbanks Owens, ACCR #391
             License Expires: 9/30/2021

20          Registered Professional Reporter
             and Commissioner for the State

21          of Alabama at Large

22

23

Page 160

Cite, LLC