# Deposition of Justin Robinson

## February 10, 2021

## Callaway, etc. v. Adcock

## 2:20-cv-598-ECM-SRW



866.993.0207
info@citedepos.com
www.citedepos.com



DEFENDANT'S
EXHIBIT
5

Justin Robinson

2/10/2021
1 (1 - 4)



**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CHANDA CALLOWAY, as Administrator
     of the Estate of Channing Lamar
6    Spivey, deceased,

7         Plaintiff,

8    Vs.                CIVIL ACTION NO.
                        2:20-cv-598
9    MASON ADCOCK,

10        Defendant.

11

12        * * * * * * * * * * * * *

13

14        DEPOSITION OF JUSTIN ROBINSON, taken pursuant

15   to stipulation and agreement before Pamela Wilbanks

16   Owens, Registered Professional Reporter, ACCR #391, and

17   Commissioner for the State of Alabama at Large, in the

18   Law Offices of Holtsford, Gilliland, Hitson, Higgins &

19   Howard, 4001 Carmichael Road, Suite 300, Montgomery,

20   Alabama, on Wednesday, February 10, 2020, commencing at

21   approximately 1:04 p.m.

22

23        * * * * * * * * * * * * *

**Page 2**

1

2         APPEARANCES

3

4    FOR THE PLAINTIFF:

5    Mr. Griffin Sikes, Jr.
     Attorney at Law
6    7515 Halcyon Pointe Drive
     Montgomery, Alabama 36117

7
     FOR THE DEFENDANT:

8
     Mr. Rick A. Howard
9    HOLTSFORD, GILLILAND, HIGGINS, HITSON & HOWARD
     Attorneys at Law
10   4001 Carmichael Road, Suite 300
     Montgomery, Alabama

11
     Mr. M. J. (Mickey) McDermott
12   THE LAW OFFICES OF MICKEY MCDERMOTT
     Attorney at Law
13   441 High Street
     Montgomery, Alabama 36104

14
     ALSO PRESENT:

15
     Ms. Chanda Calloway

16        * * * * * * * * * * * * *

17
     EXAMINATION INDEX

18
     BY MR. HOWARD . . . . . . . . . . . . . . 4
19   BY MR. SIKES . . . . . . . . . . . . . . 85
     BY MR. HOWARD . . . . . . . . . . . . . . 88
20
          * * * * * * * * * * * * *

21
     DEFENDANT'S EXHIBIT INDEX

22
23   1    Drawing of scene at Mason's house    53

**Page 3**

1         STIPULATION

2         It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of JUSTIN ROBINSON is taken pursuant to the

5    Federal Rules of Civil Procedure and that said

6    deposition may be taken before Pamela Wilbanks Owens,

7    Registered Professional Reporter, ACCR #391, and

8    Commissioner for the State of Alabama at Large, without

9    the formality of a commission, that objections to

10   questions other than objections as to the form of the

11   question need not be made at this time but may be

12   reserved for a ruling at such time as the said

13   deposition may be offered in evidence or used for any

14   other purpose by either party provided for by the

15   Statute.

16        It is further stipulated and agreed by and

17   between counsel representing the parties in this case

18   that the filing of said deposition is hereby waived and

19   may be introduced at the trial of this case or used in

20   any other manner by either party hereto provided for by

21   the Statute regardless of the waiving of the filing of

22   the same.

23        It is further stipulated and agreed by and

**Page 4**

1    between the parties hereto and the witness that the

2    signature of the witness to this deposition is hereby

3    waived.

4         * * * * * * * * * * * * *

5         COURT REPORTER:  Is this going to be

6            usual stipulations?

7         MR. HOWARD:  Sure.

8         MR. SIKES:  Yes, ma'am.

9         (Witness sworn.)

10        * * * * * * * * * * * * *

11        JUSTIN ROBINSON

12        The witness, after having first been duly sworn

13   to speak the truth, the whole truth and nothing but the

14   truth testified as follows:

15        EXAMINATION

16   BY MR. HOWARD:

17   Q.   Justin, my name is Rick Howard, and I represent

18        Mason Adcock in the lawsuit filed by

19        Ms. Calloway.  I'm going to ask you questions

20        today about what you saw.  You have a right to

21        let the court reporter get everything down that

22        you say, or you also have the right to read your

23        entire transcript and change names and minor

Justin Robinson

Page 5

1   things like that.
2      What would you like to do?  It's your
3   choice.  Most people just let the court reporter
4   do it.  If you read and sign, you've got a lot
5   of homework.  It's up to you.
6  **A.  And so I basically let her do that, or what was**
7  **the other question?**
8       MR. SIKES:  She's going to transcribe
9       it.
10      THE WITNESS:  Okay.
11      MR. SIKES:  And before it can be used
12       in evidence, you have a right to
13       read over it first and check it
14       before it is used.  But you'll
15       have to -- that will require you
16       to check it for accuracy to make
17       sure she got down what you take
18       [sic] down right.  It's a
19       protection to you.  Most people in
20       these instances waive it because
21       most court reporters, they
22       professionally take it down --
23      THE WITNESS:  That's fine.  That's

Page 6

1   fine.
2  Q.  Yeah.  Nobody has read and signed in this entire
3   case.
4  **A.  Okay.**
5  Q.  It rarely happens.
6  **A.  Okay.**
7  Q.  Could you please state your full name for me?
8  **A.  Justin Robinson.**
9  Q.  Have you ever seen Westly Calloway do drugs --
10      MR. SIKES:  You're not going to
11       incriminate him in any criminal
12       manner.
13  **A.  Westly Spivey?**
14  Q.  Yes, Spivey.  I'm sorry.
15    -- Westly Spivey do drugs?
16  **A.  No.**
17  Q.  Did anybody do drugs at the house the day of the
18   shooting?
19  **A.  I don't have any specific knowledge on that.**
20  Q.  What did you do the day of the shooting?
21  **A.  I actually came there.  I got a call, and I came**
22  **there because I had heard about an accident that**
23  **Channing was in.  And I came there in helps of**

Page 7

1   that.  I was called in helps of that.
2  Q.  Did you work that day?
3  **A.  Yes, sir.  I work every day.  I was either**
4  **working on -- I was working on the computer or**
5  **something like that.  I don't remember**
6  **specifically what I was doing that morning.**
7  Q.  Where do you work or where did you work last
8   year in May?
9  **A.  I work for myself, so I work on multiple**
10  **jobsites.**
11  Q.  What's the name of your company?
12  **A.  Legally it's Landscape Recreations, LLC.**
13  **That's -- I have another company name, too, but**
14  **that's the name, yes.**
15  Q.  What's the other company's name?
16  **A.  Well, that's my company.  That's the one.**
17  Q.  What other company do you work for?
18  **A.  Myself.  It's just -- I have a couple of**
19  **different things I'm working through.  But**
20  **legally that's the only one that is a legal**
21  **business.  The other ones are Blue Ridge**
22  **Designs.  I'm in the process of getting that**
23  **incorporated.**

Page 8

1  Q.  Any other --
2  **A.  No.  That's it.  What it is I'm having a**
3  **change in -- anyways, yeah.**
4  Q.  Did you have to go by a tire dealership to get a
5   tire repaired that day?
6  **A.  No, sir.**
7  Q.  What time did you get off work?
8  **A.  That day?**
9  Q.  Yes, sir.
10  **A.  I don't have any knowledge on that specific**
11  **question.**
12  Q.  Did Westly Spivey ride with you to work that
13   day?
14  **A.  No, sir.**
15  Q.  When is the first time that you saw Westly
16   Spivey the day of the shooting?
17  **A.  When I came to help with the accident, trying to**
18  **find him.  That was the first time that day.**
19  Q.  How did you find out about the accident?
20  **A.  A phone call.**
21  Q.  From who?
22  **A.  From him.**
23  Q.  Channing or Westly?

Page 9

1  A.  Westly.

2  Q.  Do you remember about what time that was?

3  A.  No, sir.

4  Q.  What was your cell phone number back then?

5  A.  ████████

6  Q.  And who was your carrier?

7  A.  Straight Talk, which was run off Verizon

8     Wireless towers, so it's basically the same

9     thing.

10       MR. SIKES:  Speak up a little bit.

11          You're talking -- just raise your

12          voice a little bit.

13       THE WITNESS:  Okay.

14       MR. SIKES:  Thank you.

15  Q.  When you arrived at the Spivey house, who was

16     there?

17  A.  Westly and Zana, and I do not think Channing had

18     made it back there at that time, but he may

19     have.  I'm not a hundred percent certain.

20  Q.  Do you know how he got back?

21  A.  I'm pretty sure he walked back.

22  Q.  Based on what I've heard, he was in an accident

23     sometime probably before lunch, and he walked

Page 10

1     back home.  Is that your understanding?

2  A.  Repeat that.

3  Q.  I understand that Channing was in some type of

4     an accident -- an automobile accident, and he

5     walked back home that day.

6  A.  That is correct.

7  Q.  Okay.  Did you go to the scene of the accident?

8  A.  Yes.

9  Q.  Did you go there with anyone?

10  A.  Yes.

11  Q.  Who did you go with?

12  A.  Westly and Zana.

13  Q.  Okay.  Did you pick Westly and Zana up at their

14     house?

15  A.  Yes, sir.

16  Q.  Who was at the scene of the accident when you

17     arrived?

18  A.  From what I can recall, I believe it was just

19     the policeman.  It might have been -- and then

20     later a lady policeman showed up.

21  Q.  Do you remember anything the police officer

22     said?

23  A.  No, sir.

Page 11

1  Q.  Do you remember anything that Westly said about

2     the way Channing was acting?

3  A.  I don't have any clear knowledge on that

4     situation.

5  Q.  After you left the scene of the accident, did

6     you go back to the Spivey house?

7  A.  Yes, sir.

8  Q.  Did you make it back to the Spivey house before

9     or after Channing arrived?

10  A.  I think before.  I think he was walking up.  I'm

11     not a hundred percent certain on that part of

12     the day.  I think he had just walked -- I'm not

13     a hundred percent certain.

14  Q.  Okay.  Do you remember Channing taking a nap

15     that afternoon?

16  A.  Yes.

17  Q.  Do you know how long the nap lasted?

18  A.  No, sir.

19  Q.  Do you have Facebook?

20  A.  Do I have Facebook?

21  Q.  Yes.

22  A.  Yes, sir.

23  Q.  What is your Facebook name?

Page 12

1  A.  My name.

2  Q.  Any dots?  Any dashes?  Any underscores?

3  A.  (Witness shakes head negatively.)

4  Q.  Is that a "no"?

5  A.  There's a space between my name, Justin

6     Robinson.

7  Q.  Did you get notifications from Channing's

8     Facebook page?

9  A.  As in he had tagged me or something like that,

10     or what do you mean?

