IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CHANDA CALLAWAY, )<br>As Administrator of the Estate of )<br>CHANNING LAMAR SPIVEY )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>)<br>MASON ADCOCK, )<br>)<br>    Defendant. ) | CIV. ACT. NO.: 2:20-cv-598-ECM<br>(WO) |

**MEMORANDUM OPINION and ORDER**

Now pending before the Court are the Plaintiff Chanda Callaway's ("Callaway") motion for partial summary judgment (doc. 47), the Defendant Mason Adcock's ("Adcock") motion for summary judgment (doc. 57), and Adcock's Motion to Exclude (doc. 62).

Callaway brings claims against Adcock for excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 (count one) and wrongful death pursuant to Alabama Code § 6-5-410 (count two).

Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, Adcock's motion to exclude is due to be DENIED, Callaway's motion for partial summary judgment is due to be DENIED, and Adcock's motion for summary judgment is due to be GRANTED.

## I. JURISDICTION

The Court has original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction of the Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II. LEGAL STANDARDS

### A. Motion to Exclude Under Rule 702

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This Rule requires a trial judge to ensure that an expert's testimony rests on a reliable foundation and is relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993). In determining the admissibility of expert testimony under Rule 702, a court must conduct a rigorous three part inquiry, considering whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the

application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

### B. Motion for Summary Judgment

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden

then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

The Court construes the facts in the light most favorable to the non-movant plaintiff[1] and draws all reasonable inferences in her favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party' and 'resolve all reasonable doubts about the facts in favor of the non-movant.' Moreover, the court must avoid weighing conflicting evidence or making credibility determinations." (citations omitted)).

### III.  FACTS

Plaintiff Callaway is decedent Channing Spivey's ("Spivey") aunt and the Administrator of Spivey's estate.[2] Defendant Adcock is the city of Luverne's Assistant Police Chief. Spivey resided with Westley Spivey ("Westly"), his brother, and Zanna Bloodsworth ("Bloodsworth"), Westly's girlfriend. Adcock was the Spiveys' neighbor.

Spivey was diagnosed with a brain tumor in March of 2020 and underwent surgery, radiation, and chemotherapy as part of his treatment. Spivey displayed psychological and

---

[1] While Callaway filed her own motion for summary judgment, the Court finds its resolution on Adcock's motion for summary judgment dispositive. Thus, the Court considers Callaway the non-movant.

[2] In violation of this Court's instructions in the Uniform Scheduling Order (doc. 41 at 2, Section 2), Callaway failed to cite to the evidence with appropriate specificity in her submissions. Despite this failure, the Court undertook a thorough examination of the evidence in evaluating Callaway's claims on summary judgment.

behavioral side effects from the surgery, such as moodiness, erratic behavior, and general personality changes.

On the morning of May 27, 2020, Spivey crashed his vehicle into a tree while driving "donuts" in an empty lot. At home that evening, Spivey became belligerent with Westly and Westly's friend Justin Robinson ("Robinson"). Spivey smashed a cup, punched a hole in the ceiling, and threatened to break a television set. In response, Bloodsworth called 911 asking for an ambulance. Bloodsworth told the dispatcher that Spivey had Stage IV brain cancer and was screaming. Bloodsworth cancelled her initial 911 call, telling the dispatcher that Spivey had calmed down. Bloodsworth subsequently called 911 a second time, telling the dispatcher she needed help because Spivey was screaming and aggressive. Officer Brent Penny ("Penny") was dispatched to assist the emergency medical technicians ("EMTs").

Tim White ("White"), an EMT, arrived on the scene first. Due to Spivey's combative behavior, he would not approach the Spivey residence until police backup arrived. Knowing that Adcock lived nearby, White called Adcock to ask whether Adcock heard "the ruckus . . . going on across the road." (Doc. 57-3 at 8). White did not specifically refer to Spivey or Spivey's residence during the call. After checking for noise, Adcock remained home.