11  Q.  When he posts something, you get notified.  A

12     ding and dong or whatever kind of alarm you

13     have.

14  A.  I didn't get tagged in anything, so I didn't get

15     any specific dings or anything.  I wasn't tagged

16     or anything like that.

17  Q.  Okay.  Did you know when Channing posted on

18     Facebook or uploaded video?

19  A.  I had seen some things, yes, sir.

20  Q.  What have you seen?

21  A.  There was various things.  There was no one

22     specific thing that comes to mind.

23  Q.  Did you notice a lot of postings in the two

Justin Robinson

2/10/2021
4 (13 - 16)

Page 13

1   hours before the shooting?
2   A.  I don't want -- that morning, yes.  I'm not
3   going to say within the two hours, but that
4   morning, yes.
5   Q.  What did you see?
6   A.  Like I said, I don't a hundred percent recall a
7   certain thing.
8   Q.  Were you at the Spivey house when Channing woke
9   up from his nap?
10  A.  I don't have any specific knowledge on that.
11  Q.  When you arrived at the Channing house after the
12  accident, what time did you leave the house?
13  A.  I would say it was after lunch when I went to
14  Troy, Alabama.
15  Q.  Did you have a business trip to go to Troy?
16  A.  I'm pretty sure I went to the bank.
17  Q.  Did anybody go with you?
18  A.  Westly went with me that day.
19  Q.  Okay.
20  A.  As far as I can remember.
21  Q.  Westly went to Troy with you to the bank?
22  A.  Yes, sir.  As far as I can remember, yes, sir.
23  Q.  Leaving Zana and Channing at the Spivey house?

Page 14

1   A.  I believe so.  I believe so, but I'm not a
2   hundred percent certain on that part of it.  I
3   am certain of the latter part of the day.
4   Q.  Do you know what time you returned to the Spivey
5   house?
6   A.  No, sir.
7   Q.  When you returned was Channing awake?
8   A.  I remember him being awake when I got back
9   later.  I'm not going to say if I remember if he
10  was awake or still asleep when I got back.
11  Q.  But sometime when you were there, he woke up?
12  A.  At sometime when I was there that afternoon, he
13  was awake, yes.
14  Q.  When you got back from the bank to the Spivey
15  house, what time did you leave?
16  A.  It was later after the scene.
17  Q.  So you were there during the lead-up to calling
18  911, the shooting, and the investigation
19  afterward; is that correct?
20  A.  Yes, sir.
21  Q.  Did you see any erratic behavior by Channing
22  Spivey?
23  A.  Define erratic.

Page 15

1   Q.  It's in the complaint.  It's used by the
2   plaintiff.  We'll go with your definition.
3   A.  I don't have a specific definition.
4   Q.  Did you see anything strange?
5   A.  He was acting different than maybe the years
6   before I've known him.  He was acting a little
7   different, yes.
8   Q.  How so?
9   A.  Just a little -- just different.
10  Q.  Did he punch a hole in the ceiling?
11  A.  Yes.
12  Q.  Things like that.
13  A.  Yes, sir.
14  Q.  Did you see anything -- did he threaten a TV?
15  A.  Do what, now?
16  Q.  Did he threaten to destroy a TV?
17  A.  He -- yes, I guess you could say that.
18  Q.  Did he get into an altercation with his brother?
19  A.  I guess you could say yes.
20  Q.  Did he get into an altercation with you?
21  A.  Altercation as in words?
22  Q.  Or fighting.
23  A.  There was not a specific altercation where we

Page 16

1   were arguing or anything like that.
2   Q.  Did he take a swing at you?
3   A.  Yes.
4   Q.  How many times?
5   A.  Once.
6   Q.  How many times did he take a swing at his
7   brother?
8   A.  I do not recall specific on that situation.
9   Q.  Tell me about when he took a swing at you.
10  A.  What do you want to know?
11  Q.  Where you were.  Where he was.
12  A.  He was --
13  Q.  What were you doing and what was he doing?
14  A.  He was against my truck, and his brother was
15  right beside him, and I was right here.  So it
16  was like that.
17  Q.  Everybody was outside?
18  A.  Uh-huh (positive response).
19  Q.  Is that a "yes"?
20  A.  Yes, sir.
21  Q.  Where was Zana?
22  A.  I don't recall specifically on that situation at
23  that time.  I would say sometime -- somewhere in

Justin Robinson

2/10/2021
5 (17 - 20)

Page 17

1   the yard. Could have been on the front porch.
2   Could have been in the house at that time. I
3   was pretty much focused on the matter in front
4   of me.
5   Q.  Okay. How far away was Channing from you?
6   A.  Less than 4 feet.
7   Q.  How far away was Westly from you?
8   A.  Less than 4 feet.
9   Q.  And at some point Channing took a swing at you?
10  A.  Yes.
11  Q.  Did he say anything when he took a swing?
12  A.  No.
13  Q.  Did you say anything back to him?
14  A.  I don't remember specifically on that situation.
15  Q.  Did anybody say anything?
16  A.  Actually, can I go back on two questions? He
17      did say something, but I don't remember exactly
18      what he said verbatim. I don't.
19  Q.  Who is "he"?
20  A.  Channing.
21  Q.  Okay. Did anybody say anything after he took a
22      swing at you?
23  A.  I don't have any specific knowledge of that.

Page 18

1   Q.  Would you characterize that behavior as not
2       normal?
3   A.  I would say yes.
4   Q.  After he takes a swing at you, what does Westly
5       do?
6   A.  Westly was just trying to keep him -- I guess
7       the next thing I remember is he was trying to
8       keep him down on the ground. Keep him, you
9       know -- just keep him down.
10  Q.  Westly grabbed Channing and put him on the
11      ground?
12  A.  I don't remember exactly how it went. I just
13      know he was trying to keep him down until the
14      ambulance got there.
15  Q.  Did the swing at you happen before or after Zana
16      called 911 the first time?
17  A.  I would have to say after because we were
18      outside. After she called 911. I don't
19      remember if it was the first or second time. I
20      guess just after.
21  Q.  Well, that was my next question. Do you know
22      how many times she called 911?
23  A.  I know it was twice.

Page 19

1   Q.  The first time she cancelled that. Are you
2       aware of her cancelling that call?
3   A.  I'm aware that she said that, yes.
4   Q.  Tell me what Westly told Zana that made Zana
5       cancel the first 911 call.
6   A.  I don't have any specific knowledge on that.
7   Q.  Did you hear the conversation between the two?
8   A.  I know that they were -- I was aware they were
9       on the phone, but I don't have any specific
10      knowledge of what was said.
11  Q.  What prompted her to call 911 again, if you
12      know?
13  A.  I guess just things maybe escalated I would say.
14  Q.  How were things escalating?
15  A.  That may have been when the hole was in the
16      wall -- punched in the wall. It may have been
17      then I would say.
18  Q.  Was it the wall or the ceiling?
19  A.  The ceiling.
20  Q.  Is that when he took a swing at you?
21  A.  No, sir.
22  Q.  How long was it from the time that Channing took
23      a swing at you until Zana called 911?

Page 20

1   A.  I don't have any specific knowledge on that.
2   Q.  How long was it from the time that she first
3       called 911 until she called 911 again?
4   A.  I don't have any specific knowledge on that.
5   Q.  Was Channing saying anything during this time?
6   A.  He was talking, yes.
7   Q.  What was he saying?
8   A.  I don't remember.
9   Q.  Was Channing in the front yard or back yard or
10      both?
11  A.  That night?
12  Q.  Well, after he took a swing. Where did he go?
13  A.  Throughout -- he was in different locations of
14      the yard. I don't -- can't tell you exactly
15      when or where -- what part of the front yard or
16      back yard. I do -- that's what I've got.
17  Q.  Was he screaming, talking loud, or how was he
18      acting?
19  A.  At times, yes.
20  Q.  Was he praying?
21  A.  He had talked to God, so I would say yes.
22  Q.  Did you hear anything that he said to God?
23  A.  I don't have any specific knowledge on that.

Justin Robinson

Page 21

1  Q.  Did he say anything about death?  And I'm
2  talking about Channing Spivey say anything about
3  death.
4  A.  I don't have any specific knowledge on what he
5  said about that.  I don't.
6  Q.  Did he say anything about that he can't die?
7  A.  I don't remember everything that he said.
8  Q.  Did he say anything about somebody has to kill
9  me?
10  A.  I don't remember exactly what he said.
11  Q.  Did he say anything about marijuana and THC?
12  A.  What do you mean?  Just -- I don't remember him
13  saying anything specifically, so I don't think
14  it's fair to say.
15  Q.  You were there, correct?
16  A.  Yes, sir.
17  Q.  Is it that you just don't remember or you just
18  didn't hear it?
19  A.  I just -- I don't remember.
20  Q.  Is there any reason why you would not remember?
21  A.  No, sir.
22  Q.  Were you on any drugs that day?
23  A.  No, sir.

Page 22

1  Q.  Have you ever been arrested before?
2  A.  Have I been arrested before?
3  Q.  Yes, sir.
4  A.  In my past, yes.
5  Q.  How many times?
6  A.  I don't have any specific knowledge of that
7  right this second.
8  Q.  It's your testimony that you've been arrested so
9  many times you can't remember?
10  A.  I just -- I know there's been when I was in
11  college and one time when I was in high school.
12  Q.  What have you been arrested for?
13  A.  In high school it was for -- we had -- it was
14  alcohol and minors.
15  Q.  What about in college?
16  A.  I had marijuana.
17  Q.  Who arrested you?
18  A.  Auburn police.
19  Q.  Do you remember what year?
20  A.  No, sir, I don't.
21  Q.  What was the charge?
22  A.  I just said.
23  Q.  Well, you said marijuana.  Were you dealing it?