When Penny arrived on the scene, Spivey, Bloodsworth, Westly, and Robinson were all outside the residence. Spivey was wearing only a pair of shorts that resembled swimming trunks. As Penny exited his vehicle, Spivey smashed the back window of the patrol car with his bare hands, shattering it. Spivey then advanced towards Penny. Penny

instructed Spivey to get down on the ground, but Spivey did not comply. At this point, Penny deployed his taser. The taser knocked Spivey down, but Spivey quickly got up and removed the taser prongs from his body. Sometime after deploying the taser, Penny drew his service weapon.

Spivey then approached the ambulance, hopped on the hood, hit the front windshield, and shattered the glass. Robert Knight ("Knight"), an EMT inside the vehicle, was injured when glass struck his eyes. Around this time, Penny warned Spivey that Penny would have to shoot him if Spivey did not get down on the ground. On his radio, Penny requested further police backup.

Fearing for Spivey's life, Bloodsworth told Penny that she would get Adcock for backup and ran to Adcock's front door. Meanwhile, Spivey was thrown off the ambulance when the driver put the vehicle in reverse. Back on his feet, Spivey advanced towards Penny. Penny backed up towards Adcock's property and eventually broke into a run. Spivey chased Penny in pursuit. Westly and Robinson followed behind but temporarily lost sight of Spivey and Penny. Westly describes losing sight for one or two minutes, while Robinson describes the time period as "a very brief moment." (Doc. 57-5 at 15).

After Bloodsworth reached Adcock's front door, she told Adcock "[h]e said he was going to shoot him. Don't let him shoot him." (Doc. 57-1 at 32). She did not identify with specificity to whom she was referring. The conversation between Adcock and Bloodsworth was brief.

At some point prior to going outside to investigate, Adcock retrieved his gun. Adcock told Bloodsworth and his family to remain inside the house and exited with his

6

flashlight and his gun holstered. When Adcock entered his yard, he saw Penny running onto his property. Penny yelled out Adcock's name as Penny approached. Spivey followed closely behind Penny. Adcock described Spivey as appearing wet—as if he was covered in blood. Seeing the pursuit, Adcock drew his weapon. Adcock told Spivey to stop, at which point Spivey approached Adcock. Adcock ordered Spivey to get down on the ground, but Spivey did not comply.

When Adcock saw that Spivey was unarmed, Adcock holstered his gun. Spivey and Adcock then scuffled, during which Spivey struck Adcock at least three times. Penny offered no assistance during this confrontation but did draw his weapon. Westly and Robinson, who arrived on the scene before the shooting, did not see the physical confrontation between Spivey and Adcock.[3]

Adcock pushed Spivey backwards to gain ground between them. Adcock and Spivey were between six and ten feet apart. Penny was standing approximately seven feet away from Adcock. Westly and Robinson shouted out offering themselves as backup and pleaded with Adcock not to shoot; however, Adcock and Penny did not see or hear them.

Spivey once again ignored instructions to get down and took another step towards Adcock. At this point, Adcock fired his weapon, shooting six times and striking Spivey

---

[3] Callaway claims that the physical confrontation itself is a disputed fact. However, it is undisputed that Westly and Robinson reached Adcock's property after Penny and Spivey. It is also undisputed that Westly and Robinson temporarily lost sight of Penny and Spivey. That Westly and Robinson did not see a physical confrontation, when the facts show they were not on the scene observing the entire interaction between Penny, Spivey, and Adcock, is insufficient to establish a genuine dispute as to that fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

five times. Spivey died as a result of the gunshots. The recording of the 911 call confirms that less than one minute passed between the time when Penny ran onto Adcock's property and Adcock fired the fatal shots.

On August 14, 2020, Callaway, representing Spivey's estate, filed claims against Adcock for excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 and wrongful death pursuant to Alabama Code § 6-5-410. Callaway filed a motion for partial summary judgment as to liability on her Fourth Amendment claim. Adcock filed a motion for summary judgment, asserting the defenses of qualified immunity and state agent immunity.