Page 23

1  A.  No.
2  Q.  What was the charge?
3  A.  I guess possession.  I don't remember.
4  Q.  Who was your lawyer?
5  A.  I didn't have or -- it was a court-appointed one
6  or something like that.  I don't remember.
7  Q.  Tell me about the interaction that you had with
8  police during your marijuana arrest.
9  A.  During my arrest?
10  Q.  Yes.  At some point I suppose the police
11  officers arrested you for marijuana, correct?
12  A.  Back between 2008 and 2009.  I don't know what
13  this has to do with what we're talking about.
14  Q.  You're testifying in an excessive force case
15  against a police officer.  I'm entitled to know
16  whether you're biased against police officers or
17  not, so I get to go through every interaction
18  you've ever had with a police officer.
19  A.  Okay.
20  Q.  At some point the police officers showed up and
21  arrested you for possession of marijuana.  Tell
22  me about that.
23  A.  There was a party.

Page 24

1  Q.  Where at?
2  A.  At my house.
3  Q.  What was your address?
4  A.  I don't remember.
5  Q.  What street was it on?
6  A.  I do not remember.
7  Q.  Was it in the city limits?
8  A.  Yes, sir.
9  Q.  How many people were there?
10  A.  I don't remember.
11  Q.  Do you know how the police officers got there --
12  A.  I do.
13  Q.  -- or who called the police officers?
14  A.  I actually did.
15  Q.  What did you say to them when you called them?
16  A.  Do I need to -- I'm trying to -- I don't know.
17  I just feel like maybe I should have brought an
18  attorney.  I don't know what's --
19  Q.  Well, I understand.
20  A.  -- going on.  I'm just -- I'm here to tell the
21  truth.
22      MR. SIKES:  Rick, what has this got to
23  do with anything?

Page 25

1   A.  I'm just here to tell the truth.
2           MR. HOWARD: I just told you.
3   Q.  What did you call the police officers for?
4           MR. SIKES: I know.  And I didn't find
5           it very satisfying.
6           MR. HOWARD: Well, that's fine.
7   Q.  Why did --
8           MR. SIKES: You think this is going to
9           lead to admissible evidence?
10          MR. HOWARD: Sure.
11  Q.  Why did you call the police officers?
12  A.  Well, actually, my vehicle had went missing, and
13      so I called everybody I knew to find out where
14      my vehicle was to see if somebody was playing a
15      joke. I drove a Jeep Wrangler with the top off,
16      and it was missing, so I called the police
17      because it was stolen.
18  Q.  How did that get from a possible stolen car to
19      you being arrested for marijuana?  Just tell me
20      what happened.
21  A.  Okay.  They showed up and they were talking to
22      us, and there was a piece of a joint by the
23      front steps.  And they decided to search the

Page 26

1       house.
2   Q.  Did they find any?
3   A.  Yes.
4   Q.  How much did they find?
5   A.  Very little.  Not even -- it was like stems and
6       seeds.  Shouldn't even have been arrested for
7       that.
8   Q.  Did you go to court?
9   A.  I had to.
10  Q.  What was the outcome of those charges against
11      you?
12          THE WITNESS: Should I get an
13          attorney?
14          MR. SIKES: You can if you want one.
15          But, again, this is --
16          THE WITNESS: I just don't --
17          MR. SIKES: I know.  He's -- Rick has
18          got a crazy idea that this has got
19          something to do with something.
20          You're not -- you're not going to
21          incriminate yourself in any way.
22          If you want to answer it, you can.
23          If you want to refuse to answer

Page 27

1       it, you can do that also.
2           THE WITNESS: Okay.
3   Q.  What did you do in court?
4   A.  I'd rather not answer this. I don't feel like
5       it has anything to do with --
6   Q.  Well, know that I am going to file a motion with
7       the court and ask you to come back after the
8       judge rules on it. I do think I'm entitled to
9       ask you about every interaction that you've had
10      with police officers.
11  A.  I understand.
12  Q.  You're testifying in an excessive force case
13      against a police officer, and I'm allowed to
14      know if you're biased.
15  A.  And I just want to let you know I'm not biased
16      either way.  I'm just letting you know that.
17  Q.  But you're refusing to answer questions on the
18      advice of somebody else's lawyer.
19          MR. SIKES: I'm not advising him.  I'm
20          telling him that he has that
21          right.  I'm not advising him to do
22          that or not do that.  I'm telling
23          him that he --

Page 28

1           MR. HOWARD: I'll rephrase my
2           question.
3           MR. SIKES:  This doesn't have anything
4           to do with anything, and you have
5           harassed witnesses throughout this
6           case by asking them about criminal
7           records that go back 15 years and
8           20 years and ten years that don't
9           have anything to do with anything.
10          And you're doing it under the
11          pretense of oh, this is -- I'm
12          going to find out how you're
13          biased against police because you
14          got arrested one time 12 years ago
15          on a marijuana charge that was
16          dismissed or pled down or has
17          nothing to do with anything. You
18          think this is going to -- some
19          federal judge is going to haul him
20          back here? Have at it.
21  Q.  Are you going to follow the advice --
22          MR. SIKES: I'm not advising --
23  Q.  -- or suggestion --

Justin Robinson

Page 29

1        MR. SIKES:  I'm not advising him to do

2    that.  You've said that twice.

3        MR. HOWARD:  Well, what are you doing?

4        MR. SIKES:  I'm telling him his

5    rights.

6  Q.  Are you going to listen to somebody that's

7    telling you your rights and not testify about

8    your criminal background or your interaction

9    with police officers?

10  A.  My thing is I don't want to lie to you about

11    anything.  And I've tried to erase that past of

12    mine, and I don't want to lie to you while I'm

13    on oath.  I don't want to, and I'm just --

14    that's really -- I don't want to miss a detail

15    and lie to you.  I'm not going -- I'm an honest

16    person, and that's just what I -- I don't want

17    to do that.

18  Q.  Are you going to answer the questions or not is

19    all I need to know.

20  A.  I'll answer your questions as long as -- I just

21    don't want to -- if it's something I just don't

22    remember, I don't want to lie.  I'm not going to

23    lie.

Page 30

1  Q.  Is it your testimony you don't remember the

2    outcome of your criminal case? because that was

3    the last question I asked.

4  A.  It may have been youthful offender.  It may have

5    not.  I don't remember.  I've moved past that

6    part.  I'm sorry.  It was a long time ago.

7  Q.  Any arrests since then?

8  A.  Yes.

9  Q.  How many?

10  A.  I don't think -- it has nothing to do with drugs

11    or anything like that, so I think I'm -- I don't

12    know if I need to answer this.

13        MR. SIKES:  Have you ever had a

14    criminal conviction other than

15    possibly in this possession of

16    marijuana in your college days?

17    Has there been a criminal

18    conviction of you since that time

19    that you know of?

20    THE WITNESS:  I don't remember the

21    outcomes of exactly how things

22    went.

23    MR. SIKES:  We're talking about

Page 31

1    since the --

2    THE WITNESS:  Yes.

3  Q.  What's your date of birth?

4  A.  04/02/89.

5  Q.  What's the last four digits of your social

6    security number?

7  A.  2688.

8  Q.  How many times have you been arrested since the

9    possession of marijuana charge?

10  A.  Well, there was -- I think -- because I know

11    there's going to be more questions about that, I

12    think I just need to refuse to answer about this

13    right this moment on this part of it because I

14    was here to talk about something -- and I

15    understand where you're coming from, but I'm

16    just -- at this moment I'd rather not.

17  Q.  Do you know which law enforcement agencies

18    arrested you?

19  A.  I don't want to go into that.  No offense to

20    you.

21  Q.  Have you ever filed any lawsuits before?

22  A.  No, sir.

23  Q.  Have you ever been sued before?

Page 32

1  A.  No, sir.

2  Q.  Do you remember what Zana said when she called

3    911?  Did you hear that call?

4  A.  No, sir, I don't remember what she said.

5  Q.  What have you done to prepare for today's

6    deposition?

7  A.  Nothing, really.  I mean, nothing to prepare.  I

8    mean, I just -- if I, you know, don't remember

9    something, I'm just going to tell you I don't

10    remember something.  I'm not going to -- I don't

11    want to say something under oath if I don't

12    remember it correctly.

13  Q.  Have you reviewed any photographs?

14  A.  I have seen photographs.

15  Q.  Who showed them to you?

16  A.  Well, there was a file.

17  Q.  Where?  Who showed them to you?

18  A.  Well, I believe it was Mr. Griffin that showed

19    them to me.

20  Q.  Where were you when he showed them to you?

21  A.  Well, I don't -- I guess it was his office, I

22    guess.

23  Q.  How long ago was that?

Page 33

1   A.  It's been a while.  I don't remember exactly
2       when it was.
3   Q.  In the last week or two?
4   A.  No.
5   Q.  Did he show you any documents?
6   A.  I haven't -- I've received things, but I haven't
7       overlooked things.
8   Q.  Who have you received things from?
9   A.  Mr. Griffin.
10  Q.  Through email?
11  A.  Yes, sir.
12  Q.  What's your email?
13  A.  Justin Robinson.now@gmail.com.
14  Q.  I'm going to send you a subpoena for you to
15      produce all the emails and things that he sent
16      you.  Can you do that?
17  A.  If that's what you're asking for.  As long as I
18      haven't erased them, I'll give them to you.
19  Q.  Well, I'm asking you if you haven't erased them,
20      don't erase them at this point.
21  A.  No.  I wouldn't.
22  Q.  What's the easiest format for you to produce
23      those items?

Page 34

1   A.  I guess forward it to you.
2   Q.  Okay.  Or thumb drive, disc, or print out.
3   A.  I don't have -- the easiest format for me to use
4       is hit "forward" and forward them to you.
5   Q.  Okay.  That will be fine.
6       After the meeting at Mr. Sikes' office, when
7       was the next time you spoke to Mr. Sikes?
8   A.  I've talked to him -- I don't -- I don't
9       remember exactly the next time.  I don't
10      remember exactly.  I've talked to him since, but
11      I don't remember.
12  Q.  Do you know about how many times?
13  A.  No, sir.
14  Q.  Do you still have the same phone number?
15  A.  Yes, sir.
16  Q.  You've had that phone number consistently?
17  A.  Yes, sir.
18          MR. SIKES:  If it helps you, there's
19      nothing in the world wrong with
20      you talking to me.  You're a
21      witness in this matter, and he's
22      got a right to come and talk to
23      you as a witness.  I've got a

Page 35

1       right to come talk to you as a
2       witness.  You can refuse to speak
3       to either one of us at any time.
4       You could have done it then.  You
5       can do it -- if he calls you about
6       it -- there's nothing --
7       Mr. Howard is trying to make out
8       like there's something wrong with
9       you talking to me about what you
10      know about this incident.  So,
11      again, tell him that I interviewed
12      you about these events.  It's the
13      same questions he's asking you
14      here.  Tell him as best you can
15      recollect about what you and I --
16      and mainly it's been you telling
17      me things rather than me telling
18      you things, correct?
19  A.  I just don't want to get myself in trouble by
20      saying something wrong.  I don't -- that's why
21      I'm just being very careful what I say.  If I
22      don't remember, I'm going to tell you I don't
23      remember.