## IV.  DISCUSSION

The Court will first address Adcock's motion to exclude Callaway's expert witness and Callaway's response thereto. The Court will then address the motions for summary judgment on Callaway's federal and state law claims, beginning with the federal claims.

**A. Motion to Exclude**

Adcock moves to exclude the testimony of William T. Gaut ("Gaut"), who Callaway offers as an expert in police procedures (doc. 62). Under Rule 702, to qualify as an expert, a witness is required to possess the "knowledge, skill, experience, training or education" relevant to the evidence at issue. Fed. R. Evid. 702.

Adcock argues that Gaut's testimony is based solely on Callaway's version of facts and thus impermissibly resolves issues of fact that are reserved for the jury. Adcock also claims that Gaut's testimony impermissibly makes a legal conclusion regarding the

8

objective reasonableness of Adcock's actions. Because Gaut's opinion offers "impermissible legal opinions," according to Adcock, Gaut's testimony should be excluded. (Doc. 62 at 8).

Callaway claims that Gaut's opinion is permissibly based on generally accepted law enforcement standards rather than legal conclusions on constitutional law. Callaway points out that police guidelines often mirror constitutional standards. Thus, the language used in police policies may overlap with the language used in constitutional legal analysis.

After reviewing the motions, the Court finds *Samples v. City of Atlanta*, cited by Callaway, instructive. *Samples* highlights the potential confusion that can occur between law enforcement and constitutional standards. *See Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990) ("[T]he literal wording of the question posed tends to call for an answer that would invade the province of the jury . . . to decide the reasonableness of the officer's actions. We find, however, that the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement."). The Court concludes that Adcock's criticism regarding Gaut's testimony goes to weight and not to admissibility. The Motion to Exclude is, therefore, due to be DENIED.[4]

---

[4] The Court has considered Gaut's testimony and has given it the appropriate weight in ruling on summary judgment.

### B. Fourth Amendment Excessive Force

This case asks whether a reasonable police officer is on clear notice that he would violate the Fourth Amendment by using lethal force against an unarmed, out-of-control, non-compliant suspect.[5]

No one disputes the tragic nature of this case. Nevertheless, Adcock has moved for summary judgment on the Fourth Amendment claim, asserting the defense of qualified immunity.[6] Qualified immunity protects government officials from suit when they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

1. Discretionary Function

In examining whether an official was performing a discretionary function, courts ask whether a government employee was (a) performing a legitimate job-related function,

---

[5] Also pending before the Court are Adcock's motion to supplement (doc. 73) and Callaway's corresponding motion to respond (doc. 75). Adcock points the Court to *Torres v. Howell*, 2022 WL 1664355 (11th Cir. May 25, 2022), a recent Eleventh Circuit opinion, while Callaway disputes its applicability to the case at hand. The Court will grant both motions and has considered the supplemental authority and Callaway's response accordingly.

[6] Callaway argues that the Court should make adverse inferences against Adcock based on his Fifth Amendment refusal to answer several questions about the night of the shooting in Adcock's initial deposition. However, Adcock sat for a second deposition, and answered questions, after his criminal charges were dropped. Because Adcock provided his testimony without unduly prejudicing Callaway, the Court finds an adverse inference improper in this case. *See Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 548 (5th Cir. 2012) ("[A] party may withdraw its assertion of the Fifth Amendment privilege, even at a late stage in litigation, if circumstances indicate that (1) the litigant was not using the privilege in a tactical, abusive manner, and (2) the opposing party would not experience undue prejudice as a result."); *Aim Recycling of Fla., LLC v. Metals USA, Inc.*, 2020 WL 209860, at *11 (S.D. Fla. Jan. 13, 2020) (allowing defendant to withdraw Fifth Amendment privilege shortly after criminal investigation concluded).

(b) through means that were within his power to utilize. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  The focus is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (citation omitted).

In this case, Callaway does not dispute that Adcock was performing a discretionary function within his official capacity,[7] and the Court finds that Adcock was performing a discretionary function within his official capacity.