Page 36

1           MR. SIKES:  That's -- yeah.
2   Q.  When was the last time you spoke to Mr. Sikes
3       before today's deposition?
4   A.  I don't remember.
5   Q.  In the last week?
6   A.  I don't remember.
7   Q.  You don't remember if you've spoken to him in
8       the last week?
9   A.  I don't -- I don't remember.
10  Q.  Have you been told --
11          MR. SIKES:  Rick --
12  Q.  -- about anything anybody else has testified to
13      in this case?
14  A.  No.
15  Q.  Have you seen any -- well, have you heard any
16      audio that's been produced in this case?
17  A.  No.
18  Q.  Did you --
19  A.  Now, when you say -- you mean as far as in,
20      like -- I guess I'm trying to understand.  Are
21      you asking if I've heard anything that someone
22      from the other side of -- your side has said?
23  Q.  Oh, no.  For an example, he told Zana what Mason

Justin Robinson

Page 37

1  had said in a deposition.  Has he told you what
2  anybody else has said in a deposition?
3  **A.  Those are in the emails --**
4  Q.  Oh.
5  **A.  -- I guess.  I don't know whose -- I didn't**
6  **look -- I just saw the subject matter.  I**
7  **didn't --**
8  Q.  Has he told you how to answer any questions?
9  **A.  No.**
10 Q.  Did he talk to you about your criminal
11 background?
12 **A.  I don't remember.**
13 Q.  Has he talked to you about anything that -- has
14 he talked to you about Westly's criminal
15 background?
16 **A.  I don't remember.**
17 Q.  Zana called 911 the second time.  What happens
18 next?
19 **A.  Eventually they pull up.**
20 Q.  Did the ambulance get there or the deputy get
21 there first?
22 **A.  Black SUV.  I don't know if it was -- it was a**
23 **black law enforcement vehicle first.  A Ford**

Page 38

1  **Explorer.  I believe that's what it was.**
2  Q.  Did you see an ambulance sitting up on the hill?
3  **A.  I saw an ambulance down the road, yes.**
4  Q.  I guess it's a hill.  That's just what I've been
5  told.  I don't know that for sure.
6  **A.  Definitely an incline.**
7  Q.  I was told that an ambulance arrived in the
8  neighborhood before the deputy got there but
9  parked up the road; is that correct?
10 **A.  That part right there -- I don't have a specific**
11 **knowledge on that.  I don't remember clearly on**
12 **that part.**
13 Q.  When the deputy arrives, where did he park?
14 **A.  If you are -- okay.  So say I'm looking at the**
15 **road from the house.**
16 Q.  You've got your back to the house looking --
17 **A.  I've got my back to the house looking at the**
18 **road.  The vehicle parked on the right side of**
19 **the driveway just off the road.**
20 Q.  Okay.  And on the side of the road closest to
21 the house?
22 **A.  Yes.**
23 Q.  Okay.  The deputy gets out.  What happens?

Page 39

1  **A.  The back windshield was knocked out and the --**
2  **and by the deputy -- by that vehicle -- the back**
3  **window was knocked out, and I do not think he**
4  **was out of the vehicle yet.**
5  Q.  Okay.  When he pulls up and hasn't got out yet,
6  where were you?
7  **A.  I was in the yard somewhere.**
8  Q.  Do you know where Zana was at?
9  **A.  No, sir.**
10 Q.  Do you know where Justin was at -- Weston was
11 at?
12     MR. SIKES:  Westly.
13 Q.  Westly was at.
14 **A.  He was in the yard, too, as far as I remember.**
15 Q.  How about Channing?
16 **A.  Channing was in the road at that point.**
17 Q.  Did you see the ambulance up the road?
18 **A.  At some point, yes.**
19 Q.  Was Channing in the road when you saw the
20 ambulance I guess up the road?
21 **A.  Yes.**
22 Q.  Did pretty much Channing stay in the road a lot
23 during this time?

Page 40

1  **A.  He was in the road a lot, yes.**
2  Q.  I mean, I don't know exactly how long, but I
3  just think that he was in the middle of the road
4  a lot; is that correct?
5  **A.  Yes.  He was in the road, yes.**
6  Q.  The black SUV pulls up in front of the house.
7  Did Channing go immediately over to the SUV?
8  **A.  He went over there.  I'm not going to say**
9  **immediately, but it was very -- it was just**
10 **after I'll say.**
11 Q.  Did you come to know that that was Deputy
12 Penny's car?
13 **A.  Later I found out that that's who that was, yes.**
14 Q.  I understand you had -- you did not know Deputy
15 Penny before.
16 **A.  No, sir.**
17 Q.  And when he stepped out of the car, you did not
18 know his name?
19 **A.  No, sir.**
20 Q.  But later you've learned through the course of
21 events that was Deputy Penny's SUV, correct?
22 **A.  Yes, sir.**
23 Q.  Or it's the county car that he drives.

Justin Robinson

1   A.  **Right.**
2   Q.  Do you know how the back window in the SUV got
3       broken?
4   A.  **Yes.**
5   Q.  How?
6   A.  **I just stated.  He hit it.**
7   Q.  Who is "he"?
8   A.  **Channing.**
9   Q.  Did he hit it with his fist?
10  A.  **Yes.**
11  Q.  Open hand or fist?
12  A.  **Well, you know what?  I don't know for sure.**
13  Q.  Do you know which hand he hit it with?
14  A.  **I think his right.**
15  Q.  Do you know which -- when he hit the back window
16      with his maybe right hand, do you know where he
17      was standing at?  Was he directly behind it, to
18      the passenger's side, or to the driver's side?
19  A.  **Say that again.  I want to make sure I hear you**
20      **clearly.**
21  Q.  That's fine.  I'm just trying to place where was
22      Channing when he broke the rear window out on
23      the SUV.

1   A.  **He was right behind it, so his chest is facing**
2       **the back of the vehicle, and he hits the left**
3       **back glass if you're looking at the glass of the**
4       **vehicle.**
5   Q.  Was it the glass on the side or the glass on the
6       very back?
7   A.  **Glass on the very back.**
8   Q.  Was Zana between Channing --
9   A.  **I'd like to say --**
10  Q.  -- and the deputy?
11  A.  **I don't know where she was at, no.  Not at that**
12      **time, I do not know.  I don't think so.  I don't**
13      **remember where she was at, so I don't remember**
14      **seeing her there at that point.**
15  Q.  He breaks the glass, and then what happens?
16  A.  **The next thing I remember for sure is when he**
17      **got hit with the Taser.**
18  Q.  Who is "he"?
19  A.  **Channing.**
20  Q.  Channing?
21      And the reason we have to do that is because
22      when we're reading this a year from now --
23  A.  **I understand.**

1   Q.  -- who in the world is "he"?
2   A.  **I kind of caught on.  I understand.**
3   Q.  That's okay.  I would do it too.
4       Did you see the deputy get out of the SUV
5       and pull his Taser?
6   A.  **I saw him pull his Taser.  I don't -- I saw him**
7       **pull his Taser.**
8   Q.  Did he give any warnings before he shot his
9       Taser?
10  A.  **I don't remember.**
11  Q.  Do you remember the deputy saying anything --
12      let me back up.  That was a very broad question.
13      I want to limit it.
14      Do you remember the deputy saying anything
15      at all prior to the tasing?
16  A.  **I don't remember on that one.**
17  Q.  Do you remember the deputy saying anything at
18      all from the tasing until the time Channing gets
19      to the ambulance?
20  A.  **I'm having a hard time remembering from that**
21      **time until the actual event of the shooting, but**
22      **I do remember him talking during that time but**
23      **not -- I don't remember on that -- between then**

1       and the ambulance.
2   Q.  Okay.  Would it be easier just to tell me
3       everything you remember the deputy saying?
4   A.  **I do remember him warning that he would shoot**
5       **him, Channing.**
6   Q.  Right.  Do you remember the deputy saying get on
7       the ground?
8   A.  **I do not.**
9   Q.  Did the deputy have his gun pulled out?
10  A.  **Yes.**
11  Q.  Did he have it aimed at Channing?
12  A.  **Yes.**
13  Q.  I understand that Channing was tased and went to
14      the ground and got back up; is that correct?
15  A.  **Yes.**
16  Q.  Tell me what happens after Channing got back up.
17  A.  **As he was down, the ambulance that you talked**
18      **about -- this the part I remember clearly.  The**
19      **ambulance started coming up, and then he got up.**
20  Q.  Channing got up?
21  A.  **Yes.**
22  Q.  What did Channing do when he got up?
23  A.  **Eventually he started going towards the**

Page 45

1    ambulance.
2    Q.  Did he pull the Taser wires off of him?
3    A.  Yes.  On the ground, I believe, yes.
4    Q.  When Channing was pulling the Taser wires out of
5        him while he was on the ground, what was Deputy
6        Penny doing?
7    A.  Repeat that, sir.  I'm sorry.
8    Q.  Sure.  When Channing was pulling the wires off
9        of him from the Taser, what was Penny doing?
10   A.  I don't remember.
11   Q.  Did you see Penny holding the other end of the
12       wires -- the Taser?
13   A.  May have.  I don't remember that part.
14   Q.  Somebody said the Taser malfunctioned after
15       that.  I don't know.  Do you have any
16       information about whether the Taser
17       malfunctioned?
18   A.  No, sir.
19   Q.  Channing gets up off the ground and you said
20       goes to the ambulance?
21   A.  He starts going that direction, yes.
22   Q.  Where is Westly at this time?
23   A.  I don't remember on that time because -- I know

Page 46

1        if you asked me where exactly -- I don't -- I
2        know he was in the yard.  He was somewhere in
3        the vicinity.
4    Q.  Close by?
5    A.  Close by, yes.
6    Q.  I understand.
7    A.  Close by.
8    Q.  Channing walks towards the ambulance, and then
9        what happens?
10   A.  He got on top of the hood.
11   Q.  Did he kick the brush guard on the ambulance
12       first?
13   A.  I don't know.  I don't remember that.
14   Q.  Did he kind of dive on top of the ambulance?
15   A.  He jumped on top of it, yes.
16   Q.  Did he break the windshield in the ambulance?
17   A.  I don't know if he broke it or not, but I do
18       remember seeing him maybe swing on it or
19       something.
20   Q.  How long was Channing on the ambulance hood?
21   A.  Not real long.  I would say -- if I had to put a
22       time on it, I would say maybe for sure less than
23       a minute, but I don't know down to the second.