### 2. Clearly Established Law

Once a government official establishes that he was performing a discretionary function, a plaintiff must satisfy a two-pronged inquiry to defeat a qualified immunity defense. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (quoting *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007)).  The first prong asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong asks whether the violation of the federal right was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[7] In fact, Callaway disregards this step of the analysis in her reply to Adcock's motion for summary judgment.

11

Accordingly, qualified immunity can often be addressed on the second prong alone. *See Fuqua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021).

When determining whether a violation is clearly established, the relevant question for the court is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The unlawfulness of such conduct can be clearly established in three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citations omitted)).

Callaway asserts that *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016), clearly establishes a broad statement of principle from *Tennessee v. Garner*, 471 U.S. 1 (1985), and accordingly provides "'fair notice' of what the limits are for use of deadly force." (Doc. 66 at 33). More specifically, Callaway cites *Garner*'s prohibition on deadly force when "the suspect poses no immediate threat to the officer and no threat to others." *Garner*, 471 U.S. at 11. Callaway claims that this broad statement of principle clearly establishes a violation of Spivey's constitutional rights. Callaway does not cite to any case law with indistinguishable facts. Nor does she maintain that Adcock's conduct was so egregious such that he clearly violated Spivey's constitutional rights in the absence of case law. Thus,

the Court will examine broad statements of principle in determining whether Adcock violated a clearly established constitutional right.

### a. Broad Statements of Principle Within Case Law

"[T]here is a presumption against wide principles of law." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). If a wide principle applies, "it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* "In excessive force cases, the Supreme Court has cautioned against relying on its *Garner* and *Graham* decisions for clearly established law, because 'following the lead of the Fourth Amendment's text, [those decisions] are cast at a high level of generality.'" *Cantu v. City of Dothan*, 974 F.3d 1217, 1232 (11th Cir. 2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Relying on *Perez*, Callaway asserts that *Garner* clearly establishes limits on the use of deadly force. In *Perez*, the defendant police officer fatally shot a suspect who was non-violent, compliant, unarmed, prone on the ground, and had his arms behind his back. *Perez*, 809 F.3d at 1217. The Eleventh Circuit denied the officer qualified immunity in a Fourth Amendment excessive force claim, holding that case law clearly established the Fourth Amendment's prohibition on "the use of deadly force against a non-resisting suspect who posed no danger." *Id.* at 1222–23. The Court reasoned that "[t]he unprovoked shooting of a compliant individual is 'conduct [that] lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct [should have been]

readily apparent.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)). While *Perez* references *Garner* as authority for a broad statement of principle prohibiting deadly force, it does so in the context of an "unarmed, *nondangerous*" suspect. *Id.* (emphasis added) (quoting *Garner*, 471 U.S. at 105).

Callaway's reliance on *Perez* is misplaced, as *Perez* does not sweep so broadly as to apply such general constitutional protections to unarmed *dangerous* suspects. To do so goes against the Supreme Court's admonition against considering *Garner*'s broad Fourth Amendment protections as clearly established law. Rather, *Perez* recognizes that police work often entails a "hazy border between excessive and acceptable force." *Id.* at 1223 (citing *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). It is Callaway's burden to show that Adcock violated a clearly established constitutional right, and she fails to do so. Notably, Adcock points to persuasive Eleventh Circuit case law that supports his position that he did not violate a clearly established constitutional right.

In *Benjamin v. Thomas*, 766 F. App'x 834 (11th Cir. 2019),[8] the defendant officer approached a suspect after the suspect crashed his car into another vehicle. *Id.* at 839. The suspect repeatedly failed to comply with the officer's instructions. *Id.* Despite being told to remain in his vehicle, the suspect exited the car and approached the officer. *Id.* Next told to get on the ground, the suspect instead struck the officer. *Id.* The officer then fatally shot the suspect from approximately six feet away. *Id.* The Eleventh Circuit held that the officer was entitled to qualified immunity on the grounds that he did not commit a

---

[8] The Court has considered this decision as persuasive authority in determining that Adcock's behavior did not violate clearly established law.

constitutional violation. *Id.* It reasoned that the officer's actions were reasonable under the circumstances because the suspect posed an immediate safety threat. *Id.* at 840.