Page 47

1    Q.  I understand.  I understand that the ambulance
2        was continuing to roll backwards, and Channing
3        fell off the ambulance.
4    A.  Yes, sir.
5    Q.  Was the ambulance kind of swerving to get him to
6        come off or just rolling back straight?
7    A.  It seemed they were rolling back straight.
8    Q.  Which side of the ambulance did Channing fall
9        off of?
10   A.  The other side of the road.  So if I'm on this
11       side of the road where the house is, he fell on
12       the other side.
13   Q.  Did he start hitting the mirror on the ambulance
14       after that point?
15   A.  I don't remember that.
16   Q.  Did Channing fall off in the ditch?
17   A.  He was -- so there's a big ditch ravine down
18       that side.  He was off the side of the road.  I
19       don't know if he had some on asphalt and some on
20       the grass or if he was, you know, more closer to
21       the ditch or not.  I don't remember.
22   Q.  What happens next after Channing falls close to
23       the ditch or in the ditch?

Page 48

1    A.  I believe -- I'm not a hundred percent certain,
2        but I believe that's when Mr. Penny started
3        going that direction, and -- he was going that
4        way, and he called for backup, I believe, at
5        that time and was going that direction.
6    Q.  When you say that direction, where is that to?
7    A.  To where he was at in the ditch.
8    Q.  Okay.  Because at some point Penny goes to
9        Mason's house, but you're also saying at some
10       point he went to where Channing was at in the
11       ditch or went in that direction?
12   A.  He went in that direction, yes.
13   Q.  Do you know if Westly went in that direction,
14       too, towards the ditch?
15   A.  Yes.  I believe I remember that, yes.  I believe
16       that's where I think so.
17   Q.  What happens after Channing stands up in the
18       ditch?
19   A.  Eventually, the next thing that I remember is
20       Channing walking towards Mason's house.  He's
21       still a good ways down but towards that
22       direction, and I didn't know who Mason was
23       either, by the way.  And --

Page 49

1  Q.  That was my next question.

2  A.  Penny is right there, and he's going

3     backwards -- he has his gun pulled talking about

4     I'm going to shoot; I'm going to shoot; back

5     off.  And Channing walks towards him, and they

6     stay at about the same pace.  And they move

7     backwards and they move backwards and they move

8     backwards, and they eventually get down close to

9     the driveway of Mason's.

10 Q.  Of Mason's house?  Okay.

11 A.  And just before he got down there, he took off

12    and ran, and then Channing followed him.

13 Q.  Okay.  So Channing is coming at --

14              THE WITNESS:  Is there coffee here or

15              anything like that?

16              MR. HOWARD:  Sure.

17              THE WITNESS:  Okay.  I'm just trying

18              to --

19         (Off-the-record discussion.)

20              MR. HOWARD:  We're back on the record.

21 Q.  Did you give a statement to the SBI?

22 A.  Yes, sir.

23 Q.  Was that a written statement, oral statement, or

Page 50

1     both?

2  A.  Recorded in the parking lot of Home Depot.  I

3     believe Home Depot.  I met him in Montgomery.

4  Q.  Just an odd place for a statement.

5  A.  Well, we had to meet somewhere, I guess.

6  Q.  Okay.  Do you know who took that statement?  The

7     agent's name.

8  A.  I don't remember his name.  He was a nice guy,

9     though.  I don't remember his name.

10 Q.  Did you get a copy of that statement?

11 A.  No, sir, I don't think so.

12 Q.  Did the SBI agent give you any documents,

13    photographs, or anything like that to look at?

14 A.  I don't remember.  I don't think so.

15 Q.  When we left off, you were telling me about the

16    trip from the ditch up to Mason's house.

17 A.  Yes, sir.

18 Q.  And I understand that Penny started toward

19    Channing's location at or in the ditch.  And at

20    some point, Channing started walking toward

21    Penny; is that correct?

22 A.  Channing started walking towards Penny, yes,

23    sir.

Page 51

1  Q.  And then Penny --

2  A.  And then going towards --

3  Q.  Right.

4  A.  Yes.

5  Q.  And they kind of kept the same distance all the

6     way in front of the Spivey house all the way up

7     to Mason's driveway.

8  A.  Yes, sir.

9  Q.  What was the distance between those two?

10 A.  Once again, less than 10 feet.  Can't give you

11    an exact.

12 Q.  I understand.

13 A.  Less than 10 feet.

14 Q.  Less than a car length?

15 A.  Less than a car length is actually better, so

16    yes.

17 Q.  That's usually easier.

18 A.  About 15 or 16 feet, yeah.  So that's probably

19    closer.

20 Q.  Did Penny walk all the way up to Mason's

21    driveway with the gun drawn on Calloway?

22 A.  Spivey.

23 Q.  Spivey.  I'm sorry.

Page 52

1  A.  Yes.  On Channing Spivey.

2  Q.  Channing Spivey, yes.  Not Weston.

3  A.  No, not --

4  Q.  Do you know what Weston was doing at this

5     time --

6              MR. SIKES:  Westly.

7  Q.  -- Westly was doing at this time?

8  A.  Westly was beside me at that time.

9  Q.  Where were the both of you?

10 A.  We were close to where my truck was parked in

11    the driveway, and we -- that's where we was at.

12 Q.  Did you guys move at any point as Channing and

13    Penny were walking up to Mason's driveway and

14    turned the corner to go up to Mason's house?

15 A.  Yes, we did.

16 Q.  Where did you move to and why?

17 A.  So if this right here is the road, that

18    little -- right there, we were --

19              MR. SIKES:  That won't do anything.

20              She can't --

21 Q.  We'll get you to draw a picture.  Okay?

22 A.  Okay.

23 Q.  I know you're not on artist, but we'll get you

Justin Robinson                                         2/10/2021
                                                    14 (53 - 56)

Page 53

1    to sign it and act like you are.
2    A.  I'm pretty good on paper.
3    Q.  That's good.  That's good.
4         MR. SIKES:  Again, there's a plat of
5           this, but you don't want to use
6           that, right, Rick?
7         MR. HOWARD:  That's correct.
8         MR. SIKES:  Okay.
9    A.  So that's -- this is --
10   Q.  And I understand that you put an M in a box for
11       Mason's house.
12   A.  That's correct.
13   Q.  Can you put an S in a box for the Spivey house?
14   A.  Yes.  And just for the record, this is not
15       saying this is --
16   Q.  Oh, it's not to scale.
17   A.  I'm not saying this is exactly where.  I'm just
18       going to do close.
19   Q.  And I understand.  And the reason that we're
20       doing this -- I just want to know -- to make
21       sure that we're communicating exactly where you
22       were located and where everybody was at at the
23       same time.

Page 54

1    A.  That's fine.  I understand.  This is the
2        driveway there.
3    Q.  Can you put "driveway" on that?
4    A.  I can.
5    Q.  Okay.
6    A.  And we were somewhere right in here.  I don't
7        remember exactly.  I'm not going to put
8        specifically where.  I'm just trying to give you
9        a visual representation because -- I'm trying to
10       say it, but obviously I'm better at doing it
11       this way.
12   Q.  Okay.  And I understand that you and Westly were
13       close to the driveway at the Spivey house as
14       Channing and Penny were walking up to Mason's
15       driveway.
16   A.  Uh-huh (positive response).
17   Q.  Is that correct?
18   A.  That's right.  And I'm not going to draw exactly
19       where they were at at the exact time.  I'm just
20       doing this to show -- we stayed on this side of
21       the road.
22   Q.  And that's the side of the Spivey house, right?
23   A.  Right.  Because Mason and Channing -- not --

Page 55

1    excuse me.  Not Mason.
2    Q.  Penny?
3    A.  Penny and Channing were in the road, and the gun
4        was pulled.  So I told Westly to stay on this
5        side because I was -- I wasn't sure if there was
6        going to be a shot, and I didn't want either of
7        us to be behind it and get shot.  So I stayed on
8        this side, and we were just -- we stayed there,
9        and that's where we stayed until he got -- until
10       when they ran down there.
11   Q.  And we're going to get there.  And I just want
12       to bring everything up to the point where you
13       could not see Penny and Channing as they walked
14       up to Mason's house.  And that may not be
15       correct.  I was under the assumption that maybe
16       they turned the corner and you lost sight of
17       them for a little bit; is that correct?
18   A.  We did lose sight of them for a very brief
19       moment.
20   Q.  Right.  That's what I understand.
21   A.  Not long.
22   Q.  Right.  I think it was said when they turned the
23       corner, you lost a little bit -- lost sight, and

Page 56

1    then you went down there where you could see; is
2    that correct?
3    A.  Yes, sir.  And it wasn't long at all.
4    Q.  Do you remember Penny saying anything about stay
5        back; stay back?
6    A.  To who?
7    Q.  To anybody.
8    A.  I don't -- I don't remember specific on that
9        one.
10   Q.  Do you remember any orders that Penny gave to
11       Channing?
12   A.  He did say something.  It could have been stay
13       back or, you know, I'm going to shoot or
14       something.  You know, he had the gun pulled out,
15       so yeah.
16   Q.  When they got to the corner where you lost sight
17       very briefly, what's the next thing that you saw
18       and where were you standing?
19   A.  So you said after I lost sight, what was the
20       next thing I saw?
21   Q.  I understand that you lost sight very briefly.
22   A.  Yes, sir.
23   Q.  And then I understood that you went towards

Justin Robinson

Page 57

1   Mason's house on the other side of the road so
2   you wouldn't get shot by Penny's bullet in case
3   he had to shoot.  And then at some point you got
4   across the street from Mason's house, and I
5   assume that you could see things at that point;
6   is that correct?
7   A.  Eventually, we were able to see.  But right as
8   we entered the driveway, I proceeded to holler,
9   we're coming for backup; don't shoot; don't
10  shoot.  Because based on what has happened here,
11  I don't know what's going to happen on the other
12  end of this and, once again, don't want to come
13  behind and, you know, he misses and we get --
14  missing shooting at Channing, let's say, and
15  then we get shot.
16  Q.  You were, I guess, basically behind Channing who
17  was behind the gun.
18  A.  Basically, yes.
19  Q.  Okay.  And if he missed Channing or it goes
20  through him, you would have got shot.
21  A.  Possibly, yes.
22  Q.  When you said don't shoot; don't shoot, who were
23  you yelling at?