In this case, Spivey was not an unarmed, nondangerous individual as contemplated by *Perez*. Notably, *Perez* applied its broad statement of principle in relation to "[t]he unprovoked shooting of a *compliant* individual." *Perez*, 809 F.3d at 1222. (emphasis added). As a non-compliant, dangerous individual who provoked the use of force, Spivey is outside *Perez*'s reach.

Spivey's physically violent actions on the night of the shooting warranted responsive action from law enforcement such that force applied against him could not be considered unprovoked. Indeed, the undisputed facts demonstrate that Spivey provoked Adcock's actions through violent behavior and failure to comply with police instructions.

Spivey's actions show that he posed a danger to himself and those around him. Bloodsworth called 911 on multiple occasions because Spivey was acting in an aggressive manner. Spivey then broke vehicle windows on a patrol car and an ambulance, injuring a first responder with the shattered glass.[9] Spivey also struck Adcock multiple times immediately preceding the shooting. These facts show that Spivey's violent actions provoked responsive force, moving this case outside the parameters of *Perez*.[10]

---

[9] Callaway asserts that the events at Spivey's residence should be omitted from the Court's analysis because Adcock did not have detailed knowledge of them. Callaway's argument is misguided. In examining Adcock's behavior for qualified immunity purposes, the Court imputes Penny's knowledge of events to Adcock. *See Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) ("[T]he United States Supreme Court . . . allow[s] the collective knowledge of the investigating officers to be imputed to each participating officer."). Thus, the Court examines all information known to either Penny or Adcock.

[10] Even if there was a genuine dispute of fact as to whether Spivey struck Adcock, Spivey's non-compliant advance towards Adcock in these circumstances renders him sufficiently dangerous to remove this case

Notably, *Perez* also stressed the fact that the suspect there complied with police instructions.  Here, Spivey did just the opposite.  The undisputed facts demonstrate that Spivey disregarded Penny's initial commands to get down on the ground.  Further, Spivey remained non-compliant despite non-lethal attempts to subdue him.  When Penny deployed his taser, Spivey removed the taser prongs from his body and advanced towards Penny.  Spivey continued this advance, and his general non-compliance, even after Penny drew his gun.

This pattern of non-compliance continued when events moved to Adcock's property.  Spivey first disregarded Adcock's initial instructions to get down on the ground.  Spivey then persisted in this non-compliance after two police officers drew their weapons.  Spivey's non-compliance, coupled with his violent behavior, move this case far outside the narrow constraints in *Perez* that would clearly establish a constitutional violation from Adcock's actions.

Instead, the events that took place in Adcock's yard factually resemble *Benjamin*.  Adcock, like the officer in *Benjamin*, instructed Spivey to get on the ground.  Spivey, like the suspect in *Benjamin*, did not comply.  Also like the suspect in *Benjamin*, Spivey then engaged in a physical altercation with Adcock.  Further, at the time of the shooting, there was some distance between Adcock and Spivey, and Spivey was unarmed but acting erratically.  Those facts were sufficient to grant qualified immunity in *Benjamin*.

---

from the ambit of *Perez*. *See Collar v. Austin*, 659 F. App'x 557, 560 (11th Cir. 2016) (granting qualified immunity to officer that fatally shot unarmed, non-compliant suspect who "confronted him and was acting bizarrely").

In addition to these similarities to *Benjamin*, Adcock had additional reasons to believe that Spivey posed an immediate safety threat. Earlier in the evening, Adcock received a phone call from EMT White about a disturbance nearby. This call put Adcock on notice that something was awry in the neighborhood. Then, just minutes before the shooting, Bloodsworth—who resided with Spivey—ran to Adcock's house and expressed her concern to Adcock that someone was going to be shot. Adcock sensed enough of a threat that he made a point of ensuring that his family and Bloodsworth remained safely in his home while he investigated outside. Adcock left the house armed with his gun, further showing Adcock's appreciation of the danger before even encountering Spivey.