Page 58

1   A.  Whoever was -- well, him.
2   Q.  The deputy?
3   A.  Yes.  I'm saying we're coming for backup.
4   We're -- you know, that's what I was saying, you
5   know, which --
6   Q.  Did you use the term "backup"?
7   A.  I did.
8   Q.  Have you ever had any law enforcement training?
9   A.  No.
10  Q.  Ever studied law enforcement?
11  A.  No.
12  Q.  What was Westly doing at this time?
13  A.  He was right beside me.
14  Q.  How far did you come into Mason's driveway or
15  yard?
16  A.  I'm not going to draw because I don't want to
17  miss -- we were somewhere right in here right
18  just past the driveway.  Just right there on the
19  left side of it.
20  Q.  Earlier I was talking to Westly, and he
21  indicated you stopped close to the pampas
22  grass, and we have pictures of that if that
23  rings a bell to you.  We called it bushes at

Page 59

1   first, and then we saw the pictures --
2   A.  Well, he knows a lot --
3   Q.  -- and it looks like pampas grass.
4   A.  He knows a lot about that, so that makes sense.
5   Q.  The big tall grass with the feathers on the top.
6   A.  We were close to right in that area.  I don't
7   want -- I don't remember the grass.  It was at
8   night.  I don't remember.
9   Q.  What was the lighting like?
10  A.  It was not very lit I'll say.  Not real -- not a
11  whole lot of light.  Closer to the house there
12  was but not in the driveway.  It was kind of
13  darker over here.
14  Q.  Did it look like the house had a light on under
15  the porch or something that you could use to
16  see?
17  A.  I don't recall.
18  Q.  Did you know that at some point Zana left the
19  Spivey house and went to Mason's house?
20  A.  Did I know that she had went over there?
21  Q.  Yes, sir.
22  A.  Yes, sir.
23      MR. SIKES:  Wait.  He's asking you --

Page 60

1       you're not asking him do you know
2       it then or does he know it now?
3       MR. HOWARD:  Both.
4   A.  I knew it before.
5   Q.  That's what I understood you to say.
6   A.  I knew at some point she went over there.  At
7   that time I wasn't thinking --
8   Q.  I understand.
9   A.  -- she was in -- I didn't know where she was at
10  really.
11  Q.  I understood you to say that while all this was
12  going on, you knew she left the scene and went
13  up the road to Mason's house; is that correct?
14  A.  Yes, sir.  At some point I know that she went
15  over there.
16  Q.  Do you know why?
17      MR. SIKES:  He's asking did you know
18      it while you were walking up the
19      road with Westly.  Did you know
20      then that Zana had gone up ahead?
21      THE WITNESS:  I'm not sure.  It was
22      the last thing on my mind while
23      that was taking place.

Justin Robinson

2/10/2021
16 (61 - 64)

Page 61

1  Q.  In either event, now you know that she went up
2     there, correct?
3  A.  I know that she was there.
4  Q.  Have you ever spoken to her about what happened
5     at Mason Adcock's house?
6  A.  I haven't really asked anybody anything about it
7     unless they were -- you know, mostly it's been
8     asked to me.
9  Q.  Who has mostly asked you those questions?
10  A.  Well, mostly the people right here.
11  Q.  Have you heard anything that Zana said that
12     happened at Mason Adcock's house before you got
13     there?
14  A.  I have.  But I don't recall what she said.
15  Q.  What do you see when you get to the bush in
16     Mason's yard?
17  A.  Well, when I get to the spot right to the left
18     of the driveway, wherever that was that we were
19     standing --
20  Q.  We'll call it the spot.  That's fine.
21  A.  The spot.  Because I don't want to say that it
22     was by the bush and then we -- I don't remember
23     a bush.  I just remember being right there by

Page 62

1     the left of the driveway.
2  Q.  That's fair.  We'll just call it the spot
3     instead of the bush.
4  A.  Okay.
5  Q.  When you get to the spot, what do you see?
6  A.  I see two men side by side, and then I see
7     Channing on the other side of one of those guys.
8  Q.  Could you see --
9  A.  Do you want me to draw it -- how I saw it?
10  Q.  Well, I want you to tell me about it first so
11     I'll understand it.
12  A.  Okay.
13  Q.  You saw two guys standing side by side and
14     Channing off a little bit?
15  A.  Right.  There was some space between those two
16     guys.
17  Q.  Did you recognize the deputy that got out of the
18     black SUV?
19  A.  I couldn't tell who was who.
20  Q.  Do you even know who shot?
21  A.  The man to the left.  Looking from the spot, it
22     was the man to the left.
23  Q.  The man closest to the house?

Page 63

1  A.  Yes, sir.
2  Q.  When you get to the spot, you see three guys
3     outside of the house, Channing and two other
4     figures.
5  A.  Yes, sir.
6  Q.  You can't really tell who is who; is that
7     correct?
8  A.  I didn't know either one of them, and I couldn't
9     tell, you know -- I couldn't see -- I mean, I
10     don't know who was who.  I didn't know either of
11     the guys anyways.
12  Q.  Could you tell me which one was Channing?
13  A.  Yes.
14  Q.  I mean, he just had a pair of shorts on.
15  A.  Yeah.  He had his shirt off and he was -- yeah.
16  Q.  Did you hear anything that Channing said while
17     he was at Mason's house?
18  A.  No, sir.  I don't remember.
19  Q.  Did you hear anything that anybody said at
20     Mason's house prior to the shooting?
21  A.  Repeat your question.  I'm sorry.
22  Q.  Sure.  And I'm just looking for statements.
23  A.  I understand.  I just want to tell you the

Page 64

1     truth.  I want to answer you correctly.
2  Q.  I'm looking in this question for any statements
3     that you heard and remember from the time that
4     you got to the spot until you heard the gunfire.
5  A.  I don't remember hearing anything.
6  Q.  Do you remember any statements that you heard
7     from the spot after the gunshot?
8  A.  I don't remember what was said.
9  Q.  Did you ever leave the spot?
10  A.  Yes, sir.
11  Q.  And that was after the shooting.
12  A.  Yes, sir.
13  Q.  Correct?
14     Okay.  You get to the spot.  You see three
15     guys up there.  Two are close.  Channing is
16     standing off.  What happens?
17  A.  One foot of -- one of Channing's foots moved
18     forward.  And as soon as I saw that foot move
19     forward, there was gunshots.
20  Q.  Did you see Channing touch one of the figures at
21     all?
22  A.  No, I didn't.
23  Q.  Or could you see that from back there in the

Justin Robinson

Page 65

1  dark?
2  A.  I could see --
3           MR. SIKES:  Object to the form of the
4           question.
5           MR. HOWARD:  That's fine.  You're
6           allowed to do that.
7  Q.  Go ahead.
8           MR. SIKES:  Thank you.
9           MR. HOWARD:  Even though there's --
10          MR. SIKES:  Grant me permission.
11          MR. HOWARD:  -- no evidentiary basis
12          for that objection.
13          MR. SIKES:  Well, you said it's dark.
14          I think the light will be -- that
15          it was at twilight and there was
16          plenty of light to see there.
17 Q.  Standing at the spot, could you see any touching
18     by Channing on one of the figures?
19 A.  No, sir.
20 Q.  And you still couldn't -- it still wasn't light
21     enough to tell who was who --
22 A.  Yes, sir.
23 Q.  -- as far as the officers, correct?

Page 66

1           MR. SIKES:  Object to the form.  The
2           light isn't the problem.  He
3           doesn't know either one of the two
4           people he saw.  Object to the form
5           of the question.
6  Q.  Did you recognize Deputy Penny, the one that got
7     out of the black SUV as he was standing up there
8     by the house?
9  A.  I couldn't.
10 Q.  Was it light enough to tell whether he was on
11    the left or on the right?
12 A.  It was light enough to where I could clearly see
13    two -- three figures.  I could clearly see, but
14    I didn't know who was who.  But I could clearly
15    see the three people.
16 Q.  Was it light enough for you to tell whether the
17    guy that got out of the black SUV was on the
18    right or the left?
19 A.  I didn't know.  Like I said, I don't know who
20    was who.
21 Q.  It was light enough to tell which one was
22    Channing, correct?
23 A.  It was light enough to see all three of them,

Page 67

1  and then it was light enough to see Channing,
2  and it was light enough for me to see his foot
3  move forward and then ...
4  Q.  Okay.  I've got ya.  Did you see what Channing's
5     hands were doing?
6  A.  I don't recall.
7  Q.  Do you recall whether Channing hit one of the
8     officers?
9  A.  I didn't see that.
10 Q.  Okay.  Was Channing struck with bullets as he
11    was walking?
12 A.  As his foot moved forward, from what I remember,
13    that's when the gunshots started.
14 Q.  Who was he walking to, or what direction was he
15    going in?
16 A.  I would say straight ahead, which would be the
17    person closest to the house.
18 Q.  The guy that shot?
19 A.  Correct.
20 Q.  Okay.  Do you know how far away he was from the
21    guy that shot?
22          MR. SIKES:  He?
23 Q.  How far was Channing away from the guy who shot

Page 68

1  him?
2  A.  Once again, I don't know precise, but for sure
3     less than -- I would say less than 10 feet.
4  Q.  Can you get more precise than that?
5  A.  I don't want to tell you wrong.  I don't know.
6  Q.  Did you see any injuries or pictures of injuries
7     of the officer at any time in this case?
8  A.  Repeat.  I want to hear you.
9  Q.  Sure.  Griff Sikes showed you a bunch of
10    pictures and stuff like that.  Did he present
11    the injury pictures of the officer that was
12    involved in the shooting?
13 A.  Yes.
14 Q.  Did you see those on the scene?
15 A.  No.
16 Q.  Did you ever get close enough to see them?
17 A.  No, I don't think so.
18 Q.  The shots were fired.  You were at the spot.
19    What did you do?
20 A.  After the shots were fired, what did I do?
21 Q.  Yes, sir.  You said you moved from that
22    location.  What did you do and where did you go?
23 A.  I pretty much moved fastly and ran back to the

Page 69

1    Spivey house.
2    Q.   Did Westly go with you?
3    **A.   Yes.**
4    Q.   Westly, did he run up there to where his brother
5         was at?
6    **A.   He did make a motion forward that way, but -- I**
7    **can't remember what happened in between then,**
8    **but I do remember letting him know we need to**
9    **get out of here.  I didn't feel good about the**
10   **situation.  I didn't ...**
11   Q.   Do you think something could have happened to
12        you?
13   **A.   I didn't know.**
14   Q.   Okay.  Do you know how many steps Westly made
15        towards his brother after the shooting?
16   **A.   No, sir, I don't.**
17   Q.   Do you know how long it was from the time of the
18        shooting happening until the time that you went
19        back to the Spivey house?
20   **A.   Say that again.  I'm sorry.**
21   Q.   I'm just trying to see what that gap in time is.
22        I think it's short.  I think they had the
23        shooting, and then you left.

Page 70

1         Do you know the time from the time of the
2    shooting until you stepped to go back to the
3    Spivey house?
4    **A.   It was pretty short.**
5    Q.   Do you remember anything that was said by either
6    one of the officers?
7    **A.   I know earlier you asked me if I remembered**
8    **anything being said, and at that time I didn't.**
9    **But now I do remember them basically telling**
10   **Westly to get back.**
11   Q.   That was my next question --
12   **A.   Yeah.**
13   Q.   -- because I understood that he started towards
14   the house and Channing, but somebody told him to
15   get back.
16   **A.   Uh-huh (positive response).**
17   Q.   Did that happen?
18   **A.   Yes, sir.  It was -- I don't know if it was**
19   **specifically "get back," but it was that tone,**
20   **you know.  Hey, stay away from ...**
21   Q.   Just don't come up here with us is basically the
22   message?
23   **A.   Right.**

Page 71

1    Q.   And at that time you and Westly went back to the
2         Spivey house?
3    **A.   Yes, sir.**
4    Q.   At any time did you go back and get into
5         position where you could observe what's going on
6         up at Mason's house?
7    **A.   Repeat that.  I'm sorry.  I'm trying to focus.**
8    **I'm trying.**
9    Q.   That's fine.  I just want to make it as exact as
10        I can.
11        You left Mason's house after the shooting.
12        Did you go back?
13   **A.   No, sir.**
14   Q.   Did you get into a position where you could look
15        up into his yard?
16   **A.   No, sir.**
17   Q.   I know there's a little shack house between
18        Mason's house and the Spivey house.  I don't
19        know much about that.  Did you ever go over into
20        that yard and look up to Mason's house?
21   **A.   No, sir.**
22   Q.   Were you at Mason's house long enough to observe
23        what Mason did after the shooting and what Penny

Page 72

1    did after the shooting, if you could tell them
2    apart?
3    **A.   I don't recall anything happening.  I left**
4    **pretty quickly.**
5    Q.   Did you ever see one of the police figures that
6    you saw get on a cell phone?
7    **A.   I don't remember seeing that.**
8    Q.   As you were walking off or running off --
9         Which was it?
10   **A.   A little of both.**
11   Q.   That's fair.
12        -- did you hear anything that somebody might
13   have said on the radio or a cell phone?
14   **A.   No, sir.  I don't remember.**
15   Q.   You get back to the house with Westly.  Who is
16   the next person that arrived at the Spivey
17   house?
18   **A.   I don't remember.  I know people that came, but**
19   **I don't remember an order of who did what.**
20   Q.   I get it.  I know Chanda came over there,
21   correct?
22   **A.   Uh-huh (positive response).**
23   Q.   Correct?

Page 73

```
1   A. Yes, sir.
2   Q. Is that a "yes"?
3      Your mom came.
4   A. Yes, sir.
5   Q. And at some point Zana came back home.
6   A. A long time later, but yes.
7   Q. Did she tell you where she was and what she was
8      doing?
9   A. Me and her really didn't have a one-on-one
10     conversation about that.
11  Q. When you guys got back to the house, did anybody
12     wonder where in the world is Zana?
13  A. It was definitely -- you know, we were
14     definitely aware that she had been gone for a
15     while. Sir?
16  Q. I was just saying -- it seems like you got back
17     to the house, and nobody had a clear indication
18     where she was. And there had been a shooting,
19     and I would have been worried about her. Was
20     Westly worried about her or wondered where she
21     was at?
22  A. I don't have any specific -- I don't ...
23  Q. That's fine. Did you see Zana's telephone when
```

Page 74

```
1      you got back to the house, or cell phone?
2   A. No, sir.
3   Q. Who all came over to the house that night that I
4      haven't mentioned? You said your mom, Chanda.
5      The sheriff came over.
6   A. The sheriff did.
7   Q. Who else?
8   A. I don't know the first name. His last name is
9      Morgan. It was a friend of Chanda's. Maybe a
10     relative. I don't know.
11  Q. Anybody else you can think of?
12  A. That's all I remember.
13  Q. While you were standing in the spot looking
14     towards the house and the three guys that were
15     up there, did you see anybody looking out of a
16     window?
17  A. No, sir. I don't ...
18  Q. Did you see anybody turn lights on inside the
19     house?
20  A. I don't remember anything like that.
21  Q. Have you been told which door Mason came out of,
22     or did you see it?
23  A. No, I didn't see it.
```

Page 75

```
1   Q. Have you been told anything about what Zana told
2      Mason when she arrived at the house?
3   A. I've heard it discussed, but I don't remember
4      details.
5   Q. Okay. Do you remember anything that she might
6      have told Mason?
7   A. Just that we needed help I think is what she
8      said. I don't remember specific, like I said,
9      on that. I just pretty much just let people ask
10     me what I remember, and that's about it.
11  Q. You said you don't know Mason Adcock at all,
12     correct?
13  A. No, I don't.
14  Q. Have you ever spoken to him at all?
15  A. Not that I remember.
16  Q. Do you know his wife?
17  A. Huh-uh (negative response).
18  Q. Do you know his son?
19        MR. SIKES: You need to answer out
20        loud.          .
21  A. No, sir, I don't.
22  Q. Have you spoken to anybody that works for the
23     City of Luverne about the shooting?
```

Page 76

```
1   A. No, I haven't.
2   Q. Have you spoken to anybody at the sheriff's
3      office? I know Sheriff Mears came over that
4      night. I don't know if you spoke to him or not,
5      but anybody affiliated with the sheriff's
6      office?
7   A. Not to my knowledge.
8   Q. How far was your car parked away from the
9      deputy's car when the deputy arrived? And I say
10     car. It was an SUV. How far in distance?
11  A. Let's see. It's not a real long driveway. I
12     would say it was definitely less than 20 feet.
13     I can tell you that.
14  Q. Did you pull all the way up in the driveway?
15  A. I pulled up close to where my front tire would
16     have been, I guess, parallel with the front
17     porch.
18  Q. I don't have the pictures yet from the state
19     police. What kind of car did you drive, or what
20     were you driving that night?
21  A. A Chevrolet Avalanche. Pewter in color.
22  Q. Did you see any paper come out of the Taser
23     cartridge when he fired it? Little bitty
```

Justin Robinson

Page 77

1    dots --
2  A.  I don't recall.
3  Q.  -- called chaff.
4  A.  I don't recall.
5  Q.  Did you see any physical marks on Channing from
6       the Taser barbs?
7  A.  I don't remember seeing anything like that.
8  Q.  Do you remember Deputy Penny doing anything with
9       the Taser wires after the tasing?
10  A.  I don't have any specific knowledge on that
11      either.  I'm sorry.
12  Q.  Have you told me about everything that you
13      remember Deputy Penny saying?
14  A.  That's the main things I remember him saying.  I
15      don't want to tell you something that I don't --
16  Q.  That's fine.  I'm just trying to figure out what
17      all was said.
18      Have you told me -- well, let me back up.
19      Do you remember Mason Adcock saying anything
20      that you know that he said for sure?
21  A.  I don't remember anything for sure him saying.
22  Q.  You heard something come up from close to the
23      house, but you don't know who said it, correct?

Page 78

1  A.  Don't know who said it.  Don't know either one
2       of them.  Don't know either one of their voices.
3  Q.  Do you remember Penny saying anything about get
4       back, get back, as he was, I guess, walking
5       backwards up to Mason's house?
6  A.  Like I said earlier, the main thing was -- yeah,
7       he would have had to say get back or I'll shoot.
8       I think -- actually, that makes sense.
9  Q.  Do you know if he was talking to Channing that
10      was following him, or was he talking to you
11      guys, the bystanders?
12  A.  He was talking to Channing.
13  Q.  Did you know or do you remember Penny directing
14      any language towards you or Westly?
15  A.  I don't have any specific knowledge on that.
16  Q.  What social media accounts did you have back
17      then?  I know Facebook.
18  A.  Facebook is the main one.
19  Q.  Instagram?  Anything like that?
20  A.  I had them, yes, sir.
21  Q.  Did you ever communicate with Channing through
22      social media?  I know you said you saw his
23      Facebook post, but what about Instagram?  I

Page 79

1       don't even know what was around in May 2020.
2  A.  We had talked on Facebook before, but I don't
3       know if it was way prior or not, but I don't
4       have any specific on that.  I know we hadn't on
5       anything else.
6  Q.  I want to go back and talk about the ambulance.
7       I know the ambulance was parked up the road.
8  A.  Yes, sir.
9  Q.  And Channing went up there and broke the
10      windshield and then, I guess, rolled off near or
11      in the ditch.
12      Did you know any of the EMTs that were
13      there?
14  A.  No, sir.
15  Q.  When you came back from the spot, did you see
16      the ambulance?
17  A.  I don't remember on that actually.  I don't
18      remember.
19  Q.  Do you know how many ambulances ultimately came
20      to the scene?
21  A.  No, sir.
22  Q.  Have you -- since the shooting have you spoken
23      to any EMTs about this?

Page 80

1  A.  No, sir.
2  Q.  Do you keep a journal or log about things that
3       happen to you like a diary?
4  A.  No.
5  Q.  Did you respond to any of Mr. Sikes' emails that
6       he sent to you about this case?
7  A.  I may have responded to them like, you know, an
8       address or I received something or my --
9       something was correct, but I don't recall.
10  Q.  Have you sent him anything?
11  A.  I don't recall.
12  Q.  Did you ever see Deputy Penny holster his
13      weapon?
14  A.  Holster meaning put it up?
15  Q.  Yes, sir.  I know at some point he pulled it.
16      Did you ever see him put it up?
17  A.  I don't remember.  I don't think -- I don't have
18      any specific knowledge on that.  I don't ...
19  Q.  Did you ever see Mason Adcock holster his
20      weapon?
21  A.  I don't remember.
22  Q.  When Channing punched a hole in the ceiling,
23      where was everyone located inside the house?  I

Page 81

1    know the front door opens up into the living
2    room, and there's a television in there.  Where
3    was everybody at?
4    **A.  In that main room.  In that living room.**
5    Q.  Did the punch to the ceiling come immediately
6    after the television event?  I don't know what
7    you call it.
8    **A.  I don't remember which one happened first, but**
9    **they were in the same time frame, whatever that**
10   **time frame was, yes.**
11   Q.  Did you ever see Channing touch Zana in any way?
12   **A.  I don't have any specific accurate information.**
13   **I don't remember correctly.**
14   Q.  Did you ever see him touch -- say anything to
15   Zana?
16   **A.  He had talked to Zana, yes.  He had talked to**
17   **us -- me, Westly and Zana.  We were there with**
18   **him, yes.**
19   Q.  Did he threaten her in any way?
20   **A.  I don't have any specific knowledge on that.**
21   Q.  Did Channing ever threaten Westly?
22   **A.  I don't remember specifically.**
23   Q.  Other than the swing that he took with you, did

Page 82

1    he make any aggressive actions towards you?
2    **A.  He didn't swing again or anything like that, no.**
3    Q.  Okay.  Just the one swing?
4    **A.  Uh-huh (positive response).**
5    Q.  Is that a "yes"?
6    **A.  Yes, sir.**
7    Q.  You testified that you went up to where -- or I
8    think you said you went up to where Channing
9    fell off the ambulance close or in the ditch,
10   correct?
11   **A.  You're asking where he fell?**
12   Q.  Yeah.  He fell off an ambulance.
13   **A.  Yeah.  I didn't go up there, no.**
14   Q.  Well, you said you stayed back to the house,
15   right?
16   **A.  Correct.**
17   Q.  As they were walking all the way from where the
18   ambulance was hit by Channing with his fist or
19   head, all the way past the front of the Spivey
20   house up to Mason's house, did you see any
21   injuries on Channing?
22   **A.  I don't remember seeing any.**
23   Q.  While you were there, did you notice Channing

Page 83

1    have any -- while you were there and before the
2    911 call, did Channing have any injuries to him
3    other than the scar on his head?
4    **A.  I don't remember any.**
5    Q.  Did you receive any phone calls while you were
6    there?
7    **A.  During that day while I was there or just --**
8    Q.  Well, I know that you went to the bank in Troy.
9    Did you have any connection with the outside
10   world after you got back to the Spivey house
11   from the bank?
12   **A.  After the shooting I did call my mom.**
13   Q.  Yeah.  I mean -- well, from the time you got
14   back from the bank until the shooting.
15   **A.  I don't remember.**
16   Q.  It just seems like there was the four people
17   there, and that was it until the ambulance was
18   called; is that correct?
19   **A.  Yes.**
20        MR. HOWARD:  Let's take a few minutes'
21        break.  I think I'm about
22        finished.  Okay?
23        MR. SIKES:  Okay.

Page 84

1        (A brief recess was taken.)
2        MR. HOWARD:  We can go back on the
3        record.
4    Q.  (Continuing by Mr. Howard) Did you ever see any
5    blood at all on Channing?
6    **A.  I really don't remember if I did or not.**
7    Q.  This is before the shooting and after the
8    shooting.
9    **A.  I don't remember.**
10   Q.  Okay.  Do you remember Channing having any rings
11   on?
12   **A.  No, sir, I don't remember that.**
13   Q.  Do you remember him having a watch on?
14   **A.  No, sir.**
15   Q.  Do you remember Channing having anything in his
16   hands at any point from the time 911 was called
17   until the shooting?
18   **A.  I don't.**
19   Q.  I'm going to leave your deposition open until we
20   get a ruling on your criminal history and your
21   interaction with the police officers and until I
22   get the report that you gave to ALEA.  That's
23   all I have right now.

Justin Robinson

Page 85

1  A.  Reports I gave to who?
2  Q.  The statement you gave to ALEA.
3  A.  Oh.
4  Q.  I just don't have it yet.
5  A.  Oh, okay.
6        EXAMINATION
7  BY MR. SIKES:
8  Q.  You're appearing here today pursuant to
9     subpoena, correct?
10 A.  Yes, sir.
11 Q.  Who served the subpoena on you?  I don't mean
12    the name of the person who sent -- who requested
13    that you -- authorized the process server to
14    come down and serve you with a subpoena?  Do you
15    know?
16 A.  No.  It's on the thing.
17 Q.  What I'm -- Mr. Howard subpoenaed you here
18    today, correct?
19 A.  Yes, sir.  I believe that's right.
20 Q.  That's what I'm trying to get at.
21 A.  Okay.
22 Q.  Mr. Howard subpoenaed you here today.  He had
23    the subpoena issued for you?

Page 86

1  A.  Uh-huh (positive response).
2  Q.  Okay.  And what time were you required to be
3     here?  What time did the subpoena say?
4  A.  It said nine o'clock on the subpoena.
5  Q.  There was also a subpoena for Westly Spivey
6     also, and I believe it was nine o'clock.   He
7     appeared here at nine o'clock.  Y'all came up
8     separately, correct?
9  A.  Yes, sir.
10 Q.  When you got here at nine, Mr. Howard wanted to
11    go forward with the deposition of Westly,
12    correct, and you left?
13 A.  Yes, sir.
14 Q.  Okay.  And you were to come back at about noon
15    we said; is that right?
16 A.  I believe I was told it would be lunch served at
17    noon, but I thought I understood that I needed
18    to be back at one.
19 Q.  Oh, okay.  All right.  And did you come back at
20    about one?
21 A.  Yes, sir.
22 Q.  Okay.  And I will tell you that Mr. Spivey --
23    Westly Spivey's deposition ended this morning

Page 87

1     sometime just before twelve or thereabouts.
2     Where were you at that time?
3  A.  I was in the vehicle coming down the interstate.
4  Q.  Okay.  Have you had any substantive
5     conversations with anybody after Mr. Westly
6     Spivey's deposition ended this morning at twelve
7     o'clock about what Mr. Spivey said at the
8     deposition?
9  A.  No, I haven't.
10 Q.  Okay.  You haven't heard from Mr. Howard about
11    what he said at the deposition?
12 A.  No, sir.
13 Q.  Haven't heard from me about what was said by
14    Westly in his deposition?
15 A.  No, sir.
16 Q.  Haven't had any conversation with anybody --
17 A.  No, sir.
18 Q.  -- about what Westly said in his deposition this
19    morning.
20 A.  No, sir.
21 Q.  Is that correct?
22 A.  Yes, sir.
23 Q.  Is that correct?

Page 88

1  A.  That's correct.  I haven't spoke to Westly in
2     several days actually.
3       MR. SIKES:  Okay.  That's all.
4       MR. HOWARD:  I have some follow-up
5       with those questions.
6         EXAMINATION
7  BY MR. HOWARD:
8  Q.  You were scheduled to appear for a deposition
9     about two weeks ago.  Did you know about that?
10 A.  Hold on.
11       MR. SIKES:  That was what most of the
12       calls were about to you.  Do you
13       recall last week that we were
14       trying to line up your deposition?
15       THE WITNESS:  Right.
16       MR. SIKES:  Okay.
17 Q.  Did you even know about that?
18 A.  Didn't we have a deposition set for Monday of
19    this week or something like that or --
20       MR. SIKES:  Uh-huh (positive
21       response).
22 A.  I think that's all I -- I think that's all I
23    remember.

Justin Robinson

2/10/2021
23 (89 − 92)

Page 89

1  Q.  Okay.  Did you know about your deposition being
2      set two weeks ago and Mr. Sikes accepting the
3      subpoena for you or me sending a copy of the
4      subpoena to him and --
5          MR. SIKES:  And I sent you a copy of
6              the subpoena, correct?  That's one
7              of the documents I sent you.  You
8              asked for a subpoena.
9          THE WITNESS:  I did.  I did ask for a
10             subpoena.
11         MR. SIKES:  And did I send that to
12             you?
13         THE WITNESS:  Yes.
14         MR. SIKES:  Okay.
15 Q.  What was your understanding on why those
16     depositions didn't go forward?
17 **A.  I don't know.**
18 Q.  Any emails to that effect?
19 **A.  Not that I know of.**
20         MR. HOWARD:  Okay.  That's all I've
21             got, and I may see you again.  May
22             not.  Appreciate it, though.
23         THE WITNESS:  Okay.  Thank you.

Page 90

1              Do you want to keep that?
2          MR. HOWARD:  Yeah.  We need to get you
3              to sign that.  If you'll sign it
4              and put your initials on there and
5              let me put a sticker.  That way we
6              just know it's yours.
7          (Defendant's Exhibit 1 marked for
8              identification.)
9          (Deposition concluded at approximately
10             2:35 p.m.)
11         * * * * * * * * * * * * *
12         FURTHER DEPONENT SAITH NOT
13         * * * * * * * * * * * * *
14
15         REPORTER'S CERTIFICATE
16 STATE OF ALABAMA:
17 MONTGOMERY COUNTY:
18     I, Pamela Wilbanks Owens, Registered
19 Professional Reporter, ACCR #391, and Commissioner for
20 the State of Alabama at Large, do hereby certify that I
21 reported the deposition of:
22     JUSTIN ROBINSON
23 who was first duly sworn by me to speak the truth, the

Page 91

1  whole truth and nothing but the truth, in the matter of:
2      CHANDA CALLOWAY, as Administrator
3      of the Estate of Channing Lamar
4      Spivey, deceased,
5      Plaintiff,
6      Vs.
7      MASON ADCOCK,
8      Defendant.
9      In The U.S. District Court
10     For the Middle District of Alabama
11     Northern Division
12     2:20-cv-598
13 on Wednesday, February 10, 2021.
14     The foregoing 90 computer printed pages
15 contains a true and correct transcript of the
16 examination of said witness by counsel for the parties
17 set out herein.  The reading and signing of same is
18 hereby waived.
19     I further certify that I am neither of kin nor
20 of counsel to the parties to said cause nor in any
21 manner interested in the results thereof.
22     This 24th day of February 2021.
23

Page 92

1
2
3
4
5
6          *Pam Owens*
7      Pamela Wilbanks Owens, ACCR #391
8      License Expires:  9/30/2021
9      Registered Professional Reporter
10     and Commissioner for the State
       of Alabama at Large
11
12
13
14
15
16
17
18
19
20
21
22
23