When Penny ran onto Adcock's property, Penny was screaming out Adcock's name and fleeing from Spivey, who was chasing Penny and appeared to be covered in blood. This sight would heighten any reasonable officer's sense of danger. Additionally, these circumstances call for the Court to impute Penny's knowledge of previous events to Adcock. *See Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012). Presented with this situation, it was reasonable for Adcock to perceive that Spivey posed a threat. Further, faced with a very tense situation, Adcock had to make split second decisions without the benefit of contemplative time. Imputing Penny's knowledge to Adcock, to whom Penny emergently reached out to for aid, reveals that Adcock's decision to use deadly force was informed by previous acts of violence, non-compliance, and unusual resistance to non-lethal force.

The reasonableness of Adcock's perception of danger is bolstered by the way in which other first responders reacted to Spivey that evening. The EMTs, demonstrating an

17

appreciation of the dangerous nature of Spivey's conduct, waited to approach the scene until police backup arrived. After interacting with Spivey, Penny called for police backup. After unsuccessfully deploying a taser to subdue Spivey, Penny drew his service weapon. These facts show that Adcock was not the only first responder who perceived Spivey as a dangerous threat.

As the circumstances in *Benjamin* presented an immediate safety threat that justified the use of deadly force, Spivey's actions would demonstrate to reasonable officers that he was an immediate safety threat. Thus, it cannot be said that Adcock was on fair notice that the use of deadly force would violate Spivey's Fourth Amendment rights or that the use of deadly force violated clearly established principles of constitutional law. Because the Court finds that Adcock did not violate clearly established law, the Court pretermits any determination of whether Adcock violated a constitutional right. *But see Torres v. Howell*, 2022 WL 1664355, at *4 (11th Cir. May 25, 2022) (affirming grant of qualified immunity when officer fatally shot unarmed, erratic, non-compliant suspect that was advancing towards him). Accordingly, Adcock is entitled to qualified immunity.

The Court recognizes that Spivey's erratic, aggressive, non-compliant behavior may have been due to his medical condition. However, notwithstanding the source of Spivey's behavior, a reasonable officer has a responsibility to protect the community when confronted by a dangerous suspect. Spivey engaged in violent behavior in a residential neighborhood and was unpredictable, non-compliant, and dangerous. The Court cannot say that Adcock violated clearly established law. Accordingly, Adcock is entitled to qualified immunity on Callaway's Fourth Amendment excessive force claim.

**C. Wrongful Death**

Adcock also moved for summary judgment on Callaway's wrongful death claim (doc. 57). However, Callaway fails to address this claim in her opposition to Adcock's motion for summary judgment, nor did Callaway move for summary judgment on this claim.

"[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).

Because Callaway fails to address her wrongful death claim in response to the motion for summary judgment, she has abandoned this claim.[11] Accordingly, Adcock's motion for summary judgment on Callaway's wrongful death claim is due to be GRANTED.

## V.   CONCLUSION

For the reasons discussed above, it is hereby ORDERED as follows:

1. The Defendant's Motion to exclude testimony of the Plaintiff's expert William T. Gaut (doc. 62) is DENIED.

2. The Defendant's motion to supplement authority (doc. 73) is GRANTED.

---

[11] For the same reasons Adcock is entitled to qualified immunity, he would be entitled to state agent immunity as well, as Callaway fails to establish that Adcock's actions were willful, malicious, or undertaken in bad faith. *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

3.  The Plaintiff's motion to respond to the Defendant's supplemental submission (doc. 75) is GRANTED.

4.  The Plaintiff's Motion for Partial Summary Judgment (doc. 47) is DENIED.

5.  The Defendant's Motion for Summary Judgment (doc. 57) is GRANTED, and judgment will be entered against Chanda Callaway and in favor of Mason Adcock.

6.  The Plaintiff's Motion for oral argument (doc. 80) is DENIED as moot.

A separate Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 27th day of September, 2022.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE